## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE

|  |  |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. ET AL., | ) ) ) |
| **Plaintiffs** | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| **Defendant,** | ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) ) ) |
| **Defendant-Intervenors.** | ) ) ) |

**Ct. No. 21-00133
Nonconfidential Version**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. (F/K/A JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD.), JUANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD. AND ANHUI MAXIMUM ALUMINIUM INDUSTRIED COMPANY LIMITED**

Jeffrey S. Grimson
Sarah M. Wyss
Yixin (Cleo) Li
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

September 21, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................................... 1

ISSUES PRESENTED ........................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

SUMMARY OF THE ARGUMENT ...................................................................................... 8

JURISDICTION AND STANDARD OF REVIEW ................................................................ 10

ARGUMENT .................................................................................................................... 11

I.   COMMERCE'S DECISION TO REJECT THE ADDITIONAL BENCHMARK
INFORMATION SUBMITTED BY JIANGSU ZHONGI WAS UNSUPPORTED BY
SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW .................... 11

II.  COMMERCE'S USE OF TDM DATA TO CALCULATE THE ALUMINUM
SHEET/PLATE BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND NOT IN ACCORDANCE WITH LAW .............................................. 18

A.   Commerce's Calculation of the Benchmark for Aluminum Sheet/Plate for LTAR
Program Using the TDM Data Covering HTS Subheading 7606.12 Was Overbroad ......... 19

B.   Even If the Court Upholds Commerce's Use of the TDM Data, It Must Instruct
Commerce to Use TDM Data for the Countries that Produce Aluminum Sheet/Plate to
Calculate the Aluminum Sheet Benchmark ........................................................................ 26

C.   Conclusion .................................................................................................................. 27

III. COMMERCE'S USE OF THE AVERAGE OF GTA AND COMTRADE DATA
UNDER HTS SUBHEADINGS 7601.10 AND 7601.20 TO CALCULATE THE
PRIMARY ALUMINUM BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND NOT IN ACCORDANCE WITH LAW .............................................. 27

IV. COMMERCE'S DECISION TO USE AN OUTDATED REPORT TO
CALCULATE ITS LAND BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND NOT IN ACCORDANCE WITH LAW .............................................. 30

A.   Commerce's Rejection of the 2016-2018 CBRE Reports as a Tier-Two Source Was
Unsupported by Substantial Evidence ............................................................................... 31

i.   Commerce's Rejection of the 2016-2018 CBRE Reports as a Tier-Two World Market
Price Was Unreasonable Given its Selection of Third-Country Data ................................... 31

ii.  The Data Contained in the 2016-2018 CBRE Reports Are Both Economically
Comparable to Land Prices in China and Contemporaneous ............................................... 33

B.   Even if the Court Sustains Commerce's Rejection of Tier-Two Land Benchmark Data, Commerce's Failure to Use the 2016-2018 CBRE Reports Was Still Unsupported by Substantial Evidence and Not in Accordance with Law Because Certain Data in the 2016-2018 CBRE Reports Can Be Used as a Tier-Three Source ................................................... 37

C.   Commerce's Decision to Reject the Nexus Reports As A Tier-Three Benchmark Was Unsupported by Substantial Evidence and Not in Accordance with Law ............................ 38

D.   Commerce's Rejection of the Land Information to Rebut, Clarify, or Correct Information Submitted by Zhongji in Response to the Request by Commerce Was Unsupported by Substantial Evidence and Not in Accordance with Law ............................ 40

E.   Conclusion ................................................................................................................ 45

**CONCLUSION** ........................................................................................................... **46**

# TABLE OF AUTHORITIES

**Cases**

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,
__, CIT __, 61 F. Supp.3d 1306 (2015) ................................................................... 19

Canadian Solar, Inc. v. United States,
918 F.3d 909 (Fed. Cir. 2019) ........................................................................... 10

Changzhou Trina Solar Energy Co. v. United States,
__ CIT __, 255 F. Supp. 3d 1312 (2017) ...................................................... 34, 36

Changzhou Trina Solar Energy Co. v. United States,
__ CIT __, 352 F. Supp. 3d 1316 (2018) ...................................................... 19, 27

Essar Steel Ltd. v. United States,
34 CIT 1057 721 F. Supp. 2d 1285 (2010) ......................................................... 35

Grobest & I-Mei Indus. (Vietnam) Co. v. United States,
36 CIT 98, 815 F. Supp. 2d 1342 (2012) ............................................... 11, 15, 44

Habas Sinai Ve Tibbi Gazlar Istihal Endustri A.S. v. United States,
Ct. No. 18-00144, 2020 Ct. Intl. Trade Lexis 92 (2020)................................... 39

Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,
__ CIT __, 415 F. Supp. 3d 1195 (2019) ........................................................... 13

Huayin Foreign Trade Corp. v. United States,
322 F.3d 1369 (Fed. Cir. 2003) ........................................................................... 10

JBF RAK LLC v. United States,
__ CIT __, 991 F. Supp. 2d 1343 (2014) ........................................................... 43

Jiangsu Zhongji Lamination Materials Co. v. United States,
__ CIT __, 396 F. Supp. 3d 1134 (2019) ........................................................... 44

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ............................................................................................... 10

Nippon Steel Corp. v. United States,
458 F.3d 1345 (Fed. Cir. 2006) ........................................................................... 10

NMB Sing. Ltd. v. United States,
557 F.3d 1316 (Fed. Cir. 2009) ........................................................................... 10

NTN Bearing Corp. v. United States,
74 F.3d 1204 (Fed. Cir. 1995) ...................................................................... 11, 15

Rhone Poulenc v. United States,
899 F.2d 1185 (Fed. Cir. 1990) ........................................................................... 19

RHP Bearings v. United States,
288 F.3d 1334 (Fed. Cir. 2002) ........................................................................... 10

Shelter Forest Int'l Acquisition, Inc. v. United States,
__ CIT __, 497 F. Supp. 3d 1388 (2021) ...................................................... 11, 16

Swiff-Train Co. v. United States,
793 F.3d 1355 (Fed. Cir. 2015) ........................................................................... 10

Timken United States Corp. v. United States,
434 F.3d 1345 (Fed. Cir. 2006) .................................................................... 15, 44

Universal Camera Corp. v. NLRB,
   340 U.S. 474 (1951) ........................................................................................ 10

**Statutes**

19 U.S.C. § 1516a ............................................................................................... 10
19 U.S.C. § 1677(5)(E)(iv) ................................................................................. 19
19 U.S.C. § 1677m(d) ......................................................................................... 16

**Regulations**

19 C.F.R. § 351.511(a)(2)(i) ......................................................................... passim
19 C.F.R. § 351.301(c)(2)(i) ............................................................................... 13
19 C.F.R. § 351.301(c)(3)(ii) ........................................................................ 13, 43

**Other Authorities**

Aluminum Foil From China; Institution of Antidumping and Countervailing Duty Investigations
   and Scheduling of Preliminary Phase Investigations, 82 Fed. Reg. 13,853 (USITC Mar. 15,
   2017).................................................................................................................... 3
Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative
   Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 17,360
   (Dep't of Commerce Apr. 19, 2018) .................................................................. 3
Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing
   Duty Administrative Review; 2017-2018, 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2,
   2021).................................................................................................................... 1
Certain Aluminum Foil From the People's Republic of China: Initiation of Countervailing Duty
   Investigation, 82 Fed. Reg. 15,688 (Dep't of Commerce Mar. 30, 2017) .................................. 3
Certain Aluminum Foil From the People's Republic of China: Preliminary Results of the
   Countervailing Duty Administrative Review and Rescission the Review, in Part; 2017-2018,
   85 Fed. Reg. 38,861 (Dep't Commerce June 29, 2020)............................................... 4
Certain Aluminum Foil From the People's Republic of China: Preliminary Results of
   Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and
   Partial Rescission; 2017-2019, 85 Fed. Reg. 37,829 (June 24, 2020) ...................................... 34
Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination,
   81 Fed. Reg. 3,104 (Dep't of Commerce Jan. 20, 2016) ........................................................ 38
Countervailing Duty Investigation of Certain Cold- Rolled-Steel Flat Products From the Russian
   Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical
   Circumstances Determination, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016).......... 38
Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian
   Federation: Final Affirmative CVD Determination and Final Negative Critical Circumstances
   Determination, 81 Fed. Reg. 49,935 (July 29, 2016) ................................................................ 39

Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From China: Final Results of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 17,382 (Apr. 25, 2019) ....................................................................................................................... 28

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review; 2014, 82 Fed. Reg. 32,678 (July 17, 2017) ........................................................................................................................ 26

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) ............................................... 19

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 27,587, 27,595 (Dep't of Commerce June 13, 2019) ................................................................. 4

Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination, 72 Fed. Reg. 67,893, 67,908-09 (Dec. 3, 2007) ............... 35

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (F/K/A Jiangsu Zhongji Lamination Materials Stock Co., Ltd.), Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd. and Anhui Maximum Aluminium Industries Company Limited, producers and exporters of the subject merchandise (collectively, "Zhongji"), hereby move for judgment upon the agency record.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

Zhongji challenges certain aspects of the Final Results of the first administrative review of the countervailing duty ("CVD") order on certain aluminum foil from the People's Republic of China ("China") conducted by the U.S. Department of Commerce ("Commerce").  <u>See Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017-2018</u>, 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021) ("<u>Final Results</u>") (P.R. 389), and accompanying Dec. Mem. ("Final Dec. Mem.") (P.R. 390).  The review in question covers entries of certain aluminum foil during the period of August 14, 2017 through December 31, 2018.

## ISSUES PRESENTED

**I.  Whether Commerce's rejection of the additional benchmark information submitted by Zhongji was supported by substantial evidence and otherwise in accordance with law**

Commerce's rejection of the additional benchmark information submitted by Zhongji was unsupported by substantial evidence and not in accordance with law because the period to submit benchmark information was re-opened due to Commerce's tolling of the Preliminary Results.

II.  **Whether Commerce's use of the Trade Data Monitor ("TDM") data covering Harmonized Tariff Schedule ("HTS") subheading 7606.12 to calculate the benchmark for the aluminum sheet/plate for Less Than Adequate Remuneration ("LTAR") program ("aluminum sheet/plate program") was supported by substantial evidence and otherwise in accordance with law.**

Commerce's use of the TDM data covering HTS subheading 7606.12 to calculate the benchmark for the aluminum sheet/plate program was unsupported by substantial evidence and not in accordance with law because the TDM data are over-inclusive and not specific to the input used by Zhongji.

III.  **Whether Commerce's averaging of the Global Trade Atlas ("GTA") and Comtrade pricing data covering HTS subheadings 7601.10 and 7601.20 for the benchmark of the primary aluminum for LTAR program ("primary aluminum program") was supported by substantial evidence and otherwise in accordance with law.**

Commerce's decision to average the GTA and Comtrade pricing data covering HTS subheadings 7601.10 and 7601.20 to calculate the benchmark for the primary aluminum program was unsupported by substantial evidence and not in accordance with law because the data are over-inclusive and not specific to the input used by Zhongji.

