**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

_____
                                                                    )
JIANGSU ZHONGJI LAMINATION                    )
MATERIALS CO., LTD., ET AL.,                          )
                                                                    )
                    Plaintiffs,                                    )
                                                                    )
v.                                                                   )
                                                                    )
UNITED STATES,                                              )
                                                                    )          Court No. 21-00133
                    Defendant,                                  )
                                                                    )
and                                                                )
                                                                    )
ALUMINUM ASSOCIATION TRADE              )
ENFORCEMENT WORKING GROUP,             )
ET AL.,                                                             )
                                                                    )
                    Defendant-Intervenors.                )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION**
**FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    CATHARINE M. PARNELL
Ian A. McInerney                               Trial Attorney
Attorney                                            U.S. Department of Justice
Office of the Chief Counsel for Trade    Civil Division
Enforcement and Compliance            P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce          Washington, D.C. 20044
Washington, D.C.                                Tel: (202) 532-3467

Fax: (202) 353-0461 Email:
Catharine.M.Parnell@usdoj.gov

*Attorneys for Defendant*

Dated: January 18, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... v

STATEMENT PURSUANT TO RULE 56.2 ............................................................ 1

   I.   Administrative Determination Under Review ...................................................... 1

   II.   Statement of the Issues ...................................................................................... 2

   II.   The Preliminary Results .................................................................................... 5

   III.   The Final Results .............................................................................................. 11

SUMMARY OF THE ARGUMENT ........................................................................ 16

ARGUMENT ........................................................................................................... 17

   I.   Standard of Review .......................................................................................... 17

   II.   Commerce's Benchmark Analysis To Calculate The Benefit For The Provision Of Land For Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law ............................................................. 18

      A. Legal Standard ........................................................................................... 18

      B. Commerce's Rejection of Zhongji's 2016-2018 CBRE Report As A Tier-Two Benchmark Is Supported By Substantial Evidence And In Accordance With Law .............................................................................................................. 19

      C. Commerce's Selection Of The 2010 CBRE Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In Accordance ......... 21

      With Law ....................................................................................................... 21

      D. Commerce's Rejection of Zhongji's 2016-2018 CBRE Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In ................... 23

      Accordance With Law ................................................................................... 23

      E. Commerce's Rejection Of Zhongji's Nexus Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In Accordance ......... 25

      With Law ....................................................................................................... 25

      F. Commerce's Decision To Reject Zhongji's Untimely Benchmark ............. 26

      Submission Is Reasonable And In Accordance With Law ........................... 26

   III.   Commerce's Benchmark Analysis To Calculate The Benefit For The Provision Of Primary Aluminum And Aluminum Plate And/Or Sheet And Strip For Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law ....................................................................................... 28

A. Legal Standard ..................................................................................28

B. Commerce's Selection Of The Trade Data Monitor Data As The Best
Reflection Of The Variety Of Aluminum Plate And/Or Sheet And Strip
Products Purchased By Zhongji During The Period Of Review ....................28

C. Commerce's Decision To Rely Upon The Weighted-Average of the GTA And
Comtrade Data To Calculate The Primary Aluminum Benchmark Is Based On
Substantial Evidence And In Accordance With Law ......................................31

# TABLE OF AUTHORITIES

## Cases

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ...................................20

*Canadian Solar Inc. v. United States*, 537 F.Supp.3d 1380 (Ct. Int'l Trade 2021) ..24, 26, 28, 30

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 255 F.Supp3d 1312 (Ct. Int'l trade 2017)...........................................................................................................30

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)...............................................19

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ...........................................20

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012)...........................21, 32

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992)...........................................................20

*Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ........23

*Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355 (Fed. Cir. 2003)................26

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .................20

## Statutes

19 U.S.C. § 1516a .....................................................................................................19

19 U.S.C. § 1667 ..........................................................................................................9

19 U.S.C. § 1677 ................................................................................................. passim

## Regulations

19 C.F.R. § 351.301.........................................................................................7, 8, 29, 30

19 C.F.R. § 351.511...............................................................................................passim

## Administrative Publications and Decisions

*Aluminum Extrusions from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,788 (Dep't Commerce Dec. 31, 2014) ..................................................................................10

*Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 17,360 (Dep't Commerce Apr. 19, 2018).....................................................2

*Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing*...........................................................................................................1

*Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 17,360 (Dep't Commerce Apr. 19, 2018).....................................................16

*Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No*

*Shipments, and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (Dep't Commerce June 24, 2020) ...................................................................................27

*Certain Aluminum Foil From the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017-2018*, 85 Fed. Reg. 38,861 (Dep't Commerce June 29, 2020) .......................................3

*Certain Iron Mechanical Transfer Drive Components from the People's Republic of China*, 81 Fed. Reg. 21,316 (Dep't Commerce Apr. 11, 2016)..................................25

*Citric Acid and Certain Citrate Salts: Final Results of Countervailing Duty Administrative Review; 2013*, 80 Fed. Reg. 77,318 (Dep't Commerce Dec. 14, 2015).6

*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19,444 (Dep' Commerce Apr. 17, 2020) ....35

*Countervailing Duty Investigation of Stainless Steel Sheet and Strip From the People's Republic of China:  Preliminary Affirmative Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 Fed. Reg. 46,643 (Dep't Commerce July 18, 2016) ...................................................................................7

*Countervailing Duty Investigation of Stainless Steel Sheet and Strip From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 82 Fed. Reg. 9,714 (Dep't Commerce February 8, 2017)...................................................................................................................7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) .................................................................................................................................25

*Tool Chests and Cabinets from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 56,582 (Dep't Commerce Nov. 29, 2017).....................................................................................................................11

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (F/K/A Jiangsu Zhongji Lamination Materials Stock Co., Ltd.), Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd. and Anhui Maximum Aluminium Industries Company Limited (collectively, Zhongji).

Plaintiffs challenge certain aspects of the United States Department of Commerce's (Commerce) final results in the 2017-2018 administrative review of the countervailing duty order on certain aluminum foil (aluminum foil) from the People's Republic of China (China) for the period of review from August 14, 2017, through December 31, 2018. As explained below, Commerce's determination is supported by substantial evidence and in accordance with law. Accordingly, the Court should deny the motion and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

I. **Administrative Determination Under Review**

The administrative determination at issue is Commerce's Final Results in *Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017-2018*, 86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021) (Final Results) (P.R. 395), and accompanying Issues and

Decision Memorandum (IDM) (P.R. 390).  The period of review is August 14, 2017, through December 31, 2018.

## II.   Statement of the Issues

(1)  Whether Commerce's use of TDM data to calculate a benchmark for aluminum sheet/plate for less than adequate remuneration was based on substantial evidence and in accordance with law.

