NONCONFIDENTIAL
VERSION

### UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD., ET AL., ) | |
| Plaintiffs, ) | |
| v. ) | |
| UNITED STATES, ) | Court No. 21-00133 |
| Defendant, ) | |
| and ) | |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., ) | |
| Defendant-Intervenors. ) | |

### DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

JOHN M. HERRMANN
GRACE W. KIM
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

February 17, 2022

NONCONFIDENTIAL
VERSION

## Table of Contents

Page

TABLE OF AUTHORITIES .................................................................................................... iii-v

STATEMENT OF THE CASE ..................................................................................................... 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ...................................................... 2

STATEMENT OF FACTS ........................................................................................................... 2

STANDARD OF REVIEW .......................................................................................................... 2

ARGUMENT ............................................................................................................................... 2

I.      COMMERCE'S REJECTION OF THE UNTIMELY BENCHMARK
        INFORMATION SUBMITTED BY ZHONGJI IS SUPPORTED BY
        SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ............................ 2

II.     COMMERCE'S DETERMINATION TO USE TDM DATA IN
        CALCULATING THE ALUMINUM SHEET/PLATE BENCHMARK IS
        SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN
        ACCORDANCE WITH LAW ......................................................................................... 7

        A.      TDM Data Provided the Best Benchmark on the Record ..................................... 7

        B.      Zhongji's Proposed Subset of the TDM Data Is Similarly Without
                Merit .................................................................................................................. 13

III.    COMMERCE'S DETERMINATION TO USE THE AVERAGE OF GTA
        AND COMTRADE DATA UNDER HTS SUBHEADINGS 7601.10
        AND 7601.20 TO CALCULATE THE PRIMARY ALUMINUM
        BENCHMARK IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND
        IN ACCORDANCE WITH LAW ................................................................................. 14

IV.     COMMERCE'S DECISION TO RELY ON INFORMATION IN THE
        2010 CBRE REPORT TO CALCULATE THE LAND BENCHMARK IS
        SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN
        ACCORDANCE WITH LAW ....................................................................................... 18

        A.      Zhongji's Proposed Tier-Two Land Analysis Is Baseless and
                Illogical ............................................................................................................. 18

        B.      Commerce's Tier-Three Land Benchmark Was Superior to
                Zhongji's Suggested Valuations ........................................................................ 19

NONCONFIDENTIAL
VERSION

**Table of Contents**
**(continued)**

**Page**

    C.    Commerce Properly Rejected Zhongji's Untimely-Submitted New
         Factual Information Relating to the Land Benchmark Following
         Issuance of the Preliminary Results ...................................................................21

V.     CONCLUSION ...........................................................................................................25

NONCONFIDENTIAL
VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

<u>Am. Silicon Techs. v. United States</u>,
  261 F.3d 1371 (Fed. Cir. 2001) ..................................................................................8

<u>Archer Daniels Midland Co. v. United States</u>,
  968 F. Supp. 2d 1269 (Ct. Int'l Trade 2014) ................................................... 10-11

<u>Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States</u>,
  61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ................................................................8

<u>Changzhou Trina Solar Energy Co. v. United States</u>,
  161 F. Supp. 3d 1343 (Ct. Int'l Trade 2016) ..........................................................17

<u>Changzhou Trina Solar Energy Co. v. United States</u>,
  352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ..................................................... 11-12

<u>Dongtai Peak Honey Indus. v. United States</u>,
  777 F. 3d 1343 (Fed. Cir. 2015) ............................................................... 23-24

<u>Essar Steel Ltd. v. United States</u>,
  678 F.3d 1268 (Fed. Cir. 2012) ..........................................................................9, 15

<u>Fine Furniture (Shanghai) Ltd. v. United States</u>,
  865 F. Supp. 2d 1254 (Ct. Int'l Trade 2012),
  <u>aff'd</u>, 748 F.3d 1365 (Fed. Cir. 2014) ....................................................................5

<u>Goodluck India Ltd. v. United States</u>,
  11 F.4th 1335 (Fed. Cir. 2021) .......................................................................8, 19

<u>Grobest & I-Mei Indus. (Vietnam) Co. v. United States</u>,
  815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ..........................................................23

<u>Hyundai Steel Co. v. United States</u>,
  279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ..........................................................17

<u>Maverick Tube Corp. v. United States</u>,
  107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ............................................................5

<u>Nippon Steel Corp. v. United States</u>,
  458 F.3d 1345 (Fed. Cir. 2006) ................................................................................8

<u>Pakfood Public Co. v. United States</u>,
  724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ..........................................................17

NONCONFIDENTIAL
VERSION

QVD Food Co. v. United States,
   658 F.3d 1318 (Fed. Cir. 2011)......................................................................... 6, 16-17

RZBC Group Shareholding Co. v. United States,
   Slip Op. 2016-64, 2016 Ct. Intl. Trade LEXIS 68 (June 30, 2016)............................ 10-11, 15

Seah Steel Vina Corp. v. United States,
   950 F.3d 833 (Fed. Cir. 2020)......................................................................... 24-25

Timken United States Corp. v. United States,
   434 F.3d 1345 (Fed. Cir. 2006)......................................................................... 23-24

Yantai Timken Co. v. United States,
   521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007),
   aff'd w/out op., 300 Fed. App'x 934 (Fed. Cir. 2008).........................................................5

**Statutes and Regulations**

19 U.S.C. § 1677(5)(E)(iv) ........................................................................................9

19 U.S.C. § 1677e ..................................................................................................6

19 U.S.C. § 1677m(d) ............................................................................................6

19 C.F.R. § 351.301(c)(3) .....................................................................................21

19 C.F.R. § 351.301(c)(3)(ii) ..............................................................................2, 4

19 C.F.R. § 351.301(c)(3)(iv) ...............................................................................4

19 C.F.R. § 351.301(c)(4) .....................................................................................23

19 C.F.R. § 351.511(a)(2)(ii) ...............................................................7, 9, 14, 18

**Administrative Determinations**

Aluminum Extrusions From the People's Republic of China:
   Final Results, and Partial Rescission of Countervailing Duty Administrative
   Review; 2013, 80 Fed. Reg. 77,325 (Dep't Commerce Dec. 14, 2015), and
   accompanying IDM (Dec. 7, 2015) .................................................................. 15-16

NONCONFIDENTIAL
VERSION

Certain Aluminum Foil From the People's Republic of China:
      Final Results of the Countervailing Duty Administrative Review; 2017-2018,
      86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021) ("Final Results")
      (P.R 389) ............................................................................................................. *passim*

