## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. ET AL., | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | **Ct. No. 21-00133** |
| | ) | **Nonconfidential Version** |
| **Defendant,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD ON BEHALF OF PLAINTIFFS JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. (F/K/A JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD.), JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD. AND ANHUI MAXIMUM ALUMINIUM INDUSTRIES COMPANY LIMITED**

Jeffrey S. Grimson
Sarah M. Wyss
Yixin (Cleo) Li
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

March 31, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ...................................................................................................................... 1

**I.   COMMERCE'S DECISION TO REJECT ZHONGJI'S ADDITIONAL BENCHMARK SUBMISSION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** .............................................. 1

    A.    Commerce's Regulations Unambiguously Allow Parties to Submit Benchmark Data Thirty Days Before the Preliminary Results ................................................. 1

    B.    Even if Zhongji's Submission Constituted Untimely Rebuttal Information, Commerce Abused its Discretion by Rejecting it ............................................... 6

**II.   COMMERCE'S USE OF TDM DATA TO CALCULATE THE ALUMINUM SHEET/PLATE BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** .................................................. 8

**III.   COMMERCE'S USE OF THE AVERAGE OF GTA AND COMTRADE DATA UNDER HTS SUBHEADINGS 7601.10 AND 7601.20 TO CALCULATE THE PRIMARY ALUMINUM BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** .................................................. 13

**IV.   COMMERCE'S DECISION TO USE AN OUTDATED REPORT TO CALCULATE ITS LAND BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** .................................................. 15

    A.    Commerce's Use of the 2010 CBRE Report and Rejection of the 2016-2018 CBRE Reports and the Nexus Reports Was Unsupported by Substantial Evidence and Not in Accordance with Law ................................................................................ 15

    B.    Commerce's Rejection of the Land Information to Rebut, Clarify or Correct Information Submitted by Zhongji in Response to the Request by Commerce Was Unsupported by Substantial Evidence and Not in Accordance with Law ...................... 21

**CONCLUSION** ..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

Arellano v. McDonough,
  1 F.4th 1059 (Fed. Cir. 2021) ................................................................. 6
Changzhou Trina Solar Energy Co. v. United States,
  __ CIT __, 352 F. Supp. 3d 1316 (2018) ................................................ 9
Fine Furniture (Shanghai) Ltd. v. United States,
  36 CIT 1206, 865 F. Supp. 2d 1254 (2012) ....................................... 7, 22
Fuwei Films (Shandong) Co. v. United States,
  35 CIT 1229, 791 F. Supp. 2d 1381 (2011) ............................................ 3
Grobest & I-Mei Indus. (Vietnam) Co. v. United States,
  36 CIT 98, 815 F. Supp. 2d 1342 (2012) ................................................ 6
Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,
  __ CIT __, 415 F. Supp. 3d 1195 (2019) ................................................ 3
Hamdan v. Rumsfeld,
  548 U.S. 557 (2006) ............................................................................... 6
Jinxiang Yuanxin Imp. & Exp. Co., Ltd. v. United States,
  37 CIT 917 (2013) ................................................................................ 22
NMB Sing. Ltd. v. United States,
  557 F.3d 1316 (Fed. Cir. 2009) ............................................................ 19
NTN Bearing Corp. v. United States,
  74 F.3d 1204 (Fed. Cir. 1995) ................................................................ 6
RHP Bearings v. United States,
  288 F.3d 1334 (Fed. Cir. 2002) ......................................................... 4, 20
Shelter Forest Int'l Acquisition, Inc. v. United States,
  __ CIT __,497 F. Supp. 3d 1388 (2021) ............................................ 5, 23
Timken United States Corp. v. United States,
  434 F.3d 1345 (Fed. Cir. 2006) .............................................................. 7
Yantai Timken Co. v. United States,
  31 CIT 1741, 521 F. Supp. 2d 1356 (2007) ............................................ 7

**Statutes**

19 U.S.C. § 1677(5) ..................................................................................... 8

**Regulations**

19 C.F.R. § 351.301(c)(2) ............................................................................ 5
19 C.F.R. § 351.301(c)(3) ............................................................................ 5
19 C.F.R. § 351.511(a) ................................................................................. 8
19 C.F.R. 351.301(c)(2)(i) ........................................................................... 5

**Other Authorities**

Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017-2018, 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021) ................................................................................................................................... 2

Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019, 86 Fed. Reg. 73,249 (Dep't of Commerce Dec. 27, 2021) ................................................................................................................................... 14

Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019, 85 Fed. Reg. 37,829 (June 24, 2020) ................................. 18

Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018, 86 Fed. Reg. 6,866 (Jan. 25, 2021) .................................................................................................................................. 9

Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018) ................................................................................................................................... 14

Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From China: Final Results of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 17,382 (Apr. 25, 2019) ................................................................................................................................. 10

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) ................................. 4

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) ............................................... 9

Fine Denier Polyester Staple Fiber From India: Preliminary Results of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 12,936 (Dep't of Commerce Mar. 8, 2022) .......... 3

Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination, 72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007) . 17

Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) ............................................................................................... 14

Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Prelim. Affirmative CVD Determination and Alignment of Final CVD Determination with Final Antidumping Duty Determination, 74 Fed. Reg. 45,811 (Dep't of Commerce Sept. 4, 2009) ...................... 19

Pursuant to Rules 56.2 and 81 of the Rules of the U.S. Court of International Trade, Plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (F/K/A Jiangsu Zhongji Lamination Materials Stock Co., Ltd.), Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd. and Anhui Maximum Aluminium Industries Company Limited (collectively, "Zhongji"), reply to the response briefs of Defendant the United States and Defendant-Intervenors the Aluminum Association Trade Enforcement Working Group and its individual members (JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC) ("Aluminum Association").  See Def.'s Resp. to Pls.' Mot. for J. on the Admin. R. (Jan. 18, 2022), ECF No. 35 ("Def.'s Br."); Def.-Intervenors' Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. Upon the Admin. R. (Feb. 17, 2022), ECF No. 37 ("Def.-Intervenors' Br.").[1]

Neither the United States nor the Aluminum Association successfully defended the Department of Commerce's determination regarding (1) Zhongji's May 18 benchmark submission, (2) the benchmark for the aluminum sheet/plate for Less Than Adequate Remuneration ("LTAR") program, (3) the benchmark for the primary aluminum for LTAR program and (4) the benchmark for the land for LTAR program.  The Court should remand these issues to Commerce pursuant to Zhongji's arguments in its opening brief and below.