IV.  **Whether Commerce's use of the 2010 Asian Marketview reports by CB Richard Ellis ("2010 CBRE Report") to calculate the benchmark for the land for LTAR program ("land program") was supported by substantial evidence and otherwise in accordance with law.**

Commerce's use of an outdated 2010 CBRE Report to calculate the benchmark price for the land program, instead of the preferred tier-two data from the 2016-2018 CBRE Reports with updated world-wide market average prices, or, in the alternative, tier-three data from either the 2016-2018 CBRE Reports or the 2018 MarketBeat Bangkok Industrial Reports compiled by

Nexus Innovative Real Estate Solutions ("Nexus Reports"), was unsupported by substantial evidence and not in accordance with law.[1]

## STATEMENT OF FACTS

Commerce initiated the countervailing duty investigation of certain aluminum foil from the People's Republic of China on March 30, 2017, following the filing of the petition on March 9, 2017. See Certain Aluminum Foil From the People's Republic of China: Initiation of Countervailing Duty Investigation, 82 Fed. Reg. 15,688 (Dep't of Commerce Mar. 30, 2017). The International Trade Commission (the "Commission") simultaneously conducted its investigation. See Aluminum Foil From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, 82 Fed. Reg. 13,853 (USITC Mar. 15, 2017).

On April 19, 2018, Commerce issued a countervailing duty order on certain aluminum foil from the People's Republic of China following an affirmative countervailing duty determination and an affirmative injury determination by the Commission. See Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 17,360 (Dep't of Commerce Apr. 19, 2018).

Between April 19, 2019 and April 30, 2019, interested parties requested that Commerce conduct an administrative review of the countervailing duty order on certain aluminum foil from the People's Republic of China. On June 13, 2019, Commerce initiated the first administrative review covering the period August 14, 2017 through December 31, 2018. See Initiation of

---

[1] Zhongji is combining Counts III and V from its Complaint as one issue in this brief. See Compl. at 10 (Apr. 2, 2021), ECF No. 10. References to this Court's documents are to the non-confidential version unless otherwise specified.

<u>Antidumping and Countervailing Duty Administrative Reviews</u>, 84 Fed. Reg. 27,587, 27,595 (Dep't of Commerce June 13, 2019) (P.R. 34).

On July 31, 2019, Commerce selected two mandatory respondents: (1) Jiangsu Zhongji Lamination Materials Co., Ltd. ("Jiangsu Zhongji") and (2) Xiamen Xiashun Aluminum Foil Co., Ltd ("Xiashun").   <u>See</u> <u>Certain Aluminum Foil From the People's Republic of China:</u> <u>Preliminary Results of the Countervailing Duty Administrative Review and Rescission the</u> <u>Review, in Part; 2017-2018</u>, 85 Fed. Reg. 38,861 (Dep't Commerce June 29, 2020) (P.R. 355), and accompanying Dec. Mem. at 3 ("Prelim. Dec. Mem.") (P.R. 343).

Between August 22, 2019 and May 11, 2020, Zhongji submitted timely answers to Commerce's questionnaires and supplemental questionnaires.   <u>See</u> Prelim. Dec. Mem. at 3-4 (P.R. 343).   On November 6, 2019, following a request by the Aluminum Association Trade Enforcement Working Group ("Petitioners"), Commerce initiated a new subsidy allegation ("NSA") related to the provision of aluminum plate, sheet and strip by the Government of China ("GOC").   <u>See</u> <u>id.</u> at 3, n. 20-21.

On April 1, 2020, Zhongji timely submitted benchmark data.   <u>See</u> <u>id.</u> at 5, n. 23. To calculate the aluminum sheet/plate benchmark, Zhongji proposed that Commerce use the Commodities Research Unit ("CRU") report in combination with the GTA Global Exports data because these sources represent the input used by Zhongji.   <u>See</u> Final Dec. Mem. at Cmt. 5 (P.R. 390).   Regarding the primary aluminum benchmark, Zhongji proposed that Commerce use the London Metal Exchange ("LME") because these data are more representative of the type of primary aluminum it used to produce aluminum foil.   <u>See</u> <u>id.</u> at Cmt. 6.   Finally, regarding land benchmark, Zhongji proposed that Commerce use the updated 2016-2018 CBRE Reports, a tier-two source.   <u>See</u> <u>id.</u> at Cmt. 8.   Alternatively, Zhongji proposed that Commerce use either the

Mexico and Brazil data extracted from the 2016-2018 CBRE Reports or the Nexus Reports if Commerce continues to rely on a tier-three benchmark.  See id.

On April 13, 2020, Zhongji submitted information to rebut or clarify benchmark information submitted by the petitioners.  See Prelim. Dec. Mem. at 5, n. 23 (P.R. 343).  "On April 24, 2020, Commerce tolled all deadlines in administrative reviews by fifty days, thereby further extending the deadline for {the preliminary results} until June 18, 2020."  Id. at 5, n. 25. Due to Commerce's tolling decision, the period to submit benchmark information was re-opened. On May 18, 2020, Zhongji timely submitted additional benchmark data.  See Final Dec. Mem. at Cmts 5, 6 (P.R. 390).  On May 22, 2020, Commerce rejected the document finding that the ten-day deadline to rebut, clarify or correct factual information had passed, and Zhongji's May 18 submission was filed beyond the deadline to submit rebuttal comments.  See id. at n. 109.  On May 26, 2020, Zhongji submitted a request for reconsideration of Commerce's May 22 letter. See Letter on Behalf of Zhongji to Commerce re: Objection to Commerce's Rejection of Additional Benchmark Submission and Req. for Reconsideration (May 26, 2020) (P.R. 340). Zhongji clarified that its May 18 submission was additional benchmark information submitted prior to the extended preliminary results deadline, and was not rebuttal benchmark comments.

On June 2, 2020, Commerce confirmed its decision to reject Zhongji's May 18 submission, but this time Commerce based its rejection on different reasons.  In its June 2 letter, Commerce stated that the thirty-day deadline to file benchmark comments had passed prior to the issuance of the tolling memorandum, and, therefore, Zhongji's May 18 submission was untimely filed.  See Letter from Commerce to Zhongji re: Rejection Letter at 2 (June 2, 2020) (P.R. 341) ("Second Rejection Letter").

On June 29, 2020, Commerce published its Preliminary Results, and asked the parties "to provide information to rebut, clarify, or correct information in the Land Benchmark Analysis or the Land Benchmark Memorandum." Prelim. Dec. Mem. at 17-18 (P.R. 343). On July 17, 2020, Zhongji timely submitted information to rebut, clarify, or correct land benchmark information on the record. Commerce, however, determined that Zhongji's July 17 submission contained new factual information ("NFI") and rejected the document. See Final Dec. Mem. at Cmt. 8 (P.R. 390).

On August 10, 2020, Zhongji submitted a case brief for Commerce's consideration prior to issuing the Final Results. See id. at 2, n. 5. In its case brief, Zhongji made various arguments related to the calculation of benchmarks for land, primary aluminum and aluminum sheet/plate. On March 2, 2021, Commerce published the Final Results. Commerce calculated a countervailing duty subsidy rate for 2017 of 45.22 percent and for 2018 of 48.36 for Zhongji. See Final Results, 86 Fed. Reg. at 12,172. In the Final Results, Commerce made certain determinations regarding the nature and calculation of the benefit received by Zhongji through LTAR programs on aluminum sheet/plate, primary aluminum and land.

In the Final Results, Commerce relied on the TDM data covering HTS classification 7606.12 to construct the monthly benchmark for the aluminum sheet/plate for LTAR program. See Final Dec. Mem. at Cmt. 5 (P.R. 390). According to Commerce, the TDM data best capture the different aluminum sheet/plate input products purchased Zhongji. See id. Commerce declined to use the proposed benchmark information submitted by Zhongji to calculate the benchmark price for aluminum sheet/plate because "record evidence does not demonstrate that Zhongji's purchases are more comparable to 1050 alloy than the TDM data covering HTS subheading 7606.12." Id.

In addition, Commerce stated that in its NSA questionnaire response, the GOC explained that Zhongji purchased aluminum sheet/plate under a variety of HTS subheadings including 7606.1220, 7606.1230, 7606.1259 and 7606/1290.  See id.  Commerce also stated that Zhongji did not purchase aluminum rolled products with 1050 alloy.  See id.  Finally, regarding Zhongji's alternative request that Commerce use TDM data from the countries that produce and export aluminum sheet/plate, Commerce explained that "the only information on the record concerning countries that produce and export aluminum foil stock similar to the type used in Zhongji's production of subject merchandise is contained in an affidavit," and nothing else substantiates the claims or analyzes the specific types of aluminum foil produced and exported by the countries in the TDM data, CRU report or GTA data.  Id.

In the Final Results, Commerce declined to use LME data to construct the benchmark to measure the benefit received from the primary aluminum program, because the LME "contains only a cash price for primary aluminum (i.e., unalloyed ingots) with a minimum aluminum content of 99.7%."  Id. at Cmt. 6.  According to Commerce, there is no evidence on the record that demonstrates that Zhongji used only primary aluminum with a minimum aluminum content of 99.7%.  See id.  Regarding Zhongji's alternative proposal to use only GTA and Comtrade data for HTS 7601.10, Commerce stated that there is no evidence that Zhongji "only purchased primary aluminum under HTS 7601.10 and not HTS 7601.20."  Id.  Commerce instead relied on the weighted average of the GTA and Comtrade pricing data covering HTS subheadings 7601.10 and 7601.20 to value primary aluminum.  See id.

In the Final Results, Commerce continued to rely on the 2010 CBRE report data to value land-use right in China.  See id. at Cmt. 8.  Commerce declined to use the benchmarks proposed by Zhongji.  Regarding 2016-2018 CBRE reports, Commerce cited the Laminated Woven Sacks

("LWS") from China case to explain that "Chinese land prices are distorted by the significant government role in the market, and hence, no usable tier one benchmark exists." Id. (citation omitted).  In addition, Commerce explained that because "land is generally not simultaneously available to an in-country purchaser while located and sold out-of-country on the world market," it cannot use tier-two benchmarks.  Id. (citation omitted).  Regarding the use of CBRE reports for Mexico and Brazil as tier-three benchmarks, Commerce explained that, "unlike Thailand, Mexico and Brazil are oceans apart from {China}," and Zhongji did not provide information to prove that these countries are more economically comparable to China than Thailand.  Id. Finally, regarding the use of the 2018 Nexus Reports as alternative tier-three benchmark data, Commerce stated that Zhongji did not provide explanation of the methodology used to collect the data.  See id.

## SUMMARY OF THE ARGUMENT

Commerce's rejection of the additional benchmark information submitted by Zhongji was unsupported by substantial evidence and not in accordance with law because Commerce's tolling of the Preliminary Results re-opened the period for parties to submit NFI.  According to Commerce's own governing regulations, the deadline for benchmark NFI submissions is unequivocally thirty days before the Preliminary Results, with no exception for a tolled deadline, making Zhongji's submission timely.  Further, even if the Court finds Zhongji's submission untimely, Commerce abused its discretion in rejecting it because interests of accuracy and justice overweigh the burden placed on Commerce of accepting this NFI.