(2)  Whether Commerce's decision to weight-average raw GTA and Comtrade pricing as the primary aluminum benchmark was in accordance with law.

(3)  Whether Commerce's use of the 2010 CBRE Report to calculate the benchmark for land-use rights for less than adequate remuneration was in accordance with law.

(4)  Whether Commerce's rejection of Zhongji's untimely benchmark submission was in accordance with law.

## STATEMENT OF FACTS

## I.   Initiation of the 2017-2018 Administrative Review

On April 18, 2018, Commerce published the countervailing duty order on aluminum foil from China.  *See Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 17,360 (Dep't Commerce Apr. 19, 2018) (Order).  Between April 19, 2019, and April 30, 2019, the JW Aluminum company, Novelis Corporation, and Reynolds Consumer Products, LLC (collectively, petitioners), and several respondent companies (including Zhongji) requested an administrative review under the Order.  *See Certain Aluminum Foil From the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review and*

2

*Rescission of Review, in Part; 2017-2018*, 85 Fed. Reg. 38,861 (Dep't Commerce June 29, 2020) (Preliminary Results) (P.R. 344), and accompanying Preliminary Issues and Decisions Memorandum (PDM) at 2 (P.R. 343).  On June 13, 2019, Commerce initiated an administrative review under the Order and selected Zhongji and Xiamen Xiashun Aluminum Foil Co., Ltd. (Xiashun) as mandatory respondents.  *See* PDM at 3.

Commerce issued the initial questionnaire to the government of China (China) on August 5, 2019, and received timely responses from China, Zhongji, and Xiashun from August 22, 2019, through September 22, 2019.  *See id*.  On August 23, 2019, the petitioners timely filed a new subsidy allegation, and Commerce initiated an investigation into this new subsidy allegation on November 6, 2019.  *See id*.  Between September 23, 2019, and May 7, 2020, Commerce issued supplemental questionnaires to China, Zhongji, and Xiashun, as well as questionnaires covering the new subsidy allegations.  *See* PDM at 3-4.  Commerce received timely responses to these questionnaires between October 7, 2019, and May 11, 2020.  In these questionnaires, Commerce asked China several questions concerning the structure of the primary aluminum industry and the aluminum plate and/or sheet and strip industry in China, as well as the government's role in this field.  *Id*. at 22; *see also* Initial Questionnaire at II-5, II-6 (P.R. 134); *see also* China New Subsidy Allegation Questionnaire at 3-5 (P.R. 220).  Commerce requested this information to determine whether the Government of China is the predominant provider of aluminum plate and/or sheet and strip in China and whether its presence in the market distorts all transaction prices.  In its responses, China provided only the total volume and value of imports of primary aluminum and

3

aluminum plate and/or sheet and strip in China.  PDM at 23.  China stated that the provision of primary aluminum and aluminum plate and/or sheet and strip is dictated by market forces and stated that it does not maintain the data needed to answer the remaining questions.  *Id*.

On April 1 and April 13, 2020, respectively, Commerce received timely benchmark and rebuttal benchmark submissions from Zhongji.  *See* IDM at 22-23; *see also* Zhongji Benchmark Submission Pt. 1 (C.R. 205); *see also* Zhongji Benchmark Submission Pt. 2 (C.R. 206); *see also* Zhongji Benchmark Rebuttal (C.R. 222).  On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.  *See* PDM at 5 (citing April 24, 2020 Tolling Memo (tolling deadlines in administrative reviews by 50 days)).  On May 18, 2020, Commerce received a letter from Zhongji containing an Additional Benchmark Submission, submitted pursuant to 19 C.F.R. § 351.301(c)(3)(iv).  *See* (Rejected) Add'l Benchmark Submission (Zhongji May 18, 2020 Letter) (C.R. 223).  On May 22, 2020, Commerce rejected Zhongji's May 18, 2020 letter as untimely.  *See* Rejection of Untimely Benchmark Comments (Rejection Letter) (P.R. 338).  In the Rejection Letter, Commerce explained that Zhongji's submission was untimely because,

> Pursuant to 19 C.F.R. § 351.301(c)(3)(ii), in administrative reviews, all submissions of factual information to measure the adequacy of remuneration under 351.511(a)(2) are due no later than 30 days before thescheduled  date of the preliminary results of review.  The scheduled date of the preliminary results of this administrative review was April 29, 2020.

*Id*.  Commerce observed that Zhongji had timely submitted its benchmark comments on April 1, 2020.  Additionally, Commerce elaborated that "under 19 C.F.R. § 351.301(c)(3)(iv), an interested party is permitted <u>one opportunity</u> to submit publicly available information to rebut, clarify, or correct factual information to measure the adequacy of remuneration, and such comments must be submitted within 10 days after the date such factual information is served on the interested party."  (emphasis added).  Commerce concluded that Zhongji's May 18, 2020 Letter was submitted "well beyond the 10-day deadline to submit rebuttal comments."  Rejection Letter.  Commerce also concluded that "Zhongji had already used its <u>one opportunity</u> to rebut benchmark comments filed on the record of this proceeding" when it timely filed its rebuttal benchmark comments on April 13, 2020.  *Id*. (emphasis added).  Because of this, Commerce determined that the April 24, 2020 Tolling Memo "did not apply to the benchmark rebuttal deadline nor provide parties a second opportunity to provide rebuttal comments."  *Id*.

## II.   **The Preliminary Results**

Commerce published the Preliminary Results on June 29, 2020.  *See* Preliminary Results.  In the Preliminary Results, in accordance with 19 C.F.R. § 351.511, Commerce selected benchmarks for determining the benefit from the provision of primary aluminum and aluminum plate and/or sheet at less than adequate remuneration. *See* PDM at 18-19.  Commerce preliminarily determined that China's refusal to provide the information that Commerce had requested constituted a lack of cooperation.  *Id*. at 23.  Commerce elaborated that, in previous cases, China had provided, and Commerce

5

had verified, information from other government databases concerning the value and volume of production by enterprises producing input products.  *See id*. (*citing Citric Acid and Certain Citrate Salts: Final Results of Countervailing Duty Administrative Review; 2013*, 80 Fed. Reg. 77,318 (Dep't Commerce Dec. 14, 2015) (Citric Acid from China 2013 Final Results).  Commerce also explained that it has verified the operations of China's "Enterprise Credit Information Publicity System," which requires administrative authorities in China to release detailed information of enterprises and other entities and is intended to bring clarity to companies registered in China.  *See* PDM at 23 (*citing Countervailing Duty Investigation of Stainless Steel Sheet and Strip From the People's Republic of China:  Preliminary Affirmative Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 Fed. Reg. 46,643 (Dep't Commerce July 18, 2016), and accompanying Preliminary Decision Memorandum at 21-22 (unchanged in *Countervailing Duty Investigation of Stainless Steel Sheet and Strip From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 82 Fed. Reg. 9,714 (Dep't Commerce February 8, 2017).  Because of its experience with this system, Commerce is aware that this system contains information regarding any China-registered company including annual reports, operating status, and any changes in ownership.  *See* PDM at 23.  China has stated that all companies operating within China, whether they are private or state-owned, maintain a profile within this system.  *Id*.  Therefore, because Commerce determined that the Chinese government withheld necessary information that Commerce had requested related to the operation

and ownership of companies within the primary aluminum and aluminum plate and/or sheet and strip industries, Commerce had to rely on facts available for the Preliminary Results.  Commerce found that China failed to cooperate by not acting to the best of its ability to comply with Commerce's request for information and concluded that an adverse inference was warranted in the application of facts available.  *Id*. at 24.