Citric Acid and Certain Citrate Salts:
      Final Results of Countervailing Duty Administrative Review; 2012,
      79 Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014), and accompanying
      IDM (Dec. 22, 2014) ........................................................................................... 9-10

Common Alloy Aluminum Sheet From the People's Republic of China:
      Preliminary Affirmative Countervailing Duty (CVD) Determination,
      Alignment of Final CVD Determination With Final Antidumping Duty
      Determination, and Preliminary CVD Determination of Critical
      Circumstances, 83 Fed. Reg. 17,651 (Dep't Commerce Apr. 23, 2018),
      and accompanying PDM (Apr. 16, 2018), unchanged in
      83 Fed. Reg. 57,427 (Nov. 15, 2018) (final results) ........................................ 15-16

Common Alloy Aluminum Sheet From the People's Republic of China:
      Preliminary Results of Countervailing Duty Administrative Review,
      Rescission of Review, in Part, and Intent To Rescind, in Part; 2018-2019,
      86 Fed. Reg. 33,650 (Dep't Commerce June 25, 2021), and accompanying
      PDM (June 17, 2021), unchanged in 86 Fed. Reg. 72,927
      (Dec. 23, 2021) (final results) .......................................................................... 15-16

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
      From the People's Republic of China:  Preliminary Results of the
      Countervailing Duty Administrative Review and Preliminary Intent To
      Rescind, in Part; 2014, 82 Fed. Reg. 2,317 (Dep't Commerce Jan. 9, 2017),
      and accompanying PDM (Dec. 29, 2016), unchanged in 82 Fed. Reg. 32,678
      (July 17, 2017) (final results) ................................................................................ 13

Decision Memorandum for the Final Results of the 2017-2018 Countervailing
      Duty Administrative Review of Certain Aluminum Foil from the People's
      Republic of China (Feb. 24, 2021) ("IDM") (P.R. 390) ................................. *passim*

NONCONFIDENTIAL
VERSION

This memorandum of law is filed on behalf of Defendant-Intervenors, the Aluminum Association Trade Enforcement Working Group and its individual members (JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC) (collectively "Defendant-Intervenors" or "Petitioners"), domestic producers of certain aluminum foil ("Foil"). Defendant-Intervenors respectfully request that this Court deny the USCIT R. 56.2 motion for judgment on the administrative record filed on behalf of Plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (f/k/a Jiangsu Zhongji Lamination Materials Stock Co., Ltd.) ("Jiangsu Zhongji"); Jiangsu Zhongji Lamination Materials, (HK) Ltd.; Shantou Wanshun Package Material Stock Co., Ltd.; Jiangsu Huafeng Aluminium Industry Co., Ltd. ("Jiangsu Huafeng"); and Anhui Maximum Aluminium Industries Company Limited ("Anhui Maximum") (collectively, "Zhongji" or "Plaintiffs") and affirm the findings of the U.S. Department of Commerce in their entirety.

## STATEMENT OF THE CASE

The administrative determination at issue is the United States Department of Commerce's ("Commerce" or "the Department") final results in the first annual administrative review of the countervailing duty order on certain aluminum foil from China, which addressed subject merchandise sold in the United States between August 14, 2017 through December 31, 2018. See Certain Aluminum Foil From the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017-2018, 86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021) (hereinafter, "Final Results") (P.R 395)[1] and accompanying Decision

---

[1]     Documents in the administrative record are cited by their confidential and/or public record number (i.e., "(C.R. __)" and "(P.R. __)") provided in the Index to the Administrative Record filed with the Court on May 12, 2021 (ECF No. 23).

NONCONFIDENTIAL
VERSION

Memorandum for the Final Results of the 2017-2018 Countervailing Duty Administrative Review of Certain Aluminum Foil from the People's Republic of China (Feb. 24, 2021) (hereinafter, "IDM") (P.R. 390).

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

Defendant-Intervenors agree with and incorporate by reference the issues presented and summary of the arguments provided by Defendant the United States in its memorandum of law in support of the underlying administrative determination. See Def. Resp. to Pls. Mot. For J. on the Agency R. (Jan. 18, 2022) ("Def. Br.") at 2, 16-17 (ECF No. 35).

## STATEMENT OF FACTS

Defendant-Intervenors agree with and incorporate by reference the statement of facts provided by Defendant the United States in its memorandum of law in support of the administrative determination at issue. See Def. Br. at 2-16 (ECF No. 35).

## STANDARD OF REVIEW

Defendant-Intervenors agree with and incorporate by reference the standard of review provided by Defendant the United States in its memorandum of law in support of the administrative determination at issue. See Def. Br. at 18-19 (ECF No. 35).

## ARGUMENT

I. **COMMERCE'S REJECTION OF THE UNTIMELY BENCHMARK INFORMATION SUBMITTED BY ZHONGJI IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

Commerce properly rejected Zhongji's additional benchmark submission filed on May 18, 2020. See Pls. Rule 56.2 Mot. For J. on the Agency R. (Sept. 21, 2021) ("Pls. Br.") at 11-18 (ECF Nos. 30-31). Pursuant to 19 C.F.R. § 351.301(c)(3)(ii), "all submissions of factual information…to measure the adequacy of remuneration under § 351.511(a)(2), are due no later

NONCONFIDENTIAL
VERSION

than 30 days before the scheduled date of the preliminary results of review."   The timely submission of benchmark submissions is critical to allow Commerce sufficient time to determine whether a government provided goods or services at less than adequate remuneration.   There is no statutory or regulatory authority that supports Zhongji's contention that Commerce's Tolling Memorandum, which extended the deadline for the preliminary results by an additional fifty days (from April 29, 2020 to June 18, 2020),[2] "re-opened" or "reset" the thirty-day deadline for benchmark submissions established under the agency's regulations and afforded interested parties a second opportunity to submit benchmark information. Pls. Br. at 5, 8, 13.   Defendant-Intervenors agree with the reasoning provided by the United States in its memorandum of law in support of the administrative determination at issue.   See Def. Br. at 26-28 (ECF No. 35). Defendant-Intervenors provide the following additional points in response to Zhongji's claim that Commerce improperly rejected its additional benchmark submission filed on May 18, 2020.