## ARGUMENT

**I. COMMERCE'S DECISION TO REJECT ZHONGJI'S ADDITIONAL BENCHMARK SUBMISSION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

### A. Commerce's Regulations Unambiguously Allow Parties to Submit Benchmark Data Thirty Days Before the Preliminary Results

Contrary to the United States' and the Aluminum Association's arguments, Commerce's

---

[1] All references to parties' briefs are to the nonconfidential version unless otherwise noted.

rejection of Zhongji's May 18 Benchmark Submission was unsupported by substantial evidence and not in accordance with law because the plain language of Commerce's regulations, reinforced by past practice, permits parties to submit benchmark information up until thirty days before the preliminary results.  There is no ambiguity in the benchmark deadline.  As explained in Zhongji's opening brief, the thirty-day deadline was automatically and irrefutably reset by Commerce's tolling of the Preliminary Results.  See Mem. of P. & A in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Pls. at 11-18 (Sept. 21, 2021), ECF No. 31 ("Zhongji Opening Br."); see also Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017-2018, 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021) ("Final Results"), and accompanying Dec. Mem. at Cmts. 5, 6 ("Final Dec. Mem.") (P.R. 390);[2] Mem. from Jeffrey I. Kessler to the Record re: Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19 (Apr. 24, 2020) ("Tolling Mem.") (P.R. 332).

The United States and the Aluminum Association wrongly claimed that the Tolling Memorandum did not reset the benchmark deadline because the memorandum did not apply to past deadlines and Zhongji had already submitted benchmark information on April 1, 2020 and rebuttal benchmark comments on April 13, 2020.  See Def.'s Br. at 26-27; Def.- Intervenors' Br. at 3-4.  Both the United States and the Aluminum Association latch onto the phrase "pending deadlines for actions by parties," to argue that the Tolling Memorandum did not toll the benchmark deadline.  See Def.'s Br. at 26-27; Def.- Intervenors' Br. at 3.  Both parties, however, misunderstood Zhongji's argument – the Tolling Memorandum did not extend the benchmark deadline; rather, Commerce's regulation unambiguously permitted parties to submit benchmark

---

[2] All references to record documents are to public version unless otherwise noted.

information until thirty days before the Preliminary Results irrespective of the fact that parties had already submitted benchmark information once earlier in the proceeding.  Simply put, the newly tolled deadline for the Preliminary Results reset the thirty-day benchmark deadline by law. See 19 C.F.R. § 351.301(c)(3)(ii) ("All submissions of factual information . . . to measure the adequacy of remuneration under § 351.511(a)(2), are due no later than 30 days before the scheduled date of the preliminary results of review." (emphasis added)); see also Fuwei Films (Shandong) Co. v. United States, 35 CIT 1229, 1231, 791 F. Supp. 2d 1381, 1385 (2011) (Commerce's regulation "carries the force of law and the court cannot simply ignore it.").  It was unnecessary for Commerce to expressly toll the benchmark deadline in the Tolling Memorandum because the benchmark deadline is tied to one thing and one thing only – the Preliminary Results.  By rejecting Zhongji's May 18 Benchmark Submission, Commerce adopted an interpretation that is contrary to the plain language of 19 C.F.R. § 351.301(c)(3)(ii) and that deserves no deference by this Court.  See Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, __ CIT __, __, 415 F. Supp. 3d 1195, 1212 (2019) (explaining that the Court will not accord deference to Commerce's interpretation if it is "inconsistent with the plain language of the regulation").

Nether the United States nor the Aluminum Association successfully distinguished this case from Commerce's established practice in which Commerce determined that its own extension of preliminary results resets the thirty-day benchmark deadline.  See Zhongji Opening Br. at 14-15 (citing cases where Commerce accepted benchmark submissions filed within the newly-set deadlines after the preliminary results extensions); see also Fine Denier Polyester Staple Fiber From India: Preliminary Results of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 12,936 (Dep't of Commerce Mar. 8, 2022), and accompanying Dec. Mem. at

12 n.56 (Commerce accepted Petitioners' <u>second</u> benchmark submission filed within the new thirty-day deadline after the extension of the Preliminary Results); <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination</u>, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012), and accompanying Issues and Dec. Mem. at Cmt. 10, p. 37 (in analogous circumstances, finding that "{t}he regulatory deadline for submitting new subsidy allegations is 40 days before the signature date of the preliminary determination. The preliminary determination in this investigation was extended by 65 days, and thus the deadline for new subsidy allegations was extended 65 days as well").  The Aluminum Association claimed that the current case is different from the cases cited in Zhongji's opening brief because "no party in the cases cited by Zhongji had filed rebuttal benchmark comments at the time when the preliminary results were extended and, therefore, the opportunity to submit benchmark information had not yet closed." Def.-Intervenors' Br. at 4.  The Aluminum Association did not, however, provide any support for this distinction nor explain why Zhongji's April 13 rebuttal benchmark closed the opportunity to file additional affirmative benchmark information prior to the Preliminary Results.  <u>Id.</u>  Because neither the United States nor the Aluminum Association was able to distinguish the current case from Commerce's past practice, Commerce's rejection of Zhongji's May 18 Benchmark Submission remains arbitrary and capricious because the agency treated this case differently from the above-cited cases without sufficient reasoning.  See <u>RHP Bearings v. United States</u>, 288 F.3d 1334, 1347 (Fed. Cir. 2002).