Commerce's use of the TDM data in the aluminum sheet/plate benchmark calculation was unsupported by substantial substance and not in accordance law because the TDM data are not specific to the input used by Zhongji, whereas the CRU data submitted by Zhongji are

representative of Zhongji's input.   In addition, even if Commerce's use of the TDM data is supported, Commerce's benchmark calculation was still unreasonable because Commerce should have used export data only for the aluminum sheet/plate producer countries, rather than all countries.

Commerce's use of the average of GTA and Comtrade data under HTS subheadings 7601.10 and 7601.20 to calculate the primary aluminum benchmark was unsupported by substantial evidence and not in accordance with law because those data are not specific to the input used by Zhongji, whereas the LME data submitted by Zhongji are representative of Zhongji's input.   Even if Commerce's use of GTA and Comtrade data is supported, Commerce was unreasonable in not using data under HTS subheading 7601.10 only because data under both 7601.10 and 7601.20 are overinclusive.

Commerce's use of a nearly decade-old CBRE land report to calculate its benchmark price for the land program was unsupported by substantial evidence and not in accordance with law when a preferred tier-two report with more recent 2016-2018 prices existed on the record. The 2016-2018 CBRE Reports represent a broad, "world market price" of properties like the type of land used by Zhongji and that would be available to purchasers in the country in question.   Even if Commerce's reliance on a tier-three source is supported, Commerce's benchmark choice was still unreasonable because it refused to use the Mexico and Brazil data from the 2016-2018 CBRE Reports or the data from the Nexus Reports while these data are more contemporaneous and reflect data from economically comparable countries.   Lastly, Commerce erred in rejecting the additional land benchmark submission filed timely by Zhongji.

## JURISDICTION AND STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation omitted).  Substantial evidence requires "more than a mere scintilla."  See, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (citation omitted).

Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its weight."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).  Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable."  NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citation omitted).

Further, the arbitrary and capricious standard requires that "Commerce's determination is the product of reasoned decisionmaking" or "a reasoned explanation."  Canadian Solar, Inc. v. United States, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983)).  Commerce cannot treat nearly identical facts differently without providing a reasonable explanation for its change in methodology.  See NMB Sing., 557 F.3d at 1328; see also RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (citation omitted) ("{A}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.").

Lastly, an abuse of discretion standard applies when Commerce decides whether to

accept parties' submissions beyond a regulatory or internal deadline.  See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("{Commerce} refused to consider correction of these errors because of the 'untimely' submission of the corrective information. We hold this was an abuse of discretion.").  Courts will "review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on {Commerce} and the interest in finality."  Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT 98, 123, 815 F. Supp. 2d 1342, 1365 (2012).

## ARGUMENT

### I.  COMMERCE'S DECISION TO REJECT THE ADDITIONAL BENCHMARK INFORMATION SUBMITTED BY JIANGSU ZHONGI WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce erred in rejecting Zhongji's submission of additional benchmark information on aluminum sheet/plate and primary aluminum filed on May 18, 2020.[2]  See Letter on Behalf of Zhongji to Dep't of Commerce re: Additional Benchmark (May 18, 2020) ("May 18 Benchmark Submission") (P.R. 336; C.R. 223)[3]; Letter from Dep't of Commerce to Zhongji re: Rejection of Untimely Benchmark Cmts. (May 22, 2020) ("First Rejection Letter") (P.R. 338); Second

---

[2] The additional benchmark submission was rejected and removed from the record. See Mem. from John McGowan to The File re: Request to Reject and Remove File (May 22, 2020) (P.R. 339).

[3] Zhongji cites to the rejected submission in the same manner as the respondent in Shelter Forest Int'l Acquisition, Inc. v. United States, Ct. No. 19-00212.  Commerce, in that case, similarly rejected Shelter Forest's factual submission as untimely.  Shelter Forest relied on the content of the rejected submission in its Rule 56.2 brief and included the rejected submission in its joint appendix filed with the Court.  See Pls.' Br. in S. of Rule 56.2 Mot. for J. on The Agency R., Ct. No. 19-00212, ECF No. 49-1 (Apr. 24, 2020); Public J.A., Ct. No. 19-00212, ECF No. 66 (Sept. 17, 2020).  The Court allowed the document to be included in the Joint Appendix over Defendant's motion to strike and cited to the rejected document in its opinion on the merits.  See Mem. and Order, Ct. No. 19-00212, ECF No. 73 (Oct. 15, 2020); Shelter Forest Int'l Acquisition, Inc. v. United States, __ CIT __, __, 497 F. Supp. 3d 1388, 1401-02 (2021).

Rejection Letter (P.R. 341) (rejecting Zhongji's benchmark submission again in response to Zhongji's request for reconsideration); see also Final Dec. Mem. at Cmts 5, 6 (P.R 390).  On April 24, due to COVID-19, Commerce tolled all deadlines for antidumping ("AD") and CVD reviews by fifty days, extending the deadline for the Preliminary Results to June 18, 2020, which by law reset the thirty-day deadline to submit benchmark information under 19 C.F.R. § 351.301(c)(3)(ii) to May 18, 2020.   See Mem. from John McGowan to Scot Fullerton re: Extension of Deadline for Prelim. Results of Countervailing Duty Administrative Review; 08/14/2017 - 12/31/2018 (Dec. 2, 2019) (P.R. 238); see also Mem. from Jeffrey I. Kessler to The Record re: Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19 (Apr. 24, 2020) ("Tolling Mem.") (P.R. 332).   Accordingly, Zhongji submitted benchmark NFI on May 18, 2020; Commerce, however, determined the submission was untimely filed.   See Final Dec. Mem. Cmts. 5, 6 (P.R. 390).   For the reasons detailed below, Commerce's rejection of the May 18 Benchmark Submission was unsupported by substantial evidence and not in accordance with law.

Contrary to Commerce's claim, and based on a plain reading of the governing regulation, Zhongji's May 18 Benchmark Submission was timely filed.  Commerce found that the May 18 Benchmark Submission was untimely filed because the Tolling Memorandum did not re-open the time period to for factual information submissions.  See id.  Commerce claimed that Tolling Memorandum only applied to "*pending* deadlines for actions by parties to administrative reviews," and the "30-day deadline to file benchmark comments had already passed prior to Commerce's tolling of deadlines."  Id. (citing Tolling Mem.).  Zhongji is not arguing that the Tolling Memorandum applied to past deadlines, but that the newly tolled deadline for the

Preliminary Results reset the thirty-day deadline for factual information submissions.  According to 19 C.F.R. § 351.301(c)(3)(ii), "all submissions of factual information {} to measure the adequacy of remuneration under 19 C.F.R § 351.511(a)(2) are due no later than 30 days before the scheduled date of the preliminary results of review." (emphasis added).  The "scheduled date of the preliminary results" clearly became June 18, 2020 after the issuance of the Tolling Memorandum, unequivocally making the thirty-day deadline for benchmark factual information May 18, 2020.  Commerce's denial of the new thirty-day deadline associated with the new Preliminary Results deadline runs contrary to the plain reading of the regulations.  See Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, __ CIT __, __, 415 F. Supp. 3d 1195, 1212 (2019) (explaining that the Court will review the text and purpose of Commerce's regulation and will not accord deference to Commerce's interpretation if it is "inconsistent with the plain language of the regulation").  In addition, 19 C.F.R. § 351.301(c)(3)(ii) does not include a clause allowing Commerce to alter the thirty-day deadline, which is found in other subsections such as § 351.301(c)(2)(i).  See 19 C.F.R. § 351.301(c)(2)(i) ("Allegations regarding market viability . . . are due . . . 10 days after the respondent interested party files the response . . . unless the Secretary alters this time limit.") (emphasis added).  If Commerce had intended for the thirty-day deadline for benchmark submissions to be revisable, it would have added the same clause in § 351.301(c)(2)(i) when promulgating the regulations.  Commerce, however, did not do so, further supporting Zhongji's argument that the new thirty-day deadline was unequivocally May 18, 2020.  By operation of regulation, therefore, the Tolling Memorandum reset the thirty-day deadline to submit factual information when it extended the deadline for the Preliminary Results, making Zhongji's May 18 Benchmark Submission timely.  Commerce acted unreasonably by extending its own Preliminary Results deadline but refuse to accept private

13

parties' filings whose due dates are linked by regulation to the very same deadline.

Commerce's rejection of the May 18 Benchmark Submission based on untimeliness was also unreasonable because it is inconsistent with Commerce's past practice. Commerce has a practice of accepting parties' additional benchmark submissions within the new thirty-day deadline for factual information submissions after extending the deadlines for the preliminary results. For example, in the Crystalline Silicon Photovoltaic Cells from China case, Commerce extended the deadline for the Preliminary Results on November 27, 2018, changing the deadline from December 4, 2018 to January 3, 2019. Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind the Review, in Part; 2016, 84 Fed. Reg. 5,051 (Dep't of Commerce Feb. 20, 2019), and accompanying Dec. Mem. at 3-4. Commerce then accepted the respondent's December 4, 2018 benchmark submission, indicating that Commerce did not object to the new thirty-day deadline for NFI submissions, reset by the new deadline for the Preliminary Results. Id. at 4, n. 15 (citation omitted). Importantly, the original benchmark deadline before Commerce's extension was November 4, 2018 and had already passed when Commerce extended the deadline for the Preliminary Results on November 27, 2018. Id. Commerce's claim that the thirty-day deadline had already passed when the Tolling Memorandum was issued was, therefore, unavailing. In addition, in the Steel Pipes and Tubes from Turkey case, Commerce accepted a respondent's rebuttal benchmark data filed on February 26, 2015 pursuant to the extended deadline for the Preliminary Results. Circular Welded Carbon Steel Pipes and Tubes From Turkey: Preliminary Results of Countervailing Duty Administrative Review and Preliminary Intent To Rescind in Part; Calendar Year 2013, 80 Fed. Reg. 18,809 (Dep't of Commerce Apr. 8, 2015), and accompanying Dec. Mem. at 3-4, n. 16.

14

Similarly, in the Uncoated Paper from Indonesia case, Commerce accepted parties' benchmark submissions filed beyond the thirty-day deadline after it extended the deadline for the Preliminary Determination. Certain Uncoated Paper From Indonesia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination, 80 Fed. Reg. 36,971 (Dep't of Commerce June 29, 2015), and accompanying Dec. Mem. at 3. In short, Commerce's established a practice is to accept NFI submissions filed within the new thirty-day deadline reset by the extended preliminary results deadline. Commerce's rejection of the May 18 Benchmark Submission was, therefore, unreasonable.