Commerce also determined that China did not provide all requested information regarding the specific companies that produced the primary aluminum and aluminum plate and/or sheet and strip purchased by Zhongji.  *Id*. at 24-25.  This information would have allowed Commerce to analyze whether the producers are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *Id*.  Ultimately, China did not provide all of the information that Commerce requested.  *Id*.  Commerce made multiple requests for China to provide the articles of incorporation and capital verification reports of all such producers that are majority state-owned enterprises.  *See* PDM at 25; *see also* Initial Questionnaire at 17-18; China New Subsidy Allegation Questionnaire Response at 7-8 (C.R. 133); *see also* China First Supplemental Questionnaire Response at PDF p. 6-9 (P.R. 202); *see also* China Second Supplemental Questionnaire Response at 27-28 (C.R. 176).  Commerce determined that because China withheld information that Commerce had requested with regard to these producers, Commerce had to rely on facts available to determine the status of these companies.  *See* PDM at 26-27.  Commerce then concluded that the reportedly non-government-owned or non-majority-government-owned producers of the primary aluminum and aluminum plate and/or

sheet and strip purchased by Zhongji during the period of review are "authorities"

within the meaning of section 19 U.S.C. § 1677(5)(B).

China also did not respond to questions regarding specificity within the meaning

of 19 U.S.C. § 1667(5A)(D)(iii)(I) such that Commerce had to resort to facts available.

*Id.* Thereafter, Commerce determined that an adverse inference was warranted for the

purpose of Commerce's *de facto* specificity analysis and concluded that the provision

of aluminum plate and/or sheet and strip is specific within the meaning of the statute.

*Id.*; *see also* 19 U.S.C. § 1667(5A)(D)(iii)(I).

Commerce also received data submissions for it to consider using as "tier two"

benchmarks for primary aluminum and aluminum plate and/or sheet and strip. *See*

PDM at 18. Zhongji submitted a summary table of primary aluminum prices from the

London Metal Exchange (LME), and Xiashun submitted United Nations International

Trade Statistics Database (Comtrade) data specific to several tariff numbers for primary

aluminum. *See* Xiashun's Benchmark Submission at Exhibit 2, Exhibit 3, and Exhibit 5

(C.R. 210). Specifically, Xiashun submitted Comtrade 2017 and 2018 monthly pricing

data for harmonized tariff schedule (HTS) subheadings 7601.10 (aluminum not alloyed)

and 7601.20 (aluminum alloys) as potential benchmarks for primary aluminum. The

petitioners submitted Global Trade Atlas (GTA) 2017 and 2018 monthly pricing data

for HTS subheadings 7601.10 (aluminum not alloyed) and 7601.20 (aluminum alloys)

as potential benchmarks for primary aluminum. Commerce explained that, in prior

cases, it has declined to use London Metal Exchange prices because they "contain[]

only a cash price for primary aluminum (i.e., unalloyed ingots) with a minimum

aluminum content of 99.7 percent." PDM at 18 (*citing Aluminum Extrusions from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2012*, 79 Fed. Reg. 78,788 (Dep't Commerce Dec. 31, 2014), and accompanying Issues and Decision Memorandum at 28) (*Aluminum Extrusions from China 2012*). Commerce further explained that it has found that the GTA or Comtrade data better capture a range of products that have a minimum aluminum content of 99 percent. PDM at 18 (*citing Tool Chests and Cabinets from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 56,582 (Dep't Commerce Nov. 29, 2017), and accompanying Issues and Decisions Memorandum at Comment 5 (*Tool Chests from China*); *see also* Order at 17,360, and accompanying Issues and Decisions Memorandum at 45-46. Commerce concluded that it would rely on a weighted-average of the raw GTA and Comtrade pricing data from the petitioners and Xiashun related to HTS subheadings 76.10 and 7601.20, which reflect the primary aluminum purchased by respondents to use in the production of subject merchandise. PDM at 18-19.

Additionally, both the petitioners and Zhongji provided benchmark data to value aluminum plate and/or sheet and strip. PDM at 19. Zhongji submitted 2017 and 2018 GTA data from certain European countries specific to one HTS number 7606.12. *See* Zhongji Benchmark Submission Pt. 1 at 3-6, Exhibit 5, Exhibit 6, and Exhibit 7.

Zhongji also provided a CRU Report[1] on aluminum alloyed grade 1050 rolled product prices based on London Metal Exchange data.  *See* PDM at 19; *see also* Zhongji Benchmark Submission Pt. 1 at 2-3, Exhibit 4.  The petitioners submitted 2017 and 2018 Trade Data Monitor (TDM) data pertaining to all countries, also under the same HTS number (7606.12).  PDM at 19.  Commerce determined that the record did not support Zhongji's assertion that its aluminum sheet purchases correspond more closely to aluminum alloy grade 1050 rolled products.  *Id*.  Additionally, Commerce explained that the London Metal Exchange data contain only a cash price for primary aluminum. Therefore, Commerce relied on the 2017 and 2018 Trade Data Monitor data for HTS subheading 7606.12 to value the aluminum plate and/or sheet and strip purchased by Zhongji used in the production of subject merchandise.

For land benchmarks, Commerce explained that, because of the government's significant role in the Chinese market, no usable first-tier, domestic Chinese land prices for benchmarking purposes exist.  PDM at 16.  Commerce also determined that because land is generally not simultaneously available to an in-country purchaser while located and sold out-of-country on the world market, it could not rely on second tier, world market prices as a benchmark.  *Id*. at 16-17.  Commerce stated that because land prices in China reflect the government's control over all land in China, Commerce would

---

[1]   The CRU Group initially specialized in market research in the copper mining industry.  Today, the Group provides business intelligence and data regarding the market for commodities such as metals and rare minerals.  *See* THE CRU GROUP, "About CRU," ([https://www.crugroup.com/about-cru/](https://www.crugroup.com/about-cru/)) (last visited January 11, 2022).

continue to rely on land-use prices outside of China as a third-tier benchmark.  PDM at 17.