As Commerce explained during the underlying administrative proceeding, the agency's tolling of deadlines as a result of the COVID pandemic applied to only "*pending* deadlines for actions by parties to administrative reviews."   IDM at 23 (P.R. 390) (citing Tolling Memorandum).   In this case, the deadline for interested parties to submit benchmark information was not a pending deadline; rather, as stated by Commerce, "the 30-day deadline to file benchmark comments *had already passed* prior to Commerce's tolling of deadlines."   Id. at 22-

---

[2]   See Mem. from John McGowan to Scot Fullerton re: Extension of Deadline for Prelim. Results of Countervailing Duty Administrative Review; 08/14/2017 – 12/31/2018 (Dec. 2, 2019) (extending preliminary results deadline to April 29, 2020) (P.R. 238); and Mem. to the Record re: Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19 (Apr. 24, 2020) ("Tolling Memorandum") (P.R. 332).

23 (emphasis added). Zhongji made a submission with the Commerce Department containing benchmark information on April 1, 2020, and subsequently submitted rebuttal benchmark information and comments (addressing affirmative information submitted on behalf of domestic producers) on April 13, 2020. See id.; 19 C.F.R. § 351.301(c)(3)(iv) ("An interested party is permitted *one opportunity* to submit publicly available information to rebut, clarify, or correct such factual information submitted pursuant to . . . § 351.511(a)(2) 10 days after the date such factual information is served on the interested party.") (emphasis added). Thus, when Zhongji filed additional benchmark comments on May 18, 2020, the opportunity to file benchmark submissions was closed.

Zhongji's assertion that Commerce's "denial of the new thirty-day deadline associated with the new Preliminary Results deadline runs contrary to the plain reading of the regulations" is wrong. Pls. Br. at 13. While Zhongji is correct that benchmark submissions are "due no later than 30 days before the scheduled date of the preliminary results," Commerce properly determined that the Tolling Memorandum did not reset or re-open the benchmark deadline *in this case*, because the deadline for such comments had already closed prior to the issuance of Commerce's Tolling Memorandum. See id.; 19 C.F.R. § 351.301(c)(3)(ii)); and IDM at 22-23.

These circumstances demonstrate that the facts at issue here are materially different than those cases where Commerce accepted additional benchmark information after the deadline for the preliminary results was extended. See Pls. Br. at 14-15. For example, no party in the cases cited by Zhongji had filed rebuttal benchmark comments at the time when the preliminary results were extended and, therefore, the opportunity to submit benchmark information had not yet closed. See id. (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From the People's Republic of China: Preliminary Results of Countervailing Duty

Administrative Review and Intent To Rescind the Review, in Part; 2016, 84 Fed. Reg. 5051 (Dep't Commerce Feb. 20, 2019), and accompanying Decision Memorandum at 3-4; Circular Welded Carbon Steel Pipes and Tubes From Turkey; Preliminary Results of Countervailing Duty Administrative Review and Preliminary Intent To Rescind in Part; Calendar Year 2013, 80 Fed. Reg. 18,809 (Dep't Commerce Apr. 8, 2015), and accompanying Decision Memorandum at 3-4, n.16; and Certain Uncoated Paper From Indonesia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination, 80 Fed. Reg. 36,971 (Dep't Commerce June 29, 2015), and accompanying Decision Memorandum at 3). Thus, the cases relied upon by Zhongji are inapposite.

Nor did Commerce abuse its discretion in rejecting Zhongji's untimely benchmark submission.  As the Court has held, "'Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits.'" Yantai Timken Co. v. United States, 521 F. Supp. 2d 1356, 1370–71 (Ct. Int'l Trade 2007) (quoting Reiner Brach GmbH & Co. v. United States, 206 F. Supp. 2d 1323, 1334 (Ct. Int'l Trade 2002)), aff'd without op., 300 Fed. App'x 934 (Fed. Cir. 2008); see also Fine Furniture (Shanghai) Ltd. v. United States, 865 F. Supp. 2d 1254, 1266 (Ct. Int'l Trade 2012) (recognizing that "setting and enforcing its own deadlines is within Commerce's discretion"), aff'd, 748 F.3d 1365 (Fed. Cir. 2014) (citing Reiner Brach, 206 F. Supp. 2d at 1334; Yantai Timken, 521 F. Supp. 2d at 1371).  In addition, the "{s}trict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision." Maverick Tube Corp. v. United States, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015) (citing Dongtai Peak Honey Indus. Co. v. United States, 971 F. Supp. 2d 1234, 1242 (Ct. Int'l Trade 2014)).  Here, Zhongji's abuse of discretion argument is without

NONCONFIDENTIAL
VERSION

merit, because Commerce reasonably explained that the time period for benchmark comments had already closed as of the date on which Commerce issued the Tolling Memorandum.  See IDM at 23.

Finally, Zhongji's attempt to shift the blame to Commerce for its failure to submit adequate benchmark information in a timely manner is equally unavailing.  See Pls. Br. at 17-18. While the statute requires that a respondent be provided a second opportunity to correct errors in information submitted to Commerce in response to an agency questionnaires[3] and addresses when the agency may rely on facts available when the information submitted by a respondent is deficient,[4] here Commerce was required to determine which benchmark information is the most reliable – and not whether to apply adverse facts available.  Zhongji's arguments fail to recognize that it is the party seeking the use of a particular benchmark that bears the burden of creating an adequate record.  See QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("QVD Food Co.") (stating that "'the burden of creating an adequate record lies with {interested parties} and not with Commerce'") (bracketed material in quotation) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992)). Thus, Commerce was not required to notify and provide Zhongji with an opportunity to remedy the deficiency regarding its initial benchmark submission.

For these reasons, Commerce's rejection of Zhongji's benchmark submission dated May 18, 2020, is supported by substantial evidence and in accordance with law and, thus, should be affirmed by this Court.

---

[3]     See 19 U.S.C. § 1677m(d).

[4]     See 19 U.S.C. § 1677e.

NONCONFIDENTIAL
VERSION

II.     **COMMERCE'S DETERMINATION TO USE TDM DATA IN CALCULATING THE ALUMINUM SHEET/PLATE BENCHMARK IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

As a threshold matter, Zhongji does not contest Commerce's reliance on a tier two analysis (i.e., a world market price), pursuant to 19 C.F.R. § 351.511(a)(2)(ii), to evaluate the adequacy of remuneration for Zhongji's purchases of aluminum sheet/plate. See generally Pls. Br. at 18-27. Rather, Zhongji challenges solely the particular benchmark selected by Commerce – world export prices of merchandise classified under Harmonized Tariff System ("HTS") subheading 7606.12 (the provision for alloyed aluminum sheet and plate), as reported by Trade Data Monitor ("TDM"). See id. Specifically, Zhongji urges this Court to require Commerce to either: (1) rely on the Commodities Research Unit ("CRU") Report data that Zhongji submitted to Commerce; or (2) revise the TDM data to "use only export data from the countries that actually produce and export aluminum sheet/plate." See id. Because Zhongji's argument is predicated on a fundamental misunderstanding of the law, Commerce's regulations, and case precedent regarding the selection of a benchmark, this Court should reject Zhongji's claims and sustain Commerce's finding.