Further, the United States incorrectly maintained that Zhongji "exercised its 'one opportunity' to submit <u>rebuttal benchmark comments</u> on April 13, 2020."  Def.'s Br. at 27 (emphasis added) (citing 19 C.F.R. § 351.301(c)(3)(iv)).  Contrary to Commerce's regulations

governing <u>rebuttal</u> benchmark data, 19 C.F.R. § 351.301(c)(3)(iv), Commerce's regulation governing <u>affirmative</u> benchmark information, 19 C.F.R. § 351.301(c)(3)(ii), do not specify that parties have "one opportunity" to submit benchmark information. The United States either ignored or misunderstood the record in making this claim. In the rejected submission, Zhongji submitted "<u>additional</u> benchmark information," not rebuttal information. <u>See</u> Letter on Behalf of Zhongji to Commerce re: Additional Benchmark Submission (May 18, 2020) ("May 18 Benchmark Submission") (P.R. 336) (emphasis added).[3] Further, the factual information in Zhongji's May 18 submission was provided for Commerce's use in valuing the benchmarks and not in response to either Petitioners' benchmark submission or Zhongji's April 1 benchmark submission. <u>See</u> May 18 Benchmark Submission at 2-4 (P.R. 336) (providing quality certifications of Zhongji's primary aluminum purchases and aluminum sheet/plate purchases, which directly inform Commerce's benchmark price selection). This information simply was not rebuttal information as the United States suggested and, therefore, Zhongji was not restricted by the "one opportunity" language in the rebuttal benchmark provision of Commerce's regulations, 19 C.F.R. § 351.301(c)(3)(iv).

Moreover, Commerce's affirmative benchmark regulation does not authorize Commerce to adjust the thirty-day benchmark deadline, as is the case with other subsections that employ this language: "unless the Secretary alters this time limit." <u>Compare</u> 19 C.F.R. § 351.301(c)(3)(ii) <u>with</u> 19 C.F.R. § 351.301(c)(2)(i), (ii)(A), (iv)(B). Because Commerce excluded the phrase

---

[3] As explained in Zhongji's opening brief, Zhongji cites to the rejected submission in the same manner as the Plaintiff in <u>Shelter Forest Int'l Acquisition, Inc. v. United States</u>, in which the Court allowed Plaintiff to reference the rejected document in its briefs and to include the document in the Joint Appendix. <u>See</u> Mem. and Order, Ct. No. 19-00212, ECF No. 73 (Oct. 15, 2020); <u>Shelter Forest Int'l Acquisition, Inc. v. United States</u>, __ CIT __, __, 497 F. Supp. 3d 1388, 1401-02 (2021). Similarly, in the Joint Appendix filed in this case, Zhongji will include the original filing for the Court's reference and consideration.

"unless the Secretary alters this time limit" from section 351.301(c)(3)(ii), but included it in the other sections referenced above, the Court must infer Commerce purposely left this phrase out and did not intend any exception to the thirty-day benchmark rule.  See Arellano v. McDonough, 1 F.4th 1059, 1083 (Fed. Cir. 2021) (citing Hamdan v. Rumsfeld, 548 U.S. 557, 578 (2006)) ("A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.").

Based on the plain language of Commerce's regulations and its past practice, there can be no doubt that, by tolling the Preliminary Results deadline, the thirty-day deadline for affirmative benchmark submissions was reset by regulation and Commerce acted contrary to law in rejecting Zhongji's May 18 Benchmark Submission.

### B. Even if Zhongji's Submission Constituted Untimely Rebuttal Information, Commerce Abused its Discretion by Rejecting it

The Aluminum Association wrongly argued that Commerce did not abuse its discretion in rejecting Zhongji's May 18 Submission.  Def.-Intervenors' Br. at 5.  Even if the Court construes Zhongji's May 18 submission as untimely, Commerce still abused its discretion when rejecting Zhongji's submission.  See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1207 (Fed. Cir. 1995) (stating that the deadline "must be waived where failure to do so would amount to an abuse of discretion").

When considering whether Commerce's rejection of untimely information amounts to abuse of discretion, the Court weighs the burden of late submissions on Commerce and the need for finality against the statutory goal for accuracy and fairness.  Grobest & I-Mei Indus. (Vietnam) Co. v. United States, 36 CIT 98, 123, 815 F. Supp. 2d 1342, 1365 (2012).  The Court of Appeals for the Federal Circuit made clear that the interest of finality does not arise in

preliminary results stage.  See Timken United States Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  There was essentially no burden on Commerce to review a 21-page filing with two exhibits clarifying the purity level of Zhongji's primary aluminum purchases and alloy levels of Zhongji's aluminum sheet/plate purchases.  See May 18 Benchmark Submission (Business Proprietary Document) (C.R. 223).  The value of the information, however, was high - this clarifying information was critical for Commerce to select the benchmarks and ensure the accuracy of the benefits calculation.  See infra Section II & III.  Thus, Commerce abused its discretion when rejecting Zhongji's May 18 Submission under the Grobest balancing test.