Even if Zhongji's May 18 Benchmark Submission was untimely, Commerce has an obligation not to abuse its discretion when deciding whether to accept such NFI submitted beyond a regulatory or internal deadline. See NTN Bearing, 74 F.3d at 1207 (holding that the deadline "must be waived" when circumstances require so). Courts will "review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on {Commerce} and the interest in finality." Grobest & I-Mei, 36 CIT at 123, 815 F. Supp. 2d at 1365 (holding that Commerce abused its discretion in rejecting the foreign exporter's untimely submitted separate rate certification); see also Timken United States Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("We hold that Commerce is free to correct any type of importer error –clerical, methodology, substantive, or one in judgment . . . provided that the importer seeks correction before issues its final results and adequately proves the need for the requested corrections.") (emphasis added). In this case, "interests of accuracy and fairness" are significant. The May 18 Benchmark Submission includes the quality certificates of both primary aluminum purchases and aluminum sheet/plate purchases by Zhongji. This information is a

critical link between Zhongji's aluminum purchases and the benchmark data Zhongji submitted. On the other hand, the burden on Commerce would be minimal because Commerce had ample time to review a twenty-one-page submission thirty days before the Preliminary Results. In addition, the May 18 Benchmark Submission merely intended to clarify the existing record evidence and assist Commerce to understand that the benchmark sources Zhongji submitted for both primary aluminum and aluminum sheet/plate are more accurate for Zhongji's purchases. The Court, therefore, should find that the interests of accuracy and fairness significantly outweigh the burden placed on Commerce and that Commerce abused its discretion in rejecting the May 18 Benchmark Submission.

Furthermore, Commerce erred in rejecting the May 18 Benchmark Submission when this submission only attempted to correct certain deficiencies on the record of which Commerce itself failed to notify Zhongji.  See 19 U.S.C. § 1677m(d); Shelter Forest, 497 F. Supp. 3d at 1401. Specifically, Zhongji's May 18 Benchmark Submission aimed to correct deficiencies regarding its primary aluminum purchases (missing information on the purity levels) reported in the Section III Questionnaire Response, and the deficiencies regarding Zhongji's aluminum sheet/plate purchases (missing supporting documentation for the used alloys) reported in the NSA Questionnaire Response and the NSA Supplemental Questionnaire Response.  Commerce has a statutory duty to inform the party submitting a response of the nature of the deficiency and provide that party with an opportunity to remedy or explain the deficiency.  See 19 U.S.C. § 1677m(d).  In Shelter Forest, the respondent submitted information regarding the composition of its glue after Commerce issued the Preliminary Determination in the anti-circumvention inquiry on the AD and CVD Orders on Certain Hardwood Plywood Products from China.  See Shelter Forest, __ CIT at __, 497 F. Supp. 3d at 1394-95.  Commerce rejected this submission as

untimely filed NFI.  See id.  The Court found that Commerce "abused its discretion" by rejecting Shelter Forest's submission as untimely because Shelter Forest was not made aware of the deficiencies in its glue evidence until after the Preliminary Determination.  See id, __ CIT at __, 497 F. Supp. 3d.  Commerce's reliance on the thirty-day deadline before the Preliminary Determination for NFI submission was, therefore, unreasonable due to Commerce's own failure to notify Shelter Forest of the deficiencies in the previous submissions.  See id. at 1401 ("{The regulatory deadline} cannot be read to discharge Commerce of its obligation to notify respondents of deficiencies in submissions under § 1677m(d) and then allow Commerce to claim attempts to correct those deficiencies are untimely.").

In this case, Zhongji similarly submitted NFI to correct deficiencies in its Section III Questionnaire Response, NSA Questionnaire Response and NSA Supplemental Questionnaire Response.  Exhibit 1 of the May 18 Benchmark Submission consists of quality certificates identifying the purity level of aluminum content for Zhongji's primary aluminum purchases, and Exhibit 2 consists of quality certificates identifying the alloy levels of Zhongji's aluminum sheet/plate purchases.  See May 18 Benchmark Submission at Exs. 1-2 (Business Proprietary Document) (P.R. 223).  As detailed in Section II and Section III of this brief, these two exhibits contain information critical for Commerce to assess the accuracy of the benchmark sources submitted by the parties for both programs, just as the remedial submission of the glue content by Shelter Forest was determined by the Court to be critical to Commerce's preliminary finding in the anti-circumvention inquiry.  Like the respondent in Shelter Forest, Zhongji was not aware of the deficiencies in its reported purchases until Commerce announced its benchmark selection for the primary aluminum and aluminum sheet/plate programs in the Preliminary Results. Commerce, here, failed its statutory mandate to notify and provide Zhongji an opportunity to

remedy the deficiency regarding the evidence of the primary aluminum purity levels and the aluminum sheet/plate alloy grades, when Commerce noticed the disconnection between Zhongji's benchmark proposal and Zhongji's reported sales of aluminum input.  Commerce claimed in the Final Results that "the issue here is not the clarity of Zhongji's {submissions}, but rather which benchmark information best represents the aluminum plate and/or sheet and strip purchased by the respondents during the POR."  Final Dec. Mem. at Cmt. 5 (P.R. 390).  This statement is illogical because the very information that Commerce rejected – the primary aluminum purity levels and the aluminum sheet/plate alloy grades of Zhongji's purchases – is indispensable for Commerce's determination on "which benchmark best represents the {Zhongji's aluminum purchases}."  Id.  Commerce, therefore, abused its discretion in rejecting the May 18 Benchmark Submission as untimely because it failed to notify Zhongji of the deficiencies in the reported purchases of primary aluminum and aluminum sheet in Zhongji's questionnaire responses.

In conclusion, Commerce's rejection of Zhongji's May 18 Benchmark Submission was unsupported by substantial evidence and not in accordance with law.  The Court should remand this issue and instruct Commerce to accept Zhongji's submission of factual information and reconsider relevant substantive issues accordingly.

## II.     COMMERCE'S USE OF TDM DATA TO CALCULATE THE ALUMINUM SHEET/PLATE BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's calculation of the benchmark for the aluminum sheet/plate program using the TDM data covering HTS subheading 7606.12 was unsupported by substantial evidence and not in accordance with law because the TDM data include a significant volume of data from irrelevant products not used by Jiangsu Zhongi, while the CRU data are product-specific.  In

18

addition, even if the Court agrees with Commerce's use of TDM data, the Court should remand the issue and instruct Commerce to use TDM data for the countries that produce aluminum sheet/plate to calculate the benchmark.

### A. Commerce's Calculation of the Benchmark for Aluminum Sheet/Plate for LTAR Program Using the TDM Data Covering HTS Subheading 7606.12 Was Overbroad

Commerce's decision to select TDM data as a benchmark for aluminum sheet/plate was unsupported by substantial evidence and not in accordance with law.  See Final Dec. Mem. at Cmt. 5 (P.R. 390).  It is well established that Commerce must use product-specific data to calculate benchmarks.  See Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 352 F. Supp. 3d 1316, 1335 (2018) ("Trina I") ("Commerce failed to meaningfully assess the reliability of the Comtrade data and included it despite indications that it is overinclusive in regards to the types of glass included in the data."); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying Issues and Dec. Mem. at Cmt. 6 ("Solar 2AR CVD") ("{Commerce} normally attempts to rely on data reflecting the narrowest category of products encompassing the input product, where possible."); see also Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, __, CIT __, __, 61 F. Supp.3d 1306, 1337 (2015) (citing Rhone Poulenc v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (Commerce must calculate any benefit "as accurately as possible.").  Commerce's preference for product-specific benchmark data is rooted in the statute's requirement that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added); see also 19 C.F.R. § 351.511(a)(2)(i) ("The Secretary will

normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question.") (emphasis added).  It is clear from the record that "the goods" being provided or purchased under the alleged program are Zhongji's purchases of aluminum sheet/plate and, therefore, by statute and regulation, the adequacy of remuneration shall be determined in relation to prevailing market conditions for these goods.  As detailed below, the data on the record that accurately reflect the goods in question are the CRU Report data submitted by Zhongji because these data are product-specific, whereas the TDM data used by Commerce are not.

The TDM data used by Commerce – covering prices under the HTS subheading 7606.12 – are not product-specific and not reflective of "the narrowest category of products" because they are over-inclusive and, therefore, include a significant number of other products not used to produce foil by Zhongji.  As Zhongji established in its Benchmark Submission and Rebuttal Benchmark Submission, HTS subheading 7606.12 covers a wide range of high-value-added products that [ ██████████████████████████████████████████████ ██████████████████ ].  See Letter on Behalf of Zhongji to Commerce re: Benchmark Submission at 3, Ex. 11 p. 2 (Apr. 1, 2020) (Business Proprietary Document) ("Zhongji Benchmark") (C.R. 205-209); Letter on Behalf of Zhongji to Commerce re: Rebuttal Benchmark at 2 (Apr. 13, 2020) (Business Proprietary Document) ("Zhongji Rebuttal Benchmark") (C.R. 222).  In particular, the HTS subheading 7606.12 used by Commerce in its Final Results includes: "Aluminum plates, sheets and strip, of a thickness exceeding 0.2 mm: Rectangular (including square): Of aluminum alloys: Not Clad."  Letter on Behalf of Xiashun to Commerce re: Benchmark Submission at Ex. 11 (Apr. 1, 2020) (Public Version) ("Xiashun Benchmark") (P.R. 315-326).  In addition to the broad range of products under this definition, HTS subheading

7606.12 covers <u>alloy</u> aluminum sheet, plate and strip which consist of different grades and series of products.   According to the ITC Aluminum Report provided by Zhongji in its Benchmark Submission, plate, sheet and strip under HTS subheading 7606.12 cover a universe of products such as unalloyed series 1XXX, non heat treatable (alloy series 3XXX, 5XXX), heat treatable (alloy series 2XXX, 7XXX), heat treatable (alloy series 6XXX), and other plate and sheet products.  <u>See</u> Zhongji Benchmark at Ex. 10, p. 519 (Public Version) (P.R. 311-314).  Moreover, most of the aluminum sheet covered by HTS subheading 7606.12 [ ███████████████████████

████████████████████████████████████████████████ ]  <u>See id.</u> at Ex. 11 (Business Proprietary Document) (C.R. 205-209).   For instance, a significant volume of the product imported under HTS subheading 7606.12 is aluminum plate, which is used in heavy-duty applications, for which it is often machined to shape, e.g., as structural sections for ships, armor for military vehicles and storage tanks.   <u>See</u> <u>id</u> at p. 54 (Public Version) (P.R. 311-314). Similarly, major end-use industries of sheet include aircraft wing and body panels, auto body sheet, and building facades and components.  <u>See</u> <u>id.</u>  This means that the average price of the products under HTS subheading 7606.12 is significantly higher than the price of the aluminum sheet used by Zhongji to produce aluminum foil.   Therefore, the TDM data under HTS subheading 7606.12 encompasses a countless universe of products that are made of different alloy grades.