Commerce placed benchmark information on the record to value land from "Asian Marketview Reports" by CB Richard Ellis (CBRE) for Thailand 2010.  Land Benchmark 2 (P.R. 57) (2010 CBRE Report).  Commerce explained that it has relied on the 2010 CBRE Report in other segments of this proceeding and in other CVD proceedings involving China.  *See* PDM ay 17.  Zhongji submitted a proposed land benchmark that contains CBRE world market land prices from locations such as Warsaw, Poland; Stockholm, Sweden; and Atlanta, Georgia.  *Id*.; *see also* Zhongji Benchmark Submission Pt. 1 and Pt. 2 at Exhibits 12, 13, and 14 (noting for the Court that Exhibit 13 begins in Pt. 1 and continues into Pt. 2).  Zhongji's submission also contained consumer price index data collected by the World Bank and a document called the Nexus Report.  *Id*.  However, Commerce concluded that it could not rely on the World Bank data because it does not include data that would allow Commerce to evaluate these locations' economic comparability as compared to China.  Commerce also explained that there was no explanation of the methodology used to collect the data relied upon in the Nexus Report.  *Id*.

## III.   **The Final Results**

Commerce published the Final Results on March 2, 2021.  In the Final Results Commerce continued to find that it could not use Zhongji's benchmark information to value aluminum plate and/or sheet and strip for less than adequate remuneration.  *See* IDM at 24.  Zhongji asserted that Commerce should rely on the CRU Report and GTA

data that it submitted, arguing that those data sets represent the specific type of aluminum sheet used by Zhongji to produce aluminum foil. Zhongji's Admin. Case Brief at 24-30 (C.R. 231) (Zhongji Admin. Br.). Zhongji also argued that, should Commerce continue to rely on Trade Data Monitor data, Commerce must use data from countries that produce and export aluminum plate/sheet. Zhongji Admin. Br. at 32-34.

Commerce explained that the CRU Report's data do not correspond more closely to Zhongji's aluminum sheet purchases than the Trade Data Monitor data, which cover HTS subheading 7606.12. IDM at 21. Commerce elaborated that although aluminum alloyed grade 1050 rolled products are a specific type of aluminum categorized under the broader HTS subheading 7606.12, in its New Subsidy Allegation Questionnaire Response, China explained that Zhongji purchased aluminum sheet under a variety of HTS subheadings, including 7606.1220, 7606.1230, 7606.1259, and 7606.1290. *Id*.; *see also* China New Subsidy Allegation Questionnaire Response at 20. Record evidence demonstrates that Zhongji did not purchase aluminum alloyed grade 1050 rolled product during the period of review. *Id*. Instead, Zhongji and its cross-owned companies purchased aluminum sheet produced to certain different specifications. *See* Zhongji Final Calculation Memo (C.R. 235); *see also* IDM at 21-22. Further, Zhongji's claim that the 1050 alloy has an aluminum alloy content close to some of the types of aluminum sheet it purchased is not dispositive because there is variation in the aluminum content of the products purchased by Zhongji. *Id*.; *see also* Zhongji Admin. Br. at 30-31. Commerce continued to conclude that the Trade Data Monitor data

12

covering HTS subheading 7606.12 are more representative of all the types of aluminum purchased by Zhongji. *See* IDM at 22.

Similarly, Commerce continued to reject Zhongji's argument that, if Commerce cannot rely on the CRU Report data, Commerce should rely on Trade Data Monitor data from only countries that produce and export aluminum plate/sheet. *See* Zhongji's Admin Br. at 32-33. Commerce explained that it could not rely on that dataset because all of the information is found only in an affidavit and thus there is nothing else on the record to substantiate those claims. *Id.*; *see also* IDM at 23-24.

Consistent with the Preliminary Results, Commerce continued to rely on the weighted-average of the raw GTA and Comtrade pricing data, covering HTS subheadings 7601.10 and 7601.20, to value primary aluminum. Zhongji argued that Commerce should rely on the London Metal Exchange data that it had submitted, or alternatively, if Commerce continues not to rely on the London Metal Exchange data, Zhongji argued that Commerce should weight-average the GTA and Comtrade data under only HTS subheading 7601.10, because, this subheading is specific to the inputs used by Zhongji. IDM at 26; *see also* Zhongji Admin. Br. at 34-36. However, Commerce repeatedly has declined to use London Metal Exchange prices because that data contain only a cash price for primary aluminum with a minimum aluminum content of 99.7%. *See* IDM at 26 (citing *Aluminum Extrusions from China 2012* at 28; *Tool Chests from China* at Comment 5). Commerce explained that there is no information on the record to demonstrate that Zhongji used only primary aluminum with a minimum aluminum content of 99.7 percent. *Id.*; *see also* Zhongji Section III

Questionnaire Response Exhibits Part 3 at Exhibit I-12 (C.R. 36) (noting for the Court that Exhibit I-12 continues into Part 4) (Zhongji Sec. III QR Pt. 3); Zhongji Section III Questionnaire Response Exhibits Part 4 at Exhibit I-12 cont. (C.R. 37) (Zhongji Sec. III QR Pt. 4); *see also* Zhongji Section III Questionnaire Response Exhibits Part 6 at Exhibit III-11 (C.R. 39) (Zhongji Sec. III QR Pt.6); *see also* Zhongji Section III Questionnaire Response Part 13 at Exhibit V-10 (C.R. 46) (Zhongji Sec. III QR Pt. 13). In contrast, in the original investigation, Commerce revised the primary aluminum benchmark to include only unalloyed aluminum ingot under HTS subheading 7601.10 because Commerce had verified record evidence demonstrating that the respondents' purchases were limited to unalloyed aluminum ingots.  IDM at 26; *see also Certain Aluminum Foil From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 17,360 (Dep't Commerce Apr. 19, 2018), and accompanying Issues and Decisions Memorandum at Comment 16 (Aluminum Foil CVD Inves.).  Similarly, Commerce found no evidence on the record to support Zhongji's claim that Commerce should weight-average the GTA and Comtrade data under only HTS subheading 7601.10.  *Id.*

Commerce also continued to reject Zhongji's procedural arguments with respect to its untimely benchmark comments.  *See* IDM at 23.  Commerce continued to conclude that parties are afforded one opportunity to submit rebuttal benchmark comments and that the April 24th Tolling Memo did not provide parties more time to submit benchmark comments, nor did it provide parties a second opportunity to submit rebuttal benchmark comments.  *Id*. at 22-23.  Therefore, Commerce continued to rely

14

upon the weight-average of the GTA and Comtrade data under HTS subheadings 7601.10 and 7606.20, which captures both aluminum not alloyed and alloyed with a broader minimum aluminum content of 99 percent.  IDM at 26; *see also* PDM at 18; Zhongji Admin. Br. at 35.