A.      **TDM Data Provided the Best Benchmark on the Record**

Defendant-Intervenors agree with and incorporate by reference the arguments presented by the United States in support of Commerce's rejection of the CRU Report data as an appropriate benchmark. See Def. Br. at 28-30. Defendant-Intervenors provide three additional points in response to Zhongji's claims challenging Commerce's reliance on the TDM data.

First, Commerce considered – and properly rejected – Zhongji's myriad arguments in support of its belief that the CRU Report data are "superior" to the TDM data relied on by Commerce. Compare Pls. Br. at 19-25 (ECF Nos. 30-31) with IDM at Cmt. 5 (P.R. 390); see

NONCONFIDENTIAL
VERSION

also Def. Br. at 28-30.  In essence, Zhongji is asking this Court to reweigh the record evidence, which the Court cannot do.  See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 61 F. Supp. 3d 1306, 1322 (Ct. Int'l Trade 2015) (hereinafter, "Borusan Mannesmann") ("'{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight,' but on review a 'court may {not} displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'") (bracketed material in quotation) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  Further, the Court "'must affirm {Commerce's} determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion.'"  Goodluck India Ltd. v. United States, 11 F.4th 1335, 1344 (Fed. Cir. 2021) ("Goodluck India") (bracketed material in original) (citing Hitachi Metals, Ltd. v. United States, 949 F.3d 710, 716 (Fed. Cir. 2020) and quoting Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004)); see also Borusan Mannesmann, 61 F. Supp. 3d at 1322 ("Borusan's arguments in this regard do not render Commerce's interpretation of the record 'as a whole' unreasonable, and the court cannot substitute a different interpretation thereof.") (citation omitted).  "Under the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of {the agency}."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1358 (Fed. Cir. 2006) (bracketed material added to quotation); Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001).  In this case, Commerce considered the evidence identified in Zhongji's brief and did not find the evidence compelling – a decision that should be affirmed by this Court.

Second, Zhongji's insistence that the benchmark must be "product-specific" misinterprets the law. Neither the law nor Commerce's regulations require that the benchmark be identical (i.e., "specific") to the good in question, only that the product be "comparable" to the input used in the production of the subject merchandise. Pursuant to 19 U.S.C. § 1677(5)(E)(iv), Commerce will evaluate the adequacy of remuneration for a government-provided good or service based on prevailing market conditions in the country in question, including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Commerce's regulations, which establish a three-tiered hierarchy with which to measure the adequacy of remuneration, specifically note the agency's consideration of "factors affecting comparability" when comparing "the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question" under a tier-two benchmark. 19 C.F.R. § 351.511(a)(2)(ii). In affirming Commerce's selection of a tier-two benchmark, the U.S. Court of Appeals for the Federal Circuit found:

> Though the Australian iron ore {benchmark} is not identical to NMDC's iron ore {government-provided good}, Commerce's regulations require only that it be a comparable market-determined price that would be available to the purchasers in the country at issue. We conclude Commerce properly took into account factors affecting comparability in its selection of the benchmark.

Essar Steel Ltd. v. United States, 678 F.3d 1268, 1273-74 (Fed. Cir. 2012) ("Essar Steel"). Thus, the legal standard for a tier-two benchmark only requires a "comparable" good – not an "identical" good, as claimed by Zhongji.

In applying this standard, Commerce seeks to select a benchmark that is both "robust" and reliable. As Commerce explained in the 2012 administrative review of the countervailing duty order on citric acid and certain citrate salts from China:

> …in interpreting this tier two benchmark regulation, it is the Department's practice to calculate a world market price that is as robust as possible in order to capture the range of possible market prices and variances that occur when market principles govern transactions.
>
> For example, with regard to sulfuric acid, rejecting GTIS data in favor of CRU Group data, as the RZBC Companies suggest, would result in the discarding of hundreds of market prices from 64 countries in favor of 24 market prices from northwestern Europe, Japan and South Korea.   Limiting the abundant and available world market price data on the record to the few data that only and explicitly reflect bulk shipments, results in a skewed benchmark that cannot be considered a world market price.

Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2012, 79 Fed. Reg. 78,799 (Dep't Commerce Dec. 31, 2014), and accompanying IDM at Cmt. 15 (Dec. 22, 2014) (internal citation omitted).  The Court affirmed Commerce's analysis, concluding:

> Contrary to RZBC's argument, Commerce was not obligated to use only the narrow set of prices that RZBC identified as "specific to RZBC's inputs" in terms of grade, specification, and quantity. Under tier two, Commerce's duty is simply to make "due allowance for factors affecting comparability" when averaging benchmark prices. 19 C.F.R. § 351.511(a)(2)(ii).

RZBC Group Shareholding Co.. Ltd., et. al. v. United States, Slip Op. 2016-64 at 21, 2016 Ct. Intl. Trade LEXIS 68 at *31-32 (June 30, 2016) ("RZBC Group") (citation omitted).  This finding is consistent with the Court's prior ruling involving the same countervailing duty order, in which the Court held:

> RZBC takes the stance that Commerce must use benchmark prices at the ten and eleven-digit level of specificity, which implies that Commerce must use benchmark prices that are nearly identical to RZBC's reported purchases to satisfy the regulation.  The regulation, however, does not manifest such a stringent standard. It requires only that the selected benchmarks be comparable. Considering that sulfuric acid is a commodity product, and that

-10-

> RZBC did not establish clear divisions within the sulfuric acid
> market, Commerce's selection of benchmark prices for sulfuric
> acid at the 4, 6, and 8 digit level is consistent with the regulation.

Archer Daniels Midland Co. v. United States, 968 F. Supp. 2d 1269, 1279 (Ct. Int'l Trade 2014)

(citation omitted).

Here, Commerce considered the factors affecting comparability and determined that "the

TDM data covering HTS subheading 7606.12 {i.e., at the 6-digit level} are more representative

of all the types of aluminum {sheet/plate} purchased by the respondents." IDM at Cmt. 5

(bracketed material added) (P.R. 390). Indeed, the subject merchandise covers a variety of

alloyed aluminum foil that may be manufactured using an array of alloyed aluminum

sheet/plate.[5]

Zhongji's reliance on Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp.