In addition, this case is materially different from the two cases cited by the Aluminum Association.  See Def.-Intervenors' Br. at 5.  In Yantai Timken, the Court upheld Commerce's rejection of new factual information ("NFI") submitted after the Preliminary Results, long after the deadline for NFI had passed.  See Yantai Timken Co. v. United States, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1371 (2007).  The May 18 Benchmark Submission in this case, however, was filed within the thirty-day deadline before the Preliminary Results.  The facts here are also distinguishable from the Fine Furniture case.  Although the Court in Fine Furniture acknowledged that Commerce has discretion to set and enforce its regulatory deadlines, the Court also stated that "Commerce's discretion in rejecting untimely information is not absolute." Fine Furniture (Shanghai) Ltd. v. United States, 36 CIT 1206, 1218, 865 F. Supp. 2d 1254, 1267 (2012).  The Court remanded Commerce's decision and found that Commerce's failure to consider NFI submitted by plaintiffs after the Preliminary Determination in that case "amounts to an abuse of discretion."  Id.  The facts in Fine Furniture, therefore, do not support Aluminum Association's claim.

In sum, Commerce unlawfully rejected Zhongji's May 18 Submission because it was

submitted timely, well within the thirty-day deadline before the Preliminary Results.  Even if the

Court decides that the submission was untimely, Commerce abused its discretion in rejecting it

because the interest of accuracy outweighs any burden on Commerce and there was no interest of

finality in preliminary results stage.

## II.   COMMERCE'S USE OF TDM DATA TO CALCULATE THE ALUMINUM SHEET/PLATE BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's calculation of the benchmark for the aluminum sheet/plate program using

the Trade Data Monitor ("TDM") data covering HTS subheading 7606.12 was unsupported by

substantial evidence and not in accordance with law because the TDM data include a significant

volume of data from irrelevant alloy grades not used by Zhongi.  Zhongji Opening Br. at 18-26.

By comparison, the Commodities Research Unit ("CRU") Report contain prices of alloy 1050

that are specific to the alloy grades used by Zhongji.  Nothing in the responses by the United

States or the Aluminum Association successfully refute that the CRU data are the only data on

the record that accurately estimate the "goods or services" allegedly provided for LTAR, here

aluminum sheet/plate.  See 19 U.S.C. § 1677(5)(E)(iv); 19 C.F.R. § 351.511(a)(1).

The Aluminum Association was wrong in stating that "Zhongji's insistence that the

benchmark must be 'product-specific' misinterprets the law" and "{n}either the law nor

Commerce's regulations require that the benchmark be identical (i.e., 'specific') to the good in

question, only that the product be 'comparable.'"  Def.-Intervenors' Br. at 9.  First, Zhongji is

not arguing that the selected benchmark must be identical to aluminum sheet/plate purchases by

Zhongji, but rather that Commerce failed to properly consider factors affecting comparability

when selecting benchmarks overinclusive of nonspecific products.  The Trina I Court in

discussing an aluminum benchmark determined that product specificity of benchmarks is a "vital

comparability concern{}." See Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018) ("Trina I").   Further, although "some degree of nonspecificity is tolerable," a dataset cannot be "vastly overinclusive" of irrelevant products. See id.; see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying Issues and Dec. Mem. at Cmt. 6 ("Solar 2AR CVD") ("{Commerce} normally attempts to rely on data reflecting the narrowest category of products encompassing the input product, where possible.").   Thus, although Commerce was not obligated to select benchmarks identical to Zhongji's purchases, its selection of the TDM data was still unsupported by substantial evidence and not in accordance with law because the TDM data are overinclusive and do not provide for grade of the aluminum sheet/plate purchases, a vital comparability concern.

Second, Commerce has a robust practice of using product-specific benchmarks in the past.   Specifically, Commerce has recognized that the grade of a particular product can determinate of comparability.   See Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2018, 86 Fed. Reg. 6,866 (Jan. 25, 2021), and accompanying Issues and Dec. Mem. at Cmt. 1, pp. 14-15 ("CWP from Turkey") ("Borusan Companies have also provided product catalogues and invoices, which demonstrate that X-series grade and non-X-series grade {hot rolled steel ("HRS")} each possess distinct physical characteristics and, thus, the two HRS grades are not comparable . . . Product grade, which in this case manifests itself in the form of X-series and non-X-series grade HRS, affects comparability."); Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From China: Final Results of Countervailing Duty

Administrative Review; 2016, 84 Fed. Reg. 17,382 (Apr. 25, 2019) ("PVLT from China"), and

accompanying Dec. Mem. at 6 (relying on "grade-specific rubber benchmarks in certain

instances where the record clearly indicated the grade purchased by the respondent").

Similar to the evidence available in the above-cited determinations, Commerce had a

chemical analysis establishing that the alloy grades purchased by Zhongji, [ ████████ ],

have a more similar aluminum purity level to alloy 1050 than other alloy grades, making the

CRU Report the only comparable benchmark source because the CRU Report presents alloy

1050 price data and the TDM data based on HTS subheading 7606.12 are overinclusive.  See

Zhongji Opening Br. at 22-24.  The record evidence supporting this argument is substantial and

includes the following:

- According to the International Trade Commission ("ITC") Aluminum Report,
  plate, sheet and strip under HTS subheading 7606.12 cover a universe of products
  such as unalloyed series 1XXX, non heat treatable (alloy series 3XXX, 5XXX),
  heat treatable (alloy series 2XXX, 7XXX), heat treatable (alloy series 6XXX),
  and other plate and sheet products.  See Letter on Behalf of Zhongji to Commerce
  re: Benchmark Submission at Ex. 10, p. 519 ("Zhongji Benchmark") (P.R. 311-
  314).

- The ITC Aluminum Report illustrates the major alloying metal for each series,
  from series 2XXX to 8XXX.  Id.  at Ex. 10, pp. 530-31, Table I.1.  The alloying
  metal is the major cause of a lower aluminum purity level of the aluminum alloys.
  See id. (Series 1XXX (unalloyed) has a minimum aluminum content of 99
  percent); id. at Ex. 9 (For example, the content of the major alloying metal Silicon
  for series 4XXX is up to 21.5 percent and the content of the major alloying metal
  Zinc for series 7XXX is up to 12 percent).