The record here firmly establishes that the aluminum sheet used by Jiangsu Zhongji and its affiliates, Jiangsu Huafeng Aluminium Industry Co., Ltd ("Jiangsu Huafeng") and Anhui Maximum Aluminium Industries Company Limited ("Anhui Maximum"), is different from the vast majority of aluminum sheet/plate covered by HTS 7606.12.  The aluminum foil stock, like the one used by Zhongji, [ ████████████████████████████████████████████████

███████████ ]. See id. at Ex. 11, p. 2 (Business Proprietary Document) (C.R. 205-209).
In addition, the alloy grades of Zhongji's aluminum sheet purchases are different from the
majority of the alloy grades covered by HTS 7606.12. Specifically, the aluminum foil stock used
by Zhongji to produce aluminum foil [ ████████████████████ ]. See
id.

On the other hand, the CRU Report provided by Zhongji is more product-specific, which
leads to a more accurate benchmark for the products, [ ████████████ ], used by
Zhongji.   There is ample record evidence showing that Zhongji mostly used aluminum
sheet/plate [ ███████████ ] in its production of subject merchandise. See Letter on
Behalf of Zhongji to Commerce re: NSA Suppl. Questionnaire Resp. at Ex. NSAS-1 – 2 (Feb. 6,
2020) (Business Proprietary Document) (C.R. 148-149) (showing Jiangsu Zhongji and Anhui
Maximum's aluminum sheet purchases); Letter on Behalf of Zhongji to Commerce re: NSA
Questionnaire Resp. at Ex. NSA-2 (Nov. 25, 2019) (Business Proprietary Document) (C.R. 128-
132) (showing Jiangsu Huafeng's aluminum sheet purchases); Zhongji Rebuttal Benchmark at 5
(Business Proprietary Document) (C.R. 222); see also May 18 Benchmark Submission at Ex. 2
(Business Proprietary Document) (C.R. 223).   Specifically, the CRU Report provides pricing
data for aluminum alloy 1050 rolled products to calculate the aluminum sheet benchmark.
Zhongji's purchases of alloys [ ███████ ] have close purity levels to alloy 1050, making
the CRU Report a more representative benchmark source than TDM data.   The aluminum
content in alloy 1050 is 99.5%, and the aluminum content in alloys [ ███████████
███████████ ]. See Zhongji Benchmark at Ex. 9 (Public Version) (P.R.
311-314) (For [ █████ ], the aluminum purity is calculated as a remainder after all other
elements have been removed.).   The purity level of alloy [ ████████████

██████████████████████ ]⁴.  See id.

In addition, in a comparison of the impurity levels in the different alloys, the International Alloy Designation Standard confirms that the aluminum sheet used by Zhongji to produce aluminum foil is more similar to alloy 1050 than other alloys.   For instance, the content of copper in 2XXX series alloys is significantly higher than the content of copper in alloys 1050, [ ████████ ].  See id.  The content of copper in 2XXX series alloys is up to 6, while the maximum content of copper in alloys 1050, [ ██████████ ] is only 0.05, a trace level.  See id. Similarly, the content of silicon in series 4XXX alloys is up to 21.5, while the maximum content of silicon in alloys 1050 and [ ████ ] is 0.25 and 0.3 respectively and alloy [ ████████ ██████████ ].  See id.  Moreover, the content of magnesium in series 5XXX alloys varies between 0.2 and 6.2, while alloy [ ████████████████████ ] and the content of magnesium in alloys 1050 and [ ████ ] is maximum 0.05.  See id.  Likewise, the content of zinc in series 7XXX alloys is up to 12, while the content of zinc in alloy 1050 and alloys [ ██████ ████ ] is maximum 0.05 and 0.1 respectively.  See id.  For illustration see the table below:

|  | Alloy 1050 | Alloy [ ████ ] | Alloy [ ████ ] | Other Alloys |
|---|---|---|---|---|
| Purity level | 99.5% | 99.35% | ~ 99% | Less than 99% |
| Content of Copper | 0.05 | 0.05 | 0.05 | Up to 6 in 2XXX |

---

⁴ According to the International Alloy Designation Standard, the purities of other alloys, are as below:
-   For 2XXX, the purities of alloys are from 91.45% (2618A) to 97.2% (2008).
-   For 3XXX, except for 3002, 3120,3207, 3100, 3012A, 3030, 3130, the purities of other more than 30 alloys are 96%-98%.
-   For 4XXX, the purities of alloys range from 81.1% (4032) to 98.14% (4006). Most of them are lower than 98%.
-   For 5XXX, the purities of alloys range from 91.85% (5032) to 97.8% (5005). Most of them are lower than 97%.
-   For 6XXX, except for 6101, 6101A, 6101B and 6501, the purities of other alloy range from 95% (6182) to 98.1% (6002). Most of them are lower than 98%.
-   For 7XXX, except for 7072, the purities of other alloys range from 82.68% to 97.65% (7031). Most of them are lower than 97%.
See Zhongji Benchmark at Ex. 9 (Public Version) (P.R. 311-314).

| Content of Silicon | 0.25 | 0 | 0.3 | Up to 21.5 in 4XXX |
| Content of Magnesium | 0.05 | 0.05 | 0 | 0.2 – 6.2 in 5XXX |
| Content of Zinc | 0.05 | 0.1 | 0.1 | Up to 12 in 7XXX |

**Source:** International Alloy Designation Standard provided in Zhongji Benchmark at Ex. 9 (Public Version) (P.R. 311-314).

As a result, the CRU Report that contains data for alloy 1050 more accurately reflects Zhongji's purchases because alloys [            ] are similar to alloy 1050.  Further, the CRU Report suggests significant differences in prices among different alloys.  See id. (Business Proprietary Document) (C.R. 205-209).  It shows that alloys [

            ].  Id.  The TDM data covering all alloys under the HTS subheading 7606.12 would significantly inflate the prices, making it an inaccurate and unreasonable benchmark against which to measure Zhongji's input price.

The CRU Report, therefore, is superior to the TDM data used by Commerce because the CRU Report contains prices of alloy 1050 which are product-specific, while the TDM data are not representative of the input used by Zhongji.  As explained above, Commerce wrongly claimed that "the record does not support Zhongji's claims that Commerce should use the aluminum alloyed grade 1050 rolled product prices . . . as the aluminum plate and/or sheet and strip since this product grade is similar to the types of inputs it purchased," because the record sufficiently supports Zhongji's claim.  Final Dec. Mem. at Cmt. 5 (P.R. 390).  Even though Commerce correctly noted that "Zhongji did not purchase aluminum alloyed grade 1050 rolled product during the {period of review ("POR")}," Zhongji has provided detailed analysis of the closeness between alloy 1050 and its purchases – [            ] based on comparison of aluminum content and other chemical components.  Even though Zhongji's purchases were not alloy 1050, the CRU Report is still more product-specific than the over-inclusive TDM data and would allow Commerce to calculate aluminum sheet benchmark "as accurately as possible."

24

Following the same logic, it also does not matter whether "there is variation in the aluminum content of the product purchased by Zhongji," id., because the variation does not deviate significantly from the aluminum content of alloy 1050, compared to the wide range of alloys covered by the TDM data.  As shown in the chart above, the aluminum content of alloy 1050 is 99.5%, whereas the aluminum content of the alloys [ ████████████████████████████ ████████████████████████████ ].  In contrast, the TDM data contain other alloy grades with aluminum content much less than 99% and are, therefore, less comparable and product-specific than the CRU data.

Further, Commerce failed to provide a reasonably discernable explanation when it claimed that "there is wider variation between 1050 alloy and the products Zhongji purchased with respect to the chemical composition of other elements included in one or the other product." Id.; see also NMB Sing., 557 F.3d at 1319 (Although Commerce need not provide a perfect explanation for its finding, "the path of Commerce's decision must be reasonably discernable."). Finally, Commerce rejected the CRU data because they are based on LME pricing that Commerce has declined to use in prior cases because "LME 'contains only a cash price for primary aluminum (i.e., unalloyed ingots) with a minimum aluminum content of 99.7 percent.'" Final Dec. Mem. at Cmt. 5 (P.R. 390) (citation omitted).  Here, however, this concern is irrelevant because Zhongji did not use the LME prices for primary aluminum and only used "the 1050 rolled product prices" from the CRU Report.  Zhongji Benchmark at 5, Ex. 5 (Business Proprietary Document) (C.R. 205-209).  Commerce's explanation for its refusal to use the CRU data was, therefore, unreasonable.

In sum, Commerce's decision not to use the CRU data was unsupported by substantial evidence and not in accordance with law because the CRU data are more product-specific to the

aluminum sheet/plate used by Zhongji. On remand, the Court should instruct Commerce to follow the calculation proposed by Zhongji that uses the CRU data in combination with the GTA data. Id.

**B. Even If the Court Upholds Commerce's Use of the TDM Data, It Must Instruct Commerce to Use TDM Data for the Countries that Produce Aluminum Sheet/Plate to Calculate the Aluminum Sheet Benchmark**

Even if Commerce's decision to calculate an aluminum sheet/plate benchmark based on the TDM data in the Final Results is upheld, despite the reasons explained above, Commerce's determination not to use only export data from the countries that actually produce and export aluminum sheet/plate was still unsupported by substantial evidence and not in accordance with law. The major aluminum sheet supplying countries are: [ ███████████████████████████ ███████████████████████ ]. See id. at 5, Ex. 11 (Business Proprietary Document) (C.R. 205-209). Based on this record evidence, the only reasonable determination was for Commerce to use only TDM data from the countries listed above which are [ █████████████ ███████████████████████████████ ] Id. at Ex. 11.

Commerce cannot treat similar situations differently without providing a reasonable explanation. In similar cases, Commerce has excluded exports from countries that do not produce the subject input from the relevant data used as benchmark. For instance, in Crystalline Silicon Photovoltaic Cells from China, Commerce averaged Comtrade data and IHS data to calculate the solar glass benchmark price. See e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review; 2014, 82 Fed. Reg. 32,678 (July 17, 2017), and accompanying Dec. Mem. at Cmt. 5. When calculating Comtrade data, Commerce, however, only included prices

from solar glass producing countries.  See id.  Here, the TDM data used by Commerce in the Final Results includes not only a majority of products not used to produce aluminum foil, but also countries that are not producers of aluminum sheet/plate similar to the one used by Zhongji to produce aluminum foil.

Therefore, even if Commerce's use of TDM data as the aluminum sheet/plate benchmark is sustained by the Court, Commerce's decision not to include only data from the countries that actually produce and export aluminum sheet/plate was inconsistent with its past practice, and was unsupported by substantial evidence and not in accordance with law.

### C.  Conclusion

Commerce's decision not to use the CRU data, in combination with the GTA data, for the aluminum sheet/plate benchmark calculation was unsupported by substantial evidence and not in accordance with law, because the CRU data are specific to the input purchased by Zhongji to produce aluminum foil.  By contrast, the TDM data alone do not reflect a representative world market price of the type of inputs used by Zhongji.  The Court should remand this issue to Commerce and instruct Commerce to use Zhongji's proposed benchmark.  In addition, if the Court upholds Commerce's decision to use the TDM data, the Court should remand and instruct Commerce to only use data from the producer countries of aluminum sheet/plate.