Further, Commerce continued to rely on the 2010 CBRE Report as a tier-three benchmark to calculate the benefits under the land for less than adequate remuneration program.  IDM at 31.  Zhongji argued that Commerce should rely either on the 2016-2018 CBRE data that Zhongi had submitted as a tier-two benchmark or use Mexico and Brazil data from the 2016-2018 CBRE reports or data from the Nexus Report as a tier-three benchmark.  *Id.*; *see also* Zhongji's Admin. Br. at 3-15.  Commerce continued to find that, because China land prices are distorted by the significant government role in the market, there are no usable tier-one benchmarks.  *See* IDM 31; *see also* PDM at 16; *see also* Land Benchmark Analysis Memorandum Part 1 at Attachment 1 (P.R. 60) (Land Benchmark Memo).  Commerce also continued to conclude that, because land is generally not simultaneously available to an in-country purchaser while located and sold out-of-country on the world market, it could not use second-tier world prices as a benchmark for land-use rights.  *Id.*; *see also* PDM at 16-17.

Commerce explained that the 2016-2018 CBRE Reports data from Mexico and Brazil are not superior tier-three benchmark sources to the 2010 CBRE Report (containing data from Thailand).  IDM at 32; *see also* PDM at 16-17.  Commerce elaborated that Thailand is in close geographic proximity to China and, apart from the fact that Commerce relies on data from Mexico and Brazil for deriving certain costs in

15

antidumping proceedings, is more economically comparable to China than Mexico and Brazil. *Id.* Additionally, the 2016-2018 CBRE Reports data that pertain to "logistics rent" and not "manufacturing facilities," while the 2010 CBRE Report contains data corresponding to industrial land prices in Thailand. IDM at 32; *see also* Zhongji Benchmark Submission Pt. 1 at Exhibit 13, page 18.

Finally, Commerce continued to determine that there was no explanation of the methodology used to collect the data in the Nexus Report. Despite Zhongji's arguments about contemporaneity, the 2010 CBRE Report data correspond more closely to the years Zhongji and its cross-owned affiliates purchased land-use rights than the Nexus Report with data from 2018; the reliability of the 2010 CBRE Report is well established and has been used in multiple countervailing duty proceedings involving China; and even though Commerce must adjust the data with a consumer price inflator, Commerce would be required to do the same for the Nexus Report data, which are less reliable than the 2010 CBRE Report. Therefore, Commerce continued to rely on the 2010 CBRE Report data to value land-use rights in China for the Final Results.

## SUMMARY OF THE ARGUMENT

Commerce's decision to rely upon Trade Data Monitor data to value aluminum plate and/or sheet and strip is based on substantial evidence and in accordance with law. Commerce properly declined to rely upon the CRU Report based on London Metal Exchange data because the data present in the CRU Report does not contain data that more closely resembles the aluminum Zhongji used during the period of review..

Additionally, Commerce's decision to weight-average the raw GTA data and the Comtrade data for primary aluminum benchmark purposes is based on substantial evidence and in accordance with law. The record did not establish that London Metal Exchange data are more comparable than the GTA data when examining the primary aluminum purchased by respondents. Commerce also elected to rely on a tier-three benchmark to calculate the benefits under the land for less than adequate remuneration program consistent with its practice involving land-use rights in China. The reliability of the 2010 CBRE Report is well established, and Zhongji provided no superior alternatives on the record. Finally, Commerce was not required to afford Zhongji a second opportunity to submit rebuttal benchmark comments because doing so would contravene the express language of the regulation.

## **ARGUMENT**

### I.   **Standard of Review**

The Court upholds Commerce's determination if it is supported by "substantial evidence on the record" and otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

17

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). Rather, when Congress entrusts an agency to administer a statute that demands fact-intensive inquiries, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

## II.    Commerce's Benchmark Analysis To Calculate The Benefit For The Provision Of Land For Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law

### A.    Legal Standard

Under 19 U.S.C. § 1677(5)(B)(i), a countervailable subsidy occurs when an authority provides a financial contribution and a benefit is conferred.  The definition of "financial contribution" includes the provision of goods and services.  19 U.S.C. § 1677(5)(D)(iv).  Under 19 U.S.C. § 1677(5)(E)(iv), a "benefit" is considered conferred by the provision of goods and services at "less than adequate remuneration."

By regulation, Commerce measures the adequacy of remuneration using a three-tiered hierarchy.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012).  First, Commerce will normally measure "adequate remuneration" using a "tier-one" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(i), by comparing government prices to a market-determined price for the good or service resulting from actual transactions in the country in question.  When market-based prices are unavailable,

18

Commerce will use a "tier-two" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(ii), by comparing government prices to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." If no world market prices are available, Commerce will resort to a "tier-three" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(iii), under which Commerce will measure adequate remuneration by assessing whether the government-provided input price "is consistent with market principles."

**B.    Commerce's Rejection of Zhongji's 2016-2018 CBRE Report As A Tier-Two Benchmark Is Supported By Substantial Evidence And In Accordance With Law**

Commerce appropriately determined that, based upon the evidence on the record, neither a tier-one nor a tier-two benchmark was appropriate for use as a benchmark for land.  Consistent with its past practice, Commerce first determined that it could not use Chinese land prices as a tier-one benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(i) because "Chinese land prices are distorted by the significant government role in the market."  IDM at 31 (citing *Laminated Woven Sacks from the People's Republic of China*, 72 Fed. Reg. 67,893, 67,906-08  (Dep't Commerce Dec. 3, 2007) (preliminary determination) (*Sacks from China*); Land Benchmark Memo); PDM at 16.  Commerce then determined that it could not use a tier-two benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(ii) because "land is generally not simultaneously available to an in-country purchaser while located and sold out-of-country on the world market." IDM at 31-32; PDM at 16-17.