3d 1316, 1335 (Ct. Int'l Trade 2018) ("Changzhou Trina"), therefore, is misplaced. See Pls. Br.

at 19. The input at issue in that case was solar glass, a niche product used solely in the

production of solar photovoltaics. See Changzhou Trina, 352 F. Supp. 3d at 1334. The Court

faulted Commerce for using Comtrade data reflecting two basket categories (neither of which

was specific to solar glass), when the "vast majority of flat glass is not suitable for solar panels,

but is used in the production of other merchandise." Id. In contrast, aluminum sheet/plate is a

commodity product that is produced in a wide range of specifications. Although Zhongji seeks

---

[5]   Compare IDM at 3 ("Aluminum foil is made from an aluminum alloy that contains more
than 92 percent aluminum.") (P.R. 390) with Letter from Mowry & Grimson, PLLC re: Certain
Aluminum Foil from the People's Republic of China: Benchmark Submission (Apr. 1, 2020), at
Exh. 9 (C.R. 205-209, 215-217; P.R. 311-314) ("Zhongji Benchmark Submission")
("International Alloy Designations and Chemical Composition Limits for Wrought Aluminum
and Aluminum Alloys" that demonstrates the numerous designations for alloy composition
accepted in the aluminum industry internationally.).

to characterize merchandise classifiable under HTS subheading 7606.12 in a similar fashion to solar glass, record evidence does not support Zhongji's conclusion.

For example, Zhongji asserts that "a significant volume of the product imported under HTS subheading 7606.12 is aluminum plate, which is used in heavy-duty applications." Pls. Br. at 21 (citing page 54 of the International Trade Commission's ("ITC") report on the aluminum industry submitted in Zhongji's benchmark filing). The page of the ITC report referenced by Zhongji, however, makes no mention of "a significant volume" of aluminum plate imported under HTS subheading 7606.12 – and instead only describes end uses for aluminum plate. Zhongji Benchmark Submission, Exh. 10 at 54 (C.R. 205-209, 215-217; P.R. 311-314). In fact, the ITC report states explicitly that aluminum sheet, not plate, "is considered the most widely used form of wrought aluminum in major end-use sectors." Id. Moreover, Zhongji's evidence that "most" of the aluminum sheet covered by HTS subheading 7606.12 [

] is an affidavit

that [

] See Pls. Br. at 21; Zhongji Benchmark Submission at Exh. 11 (C.R. 205-209, 215-217; P.R. 311-314). Zhongji, therefore, fails to support its claim that HTS subheading 7606.12 is "overbroad" and not representative of the range of alloys used in the manufacture of the subject merchandise, demonstrating that Zhongji's reliance on the Court's finding in Changzhou Trina is inapposite.

Third, even if the law required Commerce's reliance on an identical benchmark (which for the reasons discussed above, it does not), Zhongji's proposed benchmark - the CRU Report data - remains unusable. As Zhongji concedes, it did not purchase alloy 1050 aluminum sheet represented in the CRU report. See Pls. Br. at 24. As such, Zhongji's assertion that "{e}ven

NONCONFIDENTIAL
VERSION

though Zhongji's purchases were not alloy 1050, the CRU Report is still more product-specific" (id.) misses the mark.  The CRU Report data are specific to a product that Zhongji did not use. Zhongji's assertion that the alloy 1050 data in the CRU Report are "superior" to the TDM data is a transparent, self-serving attempt to cherry-pick prices that are significantly lower than the average value for aluminum sheet/plate used to produce the subject merchandise.

For these reasons, in addition to those identified in Defendant's response brief, this Court should affirm Commerce's use of TDM data as the most robust and reliable benchmark on the record.

**B.     Zhongji's Proposed Subset of the TDM Data Is Similarly Without Merit**

In the alternative, Zhongji's urges this Court to require Commerce to adjust the TDM data "to use only export data from the countries that actually produce and export aluminum sheet/plate." Pls. Br. at 26.  This request should also be rejected by the Court.  In addition to the evidence in support of Commerce's rejection of this argument in the underlying proceeding highlighted by Defendant (see Def. Br. at 30-31), Zhongji's attempt to draw an analogy with solar glass is unpersuasive.  In the 2014 administrative review of the countervailing duty order on crystalline silicon photovoltaic cells from China, record information demonstrated that only certain countries manufactured solar glass, a niche product.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of the Countervailing Duty Administrative Review and Preliminary Intent To Rescind, in Part; 2014, 82 Fed. Reg. 2,317 (Dep't Commerce Jan. 9, 2017), and accompanying Prelim. Decision Memo ("PDM") at 19 (Dec. 29, 2016), unchanged in 82 Fed. Reg. 32,678 (July 17, 2017) (final results).

NONCONFIDENTIAL
VERSION

Here, the record does not establish that aluminum sheet/plate is a specialized product that is manufactured only in certain countries.  Tellingly, the affidavit submitted by Zhongji [



]  See Zhongji Benchmark Submission at Exh. 11 (C.R. 205-209, 215-217; P.R. 311-314). Accordingly, Zhongji's proposed revision to the TDM data is baseless and should be rejected by the Court.

In sum, given that the use of TDM data as the benchmark to measure the adequacy of remuneration for the provision of aluminum sheet/plate is based on substantial evidence and is in accordance with the law, the Court should uphold Commerce's finding and reject Zhongji's alternative argument that a subset of the TDM data should be used.

## III.   COMMERCE'S DETERMINATION TO USE THE AVERAGE OF GTA AND COMTRADE DATA UNDER HTS SUBHEADINGS 7601.10 AND 7601.20 TO CALCULATE THE PRIMARY ALUMINUM BENCHMARK IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

Zhongji argues that Commerce erred in relying on a primary aluminum benchmark that calculated the value of merchandise classified under HTS subheadings 7601.10 and 7601.20, and that the agency should instead have relied on either: (1) London Metal Exchange ("LME") data for primary aluminum with a minimum purity of 99.7 percent; or (2) HTS data for 7601.10 alone.  See Pls. Br. at 27-30.  As with its arguments regarding the benchmark value for aluminum sheet/plate, Zhongji does not contest Commerce's reliance on a tier-two benchmark in accordance with 19 C.F.R. § 351.511(a)(2)(ii), and focuses its challenge solely on the selected world-market price.  See generally id.  In addition to the substantial evidence in support of

NONCONFIDENTIAL
VERSION

Commerce's finding presented in Defendant's response brief (see Def. Br. at 31-32), Defendant-Intervenors address three flaws in Zhongji's arguments for the Court's consideration.