- Alloy series 2XXX to 7XXX, on average, have significantly lower aluminum
  purity than series 1XXX, which has a minimum aluminum content of 99 percent.
  Id. at Ex. 9 (specifying that the aluminum content level of alloy 1050 (CRU
  Report data ) is 99.5%); Zhongji Opening Br. at 23 n.4.

- In addition, the International Alloy Designation Standard shows that alloy series
  8XXX has aluminum content level closer to 99 percent, while series 2XXX to
  7XXX have much lower aluminum content level than 99 percent.  See Zhongji
  Benchmark at Ex. 9 (P.R. 311-314).

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

- Alloy series 1XXX and 8XXX, therefore, have higher aluminum purity level than series 2XXX to 7XXX.

To summarize, the aluminum content in alloy 1050 (CRU Report data) is 99.5%, and the aluminum content in alloys [ ███ ███ ███ ████ ████ ██ ███ ████ ███████████████ ]. See id. (For [ ██████ ], the aluminum purity is calculated as a remainder after all other elements have been removed.). The purity level of alloy [ ████ ██████████████████████████████ ]. See id. Thus, the TDM data covering all alloys under the HTS subheading 7606.12, including 2XXX series to 7XXX series, are not comparable to Zhongji's input price. By failing to consider this grade-specific information in selecting the comparable benchmark, as it did in CWP from Turkey and PVLT from China, Commerce rendered its determination unsupported by substantial evidence and arbitrary.

Even if "there is variation in the aluminum content of the products purchased by Zhongji," as the United States points out, Def.'s Br. at 29 (citing Final Dec. Mem. at 22 (P.R. 390)), this aluminum content variation does not undermine the fact that [ █████████████ ██████████████████████ ], significantly higher than series 2XXX to 7XXX alloys. See May 18 Benchmark Submission at Ex. 2 (Business Proprietary Document) (C.R. 223) (The quality certificates of Zhongji's purchase, [ ███████████████ ██████████████████████████ ].). Moreover, even though Zhongji did not purchase alloy 1050 aluminum sheet represented in the CRU Report, Def.-Intervenors' Br. at 12-13, alloy 1050 is more specific to Zhongji's purchases of alloys [ █████ ], making the CRU Report the only comparable source. Commerce's selection of the overinclusive TDM data, therefore, was unsupported by substantial evidence and not in accordance with law.

11

In addition, even if the Court upholds Commerce's use of the TDM data, the Court must still find that Commerce's determination was unsupported by substantial evidence because Commerce failed to only include data from countries that actually produce and export aluminum sheet/plate, which are [ ██████████████████████████████ ██████ ].  See Zhongji Benchmark at 5, Ex. 11 (Business Proprietary Document) (C.R. 205-209, 215-217).  The United States argues that the affidavit submitted by Zhongjhi to support this argument was insufficient, see Def.'s Br. at 30.  Zhongji, however, attested to the accuracy of the affidavit by certifying the submission and there is no contrary information on the record refuting the producing countries named in the affidavit.  See id. at Company Certification (P.R. 311-314). In addition, the Aluminum Association claimed that Commerce properly denied Zhongji's proposed revision to the TDM data because the record [ ██████████████████████ ██████ ].  See Def.-Intervenors' Br. at 14, ECF No. 36 (Feb. 17, 2022) (Confidential Version).  This is unpersuasive because, even if Zhongji's propose revision does not create a perfect benchmark source, it still would narrow the over-inclusive TDM data into a more accurate benchmark for the aluminum plate/sheet allegedly purchased for LTAR and, therefore, Commerce was unsupported by substantial evidence in rejecting this proposal.

In sum, Zhongji provided a detailed analysis of the closeness between alloy 1050 and its purchases – [ ████████████████ ] - based on comparison of aluminum content.  Commerce's use of the TDM data ignores the grade-specific information on the record, and was unsupported by substantial evidence and not in accordance with law.  The Court should remand this issue for Commerce to reconsider its rejection of the CRU Report, or, alternatively, to use the TDM data of only countries that produce and export aluminum sheet/plate.

III.   **COMMERCE'S USE OF THE AVERAGE OF GTA AND COMTRADE DATA UNDER HTS SUBHEADINGS 7601.10 AND 7601.20 TO CALCULATE THE PRIMARY ALUMINUM BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

Neither the United States nor the Aluminum Association successfully defended Commerce's selection of the primary aluminum benchmark.  Despite their responsive arguments, Commerce's benchmark calculation for the primary aluminum program using the average of the Global Trade Atlas ("GTA") and Comtrade data under HTS subheadings 7601.10 and 7601.20 remains unsupported by substantial evidence and not in accordance with law because the HTS subheadings are not specific to the primary aluminum used by Zhongji.  See Zhongji Opening Br. 27-30.

The United States and the Aluminum Association argued that Zhongji did not produce evidence that it used only primary aluminum with a minimum aluminum content of 99.7 percent, justifying Commerce' rejection of the LME data.  See Def.'s Br. at 31-32; Def.-Intervenors' Br. at 16.  Critically, however, Zhongji tried to submit the very information that the United States and the Aluminum Association now claim was missing.  See supra Section I.  Specifically, Zhongji reported purchases of primary aluminum with [ ████████████████████ ████████████████████ ], which are superior to the aluminum content of the primary aluminum reported by LME.  See May 18 Benchmark Submission at Ex.1 (Business Proprietary Document) (C.R. 223).  Thus, Zhongji proffered evidence showing its primary aluminum purchases with a minimum aluminum content of 99.7 percent.