## III.   COMMERCE'S USE OF THE AVERAGE OF GTA AND COMTRADE DATA UNDER HTS SUBHEADINGS 7601.10 AND 7601.20 TO CALCULATE THE PRIMARY ALUMINUM BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

As detailed above, Commerce must use product-specific data to calculate benchmarks. See Trina I, __ CIT at __, 352 F. Supp. 3d at 1335; Solar 2AR CVD at Cmt. 6.  In addition, it is well established that Commerce must use grade-specific data to ensure the most accurate

benchmark calculation.  See e.g., Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From China: Final Results of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 17,382 (Apr. 25, 2019), and accompanying Dec. Mem. at 6 ("In particular, {Commerce} . . . relied on grade-specific rubber benchmarks in certain instances where the record clearly indicated the grade purchased by the respondent.").  Commerce's benchmark calculation for the primary aluminum program using the average of GTA and Comtrade data under HTS subheadings 7601.10 and 7601.20 was not based on substantial evidence and not in accordance with law because the HTS subheadings are not product-specific and grade-specific to the input used by Zhongji.  See Final Dec. Mem. at Cmt. 6 (P.R. 390).  Instead, the record supports Zhongji's claim that Commerce must use the LME data, or, alternatively, GTA and Comtrade data under HTS subheading 7601.10.

The record establishes that only the LME data accurately reflect Zhongji's primary aluminum purchases and, therefore, represent the only reasonable benchmark choice.  First, the LME data contain prices for primary aluminum of minimum 99.7% purity.  See Countervailing Duty Investigation of Certain Aluminum Foil From the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9,274 (Mar. 5, 2018), and accompanying Issues and Dec. Mem. at Cmt. 15 ("Foil CVD Final Det.") (In the original investigation, Commerce found that LME contains only prices for primary aluminum with a minimum aluminum content of 99.7%.).  Second, Zhongji reported purchases of primary aluminum with [ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ], which are even superior to the aluminum content of the primary aluminum reported by LME.  See May 18 Benchmark Submission at Ex.1 (Business Proprietary Document) (C.R. 223).  Commerce claimed that "there is no information on the record which demonstrates that Zhongji{} used only primary aluminum with a minimum

aluminum content of 99.7 percent."  Final Dec. Mem. at Cmt. 6 (P.R. 390).  As discussion in

Section I, however, this claim was plainly wrong because Commerce must consider the May 18

Benchmark Submission showing that Zhongji only used primary aluminum with [ ████████

████████████ ].  Therefore, based on these two pieces of evidence – Zhongji's reported data

and the LME price data - there is no question that the LME data reflect the exact grade of

aluminum ingots purchased by Zhongji.

Even if the Court upholds Commerce's decision not to use the LME data, Commerce's

primary aluminum benchmark is still unsupported by substantial evidence because Commerce

failed to use only HTS subheading 7601.10.  The record indicates that HTS subheading 7601.10

is specific to the primary aluminum used by Zhongji and HTS subheading 7601.20 is not.

Commerce's use of both HTS subheadings 7601.10 and 7601.20 to obtain a primary aluminum

benchmark price resulted in the inclusion of a massive number of other products not used to

produce aluminum foil.  As detailed in the previous paragraph, Zhongji established in its May 18

Benchmark Submission that the primary aluminum used in the production process contains

aluminum content [ ███████████ ].  See May 18 Benchmark Submission at Ex.1

(Business Proprietary Document) (C.R. 223).  According to the ITC aluminum report, the

definition of "Aluminum, unalloyed" is "{p}ure aluminum containing at least 99 percent

aluminum by weight."  Zhongji Benchmark at Ex. 10, p. 25 (Public Version) (P.R. 311-314).

Zhongji's primary aluminum, therefore, is unalloyed aluminum because it contains at least 99

percent aluminum.  Further, the description of the HTS subheading 7601.10 is "Aluminum, not

alloyed."  Xiashun Benchmark at Ex. 11 (Public Version) (P.R. 315-326).  The primary

aluminum used by Zhongji is unalloyed and is covered by HTS subheading 7601.10 only.

Commerce's use of data covering both subheadings is overinclusive because HTS subheading

7601.20 also covers "Aluminum alloys" that were not primary aluminum used by Zhongji.  Id.
In addition, Commerce unreasonably diverted from its approach in the original investigation in
which it used only GTA data of unalloyed aluminum ingot, HTS 7601.10, to calculate primary
aluminum benchmark price.  See Foil CVD Final Det. at Cmt. 16.  It is also clear from the record
that the GOC only reported HTS subheading 7601.10 as the tariff code for primary aluminum in
its response to the Initial Questionnaire.  See Letter from GOC to Commerce re: GOC Initial
Questionnaire Resp. at 33 (Sept. 20, 2019) (Public Version) (P.R. 164-180).

For the reasons above, Commerce's averaging of the GTA and Comtrade data under both
HTS subheadings 7601.10 and 7601.20 was unsupported by substantial evidence and not in
accordance with law, because this benchmark is not product-specific and grade-specific to
Zhongji's primary aluminum purchases.

## IV.   COMMERCE'S DECISION TO USE AN OUTDATED REPORT TO CALCULATE ITS LAND BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

In its benchmark calculation for the land program, Commerce incorrectly relied on the
outdated 2010 CBRE Report instead of the contemporaneous 2016-2018 CBRE Reports.  See
Final Dec. Mem. at Cmt. 8 (P.R. 390).  Commerce determined that it could not rely on a tier-one
benchmark because "Chinese land prices are distorted by the significant government role in the
market."  Id. (citation omitted).  Recognizing this, Zhongji submitted a tier-two source,
specifically the CBRE reports published in 2016, 2017 and 2018 that present broad world-market
average pricing data for properties like the type of land used by Zhongji that would be available
in China.  See Zhongji Benchmark at Ex. 13 (Public Version) (P.R. 311-314).  Commerce,
however, determined that it could not rely on Zhongji's proffered tier-two benchmark data
because "land is generally not simultaneously available to an in-country purchaser while located

and sold out-of-country on the world market." Final Dec. Mem. at Cmt. 8 (P.R. 390) (citation omitted). Commerce explained in the Preliminary Results that consistent with its past practice, it relied on the use of tier-three benchmark for purposes of calculating a benefit for the land program. See Prelim. Dec. Mem. at 17 (P.R. 343). Commerce's decision to reject the updated 2016-2018 CBRE Reports as tier-two benchmark was unsupported by substantial evidence and not in accordance with law because (1) Commerce rejected a preferred tier-two world market price in favor of a tier-three source that would not be "available to purchasers in the country in question," 19 C.F.R. § 351.511(a)(2)(ii), and (2) the 2016-2018 CBRE Reports contain not only economically comparable but also contemporaneous data. In addition, even if the Court affirms Commerce's decision to use a tier-three benchmark, Commerce erred in not using the Mexico and Brazil data from the 2016-2018 CBRE Reports or, alternatively, the Nexus Reports submitted by Zhongji. See Zhongji Benchmark at Ex. 14 (Public Version) (P.R. 311-314). Lastly, Commerce's rejection of Zhongji's additional land benchmark submission that Commerce itself solicited in the Preliminary Results was unreasonable.

### A.  Commerce's Rejection of the 2016-2018 CBRE Reports as a Tier-Two Source Was Unsupported by Substantial Evidence

As demonstrated below, Commerce erred in rejecting the 2016-2018 CBRE Reports as a tier-two benchmark source because (1) its explanation runs afoul of its later-selection of tier-three data and (2) the 2016-2018 CBRE Reports contain both contemporaneous and economically comparable data, making them a superior source to the 2010 CBRE Report.

### i.  Commerce's Rejection of the 2016-2018 CBRE Reports as a Tier-Two World Market Price Was Unreasonable Given its Selection of Third-Country Data

In selecting a benchmark, Commerce follows its standard three-tier benchmark analysis set forth in 19 C.F.R. § 351.511(a)(2) as follows:

31

(i) {Commerce} will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question. Such a price could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions;

(ii) If there is no useable market-determined price . . . Commerce will seek to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question. Where there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability; or

(iii) If there is no world market price available to purchasers in the country in question, {Commerce} will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.

19 C.F.R. § 351.511(a)(2 (i)-(iii).  Commerce's regulations clearly set forth a preference for tier-two benchmark data instead of a tier-three benchmark data.  See id. (dictating that if there is no usable market-determined price, Commerce shall use "a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question").  In this case, Zhongji submitted CBRE reports published between 2016 and 2018 that present broad world-market average pricing data that would be available to purchasers in China as a tier-two benchmark source.  See Zhongji Benchmark at Ex. 13 (Public Version) (P.R. 311-314).  Specifically, these reports include pricing data for "{p}rime {l}ogistics {r}ent" which, unlike Commerce's suggestion in its Final Results, is equivalent to that of the manufacturing and export facilities used by Zhongji.  Id.  Commerce's failure to follow its own regulatory hierarchy was unsupported by substantial evidence and not in accordance with law, as set forth below.

Commerce's explanation that it could not rely on a tier-two benchmark because "land is generally not simultaneously available to an in-country purchaser while located and sold out-of-country on the world market," stands in stark contrast to its later reasoning for selecting a tier-three Thai benchmark source, which is also an "out-of-country" source.  See Final Dec. Mem. at

Cmt. 8 (P.R. 390) (citation omitted).  Commerce claimed that its selection of industrial land data

from Thailand serves as a reasonable alternative to China as a tier-three source under 19 C.F.R. §

351.511(a)(2)(i)-(iii) but utterly failed to recognize that Thai data suffer the exact same flaw that

Commerce alleged was present in the tier-two data proposed by Zhongji, that land is generally

not sold to an in-country purchaser while located "out-of-country."  See id.  Notably,

Commerce's selected tier-three benchmark in this case is an "out of country" price, reflecting

industrial land in Thailand, that serves as an alternative to China despite such prices not being

available to a purchaser in China.  See 19 C.F.R. § 351.511(a)(2)(i)-(iii).

As Commerce's reasoning for rejecting the tier-two benchmark source was flawed, its

decision to move to the third tier of its benchmark hierarchy was unsupported by substantial

evidence and not in accordance with law.

### ii. The Data Contained in the 2016-2018 CBRE Reports Are Both Economically Comparable to Land Prices in China and Contemporaneous

Commerce relied on the 2010 CBRE Report and rejected the 2016-2018 CBRE Reports

submitted by Zhongji because "Zhongji provides no information demonstrating that these

countries {in the 2016-2018 CBRE reports} are more economically comparable to China than

Thailand."  See Final Dec. Mem. at Cmt. 8 (P.R. 390).  On the contrary, the data in the 2016-

2018 CBRE Reports not only demonstrate economical comparability, but also are superior

because they are contemporaneous, as opposed to the outdated data in the 2010 CBRE Report.