Zhongji argues that Commerce's rejection of the 2016-2018 CBRE Report as a tier-two world market price was unsupported by substantial evidence.  Pl. Br. at 31-37. Zhongji argues that it was unreasonable for Commerce to reject the world-market prices contained in the 2016-2018 CBRE Report when it ultimately selected the Thai land prices contained in the 2010 CBRE Report.  Pl. Br. at 32-33.  Zhongji, however, disregards that Commerce did not select the Thai land prices contained in the 2010 CBRE Report as tier-two world-market prices, but rather as tier-three prices pursuant to 19 C.F.R. § 351.511(a)(2)(iii).  As Commerce explained in its IDM, tier-two world-market data cannot be used to calculate a benchmark for land because land in other countries is not available to purchasers in China.  IDM at 31; *see also Canadian Solar*, 537 F.Supp.3d at 1390 ("Commerce considered the nature and scope of the market for land and reasonably concluded that land, as an in situ good, is generally not available to an in-country purchaser on the world market and therefore not suitable for a tier two benchmark.").

Zhongji argues that Commerce should have nonetheless accepted the 2016-2018 CBRE Report as a tier-two benchmark because it contains data that are economically comparable to land prices in China and because it is "superior" to the 2010 CBRE Report by virtue of its contemporaneity.  Pl. Br. at 31-37.  Regardless of contemporaneity, Commerce cannot rely on a tier-two benchmark for land.  Other than lodging its disagreements with how Commerce weighed the evidence, Zhongji makes no argument as to why this Court should compel Commerce to rely on a tier-two benchmark for land, contrary to its past practice, regulations and this Court's precedent.

*See Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1326 (Ct. Int'l Trade 2019) (mere disagreement with the evidentiary weight Commerce assigned is insufficient to show that Commerce's decision is unsupported); *see also Sacks from China*, 72 Fed. Reg. at 67,908 (finding that Commerce cannot apply a tier-two benchmark for land).  Because Commerce correctly determined that a tier-two benchmark is inappropriate for use as a benchmark for land because such prices would not be available to purchasers in China, *see* 19 C.F.R. § 351.511(a)(2)(ii), Zhongji's arguments with respect the 2016-2018 CBRE Report as a tier-two benchmark are inapposite.  Despite Zhongji's contention that Commerce must use inflators to bring the 2010 CBRE Report more in line with the period of review, Commerce would be required to make similar adjustments to other data sets on the record if it did as Zhongji insists.  IDM at 32; *see also* Zhongji Preliminary Calculation Memorandum at Attachment 2 (C.R. 225) (Zhongji Prelim. Calc. Memo.).  Commerce's reliance on the 2010 CBRE Report data to value land-use rights in China is based on substantial evidence and in accordance with law and Commerce was not required by the law or the facts to rely upon a tier-two benchmark for the Final Results.

**C.     Commerce's Selection Of The 2010 CBRE Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In Accordance With Law**

Because Commerce could not use market-specific, tier-one, or world-market, tier-two, prices to calculate a benchmark, Commerce appropriately resorted to a tier-three benchmark and relied on the 2010 CBRE Report on land prices in Thailand indexed to the period of review.  IDM at 32; PDM at 16-17.  Commerce's practice is to

evaluate several factors to determine data to use as a benchmark, including national income levels, population density, and the extent to which benchmark prices are derived from a country proximate to China, including. "producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production." *See* PDM at 17; *see also Canadian Solar Inc. v. United States*, 537 F.Supp.3d 1380, 1391 (Ct. Int'l Trade 2021) (identifying geographic proximity and economic comparability as two important factors in Commerce's tier-three analysis) (*Canadian Solar*).

Commerce selected the 2010 CBRE Report for its tier-three land benchmark calculations in the investigation segment of this proceeding, as well as past segments of other proceedings involving China.  *See* IDM at 31; *Sacks from China*, 72 Fed. Reg. at 67,908; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012) (final determination), and accompanying Issues and Decisions Memorandum at 6 and Comment 11; *Certain Iron Mechanical Transfer Drive Components from the People's Republic of China*, 81 Fed. Reg. 21,316 (Dep't Commerce Apr. 11, 2016) (preliminary results), and accompanying Issues and Decisions Memorandum at 13 (*IMTDs from China*).

In *Canadian Solar*, this Court also upheld the use of the 2010 CBRE Report in a recent administrative review of solar cells from China, holding that, with respect to the factors affecting comparability of a tier-three benchmark source, "{i}t is within Commerce's discretion to weigh the relevant factors."  *Canadian Solar*, 537 F.Supp.3d at 1391 (*citing Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355, 1360 (Fed.

22

Cir. 2003)); *see also* Aluminum Foil CVD Inves. IDM at 8.  Because Commerce has

discretion to evaluate various factors of comparability in its selection of a tier-three

benchmark and because Commerce's selection of the 2010 CBRE Report is consistent

with Commerce's past practice, Commerce's reliance on this report as a basis for its

land benchmark is reasonable and in accordance with 19 C.F.R. § 351.511(a)(2)(iii),

notwithstanding the contemporaneity arguments raised by Zhongji, which Commerce

addressed by indexing to the period of review.  IDM at 32; PDM at 16-17; *see also* Pl.

Br. at 31-45.

**D.    Commerce's Rejection of Zhongji's 2016-2018 CBRE Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In Accordance With Law**

Zhongji argues that Commerce incorrectly rejected the 2016-2018 CBRE Report

as a basis for calculating a tier-three benchmark price for land.  Pl. Br. at 37.  As

Commerce explained, these reports could not be used because they omit the factors of

comparability that Commerce requires to evaluate the report's usability, including

"national income levels, population density, and producers' perceptions that Thailand is

a reasonable alternative to China as a location for Asian production."  IDM at 32.

Despite the fact that the 2016-2018 CBRE Reports lacked comparability factors,

Zhongji argues that because Commerce found Mexico and Brazil to be comparable in a

parallel antidumping proceeding, Commerce should have used the Reports in this case

because they contain economically comparable data..  Pl. Br. at 32-33 (*citing Certain*

*Aluminum Foil From the People's Republic of China: Preliminary Results of*

*Antidumping Duty Administrative Review, Preliminary Determination of No Shipments,*

*and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (Dep't Commerce June 24, 2020), and accompanying Issues and Decisions Memorandum at 11).