First, as discussed above in section II.A., Zhongji misrepresents the relevant legal standard by claiming that Commerce must use a "product-specific" or "grade-specific" benchmark to evaluate its primary aluminum purchases.  See Pls. Br. at 28, 30.  While Commerce will seek the most reliable benchmark based on the agency's evaluation of the "factors affecting comparability," there is no requirement that the benchmark be identical to the good provided by the foreign government.  See Essar Steel, 678 F.3d at 1273-74; RZBC Group, Slip Op. 2016-64 at 21, 2016 Ct. Intl. Trade LEXIS 68 at *31-32.

Indeed, Commerce determined the benchmark used here – combining the value of merchandise classified under HTS subheadings 7601.10 and 7601.20 – to be comparable to the primary aluminum provided by the Chinese government to responding producers in other countervailing duty proceedings.  See, e.g., Common Alloy Aluminum Sheet From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, in Part, and Intent To Rescind, in Part; 2018-2019, 86 Fed. Reg. 33,650 (Dep't Commerce June 25, 2021), and accompanying PDM at 17 (June 17, 2021), unchanged in 86 Fed. Reg. 72,927 (Dec. 23, 2021) (final results); Common Alloy Aluminum Sheet From the People's Republic of China: Preliminary Affirmative Countervailing Duty (CVD) Determination, Alignment of Final CVD Determination With Final Antidumping Duty Determination, and Preliminary CVD Determination of Critical Circumstances, 83 Fed. Reg. 17,651 (Dep't Commerce Apr. 23, 2018), and accompanying PDM at 17 (Apr. 16, 2018), unchanged in 83 Fed. Reg. 57,427 (Nov. 15, 2018) (final results); and Aluminum Extrusions From the People's Republic of China: Final Results, and Partial Rescission of Countervailing

-15-

Duty Administrative Review; 2013, 80 Fed. Reg. 77,325 (Dep't Commerce Dec. 14, 2015), and

accompanying IDM at 54-55 (Dec. 7, 2015). Commerce's finding in the underlying

administrative review, therefore, is consistent with the agency's practice in identifying a

benchmark value for primary aluminum.

Second, Commerce's selection of the benchmark with which to evaluate the adequacy of

remuneration for the Chinese government's provision of primary aluminum must be based on the

administrative record developed before the agency in the underlying administrative proceedings.

The documentation relied on by Zhongji to support the claim that its primary aluminum

purchases had [                                                    ] is not on

the record, as it was properly rejected by the Commerce as untimely.  See Pls. Br. at 28-30; see

also section I above.  Further, Zhongji does not cite any record evidence to support its assertion

that "{t}he primary aluminum used by Zhongji is unalloyed and is covered by HTS subheading

7601.10 only."  Pls. Br. at 29.  To the contrary, Zhongji's responses to the Commerce

Department's questionnaire contained no information regarding the alloy specifications of its

primary aluminum purchases.  See Letter from Mowry & Grimson, PLLC, re:  Section III

Questionnaire Response by Jiangsu Zhongji Lamination Materials Co., Ltd. and Affiliates, Vol. I

at 17-18, Exh. I-12, Vol. III at 14-15, Exh. III-11, Vol. V at 14-15, Exh. V-10 (Sept. 20, 2019)

("Zhongji QR") (C.R. 33-53, P.R. 181-82); Letter from Mowry & Grimson, PLLC, re:  Second

Supplemental Section III Questionnaire Response at 23, 36, 42, and Exhs. SQ2-19, SQ2-35,

SQ2-59 (Nov. 25, 2019) (C.R. 87-127, P.R. 231-332).  The Courts have found that the burden to

develop the record lies squarely with the responding party.  See QVD Food Co., 658 F.3d at

1324 (stating that "the burden of creating an adequate record lies with {interested parties} and

not with Commerce") (bracketed material added) (quoting Tianjin Mach. Imp. & Exp. Corp. v.

United States, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992)).   Accordingly, Zhongji is responsible for absence of evidence on the record to substantiate its unfounded claims regarding the alloy characteristics of its primary aluminum purchases.

Third, Zhongji's contention that "Commerce unreasonably diverted" from the primary aluminum benchmark used in the original investigation is also unavailing.   See Pls. Br. at 30. Zhongji fails to recognize that each segment is distinct and distinguishable from prior proceedings involving the same merchandise.   See Pakfood Public Co. Ltd. v. United States, 724 F. Supp. 2d 1327, 1342 (Ct. Int'l Trade 2010) ("Commerce makes determinations based upon the record of the relevant segment of the proceeding, not previous segments."); see also Changzhou Trina Solar Energy Co., Ltd. v. United States, 161 F. Supp. 3d 1343, 1348-49 (Ct. Int'l Trade 2016) (stating that "each CVD proceeding is based on its own unique record of factual evidence and arguments presented to the agency").   As the Court has made clear, "Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings."   Hyundai Steel Co. v. United States, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Tr. 2017) (citing Pakfood Public Co., 724 F. Supp. 2d at 1345).   Thus, the benchmark for primary aluminum selected by Commerce in the original investigation is not controlling, and the agency's fresh examination of the record before it in determining the appropriate benchmark for Zhongji's purchases of primary aluminum in the underlying segment at issue in this action was proper.

For these reasons, as well as those in Defendant's response brief, Commerce's reliance on a primary aluminum benchmark that was derived based on an average of GTA and Comtrade data concerning the value of merchandise classified under both HTS subheadings 7601.10 and 7601.20 is supported by substantial evidence and in accordance with the law.

NONCONFIDENTIAL
VERSION

**IV.    COMMERCE'S DECISION TO RELY ON INFORMATION IN THE 2010 CBRE REPORT TO CALCULATE THE LAND BENCHMARK IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

Zhongji challenges Commerce's analysis of the Chinese government's provision of land for less than adequate remuneration in three respects.  First, Zhongji argues Commerce erred in not relying on the 2016-2018 reports issued by CB Richard Ellis ("CBRE Reports") as a tier-two benchmark reflecting the "world-market price" for land.  See Pls. Br. at 30-37.  In the alternative, Zhongji asserts that either the 2016-2018 CBRE Reports or the 2018 MarketBeat Bangkok Industrial Reports compiled by Nexus Innovative Real Estate Solutions ("Nexus Reports") offered superior proxies to the 2010 CBRE Report used by Commerce as the tier-three benchmark.  See id. at 38-40.  Third, Zhongji contends that Commerce improperly rejected its post-preliminary results supplemental land benchmark submission.  See id. at 40-45.  For the reasons detailed below and those discussed in Defendant's response brief, this Court should reject Zhongji's claims and should sustain Commerce's findings.