Even though "there is no requirement that the benchmark be identical to the good provided by the foreign government," Def.-Intervenors' Br. at 15, Commerce has established a practice of using data under the most accurate and the narrowest product category in measuring the adequacy of remuneration of a subsidy program.  See Solar 2AR CVD at Cmt. 6 (relying on

"data reflecting the narrowest category of products encompassing the input product, where possible"); Multilayered Wood Flooring from the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020), and accompanying Issues and Dec. Mem. at Cmt. 6 ( "Commerce's practice is normally to rely on data reflecting the narrowest category of products encompassing the input product").  Notably, Commerce in the second administrative review of this case used the LME data for the respondent's unalloyed aluminum with the minimum aluminum content of 99.7 percent, and to use the HTS subheading 7601.20 for the respondent's alloyed aluminum.  See Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019, 86 Fed. Reg. 73,249 (Dep't of Commerce Dec. 27, 2021), and accompanying Issues and Dec. Mem. at Cmt. 8, pp. 55-56. Commerce's refusal to use the LME data reflective of Zhongji's primary aluminum purchases was an arbitrary and capricious deviation from its past practice that must be overturned by this Court.  See RHP Bearings, 288 F.3d at 1347.

Alternatively, Commerce's refusal to use the GTA and Comtrade data under only HTS subheading 7601.10 was unsupported by substantial evidence and not in accordance with law because Zhongji's primary aluminum is unalloyed.  See Zhongji Opening Br. at 29-30; see also Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 9,274 (Dep't of Commerce Mar. 5, 2018), and accompanying Issues and Dec. Mem. at Cmt. 16 (In the original investigation, Commerce revised the benchmark to include only unalloyed aluminum ingot, HTS subheading 7601.10, after verifying that respondents' purchases were limited to unalloyed aluminum).  Even though Zhongji's Section III Questionnaire Response did not provide "information regarding the alloy

14

specifications of its primary aluminum purchases," Def.-Intervenors' Br. at 16, the ITC aluminum report establishes that unalloyed aluminum as "{p}ure aluminum containing at least 99 percent aluminum by weight."  Zhongji Benchmark at Ex. 10, p. 25 (Public Version) (P.R. 311-314).  This definition, coupled with the May 18 Benchmark Submission showing that the aluminum purity of Zhongji's primary aluminum was above 99 percent, conclusively establishes that Zhongji's primary aluminum is unalloyed aluminum, *i.e.*, HTS 7601.10.

For the reasons explained above, Commerce's averaging of GTA and Comtrade data covering HTS subheadings 7601.10 and 7601.20 was unsupported by substantial evidence and not in accordance with law.  The Court should remand this issue for Commerce to reconsider its benchmark selection for primary aluminum.

## IV.   COMMERCE'S DECISION TO USE AN OUTDATED REPORT TO CALCULATE ITS LAND BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

The United States and the Aluminum Association did not successfully defend (1) Commerce's selection of the 2010 Asian Marketview reports by CB Richard Ellis ("2010 CBRE Report") over the 2017-2018 CBRE Reports and the 2018 MarketBeat Bangkok Industrial Reports compiled by Nexus Innovative Real Estate Solutions ("Nexus Reports"), or (2) Commerce's rejection of Zhongji's additional land benchmark submission.

### A.   Commerce's Use of the 2010 CBRE Report and Rejection of the 2016-2018 CBRE Reports and the Nexus Reports Was Unsupported by Substantial Evidence and Not in Accordance with Law

In response to Zhongji's contemporaneity argument, both the United States and the Aluminum Association argued that the 2010 CBRE Report data correspond more closely to the actual years of Zhongji's reported land purchases.  See Def.'s Br. at 25; see also Def.-Intervenors' Br. at 20 (Confidential Version).  This argument misses the point because, even if land purchases

15

occurred prior to the period of review ("POR"), Commerce allocates the benefit received <u>during</u> the POR and, therefore, the benchmark must reflect the POR.   <u>See</u> Mem. from John C. McGowan to the File re: Prelim. Results Calcs. at 7 (June 17, 2020) (P.R. 346) ("Because the benefits passed the 0.5 percent test in all instances, we allocated the benefits over the 50-year land-use rights period and determined the benefit allocable to the POR.").  The 2016-2018 CBRE Reports and the Nexus Reports are undoubtedly more contemporaneous to the POR than the 2010 CBRE Report.

In addition to the fatally outdated prices, Commerce's selection of <u>Thailand</u> as a source for its tier-three benchmark was flawed as well.  The United States failed to meaningfully engage with the record in its response, and instead shallowly defended Commerce' selection of the Thai data in the 2010 CBRE Report by stating that "{i}t is within Commerce's discretion to weigh the relevant factors."  Def.'s Br. at 22 (internal citation omitted).  Zhongji does not simply disagree with how Commerce weighed factors, but argues that Commerce's determination was unsupported by substantial evidence because the agency's analysis of the comparability factors was flawed and unexplained.  In the Final Results, Commerce stated that it "consider{s} the extent to which proposed benchmarks represent prices in a comparable setting (e.g., a country's geographic proximity to China and the level of economic development comparable to China)."  Final. Dec. Mem. at Cmt. 8, p. 32 (P.R. 390) (internal quotation marks omitted).  Commerce further cited Laminated Woven Sacks from China where, it claimed, the agency "conducted an in-depth analysis of the economic comparability in the context of a CVD proceeding and finds Thailand {} comparable in terms of e.g., industrial land prices, per capita income, population density, stages of economic development, *etc.*"  <u>Id.</u> (citing <u>Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination;</u>

<u>Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of</u>
<u>Final Countervailing Duty Determination With Final Antidumping Duty Determination</u>, 72 Fed.
Reg. 67,893 (Dep't of Commerce Dec. 3, 2007) ("LWS from China")); <u>see also</u> <u>Certain</u>
<u>Aluminum Foil From the People's Republic of China: Preliminary Results of the Countervailing</u>
<u>Duty Administrative Review and Rescission the Review, in Part; 2017-2018</u>, 85 Fed. Reg.
38,861 (Dep't Commerce June 29, 2020) (P.R. 355), and accompanying Dec. Mem. at 16
("Prelim. Dec. Mem.") (P.R. 343).    The LWS from China decision was from 2007,
approximately ten years outdated from the POR in this case.   In addition, the underlying data
supporting this 2007 decision on Thailand's economic comparability with China were even older:
(1) Commerce decided that Thailand and China have similar GNIs based on 2006 data; (2)
Commerce decided that population density of Thailand and China was comparable based on data
from 2000 and 2004 and (3) Commerce tracked investor perception using data from 2005 and
2006.  <u>LWS from China</u>, 72 Fed. Reg. at 67, 909.