The 2016-2018 CBRE Reports include economically comparable data.  Even though the

2016-2018 CBRE Reports do not include data for Thailand, they do include information for

Mexico and Brazil.  See Zhongji Benchmark at Ex. 13 (Public Version) (P.R. 311-314).   Both

Mexico and Brazil have been included in Commerce's surrogate country list in Commerce's

parallel AD duty administrative review of this case.   See <u>Certain Aluminum Foil From the</u> <u>People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review,</u> <u>Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019</u>, 85 Fed. Reg. 37,829 (June 24, 2020), and accompanying Dec. Mem. at 11 ("Foil 1AR AD Prelim. Dec. Mem.") (determining that "Brazil . . . Mexico . . . are at the same level of economic development as China").   Commerce rejected the data from Mexico and Brazil because "other than the fact that Commerce relies on Mexico and Brazil as surrogate countries for deriving certain cost values in AD duty proceedings, Zhongji provides no information demonstrating that these countries are more economically comparable to China than Thailand."   Final Dec. Mem. a Cmt. 8 (P.R. 390).   However, Commerce, in selecting the surrogate country in the AD proceeding, referenced "economic comparability," which is a factual determination directly relevant to the land benchmark determination here.   See Foil 1AR AD Prelim. Dec. Mem. at 11.   More specifically, the presence of Mexico and Brazil in the surrogate country list for the parallel AD proceeding indicates Mexico and Brazil's economic comparability to China based on GNI and is, therefore, directly relevant to the land benchmark determination in the current CVD proceeding. See <u>id.</u>   Contrary to Commerce's claim, therefore, Zhongji did not need to provide additional information on the record because the presence of Mexico and Brazil in the surrogate country list already established these two countries' economic comparability to China.

The data in the 2010 CBRE Report, by contrast, are not economically comparable to the land purchased by Zhongji because Commerce's preference for using contemporaneous data in calculating its benchmarks is well established to best reflect the market conditions faced by respondents.   See <u>Changzhou Trina Solar Energy Co. v. United States</u>, __ CIT __, __, 255 F. Supp. 3d 1312, 1322-23 (2017) ("Changzhou Trina") (noting that "Commerce explains {its}

preference for contemporaneous data by stating that 'non-contemporaneous freight rate data may have been affected by factors no present during the POR'"). The current POR is August 14, 2017 through December 31, 2018, making the data contained in 2010 CBRE Report between seven and eight years out of date.  See Final Dec. Mem. at Cmt. 8 (P.R. 390).

Commerce detailed in its separate land benchmark memorandum, which served as its basis for relying on 2010 CBRE Report in its Final Results, that "the findings in {Laminated Woven Sacks} have largely informed Commerce practice in subsequent China CVD proceedings."  Mem. from John C. McGowan to The File re: Land Analysis Mem. at Attach. I, p. 2 (July 29, 2019) (P.R. 59-72).  This point, however, does not support Commerce's reasoning to use the 2010 CBRE Report instead of the updated 2016-2018 CBRE report.  In LWS, the period of investigation was 2006, and, accordingly, Commerce selected a CBRE Asian Industrial Property Market Flash report from 2007 to calculate its land benchmark. See Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination, 72 Fed. Reg. 67,893, 67,908-09 (Dec. 3, 2007); see also Essar Steel Ltd. v. United States, 34 CIT 1057, 1066, 721 F. Supp. 2d 1285, 1294 (2010) (noting that 19 C.F.R. § 351.511(a)(2)(i)-(ii) requires that "Commerce consider comparability when selecting appropriate benchmarks").  In other words, in LWS, Commerce selected a benchmark that was merely a year outside of the relevant period of review as compared to the seven to eight-year difference present here in the 2010 CBRE Report.  The bottom line is that Commerce's use of the 2010 CBRE Report to calculate its land benchmark was arbitrary and capricious because if Commerce had followed the practice laid out in its 2006 investigation of LWS, Commerce would have relied on

the contemporaneous 2016-2018 CBRE Reports to calculate its land benchmark.

Additionally, Commerce's selection of the outdated 2010 CBRE Report forced it to rely on a consumer price index ("CPI") inflator to adjust the data to reflect the full POR, that inherently introduced inaccuracies into Commerce's benchmark calculation.  See Mem. from John McGowan to The File re: Final Results Calculations for Zhongji at Attach. 1, Land Benchmark AR (Feb. 24, 2021) (Public Version) ("Zhongji Calc. Mem.") (P.R. 392) (indexing benefits using a "Thailand Consumer Price Index (CPI)" from the International Monetary Fund). A CPI index, like the one relied upon by Commerce in its benchmark calculation, reflects the average change in the price of all consumer goods and not just industrial land prices in Thailand. As a result, the greater extent to which Commerce relies on indexing, the more likely it is that benchmark will not represent actual land prices in Thailand.  A significant share of the so-called cost of "land" that Commerce is applying to its benchmark price is not the cost of "land" at all but rather a calculation bloat caused by the inclusion of other consumer goods in the index.  See generally Changzhou Trina, 255 F. Supp. 3d at 1323 (explaining that Commerce only uses price inflators "when there is not contemporaneous data on the record").  Commerce's claim that the data included in 2010 CBRE Report were the most comparable to land prices in China was contradicted by its use of a price index.  Simply put, the world-wide land prices in the 2016-2018 CBRE Reports are otherwise superior being contemporaneous data that do not suffer from any distortion associated with an application of a price index.

In sum, Commerce's decision to rely on a vastly outdated tier-three benchmark, when the record contained a regulatory preferred tier-two data benchmark representing "a world market price," was unsupported by substantial evidence and not in accordance with law.  This is especially the case where the data contained in the 2010 CBRE Report failed to represent a price

comparable to the land purchased by China.  The Court should remand this issue to Commerce with instructions to use the more recent 2016-2018 CBRE Reports submitted by Zhongji to calculate its land benchmark.

> **B. Even if the Court Sustains Commerce's Rejection of Tier-Two Land Benchmark Data, Commerce's Failure to Use the 2016-2018 CBRE Reports Was Still Unsupported by Substantial Evidence and Not in Accordance with Law Because Certain Data in the 2016-2018 CBRE Reports Can Be Used as a Tier-Three Source**

Even if the Court disagrees with Zhongji that Commerce was required by its own regulatory hierarchy to rely on a tier-two benchmark source, Commerce's rejection of the Mexico and Brazil data contained in the 2016-2018 CBRE Reports as a tier-three source was unsupported by substantial evidence and not in accordance with law.  Commerce briskly rejected the 2016-2018 CBRE Reports as a tier-two source, claiming that it cannot rely on these reports because the reports provide land prices for locations such as "Warsaw, Poland; Stockholm, Sweden; and Atlanta, Georgia."  Prelim. Dec. Mem. at 17 (P.R. 343).  Commerce, however, could have maintained its preference for a tier-three source and then extracted certain data from the 2016-2018 CBRE Reports as a tier-three source – specifically, the pricing information provided for either Brazil or Mexico.  See Zhongji Benchmark at Ex. 13 (Public Version) (P.R. 311-314).  Using the 2016-2018 CBRE Reports as the tier-three source is reasonable because Commerce has already determined that both Mexico and Brazil are economically comparable to China.  See Foil 1AR AD Prelim. Dec. Mem. at 11.  In addition, the 2016-2018 CBRE Reports are contemporaneous, while the 2010 CBRE Report is outdated.  Commerce, therefore, erred in rejecting the Mexico and Brazil data extracted from the 2016-2018 CBRE Reports as tier-three benchmark source.

**C. Commerce's Decision to Reject the Nexus Reports As A Tier-Three Benchmark Was Unsupported by Substantial Evidence and Not in Accordance with Law**

In the alternative, if the Court ultimately upholds Commerce's reliance on a tier-three source from Thailand, it must remand with instructions that Commerce use the Nexus Reports to calculate its land benchmark because they are contemporaneous with the POR.  See Zhongji Benchmark at Ex. 14 (Public Version) (P.R. 311-314) (submitting two reports that combined cover the entirety of 2018).  In cases where the government price was not set in accordance with market principles, Commerce's practice is to use an appropriate proxy to determine a market-based benchmark.  See Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination, 81 Fed. Reg. 3,104 (Dep't of Commerce Jan. 20, 2016), and accompanying Issues and Dec. Mem. at 16; see also Countervailing Duty Investigation of Certain Cold- Rolled-Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016) and accompanying Issues and Dec. Mem. at Cmt. 7.  The Nexus Reports, like the 2010 CBRE Report, provide land price information for factories and warehouse in Thailand.  See Zhongji Benchmark at Ex. 14 (Public Version) (P.R. 311-314).  Further, the reports explain that the source of their data is Nexus's own "real estate advisory," and they then further support the credibility of their data by providing an overview of the industrial land market in Thailand, including rental rates for Ready Built Factories and ready Built Warehouses.  See id.  The Nexus Reports, as Commerce itself found in selecting the 2010 CBRE Report, serve as an appropriate proxy by supplying Thailand pricing information that are serve as a reasonable alternative to China.  Moreover, the Nexus Reports are superior to the 2010 CBRE Report because they are contemporaneous.

Moreover, the 2018 Nexus Reports are a superior proxy to land prices in China as compared to the 2010 CBRE Report because the later report must be indexed by approximately seven to eight years while the Nexus Reports only needs to be indexed to cover the first two and half months.   In fact, Commerce's reasoning for selecting the 2010 CBRE Report was its comparability with land prices in China.   <u>See</u> Final Dec. Mem. at Cmt. 8 (P.R. 390). Commerce's regulations dictate that, when resorting to a tier-three benchmark source, it must assess "whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).   When the government price is not set in accordance with market principles, Commerce resorts to "an appropriate proxy to determine {the benchmark}." <u>Habas Sinai Ve Tibbi Gazlar Istihal Endustri A.S. v. United States</u>, Ct. No. 18-00144, 2020 Ct. Intl. Trade Lexis 92, at *12, n.13 (2020) (citing <u>Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative CVD Determination and Final Negative Critical Circumstances Determination</u>, 81 Fed. Reg. 49,935 (July 29, 2016)).   Because the 2010 CBRE Report requires additional indexing it cannot serve as an appropriate proxy to determine the benchmark.   Commerce's decision to reject the Nexus Reports, therefore, directly contrasts with its reason for selecting its benchmark source, namely comparability with land prices in China.

Further, the Nexus Reports are also more appropriate proxy as compared to the 2010 CBRE Report because the data contain broader information concerning the industrial land market in Thailand to support its finding.   For instance, like the 2010 CBRE Report, the Nexus Reports provide price data for different land area zones in Thailand as set forth below:

| 2010 CBRE Report | Nexus Reports |
|---|---|
| Ayutthaya | Ayutthaya |
| Chonburi | Chonburi |

| Chachoengsao | Chachoengsao |
|---|---|
|  | Lamchabang |
| Pathumthani | Pathum Thani |
|  | Samutprakarn |
|  | Saraburi |
| Rayang | Rayong |

See Mem. from John C. McGowan to The File re: Asian Marketview Report at Attach. I (July 29, 2019) (P.R. 57-58); see also Zhongji Benchmark at Ex. 14 (Public Version) (P.R. 311-314). As evidenced in the table above, the Nexus Reports contain information for eight of the land areas, while the 2010 CBRE Report only covers five land zones.