Zhongji improperly conflates Commerce's surrogate country selection practice, used in antidumping proceedings, with Commerce's practice of selecting data for calculating benchmarks. As Commerce explained in its IDM, other than the fact that Commerce relies on Mexico and Brazil as surrogate countries for deriving certain cost values in antidumping proceedings, Zhongji provides no evidence demonstrating that they are more economically comparable to China than Thailand. *Id*. Further, the 2016-2018 CBRE Report data pertains to "logistics rent" not land prices. Additionally, the 2010 CBRE Report contains industrial land prices in Thailand that are more comparable and proximate to China than either Mexico and Brazil. *Id*.; *see also Canadian Solar*, 537 F.Supp.3d at 1391 ("Commerce identified two important factors for its analysis: geographic proximity and economic comparability."). Commerce's practice in the countervailing duty benchmarking effort is to evaluate factors including population density, a given country's perception as an alternative to China for Asian production, and the proximity of a given country to China. IDM at 32. Although Zhongji has presented arguments with regard to economic comparability, it presents no arguments with regard to population density or proximity to China. Pl. Br. at 33; IDM at 32; *see Canadian Solar*, 537 F.Supp.3d at 1391-92 (sustaining Commerce's section of the 2010 CBRE Report as a tier-three benchmark). Commerce's conclusion that the 2016-2018 CBRE Reports were not appropriate as a tier-three benchmark to value land-use in China was supported by substantial evidence and in accordance with law.

**E.     Commerce's Rejection Of Zhongji's Nexus Report As A Tier-Three Benchmark Is Supported By Substantial Evidence And In Accordance With Law**

Zhongji argues in the alternative, that, even if Commerce relies on data pursuant to 19 C.F.R. § 351.511(a)(2)(iii) to calculate its land benchmark, it must use the Nexus Report rather than the 2010 CBRE Report because the Nexus Report is closer in time to the period of review.  Zhongji's argument that the 2010 CBRE Report "must be indexed by approximately seven to eight years while the Nexus Reports only needs to be indexed to cover the first two and half months" of the period of review is based on a fundamental misunderstanding of how Commerce selects appropriate benchmarks.  Pl. Br. at 39; IDM at 32.  Commerce explained that the Nexus Report provides no explanation of the methodology used to collect the data.  IDM at 32; PDM at 17 (*citing* Zhongji Benchmark Submission Pt. 2 at Exhibit 14).  Commerce is unable to analyze which data are included in the Nexus Report, how they were compiled, what the data table headings refer to, or otherwise conclude that the information in the Nexus Report is reliable.  *Id.*

Additionally, despite Zhongji's other arguments about the contemporaneity of the Nexus Report and its reliability, the 2010 CBRE Report data correspond more closely to the years in which Zhongji and its cross-owned affiliates purchased land-use rights than do the Nexus Report data from 2018.  IDM at 32; Zhongji Prelim. Calc. Memo. at Attachment 2.  Further, the reliability of the 2010 CBRE Report data are well-established, having been utilized for benchmarks in many other China countervailing duty proceedings.  IDM at 32 (*citing Sacks from China,* 72 Fed. Reg. at

67,908; Land Analysis Memo.); *see also Canadian Solar*, 537 F.Supp.3d at 1391-92 ("Based on similarity of geographic location, per capita income, regional population density, and economic development Commerce's chosen tier three benchmark: land prices for industrial zones in Thailand from 2010, is supported by substantial evidence."). Finally, even though Commerce must adjust the data with a consumer price inflator, this alone does not render the data unreliable. Commerce would be required to make similar adjustments if it relied on the Nexus Report data. IDM at 32; *see also Changzhou Trina Solar Energy Co., Ltd. v. United States*, 255 F.Supp3d 1312, 1322-23 (Ct. Int'l trade 2017) (recognizing that Commerce uses price inflators only when there is no contemporaneous data on the record). When Commerce is required to use a price inflator, Commerce's practice is to rely on the more reliable dataset, which in this case is the 2010 CBRE Report. *Id*. Commerce's decision to reject the Nexus Report as a tier-three benchmark to value land-use rights in China is supported by substantial evidence and in accordance with law.

## F.    Commerce's Decision To Reject Zhongji's Untimely Benchmark Submission Is Reasonable And In Accordance With Law

Commerce's decision to reject Zhongji's untimely benchmark submission was in accordance with law. Zhongji argues that the April 24, 2020 Tolling Memo extending the deadline for the Preliminary Results by 50 days somehow increased the time for benchmark submissions and simultaneously allowed parties a second opportunity for rebuttal benchmark comments, neither of which is supported by Commerce's regulations. Zhongji cites to no provisions that provide for such extensions or other

opportunities.  Pl. Br. at 5.  Zhongji is correct that the April 24, 2020 Tolling Memo

extended the deadline for the Preliminary Results by 50 days , but Zhongji completely

ignores the fact that the time for submitting benchmark comments had already passed

before Commerce's April 24, 2020 Tolling Memo.  IDM at 23; Rejection Letter.

 Pursuant to 19 C.F.R. § 351.301(c)(3)(ii), all submissions of factual information

in administrative reviews to measure the adequacy of remuneration are due no later than

30 days before the scheduled date of the Preliminary Results[2].  *Id*.  Zhongji timely

submitted its benchmark data on April 1, 2020.  *Id*.  Zhongji then exercised its "one

opportunity" to submit rebuttal benchmark comments on April 13, 2020 (which

Commerce explained was a timely submission).  IDM at 22-23; 19 C.F.R.

§ 351.301(c)(3)(iv) ("An interested party is permitted one opportunity to submit

publicly available information to rebut, clarify, or correct such factual information

submitted pursuant to . . .351.511(a)(2) 10 days after the date such factual information

is served on the interested party." (emphasis added)).  When Zhongji submitted its

rebuttal benchmark comments, that was its final opportunity to submit new factual

information with respect to benchmarks.  *Id*.  The fact that Commerce extended the

deadline for the Preliminary Results 11 days later has no bearing on the deadlines that

interested parties had to submit benchmark information and rebuttals in this proceeding.

Rejection Letter; April 24, 2020 Tolling Memo, IDM at 22-23.  Commerce's decision

---

[2]  Before the April 24, 2020 Tolling Memo, this date was April 29, 2020.

to reject Zhongji's additional benchmark submission as untimely is supported by substantial evidence and in accordance with law.

### III. Commerce's Benchmark Analysis To Calculate The Benefit For The Provision Of Primary Aluminum And Aluminum Plate And/Or Sheet And Strip For Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law

#### A. Legal Standard

As explained above, under 19 U.S.C. § 1677(5)(B)(i), a countervailable subsidy occurs when an authority provides a financial contribution and a benefit is thereby conferred.  The definition of "financial contribution" includes the provision of goods and services.  19 U.S.C. § 1677(5)(D)(iv). Under 19 U.S.C. § 1677(5)(E)(iv); a "benefit" is considered conferred by the provision of goods and services at "less than adequate remuneration."  As further explained above, Commerce's regulations ascribe a three-tiered hierarchy by which Commerce measures the adequacy of remuneration. *See Essar Steel Ltd.*, 678 F.3d at 1273.