**A.    Zhongji's Proposed Tier-Two Land Analysis Is Baseless and Illogical**

In addition to the factual and legal rebuttal to Zhongji's proposed tier-two benchmark analysis presented in Defendant's response brief (see Def. Br. at 18-21), Zhongji's argument should be rejected because it is illogical.  In particular, Zhongji quotes 19 C.F.R. § 351.511(a)(2)(ii), which addresses the identification of a "world-market price" to be used as a benchmark, and asserts that the world-price benchmark "would be available to purchasers in the country in question."  Pls. Br. at 32-33.  There is, however, no "world market price" for land such that purchasers in China could acquire and utilize land in Mexico, Brazil or Thailand for production of subject merchandise in China.  Tellingly, Zhongji fails to identify any case precedent to substantiate that Commerce has ever considered land to be tradable (i.e., a world

market good), pursuant to 19 C.F.R. § 351.511(a)(2)(ii).   See generally id. at 31-37.
Accordingly, the Court should affirm Commerce's rejection of Zhongji's tier-two benchmark
proposal.

>    **B.**    **Commerce's Tier-Three Land Benchmark Was Superior to Zhongji's Suggested Valuations**

Perhaps recognizing the invalidity of its tier-two benchmark proposal, Zhongji challenges
Commerce's rejection of both the 2016-2018 CBRE Reports and Nexus Reports, asserting that
either report is a "superior" tier-three benchmark to the information relied on by Commerce in
the Final Results.   See Pls. Br. at 37-40.   Defendant-Intervenors agree with and incorporate by
reference the information and arguments presented by Defendant in its response brief.   See Def.
Br. at 21-26.   Defendant-Intervenors highlight two additional points in response to Zhongji's
attempt to undermine Commerce's reliance on a well-established land benchmark.

As with Zhongji's other benchmark arguments discussed above, Zhongji is essentially
inviting this Court to reweigh the record evidence, contrary to the standard of review.   See
Goodluck India, 11 F.4th at 1344 (Fed. Cir. 2021) ("Under the substantial evidence standard of
review, a reviewing court 'must affirm {Commerce's} determination if it is reasonable and
supported by the record as a whole, even if some evidence detracts from {Commerce's}
conclusion.'") (bracketed material in original) (citing Hitachi Metals, Ltd. v. United States, 949
F.3d 710, 716 (Fed. Cir. 2020) and quoting Altx, Inc. v. United States, 370 F.3d 1108, 1121
(Fed. Cir. 2004)).   Here, Zhongji cannot and does not offer evidence to demonstrate that the 2010
CBRE Report used by Commerce was not supported by substantial evidence and in accordance
with law.   See generally Pls. Br. at 33-40.   Zhongji's challenge, therefore, fails as a legal matter.

NONCONFIDENTIAL
VERSION

Instead, Zhongji emphasizes the purported "superiority" of its proposed benchmarks, focusing almost exclusively on the alleged contemporaneity.  Zhongji's oft-repeated claim that both the 2016-2018 CBRE Reports and Nexus Reports are "more contemporaneous" than the 2010 CBRE Report is factually inaccurate.  The fatal flaw is Zhongji's reliance on the length of time between the 2010 CBRE Report and the period of review ("POR") – instead of the time of bestowal for the provision of land at issue.  See Pls. Br. at 35, 39 (noting the seven to eight-year difference).  In their responses to Commerce's initial questionnaire, both Jiangsu Zhongji and Jiangsu Huafeng reported no new purchases or leases of any land or land-use rights during the POR, while Anhui Maximum indicated its land use rights were purchased in 2012 and 2013.  See Zhongji's Sept. 20, 2019 QR, Vol. I at 20, Vol. III at 17, Vol. V at 18.  (C.R. 33; P.R. 181).  In fact, Jiangsu Zhongji's and Jiangsu Huafeng's land use right purchases occurred in [

        ] See id. at Exh. I-1 (C.R. 34; P.R. 182).  As such, Commerce's reliance on a land benchmark based on a report prepared in 2010 was [

    ] for the Chinese government's provision of land to Jiangsu Zhongji, Jiangsu Huafeng, and Anhui Maximum than either of Zhongji's proposed sources.  Thus, use of either the 2016-2018 CBRE Reports or 2018 Nexus Report would require Commerce to make consumer price index ("CPI") adjustments for [

        ]  Zhongji itself, however, cautions that the use of CPI adjustments "inherently introduced inaccuracies into Commerce's benchmark calculation."  Pls. Br. at 36. Accordingly, by Zhongji's own contemporaneity standard, Commerce's benchmark is superior to the alternative sources proposed by Zhongji.

NONCONFIDENTIAL
VERSION

C.   **Commerce Properly Rejected Zhongji's Untimely-Submitted New Factual Information Relating to the Land Benchmark Following Issuance of the Preliminary Results**

Separate from the procedural issue regarding Zhongji's untimely submission of new factual information following Commerce's tolling of the deadline for issuing the preliminary results discussed above in section I, Zhongji also contests Commerce's rejection of its submission of new factual information concerning the land benchmark <u>after</u> Commerce's issuance of the preliminary results in July 2020.  <u>See</u> Pls. Br. at 40-45.  Zhongji argues that because Commerce reopened the record in the preliminary results, the agency's subsequent rejection of the information that it submitted was unreasonable and an abuse of discretion.  <u>See</u> <u>id.</u> at 41-44.  Further, Zhongji claims that Commerce should have allowed Zhongji to correct certain land information on the record in the "interests of accuracy and fairness."  <u>Id.</u> at 44-45. Defendant's brief did not address this issue, but instead focused solely on the procedural challenge to Zhongji's second benchmark submission filed in May 2020, as addressed above in section I.  <u>See</u> <u>generally</u> Def. Br. at 26-28.  For the reasons detailed below, the Court should also reject Zhongji's request for remand on this issue.