Further, Commerce did not update the economical comparability decision regarding
Thailand in its Land Analysis Memorandum in this review.   Mem. from John C. McGowan to
the File re: Land Analysis Mem. at Attach. 1, p. 30 (July 29, 2019) (Public Document) (P.R. 60-
72) ("Land Analysis Mem.") (relying solely on LWS from China for comparisons of GNIs,
population density and investor perception).   Thus, while Commerce claimed that "Zhongji
provides no information demonstrating that {Mexico and Brazil} are more economically
comparable to China than Thailand," Commerce's own decision on Thailand's economic
comparability was unjustifiably outdated and unsupported by substantial evidence.  Final. Dec.
Mem. at Cmt. 8, p. 32 (P.R. 390).

The United States and the Aluminum Association also failed to persuasively counter Zhongji's claim that Brazil and Mexico are economically comparable to China and Thailand, currently, is not.  See Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019, 85 Fed. Reg. 37,829 (June 24, 2020), and accompanying Dec. Mem. at 11 ("Foil 1AR AD Prelim. Dec. Mem.") (establishing that Brazil and Mexico are on the surrogate country list in Commerce's parallel antidumping ("AD") review and Thailand is not).  The United States merely stated the obvious - that Commerce's surrogate country selection practice and Commerce's benchmark selection practice are different.  See Def.'s Br. at 24.  Despite different legal frameworks in AD and CVD proceedings, Commerce's surrogate country determination in the parallel AD proceeding is undoubtedly relevant because it was based on "per capita GNI," one of the factors that Commerce listed for determining economic comparability in this CVD case.  Id.; see also Final. Dec. Mem. at Cmt. 8, p. 32 (P.R. 390).  In addition, the per capita GNI data used in the parallel AD review were from the yearly-updated World Bank's World Development Report.  Foil 1AR AD Prelim. Dec. Mem. at 10. Therefore, Commerce's reliance on the 2010 CBRE Report was unsupported by substantial evidence because Commerce's economic comparability decision on Thailand was based on outdated data.

Not only was Commerce's economic comparability decision unsupported by substantial evidence, but Commerce failed to explain why geographic proximity was important for benchmark selection.  Final. Dec. Mem. at Cmt. 8, p. 32 (P.R. 390) (conclusively stating that "unlike Thailand, Mexico and Brazil are oceans apart from, and thus not geographically proximate to, China").  The United States only repeated Commerce's insufficient, conclusive

reasoning and the Aluminum Association did not even attempt to defend Commerce.  Def.'s Br. at 24; Def.-Intervenors' Br. at 18-20.  Conclusive statements, however, are not "reasonably discernable" explanation of Commerce's decision.  See NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citation omitted).

In addition, the United States argued that the 2016-2018 CBRE Reports "pertain{} to 'logistics rent' not land prices,"  Def.'s Br. at 24, but this fails for two reasons.  First, Commerce has a practice of using rental prices for land benchmarks.  See Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Prelim. Affirmative CVD Determination and Alignment of Final CVD Determination with Final Antidumping Duty Determination, 74 Fed. Reg. 45,811, 45,815 (Dep't of Commerce Sept. 4, 2009) (using two rental reports for the land benchmark).  Second, Commerce rejected the 2016-2018 CBRE Reports because they consist of "'logistics rent' but not 'manufacturing facilities'" without explaining why land benchmarks had to include prices for manufacturing facilities.  Final Dec. Mem. at Cmt. 8, p. 32 (P.R. 390).  Commerce's apparent insistence that the benchmark source must reflect "manufacturing facilities" is entirely inconsistent with the broad land LTAR purchases that it required Zhongji to report, namely any "acquired or leased {} land-use rights" in the Section III Questionnaire, including a "facility or office."  See Letter on Behalf of Commerce to Mr. Gu Yu re: Initial Questionnaire at III-12 (Aug. 5, 2019) (P.R. 134).  Commerce's rejection of the 2016-2018 CBRE Reports because they omit prices for one type of facilities was unreasonable and unsupported where Commerce collected land use data from Zhongji for all types of facilities and office space.  Even if the 2016-2018 CBRE Reports do not contain prices for all types of facilities and offices, this minor imperfection does not detract from the fact that they are the only usable source in this review because the 2010 CBRE Report is outdated in terms of both prices and Commerce's economic comparability

decision.  See Land Analysis Mem. at Attach. I, p. 31 (P.R. 60-72) (acknowledging that the preferable industrial land prices are difficult to find).

With regard to the Nexus Reports, the United States claimed that Commerce was justified in rejecting this source because Zhongji provided "no explanation of the methodology used to collect the data," Def.'s Br. at 25 (citing Final Dec. Mem. at 32 (P.R. 390)), but in fact Commerce's determination was arbitrary because Commerce accepted TDM data despite a similar flaw.  Commerce accepted TDM data, which similarly did not include the explanation of the methodology used to collect the data.  See Letter on behalf of Aluminum Association to Commerce re: Pet'rs' Submission of Factual Information to Measure Adequacy of Remuneration at Attach. 1 (Apr. 1, 2020) (P.R. 307-310); see also RHP Bearings, 288 F.3d at 1347.