For the above reasons, Commerce's rejection of the Nexus Reports as the tier-three benchmark source was unsupported by substantial evidence and was not in accordance with law because the Nexus Reports were far superior to the 2010 CBRE Report due to their contemporaneity and comparability.

**D. Commerce's Rejection of the Land Information to Rebut, Clarify, or Correct Information Submitted by Zhongji in Response to the Request by Commerce Was Unsupported by Substantial Evidence and Not in Accordance with Law**

In the Final Results, Commerce justified its rejection of Zhongji's submission of NFI[5] after the issuance of the Preliminary Results by explaining that parties were not provided such opportunity to submit NFI after the Preliminary Results. See Letter on Behalf of Zhongji to Commerce re: Additional Benchmark Information (July 9, 2020) ("Zhongji Add'l Land Bechmark") (P.R. 357; C.R. 230)[6]; Final Dec. Mem. at Cmt. 8 (P.R. 390). For the reasons below, Commerce wrongfully rejected Zhongji's submission of additional land benchmark

---

[5] In rejecting this information, Commerce removed Zhongji's letter from the file. See Mem. to the File From John C. McGowan re: Request to Reject and Remove File (July 17, 2020) (P.R. 359).

[6] Zhongji cites to the rejected letter in the same manner as the respondent in Shelter Forest Int'l Acquisition, Inc. v. United States, Ct. No. 19-00212.

information, and the Court should remand this issue to Commerce with instructions that Commerce admit Zhongji's additional land benchmark information submission and reconsider the land benchmark calculation.

> In the Preliminary Results, Commerce explicitly stated the following:
>
> {W}e invite parties to submit alternative benchmark data that is consistent with the guidance provided in *Sacks from China* and the Land Benchmark Analysis. Interested parties have seven days from the publication of these preliminary results in the Federal Register to provide information to rebut, clarify, or correct information in the Land Benchmark Analysis or the Land Benchmark Data Memorandum.

Prelim. Dec. Mem. at 17-18 (P.R. 343) (citation omitted).  Zhongji submitted a letter to Commerce and asked for clarification on "whether the parties are allowed to provide new factual information or only submit comments on the record information."  Letter on Behalf of Zhongji to Commerce re: Req. for Clarification and Extension to Submit Land Benchmark Information (July 2, 2020) ("Clarification Request") (P.R. 353).  Commerce replied by stating that "parties are not permitted to submit new factual information relating to Commerce's Land Benchmark Memo or land benchmark analysis" and "parties may submit land benchmark comments to rebut, clarify, or correct information on the record."  Letter from Commerce to Zhongji re: Land Benchmark Cmts. (July 6, 2020) ("Clarification Letter") (P.R. 354); see also Letter from Commerce to Zhongji re: Additional Land Benchmark Information (July 17, 2020) ("Add'l Land Benchmark Rejection Letter") (P.R. 358); Final Dec. Mem. at Cmt. 8 (P.R. 390) ("{B}ecause Commerce had placed no new factual information on the record in reaching {its} preliminary results concerning the land benchmark, {Commerce} recognized there was no basis for permitting parties to submit new factual information to rebut, clarify, or correct the 2010 CBRE Report data.").

First, Commerce's clarification in response to Zhongji's Clarification Request, as well as Commerce's rejection of the benchmark information submission in the Additional Land

Benchmark Rejection Letter and in the Final Results, was unreasonable and contradicted with the explicit language in the Preliminary Results.  Commerce unequivocally invited parties to "submit alternative benchmark data that is consistent with the guidance provided in *Sacks from China* and the Land Benchmark Analysis" in the Preliminary Determination.  Prelim. Dec. Mem. at 17 (P.R. 343) (emphasis added).  Contrary to Commerce's claim, the Preliminary Results did not limit parties' submission to only "comments," but asked parties to submit "information to rebut, clarify, or correct information in the Land Benchmark Analysis or the Land Benchmark Data Memorandum."  Id. at 17-18 (emphasis added).  Commerce's subsequent withdrawal of this invitation for parties to submit "information" and clarification directing parties to only submit "comments to rebut, clarify, or correct information on the record" contradicted with the explicit language in the Preliminary Results and were, therefore, unreasonable.  Clarification Letter (P.R. 354) (emphasis added); see also Add'l Land Benchmark Rejection Letter (P.R. 358).   If Commerce had intended to revise the language that invited parties to put additional information on the record, it should have amended the Preliminary Results.  Commerce, however, failed to do so, making it reasonable for Zhongji to continue to rely on the language in the Preliminary Results.

Second, Commerce's attempt to limit parties' submission to only "comments" was unreasonable because Commerce never had to invite parties to comment on the Land Benchmark Analysis and the Land Benchmark Data in the first place.  As Commerce correctly noted itself, "Commerce had placed the Land Benchmark Analysis and the Land Benchmark Data Memorandum on the record on July 29, 2019, months before the Preliminary Results, and Zhongji did not, at that time, provide comments or factual information to rebut, clarify, or correct the information therein."  Final Dec. Mem. at Cmt. 8 (P.R. 390).  It was, therefore, unreasonable

for Commerce to claim that it only invited parties in the Preliminary Results to submit "comments" on the land benchmark information, when Commerce was itself aware that parties had the opportunity to comment months before the Preliminary Results.  The only reasonable explanation left is that Commerce, in the Preliminary Results, allowed parties to submit <u>factual information</u> to rebut, clarify, or correct the Land Benchmark Analysis and Land Benchmark Data Memorandum, rather than only comments.

Finally, Commerce rejected Zhongji's additional benchmark submission because it "consisted entirely of {NFI}," while "all submissions of factual information to measure the adequacy of remuneration under 19 CFR 351.511(a)(2) are due no later than 30 days before the scheduled date of the preliminary results of review."  <u>Id.</u> (citing 19 C.F.R. § 351.301(c)(3)(ii)). Commerce's explanation was unavailing because (1) as detailed above, Commerce explicitly re-opened the window for parties to submit NFI in the Preliminary Results, and (2) Commerce is not required to strictly follow regulatory deadlines and has considerable discretion in modifying them.  With respect to the second point, the Court has numerously sustained Commerce's discretion to relax and modify its procedural rules.  <u>See</u> <u>JBF RAK LLC v. United States</u>, __ CIT __, __, 991 F. Supp. 2d 1343, 1352 (2014) ("Commerce enjoys considerable discretion in the conduct of its administrative proceedings . . . {t}he Federal Circuit has stated that '{a}bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'") (citation omitted).  Indeed, in the original investigation of this case, the Court sustained Commerce's late filing of the Preliminary Results beyond the statutory deadline because "statutory deadlines are not mandatory in the absence of an express statement of consequences from Congress."  <u>Jiangsu Zhongji Lamination</u>

Materials Co. v. United States, __ CIT __, __, 396 F. Supp. 3d 1134, 1355 (2019).  Therefore, contrary to Commerce's contention that parties could only submit NFI no later than 30 days before the Preliminary Results, 19 C.F.R. § 351.301(c)(3)(ii), Commerce had the discretion to, and did, change the deadline to submit factual information to seven days after Preliminary Results.  See Prelim. Dec. Mem. at 17 (P.R. 343).  Commerce cannot have the best of both worlds.  It cannot conveniently use its discretion and flexibility to modify the regulatory deadline to submit factual information in the Preliminary Results, and then claim its "obligation" to follow the regulatory deadline in the Final Results.  Therefore, Commerce's citation to the regulatory deadline in rejecting Zhongji's submission of additional NFI was unsupported by substantial evidence and not in accordance with law.

In addition, as discussed in Section I regarding Commerce's rejection of the May 18 Benchmark Submission, Commerce does not have unchecked authority to reject new factual information submitted beyond a regulatory or internal deadline.  Although Commerce maintains discretion to reject untimely filed NFI, Courts will ultimately "review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on {Commerce} and the interest in finality."  Grobest & I-Mei, 36 CIT at 123, 815 F. Supp. 2d at 1365;  see also Timken, 434 F.3d at 1353 ("We hold that Commerce is free to correct any type of importer error –clerical, methodology, substantive, or one in judgment . . . provided that the importer seeks correction before issues its final results and adequately proves the need for the requested corrections." (emphasis added)).   The burden on Commerce, given that the information submitted by Zhongji merely clarifies factual information already submitted on the record, would be minimal as Commerce would not need to directly include these sources in its calculations. Zhongji merely sought to correct information on the record concerning the Nexus Reports.  In

other words, Zhongji sought to correct Commerce's substantive error to rely on the outdated information in the 2010 CBRE Report prior to the issuance of its Final Results.  See Timken, 434 F.3d at 1353.  On the other hand, there are significant "interests of accuracy and fairness" for accepting this submission because, although the existing record affirmatively establishes that Commerce should have relied on the Nexus Reports, this information would have further demonstrated that Commerce wrongly relied on the 2010 CBRE Report in calculating its land benchmark.  Therefore, the interests of accuracy and fairness substantially outweigh the burden placed on Commerce, making Commerce's rejection of the Zhongji Additional Land Benchmark unreasonable.  This is especially the case when Commerce explicitly solicited this submission in its Preliminary Results.

In sum, Commerce explicitly invited parties to submit factual information to rebut, clarify, or correct land benchmark information on the record.  Commerce's later attempt to fall back on the original regulatory deadline was unreasonable and unsupported by substantial evidence.  The Court should remand this issue with instructions that Commerce admit Zhongji's submission and reconsider its land benchmark calculation accordingly.

### E. Conclusion

In conclusion, Commerce's rejection of the contemporaneous 2016-2018 CBRE Reports as a tier-two source and reliance on the outdated 2010 CBRE Report as a tier-three source, was unsupported by substantial evidence and not in accordance with law.  If the Court upholds Commerce's selection of a tier-three source, Commerce's refusal to use either the Mexico and Brazil data from the 2016-2018 CBRE Reports or the Nexus Reports as the tier-three benchmark was unsupported by substantial evidence and not in accordance with law.  Finally, Commerce unreasonably rejected Zhongji's Additional Land Benchmark submission.

**CONCLUSION**

Commerce's decisions to reject the May 18 Benchmark Submission, to use TDM data covering HTS subheading 7606.12 for the aluminum sheet/plate benchmark, to use the average of GTA and Comtrade data under HTS subheadings 7601.10 and 7601.20 for the primary aluminum benchmark, and to use the 2010 CBRE Report for the land benchmark, were unsupported by substantial evidence and not in accordance with law.  The Court should remand these issues to Commerce with instructions pursuant to Jiangsu Zhong's arguments in this brief.


Respectfully submitted,

Dated: September 21, 2021

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
*Counsel to Zhongji*

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,969 words.

<u>Dated</u>: September 21, 2021

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
*Counsel to Zhongji*