#### B. Commerce's Selection Of The Trade Data Monitor Data As The Best Reflection Of The Variety Of Aluminum Plate And/Or Sheet And Strip Products Purchased By Zhongji During The Period Of Review Is Based On Substantial Evidence And In Accordance With Law

Zhongji argues that the Trade Data Monitor data are not specific to the products that Zhongji produces and that Commerce should have instead relied upon the CRU Report that Zhongji submitted.  Pl. Br. at 18-27; IDM at 20.  The record does not support Zhongji's claims that Commerce should use the aluminum alloyed grade 1050 rolled product prices based on London Metal Exchange data in the CRU Report as the benchmark for the aluminum plate and/or sheet and strip because this product grade is

28

similar to the types of inputs Zhongji purchased. IDM at 21. Although aluminum alloyed grade 1050 rolled products are a specific type of aluminum categorized under the broader HTS subheading 7606.12, in its New Subsidy Allegation Questionnaire Response, China explained that Zhongji purchased aluminum sheet under a variety of HTS subheadings, including 7606.1220, 7606.1230, 7606.1259, and 7606.1290. *Id.*; China New Subsidy Allegation Questionnaire Response at 20. Zhongji did not purchase aluminum alloyed grade 1050 rolled product during the period of review, its cross-owned companies purchased aluminum sheet produced to certain different specifications. *Id.*; *see also* Zhongji Final Calc. Memo. This data from China runs contrary to Zhongji's claims that merchandise classified under HTS subheading 7606.12 are "overbroad" when compared to what it produces. Pl. Br. at 19; *see also* China New Subsidy Allegation Questionnaire Response at 20 ("The {Gov. of China} further confirms with the mandatory respondents that the below four HTS codes are applicable to their purchased aluminum sheet during the {period of review}.").

Indeed, Zhongji's claim that the 1050 alloy has an aluminum alloy content close to some of the types of aluminum sheet it purchased is not dispositive because there is variation in the aluminum content of the products purchased by Zhongji. IDM at 22; *see also* Final Calc. Memo. at Exhibit NSA-1 and Exhibit NSA-2 (recognizing that much of the specific discussion of the different types of aluminum alloy is BPI). Further, there is more variation between 1050 alloy and the products Zhongji purchased in terms of chemical composition than Zhongji suggests. *Id.*; *see also* Zhongji New Subsidy Allegation Questionnaire Response at Exhibit NSA-1 and Exhibit NSA-2.

Despite Zhongji's contention that the CRU Report provides pricing for aluminum 1050

rolled products which have "close purity levels to alloy 1050," Pl. Br. at 22, these

arguments ignore the fact that the CRU Report data are based on prices from the

London Metal exchange, data that Commerce elaborated on in the Preliminary Results:

> {i}n prior cases, Commerce has <u>declined</u> to use these prices
> because the LME contains only a cash price for primary
> aluminum (i.e., unalloyed ingots) with a minimum aluminum
> content of 99.7 percent.  Instead, Commerce has found the
> GTA or Comtrade data better captures a range of products that
> have a minimum aluminum content of 99 percent.

IDM at 22 (emphasis added) (*citing Aluminum Extrusions From China 2012* at 28; *Tool*

*Chests from China* at Comment 5); PDM at 19.  The same issues with the CRU Report

are present in this case.  Commerce reasonably selected Trade Data Monitor data

because it better captures the different aluminum plate and/or sheet and strip input

products purchased by Zhongji during the period of review.

Zhongji argues that, even if Commerce continues to rely upon the Trade Data

Monitor data, Commerce should use data from only countries that produce aluminum

sheet/plate to calculate benchmarks.  Pl. Br. at 26.  This argument is unpersuasive.  The

only information on the record concerning countries that produce and export aluminum

foil similar to Zhongji's is contained in an affidavit.  IDM at 24; *see also* Zhongji

Benchmark Submission Pt. 1 at Exhibit 5 and Exhibit 11.  Nothing else on the record

substantiates the claims made in the affidavit or analyzes the specific types of

aluminum foil produced and/or exported by each of the countries included in the Trade

Data Monitor data, CRU Report data, or GTA data.  Thus, Commerce cannot

conclusively determine which data represent the relevant producers and the different types of aluminum foil made in each country.  IDM at 24.  In other proceedings, Commerce has found that aluminum sheet is widely traded and produced, and as discussed above, using a benchmark that captures what Zhongji actually produced is most appropriate.  IDM at 24; *see also Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19,444 (Dept' Commerce Apr. 17, 2020) (investigation involving aluminum sheet from 18 countries).

## C. Commerce's Decision To Rely Upon The Weighted-Average of the GTA And Comtrade Data To Calculate The Primary Aluminum Benchmark Is Based On Substantial Evidence And In Accordance With Law

Zhongji argues that Commerce should use the London Metal Exchange data or, alternatively, GTA and Comtrade data under HTS subheading 7601.10 to calculate the primary aluminum benchmark.  Pl. Br. at 28.  However, as discussed above, "Commerce has repeatedly declined to use [LME prices] because the LME data contain only a cash price for primary aluminum (*i.e.*, unalloyed ingots) with a minimum aluminum content of 99.7 percent."  IDM at 26 (citing PDM at 18 (citing *Aluminum Extrusions from China 2012* at 28; *Tool Chests from China* at Comment 5; Order at 17360; and Inves. IDM at Comment 15)).  Commerce is willing to adjust the benchmark when presented with reliable, verifiable information—just as it did in the underlying investigation.  IDM at 26; *see also* Aluminum Foil CVD Inves. IDM at

Comment 16 [cite].  However, Zhongji has not produced evidence that it uses only primary aluminum with a minimum aluminum content of 99.7 percent in this case.

Finally, there is no evidence to support Zhongji's claim that Commerce should only use the weighted-average of the GTA and Comtrade data covering HTS subheading 7601.10.  IDM at 26.  There is no information on the record demonstrating that Zhongji purchased only primary aluminum under HTS subheading 7601.10 and not under HTS subheading 7601.20.  IDM at 26.  The raw GTA and Comtrade pricing data related to HTS subheadings 7601.10 and 7601.20 reflect the primary aluminum purchased by Zhongji for use in the production of subject merchandise.  Accordingly, Commerce reasonably relied upon them consistent with its practice, based on substantial evidence, and in accordance with law.  PDM at 19 (citing *Aluminum Extrusions from China 2012* at 28).

## CONCLUSION

For these reasons, we respectfully request the Court to deny plaintiffs' motion for judgment upon the agency record and to enter judgment for the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

Catharine M. Parnell

OF COUNSEL:
Ian A. McInerney
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

Trial Attorney
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-3467
Fax: (202) 353-0461Email:
Catharine.M.Parnell@usdoj.gov

*Attorneys for Defendant*

Dated: January 18, 2022

33