Commerce's regulations explicitly establish a deadline to submit factual information in regard to the measurement of the adequacy of remuneration <u>prior to</u> the issuance of the preliminary results.  <u>See</u> 19 C.F.R. § 351.301(c)(3).  Thus, the regulatory deadline had already passed when Zhongji submitted its post-preliminary results filing.  Indeed, Zhongji sought clarification from Commerce, because new information typically would not be accepted, stating "it is not clear whether the interested parties are allowed to submit new factual information." Letter from Mowry & Grimson, PLLC, re: Request for Clarification and Extension to Submit Land Benchmark Information, at 2 (July 2, 2020). (P.R. 353)

In response, Commerce confirmed that "parties {were} not permitted to submit new factual information relating to Commerce's Land Benchmark Memo or land benchmark analysis." Letter from the Department of Commerce to Jiangsu Zhongji Lamination Materials Co., Ltd., at 2 (July 6, 2020) (bracketed material added) (P.R. 354). Although Commerce did not expressly acknowledge the error in the language included in the <u>Preliminary Results</u>, the response to Zhongji established that it was not Commerce's intention to reopen the record for new information in regard to the land benchmark. <u>See id.</u> Zhongji, however, ignored Commerce's explicit instructions and nevertheless submitted new factual information, which Commerce subsequently rejected and properly removed from the administrative record. <u>See</u> Letter from the Department of Commerce to Jiangsu Zhongji Lamination Materials Co., Ltd. (July 17, 2020) (notifying Zhongji of the rejection) (P.R. 358); <u>see also</u> Memorandum to the File from John C. McGowan, International Trade Compliance Analyst, Antidumping & Countervailing Duty Operations, Office VI, Subject: Request to Reject and Remove File (July 17, 2020) (removing Zhongji's additional land benchmark documents from the record) (P.R. 359).

Zhongji now contends that because Commerce did not amend the <u>Preliminary Results</u>, "it {was} reasonable for Zhongji to continue to rely on the language in the Preliminary Results" and to submit new factual information. Pls. Br. at 42. Zhongji's argument, however, is undermined by its request of Commerce that the agency clarify the extent to which new factual information would be accepted – and the agency's explicit statement that new information would not be accepted. Based on these facts, Zhongji's argument that Commerce acted in a reasonable manner is untenable.

NONCONFIDENTIAL
VERSION

Zhongji's second point that Commerce's preliminary results did allow parties to submit new factual information, because the agency had never invited parties to comment on the land benchmark information placed on the record, is incorrect. See Pls. Br. at 42. When Commerce placed land benchmark information and analysis on the record on July 29, 2019, the agency established a deadline of August 12, 2019, for interested parties to submit affirmative comments on the information, as well as a deadline of August 19, 2019, for interested parties to submit rebuttal comments. See Memorandum to the File from John C. McGowan, re: Comment Period for Analysis/Benchmark Memos Placed on the Record (Aug. 2, 2019) (P.R. 133). Commerce's establishment of these deadlines was in accordance with section 351.301(c)(4) of its regulations, which provide an interested party with "one opportunity to submit factual information to rebut, clarify or correct factual information placed on the record of the proceeding by the Department by the date specified." 19 C.F.R. § 351.301(c)(4). Further, Zhongji submitted benchmark information relating to land valuation on April 1, 2020. See Zhongji Benchmark Submission at 6-7, Exhs. 12-14. (C.R. 205-209, 215-217; P.R. 311-314). Thus, Zhongji was afforded multiple opportunities to submit information on land valuation and did so in its initial benchmark submission.

In light of these facts, Zhongji's reliance on Grobest & I-Mei and Timken is misplaced. See Pls. Br. at 44-45 (citing Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT 98, at 123, 815 F. Supp. 2d 1342, 1365 (2012) ("Grobest & I-Mei") and Timken United States Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("Timken")). While the Court in Grobest & I-Mei recognized a limit to Commerce's discretion to reject untimely information based on "the interests of accuracy and fairness," the courts have also sustained Commerce's rejection of untimely information where a party has had an opportunity to be heard. For example, in Dongtai

Peak Honey Indus. v. United States, the Federal Circuit rebuffed Dongtai Peak's "fairness and

accuracy" argument and upheld Commerce's rejection of untimely information, finding:

> {t}his court has made clear Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply. See PSC VSMPO, 688 F.3d at 761-62. Here, the record shows Dongtai Peak was afforded both notice and a meaningful opportunity to be heard. . . .
>
> Accordingly, because Dongtai Peak failed to establish good cause with respect to its failure to submit its extension requests in a timely manner, Commerce reasonably exercised its discretion in rejecting the requests and in enforcing the applicable deadline.

Dongtai Peak Honey Indus. v. United States, 777 F.3d 1343, 1353 (Fed. Cir. 2015).   Here,

Zhongji was similarly granted a "meaningful opportunity to be heard," which it exercised in both

its April 1, 2020 benchmark submission and its April 13, 2020 rebuttal benchmark comments.

See IDM at 22-23.

Nor does Timken establish a bright-line rule obligating Commerce to accept corrections

to record evidence.   See Timken, 434 F.3d at 1353 ("Finally, the convenience of the bright-line

rule that Commerce advocates is troubling.").   Rather, the courts have emphasized limitations on

untimely information when the parties had already been afforded an opportunity to provide it.

See Seah Steel Vina Corp. v. United States, 950 F.3d 833, 844 (Fed Cir. 2020) (finding

Commerce did not abuse its discretion when it declined to reopen the record for respondent's

untimely factual information) (citing Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed.

Cir. 2012) (explaining that Commerce does not abuse its discretion when it declines "to reopen

the record after it had long since closed" for evidence the respondent could have but did not

previously provide and that Commerce was not "required under 19 C.F.R. § 351.301(c)(4) to

allow belated rebuttal of evidence already on the record") (citing <u>PSC VSMPO-Avisma Corp. v.
United States</u>, 688 F.3d 751, 761 (Fed. Cir. 2012)).

For these reasons, Zhongji's contention that Commerce's rejection of its submission was
an abuse of the agency's discretion is unavailing.   <u>See</u> Pls. Br. at 43-44.   Commerce's
notification of Zhongji that the submission of new factual information was not permitted served
to correct an error in language included in the preliminary results memorandum.   Commerce's
correction of that language would only have been "unreasonable" if the parties had not been
afforded an opportunity to submit factual information regarding land benchmarks.   Here, the
parties had multiple opportunities to do so, and Zhongji took advantage of those opportunities.
Accordingly, the Court should reject Zhongji's request to reopen the record to allow for its
rejected land benchmark.

## V.      CONCLUSION

For these reasons, the Court should deny Zhongji's motion for judgment on the
administrative record and should sustain the <u>Final Results</u> in their entirety.

Respectfully submitted,

*John M. Herrmann*

JOHN H. HERRMANN
GRACE W. KIM

Counsel to Defendant-Intervenors

Dated:  February 17, 2022

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's June 15, 2021 Order (ECF No. 26), setting the word limitation to Defendant-Intervenors' Response Brief to 10,000 words, counsel for Defendant-Intervenors, the Aluminum Association Trade Enforcement Working Group and its individual members (JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC) certifies that this Response Brief contains 7,327 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

/s/John M. Herrmann
JOHN M. HERRMANN
GRACE W. KIM
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  February 17, 2022