In addition, and as explained fully in Section IV.B below, Commerce improperly rejected Zhongji's Additional Land Benchmark submission where Zhongji provided the relevant information to establish the Nexus Reports' background and credibility after the Preliminary Results.  See Letter on Behalf of Zhongji to Commerce re: Additional Benchmark Information (July 9, 2020) ("Zhongji Add'l Land Benchmark") (P.R. 357; C.R. 230).[4]  More specifically, NEXUS provides "{f}easibility and {m}arket {a}nalyses to help identify the probable outcomes of future property development or investment" and its "research measures and evaluates current and projected economic and market conditions impacting real estate."  Zhongji Add'l Land Benchmark at Ex. 1 (P.R. 357).  Zhongji also submitted additional datasets from other reputable real estate companies to corroborate the accuracy and reliability of the Nexus Reports data.  See id. at 3-4, Exs. 2-8.  Commerce, however, failed to consider this critical information and revise its benchmark in the Final Results.

---

[4] Zhongji cites to the rejected letter in the same manner as the respondent in Shelter Forest Int'l Acquisition, Inc. v. United States, Ct. No. 19-00212.

In sum, Commerce's rejection of the 2016-2018 CBRE Reports and the Nexus Reports was unsupported by substantial evidence and not in accordance with law because these were the only reasonable choices given the facts on the record. The Court should remand this issue for Commerce to reconsider its land benchmark selection.

### B. Commerce's Rejection of the Land Information to Rebut, Clarify or Correct Information Submitted by Zhongji in Response to the Request by Commerce Was Unsupported by Substantial Evidence and Not in Accordance with Law

Despite the responsive arguments made by the Aluminum Association and the United States, Commerce's rejection of Zhongji's submission of additional land benchmark information after the Preliminary Results remains unsupported by substantial evidence and not in accordance with law. See Zhongji Opening Br. at 41-45.

The Aluminum Association argued that "Commerce's regulations explicitly establish a deadline to submit factual information in regard to the measurement of the adequacy of remuneration prior to the issuance of the preliminary results." Def.-Intervenors' Br. at 21 (citing 19 C.F.R. § 351.301(c)(3)); id. at 23 (emphasizing that parties only have one opportunity to submit rebuttals) (citing 19 C.F.R. § 351.301(c)(4)). This argument is unavailing. The regulation explicitly grants Commerce the authority to "request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information." 19 C.F.R. § 351.301(a) (emphasis added). Commerce unequivocally reopened the record in the Preliminary Results when it "invite{d} parties to submit alternative benchmark data" for the land program to "provide information to rebut, clarify, or correct information in the Land Benchmark Analysis or the Land Benchmark Data Memorandum." Prelim. Dec. Mem. at 17-18 (P.R. 343) (citation omitted). Zhongji properly submitted the Additional Land Benchmark at this invitation of Commerce. In addition, Commerce has regularly solicited NFI after the

preliminary results/determination.  See, e.g., Fine Furniture, 36 CIT at 1217, 865 F. Supp. 2d at 1265-66; Jinxiang Yuanxin Imp. & Exp. Co., Ltd. v. United States, 37 CIT 917, 923 (2013). Zhongji's request for clarification also did not undermine Zhongji's later reliance on the language of the Preliminary Results, Def.-Intervenors' Br. at 22, because Commerce's response contradicts with the explicit language of the Preliminary Results and was, therefore, unreasonable.  Zhongji Opening Br. at 42.  Commerce cannot have the best of both worlds.  It cannot conveniently use its discretion to modify the regulatory deadline to submit factual information in the Preliminary Results as it did with regards to Zhongji's May 18 Benchmark Submission, and then arbitrarily claim its "obligation" to follow the regulatory deadline in the Final Results.

Even if the Court deems Zhongji's Additional Land Benchmark untimely, as discussed in Section I regarding Commerce's rejection of the May 18 Benchmark Submission, Commerce does not have unchecked authority to reject untimely corrective information.  Zhongji Opening Br. at 44-45 (elaborating that Commerce should accept Zhongji's Additional Land Benchmark under the Grobest & I-Mei balancing test).  The Aluminum Association wrongly claimed that Commerce did not abuse its discretion in rejecting this submission because "Zhongji was {} granted a 'meaningful opportunity to be heard,' which it exercised in both its April 1, 2020 benchmark submission and its April 13, 2020 rebuttal benchmark comments."  Def.-Intervenors' Br. 24 (citing Prelim. Dec. Mem. at 22-23 (P.R. 343)).  Zhongji, however, was not aware of the alleged deficiency in the Nexus Report until the Preliminary Results, where Commerce first claimed that "there is no explanation of the methodology used to collect the data used in the Nexus Report."  Prelim. Dec. Mem. at 17 (P.R. 343).  Zhongji then submitted this Additional Land Benchmark to substantiate the credibility and usability of the Nexus Reports.  See Shelter

Forest, __ CIT at __, 497 F. Supp. 3d at 1400-01 (finding that Commerce "abused its discretion" in rejecting the respondent's submission of the glue information after the Preliminary Determination because the respondent was not made aware of the deficiencies in its glue evidence until after the Preliminary Determination).

In conclusion, Commerce's rejection of Zhongji's submission of additional NFI was unsupported by substantial evidence and not in accordance with law.


## CONCLUSION

For the foregoing reasons, the Court should grant Zhongji's motion for judgment on the agency record and remand the Final Results for redetermination consistent with the points of law and record evidence discussed in Zhongji's opening brief and this reply brief.


Respectfully submitted,

Dated: March 31, 2022                    /s/ Jeffrey S. Grimson
                                         Jeffrey S. Grimson
                                         Sarah M. Wyss
                                         Yixin (Cleo) Li
                                         *Counsel to Zhongji*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,876 words.


Dated: March 31, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to Zhongji*