C-570-054
Remand
Slip Op. 23-41
**Public Version**
E&C/OVI:  TRW

***Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Co.,***
***(HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd.,***
***Jiangsu Huafeng Aluminium Industry Co., Ltd.,***
***and Anhui Maximum Aluminium Industries Company Limited, v. United States***,
**625 F. Supp. 3d 1355 (CIT March 21, 2023)**
**Certain Aluminum Foil from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination in accordance with the March 21, 2023, order of the United States Court of

International Trade (the Court or CIT) in *Jiangsu Zhongji Lamination Materials Co., Ltd.,*

*Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material*

*Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd., and Anhui Maximum Aluminium*

*Industries Company Limited v. United States*, Court No. 21-00133, Slip. Op. 23-41 (CIT August

27, 2020) (*Remand Order*).  This action arises out of the final results of the first administrative

review of the countervailing duty (CVD) order on certain aluminum foil from the People's

Republic of China (China),[1] covering the period of review (POR) August 14, 2017, through

December 31, 2018.[2]

---

[1] *See Certain Aluminum Foil from the People's Republic of China:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 FR 17360 (April 19, 2018) (*Order*).
[2] *See Certain Aluminum Foil from the People's Republic of China:  Final Results of the Countervailing Duty Administrative Review; 2017–2018*, 86 FR 12171 (March 2, 2021) (*Final Results*) and accompanying Issues and Decision Memorandum (IDM).

In its *Remand Order*, the Court held that Commerce did not adequately explain its decision to select the Trade Data Monitor (TDM) data source to calculate the benchmark for the aluminum plate, sheet, and strip program and its decision not to use the submissions of Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd., and Anhui Maximum Aluminium Industries Company Limited (collectively, the Zhongji Respondents), and that Commerce did not adequately explain its conclusion regarding the relevance of London Metal Exchange (LME) data with respect to Commerce's rejection of the Commodities Research Unit (CRU) Report.[3]   In particular, the Court held that Commerce did not elucidate whether one or both of its particular findings regarding the LME data — (1) that these data contain only a "cash price" for primary aluminum, and (2) that this cash price pertains only to primary aluminum with a "minimum aluminum content of 99.7 percent" — provided the basis for Commerce's rejection of the CRU Report as use for a benchmark.  Therefore, the Court remanded the *Final Results* to Commerce for further explanation or reconsideration, consistent with its decision, of Commerce's selection of data to calculate the benchmark for the aluminum plate, sheet, and strip program.

In addition, the Court held that Commerce did not explain adequately its selection of data to calculate the benchmark for the land program by failing to explain adequately its decision to: (1) select Thai land prices from CB Richard Ellis (CBRE) Reports for the first through fourth quarters of 2010 (2010 CBRE Report data) as a tier three benchmark; and (2) reject the 2016-

---

[3] *See Final Results* IDM at Comments 5 and 6; *see also Certain Aluminum Foil from the People's Republic of China:  Preliminary Results of the Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017–2018*, 85 FR 38861 (June 29, 2020) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM) at 18-20.

2018 CBRE Reports and the Nexus Report as suitable for use as benchmarks.[4]  Therefore the

Court remanded Commerce's selection of a tier three benchmark for the land program for

Commerce to:  (1) explain further or reconsider its evaluation of the contemporaneity of data

sources in the record, particularly Commerce's purported practice to select data sources that

correspond most closely to the point in time at which land use rights were purchased; (2) explain

the reasons that Commerce's selected benchmark on remand is consistent with such a practice in

evaluating the contemporaneity of data sources; (3) explain the reasons that each data source that

Commerce may decide to select on remand — should Commerce select more than one data

source — is consistent with Commerce's practice in determining whether a data source provides

an appropriate remuneration benchmark; and (4) explain further or reconsider its selection of

CBRE Report data for Thailand for the first through fourth quarters of 2010 (2010 CBRE Report

data), specifically with reference to the adequacy, context, and references for the data in that

report in comparison to Commerce's criticism of the adequacy, context, and references for the

data in the Nexus Report.

     Pursuant to the *Remand Order*, we further explain Commerce's selection of data to

calculate the benchmark for the aluminum plate, sheet, and strip program.  We explain our

decision to select the TDM data source instead of the submissions of the Zhongji Respondents.

We also explain our conclusion regarding the relevance of LME data contained in the CRU

Report.

     Additionally, with respect to the land benchmark, and pursuant to the *Remand Order*, we:

(1) explain further our evaluation of the contemporaneity of data sources in the record;

---

[4] *See Preliminary Results* PDM at 18-20; *see also* Memorandum, "Asian Marketview Report," dated July 29, 2019 (Land Benchmark Data Memorandum) (containing 2010 "CB Robert Ellis Asian Marketview Report" (2010 CBRE Report)); and Zhongji Respondents' Letter "Benchmark Submission" April 1, 2020 (Zhongji Respondents' Benchmark Submission), at Exhibit 14 (containing Nexus Report).

(2) explain the reasons that Commerce's selected benchmark is consistent with such a practice in evaluating the contemporaneity of data sources; (3) explain the reasons that each data source that Commerce selected in *Final Results* is consistent with Commerce's practice in determining whether a data source provides an appropriate remuneration benchmark; and (4) explain further our selection of the 2010 CBRE Report data, specifically with reference to the adequacy, context, and references for the data in that report in comparison to Commerce's criticism of the adequacy, context, and references for the data in the Nexus Report.

## II.   BACKGROUND

On June 13, 2019, Commerce published the notice of initiation of an administrative review of the *Order*, covering 35 producers and exporters of subject merchandise during the POR.[5]  Commerce published its *Preliminary Results* on June 29, 2020.  Commerce published its *Final Results* on March 2, 2021.  On March 21, 2023, the Court issued the *Remand Order*, which ordered Commerce to explain or reconsider certain decisions Commerce made in the *Final Results*, as described above.  On June 6, 2023, we released our Draft Results of Redetermination and requested comments from interested parties.[6]  On June 26, 2023, we received comments on the Draft Results of Redetermination from the Aluminum Association Trade Enforcement Working Group and its individual members, JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC (collectively, the petitioners) and from the Zhongji Respondents.[7]

---

[5] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 27587 (June 13, 2019).
[6] *See* Draft Results of Redetermination Pursuant to Court Remand, *Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd., and Anhui Maximum Aluminium Industries Company Limited, v. United States*, Court No. 21-00133 (CIT March 21, 2023), dated June 6, 2023 (Draft Results of Redetermination).
[7] *See* Petitioners' Letter, "Petitioners' Comments on Draft Results of Redetermination (Jiangsu Zhongji Lamination Materials Co., Ltd., et. al. v. United States, Court No. 21-00133)," dated June 26, 2023 (Petitioners' Comments) and Zhongjj's Letter, "Comments on Draft Remand Redetermination," dated June 26, 2023 (Zhongji's Comments).

### III.    ANALYSIS REGARDING THE BENCHMARK FOR THE ALUMINUM PLATE/SHEET PROGRAM

As instructed by the Court, we further explain below our selection of data to calculate the benchmark for the aluminum plate, sheet, and strip program.  Specifically, we further explain our decision to select the TDM data source instead of the data contained in the submissions of the Zhongji Respondents.  We have also reconsidered our conclusion regarding the relevance of LME data contained in the CRU Report.  As discussed in detail below, we continue to find that the TDM export data regarding Harmonized Schedule (HS[8]) subheading 7606.12 is superior to the proposed benchmark which the Zhongji Respondents derived from 1050 aluminum alloy rolled product prices in the CRU Report; it is also superior to the 1050 aluminum alloy rolled product prices, the LME primary aluminum price data, and other price information contained in the CRU report itself.

**Background**

In the *Preliminary Results*, we explained that we relied on "tier two" (world market) prices for the input benchmarks for the primary aluminum for less than adequate remuneration (LTAR) and aluminum plate, sheet and/or strip for LTAR programs, in accordance with 19 CFR 351.511(a)(2).[9]  In terms of information on the administrative record regarding tier two aluminum plate, sheet, and/or strip benchmarks (*i.e.*, world market prices that would be available to purchasers in the country under investigation), the Zhongji Respondents provided 2017 and 2018 Global Trade Atlas (GTA) data from certain [                    ] and [        ] countries

---

[8] While parties may have referred to the HS as "HTS," Commerce notes that the 'HS' subheading refers to the global Harmonized Schedule/System, while 'HTS' refers specifically to the U.S. tariff schedule used solely for U.S. imports of goods.  Thus, when referring to import data for non-U.S. countries, the correct terminology is 'HS' for the schedule subheadings.  *See Forged Steel Fittings from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 50339 (October 5, 2018), and accompanying IDM at Comment 3, fn 60.
[9] *See Preliminary Results* PDM at 15-16.

specific to HS subheading 7606.12, under which the Zhongji Respondents', as well as Xiamen

Xiashun Aluminum Foil Co., Ltd.'s (Xiashun) aluminum [        ][10] purchases are properly

classified.[11]  The Zhongji Respondents also provided a CRU Report on aluminum alloy grade

1050 rolled product prices "*based* on LME data."[12]

      The Zhongji Respondents claimed that their input purchases relate more closely to the

specific grade 1050 pricing data in the CRU Report, than to the broader range of products that

may enter under HS subheading 7606.12.[13]  Thus, the Zhongji Respondents requested that, to

establish a benchmark, we combine the data regarding certain [                    ] Countries in

the CRU Report with data regarding certain [      ] country exports within the broader GTA

data, using a ratio (of CRU Report data over the GTA Western-European data for HS 7606.12) to

adjust the GTA data for [      ] country exports.[14]  However, we preliminarily found that the

administrative record did not support the assertion that the Zhongji Respondents' aluminum

sheet purchases correspond more closely to aluminum alloy grade 1050 rolled products.[15]

      We also preliminarily determined that the LME data contained in the CRU Report reflect

only a "cash" price for primary aluminum.[16]  In contrast, we explained in the *Preliminary Results*

---

[10] [                                                                                    ]. *See*
Xiashun's Letters, "Xiashun Section III Questionnaire Response," dated September 20, 2019, at Exhibit 15; and
"Final – Benchmark Submission," dated April 1, 2020 (Xiashun's Benchmark Submission), at 3 and Exhibit 7;
Zhongji Respondents' Letter, "Second Supplemental Section III Questionnaire Response," dated November 25,
2019, at Exhibits SQ2-19, SQ2-35, and SQ2-59; and Zhongji Respondents' Benchmark Submission at 3, and GOC
NSA Response at 2.

[11] *See Preliminary Results* PDM at 19; *see also* the petitioners' Letter, "Petitioners' Submission of Factual
Information to Measure Adequacy of Remuneration," dated April 1, 2020 (Petitioners' Benchmark Submission), at
5-6 and Attachment 1; and Xiashun's Benchmark Submission at 3 and Exhibit 7.

[12] *See Preliminary Results* PDM at 19 (emphasis added); *see also* Zhongji Respondents' Benchmark Submission at
2-3 and Exhibit 4.

[13] *See* Zhongji Respondents' Benchmark Submission at 3-5; s*ee also Preliminary Results* PDM at 19.

[14] *See* Zhongji Respondents' Benchmark Submission at 3-6 and Exhibits 5, 6, and 7; s*ee also Preliminary Results*
PDM at 19.

[15] *See Preliminary Results* PDM at 19.

[16] "Cash" refers to the form of settlement (*i.e.*, payment and delivery terms).  *Id.*; *see also* Zhongji Respondents'
Benchmark Submission at Exhibit 4.

that the 2017 and 2018 TDM data provided by the petitioners cover worldwide exports under HS subheading 7606.12.  Based on the above, we preliminarily determined to rely solely on the TDM data for 2017 and 2018 for HS subheading 7606.12 as a benchmark for examining the adequacy of remuneration for the aluminum plate, sheet, and/or strip purchased by respondents used in the production of subject merchandise.[17]

In the *Final Results*, we confirmed our conclusion that the record does not support the Zhongji Respondents' arguments that we should use the aluminum alloy grade 1050 rolled product prices as benchmarks for their purchases of aluminum sheet.[18]  The Government of China (GOC) explained in its NSA Response that the Zhongji Respondents and Xiashun purchased aluminum sheet under a variety of Chinese HS subheadings, including 7606.1220, 7606.1230, 7606.1259, and 7606.1290.[19]  While we found that aluminum alloy grade 1050 rolled products are a specific type of aluminum categorized under the broader HS subheading 7606.12, we concluded that the Zhongji Respondents did not purchase aluminum alloy grade 1050 rolled product during the POR.[20]  We explained that, to the contrary, the Zhongji Respondents purchased aluminum sheet produced to different specifications and the evidence on the administrative record did not demonstrate that the Zhongji Respondents' purchases are more comparable to grade 1050 alloy than to the aluminum sheet products represented in the TDM data covering HS subheading 7606.12.[21]  We found that the Zhongji Respondents' claims that the grade 1050 alloy has an aluminum alloy content close to that of some of their purchases were

---

[17] *See Preliminary Results* PDM at 19.
[18] *See Final Results* IDM at 21-22.
[19] *Id.* at 21; *see also* GOC's Letter, "GOC New Subsidy Allegation Questionnaire Response," dated November 25, 2019 (GOC NSA Response), at 20.
[20] *See Final Results* IDM at 21.
[21] *Id.* at 21-22; *see also* Memorandum, "Final Results Calculations for Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Jiangsu Huafeng Aluminum Industry Co., Ltd, Shantou Wanshun Material Stock Co., Ltd., and Anhui Maximum Aluminum Industries Company Limited," dated February 24, 2021 (Zhongji Respondents Final Calculation Memorandum).

not dispositive, given the variation in the aluminum content of the products they purchased.[22]
We also explained that there is wider variation between grade 1050 alloy and the products the
Zhongji Respondents purchased with respect to the chemical composition of other elements
included in one or the other product.[23]   Therefore, in the *Final Results*, we dismissed these price
estimates because they are not representative of world market prices as required by our
benchmark hierarchy, finding that record evidence did not demonstrate that grade 1050
aluminum alloy rolled products better represent the products that the Zhongji Respondents
purchased than the TDM HS subheading 7606.12 export data.   On this basis, we found that the
TDM data covering HS subheading 7606.12 are more representative of all the types of aluminum
purchased by both of the respondents.[24]

**Analysis**

        The record shows that the Zhongji Respondents purchased aluminum sheet products
classified under the following specifications: [


                                                ].[25]   Xiashun, the other mandatory
respondent individually examined, purchased only "[                    ]."[26]   As explained
above, according to the Zhongji Respondents, Xiashun and the GOC, these specifications each

---

[22] *See Final Results* IDM at 22.
[23] *Id.* at 22; *see also* Zhongji Respondents' Letter, "New Subsidy Allegation Questionnaire Response," dated
November 25, 2019 (Zhongji Respondents NSA QR), at Exhibit NSA-2; Zhongji Respondents' Letter, "Certain
Aluminum Foil from the People's Republic of China," dated February 6, 2020 (Zhongji Respondents NSA SQR) at
Exhibits NSAS-1 and NSAS-2; and Zhongji Respondents Final Calculation Memorandum at Exhibit 1 (worksheets
"Zhongji Sheet AR," "Jiangsu Huafeng Sheet AR," and "Anhui Max Sheet AR").
[24] *See Final Results* IDM at 22.
[25] *See* Zhongji Respondents NSA QR at Exhibit NSA-2; Zhongji Respondents NSA SQR at Exhibits NSAS-1 and
NSAS-2; and Zhongji Respondents Final Calculation Memorandum at worksheets "Zhongji Sheet AR," "Jiangsu
Huafeng Sheet AR," and "Anhui Max Sheet AR."
[26] *See* Xiashun's Letter, "New Subsidy Allegation Questionnaire Response," dated November 18, 2019, at Exhibit
MC-1; *see also* Memorandum, "Final Results Calculation Memorandum for Xiamen Xiashun Aluminum Foil Co.,
Ltd.," dated February 24, 2021, at "7 Al Plate, Sheet, Strip."

fall into one of four Chinese HS subheadings which are all covered by HS subheading 7606.12.[27] Thus, all of the specifications of aluminum that the Zhongji Respondents and Xiashun purchased are classified under HS subheading 7606.12, the most detailed tariff schedule classification covering these products at the internationally harmonized (six-digit) level of specification.

### The TDM Data Are Superior to the CRU Data on the Record

The TDM data for HS subheading 7606.12, which we relied on as the benchmark for the *Final Results*, provide world market export quantities and total values from which average unit values (AUV) may be derived.  In contrast, the CRU Report proposed by the Zhongji Respondents provides only [                    ] price data (from [          ], [          ], [        ] and [                    ]) and only for grade 1050 aluminum alloy rolled products.  Using this 1050 aluminum alloy rolled product price data and GTA export data for HS subheading 7506.12, the Zhongji Respondents derived price estimates for grade 1050 aluminum alloy rolled products.[28]  The Zhongji Respondents summarized how they calculated a "world price benchmark" as follows:

[

---

[27] *See* Zhongji Respondents' Benchmark Submission at Exhibit 11; Xiashun's Benchmark Submission at 3 and Exhibit 7; GOC NSA Response at 20; and *Final Results* IDM at 21-22.
[28] *See* Zhongji Respondents' Benchmark Submission at Exhibits 5, 6, and 7.

].[29]

Thus, the Zhongji Respondents proposed a benchmark that is based in part on [

] 1050 alloy sheet prices, and in part on GTA AUVs for HS subheading 7606.12.  The

proposed benchmark is calculated by reducing certain [        ] export AUVs for HS subheading

7606.12 by the ratio of [                    ] 1050 aluminum alloy rolled product prices to

[                  ] export AUVs for HS subheading 7606.12.  These adjusted [       ] export

AUVs are then averaged with the [                  ] 1050 aluminum alloy rolled product

prices themselves to create a combined [                  ]-[        ] *estimate* for 1050 aluminum

alloy rolled product prices.  Thus, the resulting estimate is based largely on extrapolation, and, in

dismissing it for use as the benchmark, we found in the *Final Results* that this estimate did not

satisfy the requirements of 19 CFR 351.511(a)(2)(ii), "where it is reasonable to conclude that

such prices would be available to purchasers in" China.

We continue to find that there are serious flaws with using either the [                    ]

1050 aluminum alloy rolled product prices or the Zhongji Respondents' estimates of worldwide

1050 alloy prices as the proposed aluminum sheet benchmark.  As an initial matter, the Zhongji

Respondents' proposed benchmarks are neither prices nor AUVs themselves, but rather, are

merely estimates extrapolated from [                  ] 1050 aluminum rolled product prices

and worldwide export AUVs for HS subheading 7606.12.

---

[29] *Id.* at 5-6.

Regarding comparability of 1050 alloy sheet to the Zhongji Respondents' purchases, the Zhongji Respondents also claimed that their input purchases relate more closely to the specific grade 1050 pricing data in the CRU report, rather than to the broader range of products that may enter under HS subheading 7606.12.  The Zhongji Respondents made three arguments in support of this assertion.

First, the Zhongji Respondents provided a declaration from [

].[30]  We find that this declaration is no more specific and no more authoritative than the Zhongji Respondents' own assertions; the main difference is that the [                                  ] making the declaration is [

].  However, we note that these statements are contradicted by the petitioners, who comprise multiple U.S. producers of aluminum foil with expertise in these product comparisons.  Moreover, the statements contained in the declaration do not specify how much of world exports under HS subheading 7606.12 are represented by foil stock aluminum sheet of the kind that the Zhongji Respondents used, or of 1050 aluminum alloy rolled products, or how much of these export volumes are made up of the types of sheet and plate which are unsuitable for use as foil stock.  Furthermore, these statements are not supported by specific record evidence.

Second, the Zhongji Respondents provided a U.S. International Trade Commission (ITC) report on the aluminum industry,[31] specifically pointing to the following passage of the report:

> Aluminum plate is used in heavy-duty applications, for which it is often machined to shape, *e.g.*, as structural sections for ships, armor for military vehicles and storage tanks.  Sheet is considered the most widely used form of wrought aluminum

---

[30] *See* Zhongji Respondents' Benchmark Submission at Exhibit 11.
[31] *Id*. at Exhibit 10 (containing *Aluminum: Competitive Conditions Affecting the U.S. Industry*, Inv. No. 332-557, USITC Pub. 4703 (June 2017) (ITC Aluminum Industry Report)).

in major end-use sectors, *e.g.*, as aircraft wing and body panels, auto body sheet, packaging, and building facades and components.[32]

However, we find that this is insufficient evidence to conclude that 1050 aluminum alloy rolled products prices provide a better benchmark than the TDM HS subheading 7606.12 export AUVs.  We note that this statement in the ITC Aluminum Industry Report does not specify the relative proportions of these identified applications nor their proportions relative to the overall uses of aluminum plate and sheet.  The statement's apparent purpose is not to distinguish between the relative volumes of different commercial grades of aluminum sheet exported from around the world, but merely to list examples of applications of aluminum plate and sheet.  The Zhongji Respondents claimed that "aluminum foil stock like the one used by {the Zhongji Respondents} [

                    ]," and that "most of the aluminum sheet covered by HS subheading 7606.12

[

                    ]"[33]  However, we find these statements to be unsupported by record evidence and we find that the ITC Aluminum Industry Report and the [

              ] do not demonstrate that grade 1050 aluminum alloy rolled products better represent the products that the Zhongji Respondents purchased than the TDM HS subheading 7606.12 export data.

Third, the Zhongji Respondents provided the Aluminum Association's *International Alloy Designations and Chemical Composition Limits for Wrought Aluminum and Wrought Aluminum Alloys* (*Aluminum Association's Standards Publication*).[34]  With reference to this

---

[32] *See* ITC Aluminum Industry Report at 54.
[33] *See* Zhongji Respondents' Benchmark Submission at 3-4 and Exhibit 10 and Zhongji Case Brief at 26-27; *see also* ITC Aluminum Industry Report at 519.
[34] *See* Zhongji Respondents' Benchmark Submission at Exhibit 9.

publication, the Zhongji Respondents argue that the chemical compositions of the specifications of the products that the Zhongji Respondents purchased more closely resemble the chemical composition of 1050 aluminum alloy rolled products covered by the CRU Report than the products exported under HS subheading 7606.12 as a whole.

As explained below, we continue to find that the Zhongji Respondents have not provided sufficient evidence for us to determine that 1050 aluminum alloy rolled product prices are superior to HS subheading 7606.12 AUVs for benchmarking their purchases.  We further find that these price estimates are not representative of world market prices as required by our benchmark hierarchy.  In contrast, the petitioners, also foil producers, have proposed export prices under HS subheading 7606.12 as the most appropriate benchmark.  Xiashun (the other respondent that purchased similar sheet products as the Zhongji Respondents) seems to agree, as it identified HS subheading 7606.12 as consistent with its own purchases ("{a}t Exhibit 7, we provide supporting documents that [                              ] purchased by Xiashun during the POR should be classified under {HS} 7606.12").[35]  We recognize that the petitioners' proposed benchmark, export data for products classified under HS subheading 7606.12, is imperfect in terms of the exact range of products covered by the data and their relative proportions *vis a vis* the range and proportions of the products found in the Zhongji Respondents' (and Xiashun's) purchase data, in particular with regard to chemical compositions and primary commercial uses.  However, this imperfection does not by itself automatically rule out the petitioners' proposed benchmark in favor of the Zhongji Respondents' proposed benchmark.  Rather, we must compare and weigh the relative strengths and weaknesses of the various benchmarking options.

---

[35] *See* Petitioners' Benchmark Submission at 5-6 and Attachment 1; and Xiashun's Benchmark Submission at 3 and Exhibit 7.

C-570-054

As explained above, the record shows that the Zhongji Respondents purchased a much wider range of sheet products than the 1050 aluminum alloy rolled products in the Zhongji Respondents' proposed benchmark source; the Zhongji Respondents' purchased [


],[36] while Xiashun purchased [                    ].  Neither respondent purchased any 1050 aluminum alloy rolled products.  We stated in the Draft Results of Redetermination that all of the aluminum sheet which the Zhongji Respondents purchased has similar chemical composition to 1050 aluminum alloy, having between [                ] percent minimum aluminum content, compared to the 1050 aluminum alloy's 99.5 percent aluminum content, but that neither respondent purchased 1050 aluminum alloy rolled products.[37]  As explained in the "DISCUSSION OF PARTIES' COMMENTS" section, below, we note that the minimum aluminum content of the [


].  Without even specifying the differences in the content of other alloy elements or their importance, these facts illustrate clearly that the 1050 products are at best a vague approximation and are better described as a mis-match in terms of the chemical content of the product designations Zhongji (and Xiashun) actually used.

As for the comparability of the products in the TDM data to the Zhongji Respondents' purchases, HS subheading 7606.12 covers "{a}luminum plate, sheets, and strip, of a thickness exceeding 0.2mm … of aluminum alloys."  This is much broader than the products represented

---

[36] *See* Zhongji Respondents NSA QR at Exhibit NSA-2; Zhongji Respondents NSA SQR at Exhibits NSAS-1 and NSAS-2; and Zhongji Respondents Final Calculation Memorandum at worksheets "Zhongji Sheet AR," "Jiangsu Huafeng Sheet AR," and "Anhui Max Sheet AR."
[37] *See* the *Aluminum Association's Standards Publication* at 1 and 13-15.

by 1050 aluminum alloy rolled products. Moreover, unlike 1050 aluminum alloy rolled products, HS subheading 7606.12 covers all of the four Chinese HS subheadings which the GOC reported the respondents used, as explained above.[38] Furthermore, while the Zhongji Respondents claim that the 1050 aluminum alloy rolled products are more representative than the products making up HS subheading 7606.12 export AUVs, there is insufficient information to determine the specifications that are represented in the TDM or GTA HS subheading 7606.12 export data, or those specifications' relative quantities. Nevertheless, information on the record, including, the *Aluminum Association's Standards Publication*, do not support the Zhongji Respondents' claims that 1050 aluminum alloy rolled products are more representative than the products making up the HS subheading 7606.12 export data. We stated in the Draft Results of Redetermination that the maximum aluminum content in the *Aluminum Association's Standards Publication* ranges from 99 percent to 99.99 percent. However, as Zhongji points out, many of the designations listed in the *Aluminum Association's Standards Publication* have aluminum content lower than 99 percent.[39] For example, for example, Zhongji points out that most 7XXX alloys contain 4-9 percent of Zinc and as noted above, the aluminum content of [

].[40] As noted above, all of the aluminum sheet in the Zhongji Respondents' purchases have between [                    ] percent minimum aluminum content, and the 1050 aluminum alloy's aluminum content is 99.5 percent minimum aluminum content. Thus, the aluminum content of 1050 aluminum alloy rolled products falls within the range of the aluminum content of the products that the Zhongji

---

[38] *See* Zhongji Respondents' Benchmark Submission at Exhibit 10 (page 477); *see also* GOC NSA Response at 20; Zhongji Respondents NSA QR at Exhibit NSA-2; Zhongji Respondents NSA SQR at Exhibits NSAS-1 and NSAS-2; Zhongji Respondents Final Calculation Memorandum at worksheets "Zhongji Sheet AR," "Jiangsu Huafeng Sheet AR," and "Anhui Max Sheet AR."
[39] *See* Zhongji's Comments at 5.
[40] *Id.*

C-570-054

Respondents purchased.  However, these facts alone do not demonstrate that 1050 aluminum alloy rolled products are more representative than the TDM HS subheading 7606.12 export data covering the range of products that the Zhongji Respondents purchased.  A review of the specifications that the Zhongji Respondents purchased shows that the aluminum content of the Zhongji Respondents' aluminum sheet purchases [                              ] of the aluminum content of the specifications identified in the *Aluminum Association's Standards Publication* (*i.e.*, [                    ] for the Zhongji Respondents' purchases, as compared to 99 percent to 99.9 percent for the range of products identified in the *Aluminum Association's Standards Publication*, as explained above).  Thus, while the 1050 aluminum alloy rolled products have similar aluminum content to the range of products that the Zhongji Respondents purchased, the products that the Zhongji Respondents purchased cover a broader range of the products identified in the *Aluminum Association's Standards Publication*, implying that 1050 alloy is neither uniquely representative nor more representative of the products that the Zhongji Respondents purchased with respect to aluminum content.

Notwithstanding these considerations, we note that aluminum content alone is not the only important consideration or even the most important consideration.  The proportions of other elements within the 1050 aluminum alloy specifications and the specifications that the Zhongji Respondents purchased likely have their own significance.  The aluminum alloy specifications of the aluminum sheet products that the Zhongji Respondents purchased seem to differ slightly in many respects with respect to other specific elements, in relation to each other and in relation to 1050 aluminum alloy.  However, the Zhongji Respondents have not provided evidence or made claims regarding the significance of other alloy element specifications, nor have they pointed to any information regarding the chemical compositions in the HS subheading 7606.12 products

that would argue against the HS subheading 7606.12 export data, in favor of the 1050 aluminum alloy rolled products data. Such information would be the minimum necessary for the sort of detailed analysis to determine whether the specifications making up the HS subheading 7606.12 export data or 1050 aluminum alloy were more chemically similar to the products that the Zhongji Respondents purchased. Without the possibility of such an analysis, we must instead consider which benchmark data source is sufficient to cover the products that the Zhongji Respondents purchased, and what other factors support or detract from using the 1050 aluminum alloy rolled product data or the TDM HS subheading 7606.12 export data.

In addition, not only the petitioners, but also Xiashun, the other mandatory respondent in the administrative review, identified HS subheading 7606.12 as consistent with its own purchases of aluminum sheet ("{a}t Exhibit 7, we provide supporting documents that [

] purchased by Xiashun during the POR should be classified under 7606.12").[41]

***Commerce's Conclusion Regarding LME Data in the CRU Report***

Regarding the Court's finding that Commerce did not explain adequately its conclusion regarding the relevance of LME data with respect to Commerce's rejection of the CRU Report, we have reconsidered our statements regarding the LME data in the CRU Report. We stated in the *Final Results* that "the record does not support the Zhongji Respondents' claims that Commerce should use the aluminum alloy grade 1050 rolled product prices *based on LME data* in the CRU Report as the aluminum plate, sheet, and/or and strip benchmark since this product grade is similar to the types of inputs it purchased."[42] However upon further consideration, it is not clear from the information in the CRU Report that the [                    ] prices for 1050 aluminum alloy rolled products are derived from the LME data in the CRU Report, rather than

---

[41] *See* Xiashun's Benchmark Submission at 3 and Exhibit 7.
[42] *See Final Results* IDM at 21 (emphasis added).

C-570-054

possibly being simply reported separately, independent of each other.  The CRU Report identifies "conversion fees over LME" as part of the report, but it is not clear from the CRU Report itself or from other record evidence whether [                    ] 1050 aluminum alloy rolled product prices in the CRU Report are derived from the LME prices by adding these conversion fees, or whether the conversion fees are simply the differences between the LME prices and the reported [                    ] 1050 alloy sheet prices.  As a result, upon further consideration, Commerce's finding that the 1050 aluminum alloy rolled product prices appear to be derived from LME prices is not a valid reason for rejecting the CRU Report's [

        ] 1050 aluminum alloy rolled product prices or the Zhongji Respondents' proposed benchmarks.

    We continue to find that the LME data contained in the Zhongji Respondents' Benchmark Submission is not usable as a benchmark for aluminum sheet.  The LME data reflect primary aluminum, a significantly different product than the aluminum sheet which the Zhongji Respondents (and Xiashun) purchased.  Thus, the TDM data for HS subheading 7606.12 provide a demonstrably superior benchmark, in terms of comparability and for the additional reasons explained above.  In the *Final Results*, we also determined that LME data contained in the CRU Report reflects only a "cash" price for primary aluminum.[43]  On further analysis, we find that while the LME data which the Zhongji Respondents submitted as benchmarks for primary aluminum contain both "cash-settlement" and "3-month" prices, the LME prices in the CRU Report appear to be "3-month" LME prices, not "cash" settlement prices.[44]  However, this distinction is largely unimportant to this analysis and it does not argue in favor of using either of the LME prices which the Zhongji Respondents submitted as benchmarks for aluminum plate, or

---

[43] *See Preliminary Results* PDM at 19; and *Final Results* IDM at Comment 5.
[44] *See* Zhongji Respondents' Benchmark Submission at Exhibits 4 and 7.

sheet, because the important distinction is that the LME prices are for primary aluminum, not for plate or sheet.

***Commerce's Decisions Regarding Other Data Sources on the Record***

The Zhongji Respondents also provided GTA aluminum plate and aluminum sheet export data for HS subheading 7606.12. We did not use these data, but instead used the TDM data provided by the petitioners. However, these data and the TDM data are both export AUVs reported by various countries, and the Zhongji Respondents did not submit the GTA data for use as a benchmark. Instead, the Zhongji Respondents suggested a methodology based primarily on the estimated world price of 1050 aluminum alloy rolled products, as explained above. Therefore, we find that there is no reason for using the GTA export data for HS subheading 7606.12 submitted by the Zhongji Respondents instead of the TDM data.

***Conclusion***

The HS subheading 7606.12 data capture the variety of products that the Zhongji Respondents (and Xiashun) purchased and are based on actual export AUVs, whereas the benchmark data provided by the Zhongji Respondents are grade 1050 data price estimates extrapolated from [                    ] grade 1050 aluminum alloy (minimum aluminum content of 99.7 percent) sheet prices. The TDM export data for HS subheading 7606.12, in contrast to either the 1050 aluminum alloy rolled products data contained in the CRU Report or the Zhongji Respondents' Benchmark Submission, [                         ] the Zhongji Respondents' aluminum sheet purchases. We have previously used TDM data as a source of benchmark data in other proceedings, and unlike the LME data, the TDM data pertain to aluminum sheet and

plate products, not to primary aluminum.[45]  Lastly, we note that the Zhongji Respondents'
Benchmark Submission and Xiashun's Benchmark Submission both contain GTA export data for
HS subheading 7606.12.  We find that these data are not superior to, and are not significantly
different from, the TDM Export data with respect to source and methodology.  For these reasons,
we continue to find that the TDM data submitted by the petitioners is the best data source for
aluminum sheet benchmarks as they better capture and reflect the Zhongji Respondents' (and
Xiashun's) input purchases.

## IV. ANALYSIS REGARDING COMMERCE'S SELECTION OF A LAND USE RIGHTS BENCHMARK

As instructed by the Court, we:  (1) further explain below the data sources that
Commerce selected in the *Final Results* for benchmarking land, in light of the issue regarding the
contemporaneity of the data sources on the administrative record; (2) further explain the reasons
for Commerce's selection of the 2010 CBRE Report data as the source for the land benchmark
given the contemporaneity of data sources; (3) further review Commerce's selection of the 2010
CBRE data source in the *Final Results* in view of Commerce's past practice; and (4) further
explain our selection of the 2010 CBRE Report data over the Nexus Report.

**Background**

In the *Preliminary Results*, we explained that we relied on land prices outside of China as
a "tier three" (assessment of whether the government price is consistent with market principles)
benchmark for the Land for LTAR program, in accordance with 19 CFR 351.511(a)(2)(iii).[46]

---

[45] *See, e.g.*, *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 86 FR 27379 (May 20, 2021), and accompanying IDM at 43; and *High Pressure Steel Cylinders from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2017*, 74 FR 71373 (December 27, 2019), and accompanying IDM at 11.
[46] *See Preliminary Results* PDM at 15-16.

On July 29, 2019, we placed on the record benchmark information to value land from "Asian Marketview Reports" by CBRE for Thailand 2010.[47]  As we explained in the *Preliminary Results*, we used this benchmark in prior segments of this proceeding, and in other proceedings.[48]  As explained in the *Preliminary Results*, we initially selected this information in *LWS from China* after considering a number of factors, including national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production.[49]  We preliminarily found that this benchmark was suitable, and we relied on it in the *Preliminary Results* of the instant proceeding.[50]  As also explained in *Preliminary Results*, the Zhongji Respondents submitted a proposed land benchmark that contains CBRE world market land prices from various locations.[51]  Specifically, in the 2016-2018 CBRE Reports, the Zhongji Respondents provided land benchmark data for multiple localities in the following countries:  Australia, Belgium, Canada, Chile, the Czech Republic, France, Germany, Hong Kong, Hungary, Italy, Japan, Mexico, the Netherlands, New Zealand, Poland, Russia, Singapore, South Korea, Spain, the United Kingdom, and the United States.[52]  However, we preliminarily found that those countries were not reasonable alternatives to

---

[47] *Id.* at 17 (citing Land Benchmark Data Memorandum (containing "Asian Marketview Report" pricing data)).
[48] *Id.* (citing *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Final Affirmative Determination*, 83 FR 9274 (March 5, 2018)); and *Countervailing Duty Investigation of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China:  Preliminary Affirmative Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 FR 21316 (April 11, 2016), and accompanying PDM at 13, unchanged in *Countervailing Duty Investigation of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China:  Final Affirmative Determination*, 81 FR 75037 (October 28, 2016) (*Mechanical Transfer Drive Components from China*), and accompanying IDM).
[49] *See Preliminary Results* PDM at 17; *see also Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 FR 35639 (June 24, 2008) (*LWS from China*), and accompanying IDM at 17-18 and Comments 10 and 11.
[50] *Id.*
[51] *Id.*; *see also* Zhongji Respondents' Benchmark Submission at Exhibits 12-13 (containing the 2016-2018 CBRE Reports and related proposed benchmark calculations).
[52] *See* Zhongji Respondents' Benchmark Submission at Exhibits 12-13.

China.[53]  We further preliminarily determined that while the Zhongji Respondents included

consumer price (CPI) index data collected by the World Bank in their benchmark submission,

the submission did not include data that allow us to evaluate the economic comparability of these

locations with respect to China.[54]  The Zhongji Respondents also submitted land benchmark data

for the first half 2018 regarding Thailand from a 2020 Nexus Report.  However, in the

*Preliminary Results*, we determined that there was no explanation of the methodology used to

collect the data used in the Nexus Report.[55]  We further explained in the *Preliminary Results* that

we cannot evaluate the scope and quality of the data.  For these reasons, and because Commerce

has previously relied on the 2010 CBRE land benchmark data specific to Thailand to determine

the adequacy of remuneration for land in China, we relied on this data in the *Preliminary

Results*.[56]

　　　　For consideration in the *Final Results*, the Zhongji Respondents argued that we rejected

2016-2018 CBRE Reports, which the Zhongji Respondents had put forth as sources of land

benchmarks, on the basis that they did not include data that would allow us to evaluate the

economic comparability of certain locations to China.[57]  However, the Zhongji Respondents

pointed out that Mexico and Brazil were included in these data and are used as surrogate

countries in non-market economy (NME) antidumping duty (AD) cases.[58]  The Zhongji

Respondents also noted that the 2010 CBRE data would have to be inflated to the POR using the

Thai CPI to adjust the data to reflect the full POR.[59]  In addition, the Zhongji Respondents noted

---

[53] *See Preliminary Results* PDM at 17.
[54] *Id*.
[55] *Id.*; *see also* Zhongji Respondents' Benchmark Submission at Exhibit 14.
[56] *See Preliminary Results* PDM at 17.
[57] *See Final Results* IDM at 30.
[58] *Id.*
[59] *Id.* (citing *Preliminary Results* PDM at 17; *Changzhou Trina Solar Energy Co. v. United States*, 255 F. Supp. 3d
1312, 1322-23 (CIT 2017); *Laminated Woven Sacks from the People's Republic of China:  Preliminary Affirmative*

that the Nexus Report contain price information for "ready built factory" and "ready built warehouse" land prices in different regions in Thailand and do not require CPI indexing.[60] Therefore, the Zhongji Respondents argued that were we to use a tier three benchmark, we could rely on the Mexico and Brazil data in the 2016-2018 CBRE Reports or the Thai data in the Nexus Report because they are more contemporaneous with the POR.[61]

In the *Final Results*, we continued to use the 2010 CBRE Report data as the source of the land benchmark. Specifically, we explained that we cannot rely on "tier one" land benchmarks (market prices from actual transactions within the country under investigation) or tier two benchmarks (world market prices that would be available to purchasers in the country under investigation) to assess the benefits from the provision of land for LTAR in China.[62] In addition, with respect to using the 2016-2018 CBRE Reports data for Mexico and Brazil as tier three benchmarks (for an assessment of whether the government price is consistent with market principles), we found that information on the record does not demonstrate that this data source is superior to the 2010 CBRE Report data for Thailand because, unlike Thailand, Mexico and Brazil are in North and South America, respectively, and thus, not geographically proximate to China.[63]

## Analysis

As we explained in the *Final Results*, when reviewing land benchmark prices, our practice is to examine such prices "'on a case-by-case basis and {to} consider the extent to

---

*Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, in Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 72 FR 67893, 67908-09 (December 3, 2007); and *Essar Steel Limited v. United States*, 721 F. Supp. 2d 1285, 1294 (CIT 2010)).
[60] *See Final Results* IDM at 30 (citing Zhongji's Letter, "Case Brief," dated August 10, 2020, (Zhongji Case Brief) at 3-4).
[61] *Id.*
[62] *See Final Results* IDM at 31-32 (citing Land Benchmark Data Memorandum at Attachment 1; and *LWS from China* IDM at 17-18 and Comments 10 and 11).
[63] *See Final Results* IDM at 32.

which proposed benchmarks represent prices in a comparable setting' (*e.g.*, a country's geographic proximity to China and the level of economic development comparable to China)."[64] Guided by this practice, we continue to find that the Thai land benchmark data in the 2010 CBRE Report data contains the best record information to serve as a tier three benchmark for the land for LTAR program.

As an initial matter, contemporaneity is identified by Commerce's regulations with reference to the year in which the subsidy is approved, for example, when identifying a discount rate for the purposes of allocating a non-recurring subsidy (19 CFR 351.524(d)(3), "… select a discount rate based on the data for the year in which the government agreed to provide the subsidy …").  Additionally, in identifying a land for LTAR benchmark, Commerce's practice is to look to the year in which the land use rights were acquired from the government providing the subsidy to determine the appropriate time period for calculating the land benchmark.[65]  The Court has acknowledged this practice.[66]  Thus, for purposes of identifying a land for LTAR benchmark in China, under Commerce's regulations and practice, we must determine when the producer/exporter acquired the land-use rights from the GOC and seek benchmark information that is contemporaneous with that event.  Accordingly, in the absence of data that are more contemporaneous to when the Zhongji Respondents acquired the land use rights from the GOC,

---

[64] *Id.* at 32 (citing *Preliminary Results* PDM at 17).
[65] *See, e.g.*, *LWS from China* IDM at 17 ("In order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 *to the year the transaction was officially approved by the country*) … ." (emphasis added)); and *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011) ("New Zhongya acquired its land-rights in 2006, and the Guang Ya Companies acquired their land-use rights in 2007.  As 2007 is more contemporaneous *with the times of these purchases*, we have used the 2007 prices for Thai industrial land for benchmark purposes." (emphasis added)).
[66] *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 961 F. Supp. 2d 1346, 1345 (CIT 2014) (*Zhaoqing*), (upholding Commerce's selection of the land benchmark as reasonable and stating "{Commerce's} defense of its decision not to discount for inflation rests on the relatively short time separating New Zhongya's *acquisition of land use rights* in June and October of 2006 and the second quarter of 2007 from which the indicative values in the CBRE Report were drawn." (emphasis added)).

and that are from locations with similar geographical and economic development comparability as Thailand, the 2010 CBRE land prices offer the best available source on the record to serve as a tier three benchmark.

Moreover, regarding the contemporaneity of the 2010 CBRE Report data, in the *Final Results*, we concluded that, though we must adjust the 2010 CBRE Report data with a CPI inflator, this alone does not render the data unreliable.[67]  In Commerce's practice, when the only prices available on the record are historical or non-contemporaneous prices or AUVs, which are otherwise suitable for benchmarking, Commerce routinely deflates or inflates those prices to the relevant time period to account for the temporal effects on prices and, thereby, bring those prices reasonably up to date.[68]  Furthermore, we found that we would be required to make similar adjustments if we relied on the Nexus Report data or the 2016-2018 CBRE Report data.[69]  In fact, the Zhongji Respondent's land use rights were acquired in [                    ].[70] Therefore, we [                                        ], the land value benchmarks in the 2010 CBRE Report data, according to the year in which the Zhongji Respondents acquired the land use rights under consideration.[71]

Although the Zhongji Respondents argued that the 2016-2018 CBRE Reports and Nexus Report data were more contemporaneous with the POR, this argument is misplaced; the relevant time periods to consider are the years when the Zhongji Respondents acquired the land use rights, which took place in [                    ], as explained above, and not during the POR.

---

[67] *See Final Results* IDM at 32.
[68] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 FR 40491 (July 7, 2022), and accompanying IDM at Comments 9 and 17.
[69] *See Final Results* IDM at 32.
[70] *See* Zhongji Respondents Final Calculation Memorandum at Exhibit 1 (worksheets "Zhongji Companies' Land LTAR AR," "Zhongji Co. Land Alloc AR," and "Land Benchmark AR").
[71] *See* 2010 CBRE Report at 2, 4, 6, and 8.

Accordingly, while the data in the 2016-2018 CBRE Reports are more contemporaneous with the

POR, the relevant consideration is that [

                                        ].  As explained above, Commerce seeks a benchmark that is as

contemporaneous as possible with the year of government's approval of the land-use rights,

indexed to the year of approval, as necessary.[72]  The 2010 CBRE Report data are [

                                                                                    ].  Thus, for

this redetermination, we continue to use the land data in the 2010 CBRE Report data as

benchmarks, [

                              ], by the relevant Thai CPI.[73]

        In terms of economic comparability, in the *Final Results*, we found that, other than the

fact that Commerce relies on Mexico and Brazil as surrogate countries for deriving certain

surrogate values in NME AD proceedings, the Zhongji Respondents provided no information

demonstrating that these countries are more economically comparable to China than Thailand.[74]

Nor did they explain why reliance on these countries as surrogates for valuing factors of

production in the context of NME AD cases is relevant to the economic comparability that

Commerce must consider when identifying world market prices as benchmarks for evaluating

whether a government provided a good for LTAR.  In contrast, we have previously conducted an

in-depth analysis of the economic comparability in the context of a land for LTAR benchmark

selection analysis in a CVD proceeding, finding Thailand and Vietnam to be comparable to

China in terms of, *e.g.*, industrial land prices, per capita income, population density, stages of

---

[72] *See, e.g.*, *LWS from China* IDM at 17; and *Mechanical Transfer Drive Components from China* IDM at 13.
[73] *See Final Results* IDM at 32..
[74] *Id.*.

economic development, *etc.*[75]  We also found that the 2016-2018 CBRE Reports data pertain to "logistics rent" but not to "manufacturing facilities,"[76] while the 2010 CBRE Report data contains industrial land rates in Thailand,[77] and thus, better matches the type of land acquired.

The Zhongji Respondents correctly note that Commerce has found Mexico and Brazil to be among the countries that are economically comparable with China for the purposes of selecting surrogate cost values in NME AD proceedings.  However, the object of AD surrogate value analysis is market pricing of portable commodities traded across borders, which are not directly comparable to land (which is not traded across borders).  Given that commodities are bought and sold across transnational markets, geographical proximity, while not irrelevant, is not necessarily a primary concern for commodities.  However, geographical proximity is relevant for land, as location is always a primary factor in valuation and, thus, geographical proximity is a cardinal consideration for benchmarking.  Hence, while commodity prices in Mexico and Brazil may be useful for surrogate cost valuation in the AD context, this does not render land prices in those two countries, even if contemporaneous with the time period at issue (which in this case they are not), compelling for purposes of benchmarking land in China in the CVD context, given that both countries are oceans apart from China.  In this sense, contemporaneity must yield to geographical proximity when considering benchmarks for land.

We stress that although general economic comparability may be the primary criterion in NME surrogate country selection in AD proceedings, for land benchmark selection in CVD proceedings, the analysis must consider both economic comparability and geographical proximity due to the unique nature of land, which cannot be traded across borders like consumer

---

[75] *Id.* (citing Land Benchmark Data Memorandum at Attachment 1; and *LWS from China* IDM at 17-18 and Comments 10 and 11).
[76] *See Final Results* IDM at 32 (citing Zhongji Respondents' Benchmark Submission at Exhibit 13 (page 18)).
[77] *Id.*

commodities.  Selection of tier three benchmarks in a CVD LTAR analysis for land is focused on the economic conditions affecting land and land rent prices alone, not the overall economic conditions affecting a variety of labor, material, overhead, energy, and other inputs, which are at issue in NME surrogate country selection analyses.  Additionally, geographic location, not merely with respect to, *e.g.*, urban *vs.* rural locations within a given country, but also with respect to localized land pricing conditions in different parts of the world, must naturally be a central factor in our selection of suitable benchmarks for the purposes of evaluating the adequacy of remuneration for land.  Thus, as we must rely on the available record information to determine the most suitable benchmark source, we turned to the only available prices from a geographically proximate source, Thailand.  Unlike Mexico and Brazil, Thailand is situated in China's immediate region to the south and connected by land to China.  While those Thai prices are not completely contemporaneous, they are the most contemporaneous record information available, and we followed Commerce practice by indexing for inflation to bring them up to date with the POR.

We also consider comparability of the land, in terms of use or potential use, to be highly significant.  For example, all things being equal, factory, or manufacturing facilities rent or even general categories like "industrial" rent are more appropriate than agricultural, residential, or even office, warehouse, or "logistics" property rent as a benchmark for land use rights in LTAR analyses in which the land use rights in question are for land used primarily for manufacturing or general industrial applications.  As explained in *Final Results*, the 2016-2018 CBRE Reports data provided by the Zhongji Respondents pertain to "logistics rent," not to "industrial" land,[78]

---

[78] *See* Zhongji Respondents' Benchmark Submission at Exhibit 13 (page 18).

while the 2010 CBRE Report data contains "industrial land" rent in Thailand.[79]  Therefore, we

consider the Thai 2010 CBRE Report data to better represent the type of property under

consideration.

Regarding the 2018 Nexus Report, the report does identify "ready-build factory" land in

three regions within Thailand.  However, as we explained in the *Preliminary Results* and in the

*Final Results,* there is no explanation of the methodology used to collect the data used in the

Nexus Report on our administrative record.  In contrast, we have previously evaluated the

sources, content, and methodology of the 2010 CBRE Report data.[80]  We rely on parties to

provide timely information to explain not only the benchmark sources themselves, but also to

provide information on how these data were derived, so that we can determine whether the

resulting data are appropriate as sources for benchmarks.  The 2018 Nexus Report lacks any

detailed information regarding methodology.

For the reasons explained above, we continue to find the data from the 2018 Nexus

Report and the 2016-2018 CBRE Reports to be less suitable as land benchmarks compared to the

2010 CBRE Report data.  The 2010 CBRE Report data are the best available data source for

purposes of serving as the Land for LTAR program benchmark here because:  (1) the land price

2010 CBRE report data is for industrial land, rather than logistics and distribution land; (2) the

data is related to land in Thailand, which is more geographically proximate to China; (3) the data

are more contemporaneous with the years when the Zhongji Respondents acquired the land use

rights; and (4) Commerce has found Thailand to be comparable to China in terms of level of

economic development, population, and geographic proximity.  Moreover, as explained above

---

[79] *See Final Results* IDM at 32.  The 2016-2018 CBRE Reports define logistics buildings to be purpose built for distribution and to exclude manufacturing facilities: "Building must be purpose-built for logistics and distribution (manufacturing facilities not included).  *See* Zhongji Respondents' Benchmark Submission at Exhibit 13.
[80] *See LWS from China* IDM at 17-18.

and in the *Preliminary Results*, in examining the economic comparability and contemporaneity of benchmark data, we have relied on 2010 CBRE Report data in prior segments of this proceeding, and in other proceedings.[81]  As we also explained in the *Preliminary Results* and the *Final Results*, we initially selected these data in *LWS from China* after considering a number of factors, including national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production.[82]  These data are also reasonably contemporaneous with the relevant time period, *i.e.*, the years when the Zhongji Respondents acquired the land use rights in question.  Thus, consistent with our practice, we find that this benchmark, appropriately indexed, continues to be the best available information on the record to serve as a tier three benchmark for evaluating the adequacy of remuneration for land use rights in China.

## VI.    DISCUSSION OF PARTIES' COMMENTS

### Comment 1:    Analysis Regarding the Benchmark for the Aluminum Plate, Sheet and/or Strip for LTAR Program

***Petitioners' Comments***[83]

- The petitioners agree with Commerce's finding that the TDM export data regarding merchandise classified under HS subheading 7606.12 are superior to the 1050 aluminum alloy rolled product prices derived by Zhongji from the CRU Report, the 1050 aluminum alloy rolled product prices, LME primary aluminum price data; and other price information contained in the CRU Report.
- Commerce was incorrect in concluding, with reference to the *Aluminum Association's Standards Publication*, that "all of the aluminum plate which the Zhongji Respondents purchased has similar chemical composition to 1050 aluminum alloy, having between [          ] percent minimum aluminum content, compared to the 1050 aluminum alloy's 99.5 percent aluminum content."
- While [

                                                                                   ].

---

[81] *See Preliminary Results* PDM at 27; *see also Mechanical Transfer Drive Components from China* IDM at 13.
[82] *See LWS from China* IDM at 17-18 and Comments 10 and 11; *see also* 2010 CBRE Report at 2, 4, 6, and 8.
[83] *See* Petitioners' Comments at 2-5.

- [

                        ].
- [

                                        ].

***Zhongji's Comments***[84]

- Commerce's continued reliance on the TDM data covering HS subheading 7606.12 does not comply with the *Remand Order*.
- It is unreasonable for Commerce to focus on the minor mismatch between alloy 1050 and Zhongji's alloys without considering the much bigger mismatch between HS subheading 7606.12 and Zhongji's alloys.
- In the *Remand Order*, the CIT stated that Commerce did not adequately explain its finding that the TDM data correspond more closely to Zhongji's purchases than the CRU data and did not adequately explain the alleged "wider variation" between CRU Report's alloy 1050 products and Zhongji's purchases, compared to TDM's six-digit HS subheading products.
- The CRU data covering alloy 1050 correspond more closely to Zhongji's 1XXX alloy and 8XXX alloy purchases than TDM's overbroad global export data covering HS subheading 7606.12.
- Zhongji provided a third-party expert declaration and an ITC report to establish that most products and alloy products under HS subheading 7606.12 are not suitable for foil production.
- In the Draft Results of Redetermination, Commerce found the expert declaration non-authoritative and rejected both pieces of record evidence because they do not specify the exact export volumes of irrelevant products under the six-digit code.
- Commerce cannot deem an expert declaration non-authoritative simply by reasoning that the declaration is "contradicted by the petitioners," a participating party of opposite interest in the case.
- Commerce did not, and could not, point to any contrary record evidence where the petitioners established that most products under HS subheading 7606.12 are used for producing foil.
- Commerce does not need the export volumes of the aluminum sheet and plate not used for foil production to determine that the TDM data are overbroad because ample record evidence indicates that a majority of aluminum plates, sheets and strip classified under HS subheading 7606.12 are not foil stock.
- HS subcategory 7606.12 covers two 8-digit subcategories, 7606.12.30 and 7606.12.60. 7606.12.60 covers one eight-digit subheading, 7606.12.60 and two ten-digit subheadings, 7606.12.30.45 and 7606.12.55, which identify products that cannot be used for foil stock. Thus, Commerce was unreasonable in concluding that HS subheading 7606.12 is not overbroad because Zhongji did not provide specific export volume of non-foil-stock products.

---

[84] *See* Zhongji's Letter, "Comments on Draft Remand Redetermination," dated June 26, 2023 (Zhongji's Comments) at 2-7.

- The HS subheading also does not distinguish between different alloys. Zhongji provided the International Alloy Designation Standard to show that there are eight alloy series groups with a total of hundreds of alloys designed for different end uses and customer needs. Zhongji also provided the ITC Aluminum Report showing the major end uses for each series. Notably, only series 1XXX and 8XXX show end uses "food packaging" and "foil," while series 2XXX to 7XXX only show end uses that require expensive, high-value-added products, such as for aircraft, automotive or marine industries. This further proves that the HS subheading 7606.12 not only includes irrelevant subcategories for foil production such as clad aluminum or can stock, but it also includes hundreds of irrelevant alloys not suitable for foil production.
- In the Draft Results of Redetermination, Commerce incorrectly focused on the fact that Zhongji and Xiashun did not purchase 1050 alloy, covered by the CRU data. As conceded by Commerce itself, "1050 aluminum alloy rolled products have similar aluminum content to the range of products that the Zhongji Respondents purchased," noting less than one percent of aluminum content variation between Zhongji's alloys and 1050 alloy.
- The similarity between Zhongji's alloys and 1050 alloy proves that 1050 alloy is representative of Zhongji's alloys, especially given that there are hundreds of other alloys with much lower aluminum content.
- Zhongji Benchmark Submission at Exhibit 9 shows, for example, that most 7XXX alloys contain 4-9 percent zinc, making the residual aluminum purity much lower than the approximate 99 percent aluminum purity of Zhongji's alloys and 1050 alloy.
- Commerce also failed to explain why the "other elements" other than aluminum matter more than aluminum content and why other elements must match perfectly among Zhongji's own alloys, and also in relation to 1050 alloy.
- Commerce incorrectly concluded in the Draft Results of Redetermination that Zhongji did not provide evidence on the overbreadth of HS subheading 7606.12 when: 1) the HS subheading 7606.12 includes a majority of subcategories not used as foil stock and 2) the subheading does not distinguish between alloys, the majority of which cannot be used for foil production.
- The CIT's remanded this issue for Commerce to explain why 1050 alloy does not correspond "more closely" to Zhongji's purchases than HS subheading 7606.12, not why the 1050 alloy does not match with Zhongji's purchases perfectly.
- Commerce also failed to comply with the Court's instructions to explain its rejection of the CRU Report based on the LME data included in the report.
- The CIT instructed Commerce to further explain how the London Metal Exchange (LME) data in the CRU Report supported Commerce's decision to reject the CRU Report.
- Commerce failed to comply with the *Remand Order* by not adequately explaining its continued selection of the TDM data over the CRU data. Commerce's use of the TDM data remains unsupported by substantial evidence and the only reasonable benchmark choice for aluminum sheet and plate is the CRU report.
- Commerce first stated that it is not clear from the CRU Report whether "[



]." The CRU Report, however, clearly shows that the prices for alloy 1050 products [                                                                                    ].

- Commerce incorrectly concluded that the CRU Report cannot be used to value the aluminum sheet benchmark because it contains LME data reflecting primary aluminum. In making the final remand redetermination, Commerce must note that the 1050 alloy prices from the CRU Report are not LME prices but are [                                           ].  The very presence of [
                                    ], here aluminum sheet.
- Finally, if Commerce does not agree with Zhongji's proposed benchmark calculation in combination with the GTA data to arrive at [                                        ], Commerce should use the CRU data alone.

**Commerce's Position:**

> ***TDM export AUVs are the only world market price data on the record and the only benchmark which covers the range of products the respondents purchased.***

We have reviewed the comments submitted on the Draft Results of Redetermination and we have not changed our selection of the benchmark as used in the *Final Results*.[85]  As we explained above and in the Draft Results of Redetermination, the export AUV data for HS subheading 7606.12 is the best available benchmark on the record.

As explained above, the AUV data for HS subheading 7606.12 are the only usable tier two world market prices available on the record, and the only benchmarks on the record which cover the range of products that the Zhongji Respondents (and Xiashun) actually purchased.  As explained above, the benchmark that the Zhongji Respondents propose are, at best, mere estimates of world market prices, as they are ultimately based in part upon [                    ] 1050 aluminum prices and in part on GTA [        ] export AUVs.  Furthermore, as we explained consistently in the underlying administrative review and in this remand proceeding, the administrative record did not support the assertion that the Zhongji Respondents' aluminum sheet purchases correspond more closely to aluminum alloy grade 1050 rolled products.[86]  As we explained in the *Final Results* and Draft Results of Redetermination, while we find that

---

[85] *See Final Results* IDM at Comment 5.
[86] *See Preliminary Results* PDM at 19 and *Final Results* IDM at 21-22.

aluminum alloy grade 1050 rolled products are a specific type of aluminum categorized under the broader HS subheading 7606.12, the Zhongji Respondents did not purchase aluminum alloy grade 1050 rolled product during the POR, and the evidence on the administrative record did not demonstrate that the Zhongji Respondents' purchases are more comparable to grade 1050 alloy than to the aluminum sheet products represented in the TDM data covering HS subheading 7606.12.[87]  As stated above, compared to the 1050 aluminum alloy's 99.5 percent aluminum content, the minimum aluminum content of the [

] sheet that the Zhongji Respondents purchased range from [                                    ] percent aluminum content.[88]  This demonstrates that the 1050 aluminum sheet products are not representative of the range of products that the Zhongji Respondents (and Xiashun) purchased. In contrast, the TDM HS subheading 7606.12 export AUV data cover all of the products which the Zhongji Respondents and Xiashun purchased.

*The Zhongji Respondents' arguments overstate the similarity between the 1050 aluminum alloy rolled products and the products the Zhongji Respondents purchased, and lack the suitability of the TDM Export AUV data.  The Zhongji Respondents also ignore the fact that the CRU Report data and their proposed benchmarks do not represent tier-two world market prices.*

As an initial matter, however, we note that in the Draft Results of Redetermination, we erred slightly in our characterization of the *Aluminum Association's Standards Publication* data regarding chemical compositions of various aluminum alloys.  Specifically, we stated in the that the range of the aluminum content of the aluminum alloy designations listed in the *Aluminum Association's Standards Publication* is 99 percent to 99.99 percent.  However, as Zhongji

---

[87] *See Final Results* IDM at 21-22; *see also* Memorandum, "Final Results Calculations for Jiangsu Zhongji Lamination Materials Co., Ltd., Jiangsu Zhongji Lamination Materials Co., (HK) Ltd, Jiangsu Huafeng Aluminum Industry Co., Ltd, Shantou Wanshun Material Stock Co., Ltd., and Anhui Maximum Aluminum Industries Company Limited," dated February 24, 2021 (Zhongji Respondents Final Calculation Memorandum).
[88] *See* Zhongji Respondents' Benchmark Submission at Exhibit 9 (pages 1 and 13-15).

Respondents point out, many of the designations listed in the *Aluminum Association's Standards Publication* have aluminum content lower than 99 percent which is not specifically stated.[89]  For example, the Zhongji Respondents point out that most 7XXX alloys contain 4-9 percent of Zinc.[90]  Yet, as the petitioners note, we also erroneously stated that all of the aluminum sheet that the Zhongji Respondents purchased has similar chemical composition to 1050 aluminum alloy, having between [                              ] percent minimum aluminum content, compared to the 1050 aluminum alloy's 99.5 percent aluminum content.  In fact, that record evidence provided by the Zhongji Respondents shows that the minimum aluminum content of the [

                                            ], but that the minimum aluminum content of [

             ].[91]  As the petitioners also point out, [

                                            ].[92]  The petitioner argues that [

                                            ].  But without examining these differences in other elements, it is apparent that the differences in aluminum content alone demonstrate that the 1050 products are at best only a vague approximation for the [                        ] sheet products which Zhongji Purchased ([

                        ]), and in fact are actually better described as a mis-match in terms of the chemical content of [            ] the product designations Zhongli actually purchased.[93]

---

[89] *See* Zhongji's Comments at 5.
[90] *Id.*
[91] *See* Zhongji Benchmark Submission at Exhibit 9, at pages 1, 13-14.
[92] *See* Petitioners' Comments at 4-5.
[93] *See* the *Aluminum Association's Standards Publication* at 1 and 13-15.

Regarding these other elements, Zhongji argues that "Commerce also failed to explain why the 'other elements' other than aluminum matter more than aluminum content and why other elements must match perfectly among Zhongji's own alloys, and also in relation to 1050 alloy."[94]   However, as we have further explained above and in the Draft Results of Redetermination, from our explanation in the *Final Results*, the record demonstrates that there is wider variation between grade 1050 alloy and the range of products the Zhongji Respondents purchased with respect to the chemical composition of other elements included in one or the other product.[95]   Moreover, as we explain above and in the Draft Results of Redetermination:

> {t}he proportions of other elements within the 1050 aluminum alloy specifications and the specifications that the Zhongji Respondents purchased likely have their own significance. The aluminum sheet specifications that the Zhongji Respondents purchased seem to differ slightly in many respects with respect to other specific elements, in relation to each other and in relation to 1050 aluminum alloy. However, the Zhongji Respondents have not provided evidence or made claims regarding the significance of other alloy element specifications, nor have they pointed to any information regarding the chemical compositions in the HTS 7606.12 products that would argue against the HTS 7606.12 export data, in favor of the 1050 aluminum alloy rolled products data. Such information would be the minimum necessary for the sort of detailed analysis to determine whether the specifications making up the HTS 7606.12 export data or 1050 aluminum alloy were more chemically similar to the products that the Zhongji Respondents purchased. Without the possibility of such an analysis, we must instead consider which benchmark data source is sufficient to cover the products that the Zhongji Respondents purchased, and what other factors support or detract from using the 1050 aluminum alloy data or the HTS 7606.12 export data.

Thus, while Zhongji is correct that we have not explained that these elements "matter more than aluminum content and why other elements must match perfectly among Zhongji's own alloys, and also in relation to 1050 alloy,"[96] Zhongji failed to provide evidence to demonstrate that the

---

[94] *See* Zhongji's Comments at 5.
[95] *Id.* at 22; *see also* Zhongji Respondents NSA QR at Exhibit NSA-2; Zhongji Respondents NSA SQR at Exhibits NSAS-1 and NSAS-2; and Zhongji Respondents Final Calculation Memorandum at Exhibit 1 (worksheets "Zhongji Sheet AR," "Jiangsu Huafeng Sheet AR," and "Anhui Max Sheet AR").
[96] *See* Zhongji's Comments at 5.

relative proportions of the various other alloy elements matter more (or less).  In other words, Commerce relied on record information in its benchmark analysis.  Therefore, while we acknowledge that the other elements *might* matter more (or less) than aluminum content, we have not conducted such an analysis and our statements should not be construed as an indication that we are relying on these differences in our determination.  However, there is no need to rely on any such analysis of the relative proportions of the other (minor) alloy elements.  The differences in aluminum content alone raise serious doubts about Zhongji's assertions that 1050 alloy is more representative of the products that Zhongji (or Xiashun) purchased, compared to the products in the broad HS subheading 7606.12 export data.

Zhongji also argued in its comments on the Draft Results of Redetermination and in its benchmark submission that "aluminum foil stock like the one used by {the Zhongji Respondents} [

]," and that "most of the aluminum sheet covered by {HS subheading} 7606.12 [

]"[97]  However the calculation which Zhongji finds it necessary to make to the CRU 1050 aluminum alloy data, which Zhongji proposed we use instead, relies on both [                    ] GTA export data for and [        ] GTA export data for HS subheading 7606.12.  Zhongji's methodology thus relies on an assumption that the differences between the products represented by the [                    ] export data and the products represented by the [        ] export data are insignificant.  Otherwise, the ratio between the [                    ] export AUVs and the CRU price data for 1050 aluminum alloy rolled products cannot be reasonably applied to the [        ] Export AUVs, even to attempt to merely

---

[97] *See* Zhongji Respondents' Benchmark Submission at 3-4 and Exhibit 10 and Zhongji Case Brief at 26-27.  *See also* ITC Aluminum Industry Report at 519.

approximate world market prices. Unsurprisingly, therefore, Zhongji suggests in its comments

on the Draft Results of Redetermination that "if Commerce does not agree with Zhongji's

proposed benchmark calculation in combination with the GTA data to arrive at [

                              ], Commerce should use the CRU data alone."[98]  Zhongji suggests that

to actually eliminate the possibility of the supposed product mis-match created by using export

AUVs, we would need to rely directly on the CRU Report data for 1050 aluminum alloy.

However, the CRU Report data are not "tier two" (world market) prices, and the CRU Report

data are at best an estimate of "tier two" (world market) prices.  Thus, in order to avoid the

supposed product mismatch issue Zhongji is concerned with (the potential mismatch between the

products Zhongji purchased and the products represented by the TDM export AUVs for HS

subheading 7606.12), not only would we need to accept an even more explicit mis-match (that

between the 1050 aluminum alloy and the products Zhongji purchased), we would also have to

depart entirely from the "tier two" (world market) prices available on the record in favor of

benchmarks that are not a "tier two" (world market) prices at all.  We find that this is no solution

at all, and in fact only introduces a clearer and more explicit product mismatch as well as a

methodological problem, as the Zhongji Respondents' proposed methodology (and the

alternative methodology of using the CRU data directly proposed by the Zhongji Respondents)

departs from the regulatory framework regarding "world market price" "available to purchasers

in the country in question" as provided under 19 CFR 351.511(a)(2).

> ***Zhongji is incorrect that the Commerce's finding hinges on the assumption that the
> CRU Report prices are derived from LME primary aluminum prices.***

Zhongji also notes that we stated in the Draft Results of Redetermination, as we reiterated

above, that it is not actually clear whether the CRU Report prices for 1050 aluminum alloy rolled

---

[98] *See* Zhongji Case Brief at 7.

products are derived from the LME prices contained therein by adding the cost of conversion

from primary aluminum to 1050 aluminum alloy rolled products (*i.e.*, "conversion fees"), or

whether these conversion fees are derived from the LME prices and the 1050 aluminum alloy

rolled product prices.  On this basis, Zhongji argues that "{t}he CRU Report…clearly shows that

the prices for alloy 1050 products [                                                                                    ].

However, this is not in dispute.  It is clear that the conversion fees represent the difference

between the 1050 aluminum alloy rolled product prices and the LME primary aluminum prices.

It is not clear whether the 1050 aluminum alloy rolled product prices are derived from the LME

primary aluminum prices and the conversion fees or whether the conversion fees are derived

from the LME primary aluminum prices and the 1050 aluminum alloy rolled product prices.

However, this distinction is not necessary to the results of our analysis, and as we have explained

in the Draft Results of Redetermination and above, as long as this matter is in doubt, it would not

be reasonable for us to reject the CRU 1050 aluminum alloy rolled product prices merely on the

basis that they are derived from LME prices.  Thus, as explained in the *Final Results*, and further

explained in the Draft Results of Redetermination and above, there are other sufficient reasons to

reject the CRU 1050 aluminum allot prices and the Zhongji Respondents' proposed benchmarks

derived therefrom.

As explained above, Zhongji provided a third-party expert declaration to establish that

most products under HS subheading 7606.12 are not suitable for foil production.  The Zhongji

respondents argue that Commerce cannot deem an expert declaration non-authoritative simply by

reasoning that the declaration is "contradicted by the petitioners," a participating party of

opposite interest in the case.  However, we are not simply rejecting the only uniquely expert

opinion on this matter on the record.  Rather, we merely recognize that this expert is no more

C-570-054

authoritative on this matter than either Zhongji or the petitioners.  Moreover, as we explained

above, the statements contained in the declaration do not specify how much of world exports

under HS subheading 7606.12 are represented by foil stock aluminum sheet of the kind that the

Zhongji Respondents used, or by 1050 aluminum alloy rolled products, or how much of these

export volumes are made up of the types of sheet and plate that are unsuitable for use as foil

stock.  These statements are also not supported by any other specific record evidence.  Therefore,

the expert declaration provided by the Zhongjji Respondents does not demonstrate that grade

1050 aluminum alloy rolled products better represent the products that the Zhongji Respondents

purchased than the TDM HS subheading 7606.12 export data.  Thus, while we do not discount

the value of the expert declaration, this expert opinion is neither specific nor sufficiently

supported (either alone or in combination with the Zhongji Respondents' own expertise) to

supersede the expertise of the petitioners or other record evidence.

    As explained in the Draft Results of Redetermination and as explained above, the Zhongji

Respondents placed an Aluminum Industry Report on the administrative record and used

information describing the uses of aluminum sheet and plate on page 54 of this report to support

their statement in the Zhongji Respondents' Benchmark Submission that "{a}n important

volume of the product imported under HS subheading 7606.12 is aluminum plate, which is used

in heavy-duty applications, for which it is often machined to shape, *e.g.*, as structural sections for

ships, armor for military vehicles and storage tanks."[99]  As we explained in the Draft Results of

Redetermination and above, these statements, from the ITC Aluminum Industry Report, do not

specify the relative proportions of these identified applications nor their proportions relative to

the overall uses of aluminum plate, sheet and strip.  Moreover, the apparent purpose of the

---

[99] *See* Zhongji Respondents' Benchmark Submission at 3-4 (citing Aluminum Industry Report at 54).

statement is not to distinguish between the relative volumes of different commercial grades of aluminum sheet exported from around the world, but merely to list examples of applications of aluminum plate and sheet.  As explained above, on the basis of the ITC Aluminum Industry Report, the Zhongji Respondents claimed that "aluminum foil stock like the one used by {the Zhongji Respondents} [

                                    ]," and that "most of the aluminum sheet covered by {HS subheading} 7606.12 [

                                                ]"[100]  These statements are unsupported by record evidence. Contrary to Zhongji's contention, the ITC Aluminum Industry Report simply does not demonstrate that grade 1050 aluminum alloy rolled products better represent the products that the Zhongji Respondents purchased than the TDM HS subheading 7606.12 export data.

For these reasons, we find that the benchmark that we used in the *Final Results* continues to be superior to any of the other benchmark possibilities that are on the record.  Accordingly, no changes to the *Final Results* are necessary.  With the above matters addressed, we conclude that we have complied with the *Remand Order*.

**Comment 2:   The Benchmark for the Land for LTAR Program**

***Zhongji's Comments***[101]

- Commerce's continued reliance on the Thai 2010 CBRE Report data for the land benchmark does not comply with the *Remand Order*, because Commerce did not explain the purported practice "to select data sources that correspond most closely to the point in time at which land use rights were purchased."
- In the Draft Results of Redetermination, Commerce cited to the regulation on non-recurring subsidies in determining that "contemporaneity is identified by Commerce's regulations with reference to the year in which the subsidy is approved."

---

[100] *See* Zhongji Respondents' Benchmark Submission at 3-4 and Exhibit 10 and Zhongji Case Brief at 26-27.  *See also* ITC Aluminum Industry Report at 519.
[101] *See* Zhongji's Comments at 7-17.

- Commerce continued to rely on the reasoning that the 2010 CBRE Report data are more contemporaneous than Zhongji's proposed benchmarks because the 2010 Report corresponds more closely to the year when Zhongji acquired the land use rights.
- Commerce failed to adequately explain this purported practice because 1) the timing of Commerce's placement of the 2010 CBRE Report data on the record suggests that Commerce's reasoning is pretextual and 2) Commerce has constantly relied on the same outdated report even when the land purchase years do not correspond more closely to 2010.
- Commerce placed the 2010 CBRE Report data on the record before Zhongji reported the land purchase years in its Section III questionnaire response, indicating that Commerce intended to use the 2010 CBRE Report data before knowing when Zhongji purchased the land use rights. The timing of the placement of the 2010 CBRE by Commerce undermines its own finding that Commerce considered land purchase years in determining the contemporaneity of benchmark sources.
- Commerce has relied on the same outdated report in numerous cases even when the land purchase years by respondents do not correspond more closely to 2010. It is unreasonable and arbitrary for Commerce to claim that it has a practice here just because the facts in this case happen to support it while failing to follow the supposed "practice" in other cases when the facts do not support it.
- Because Commerce failed to adequately explain its purported practice of associating contemporaneity with respondents' land purchase years, Commerce failed to explain why the 2010 CBRE Report data are more contemporaneous than Zhongji's proposed data covering the POR. Commerce, therefore, must exclude the 2010 CBRE data in the final remand redetermination.
- Commerce failed to comply with the CIT's order to explain its selection of the 2010 CBRE Report data because Commerce cannot point to any other record evidence to support its economic comparability analysis other than the extremely outdated underlying data – as old as the year 2000 – relied on in *LWS from China*.
- Commerce also failed to adequately explain its analysis of geographic proximity factor in land benchmark selection. Commerce could point to nothing but the "previously conducted {} analysis in a CVD proceeding," namely, *LWS from China*.
- Commerce in that case, however, relied on extremely outdated data in determining that China and Thailand are economically comparable. For example: (1) Commerce decided that Thailand and China have similar Gross National Income based on 2006 data; (2) Commerce decided that population density of Thailand and China was comparable based on data from 2000 and 2004 and (3) Commerce tracked investor perception using data from 2005 and 2006.
- The Land Analysis Memorandum Commerce cited in the Draft Results of Redetermination also did not attempt to update the economic comparability metrics for POR 2021.
- The Land Analysis Memorandum and the *LWS from China* decision do not support Commerce's economic comparability analysis because the underlying data are fatally outdated. The same court then rejected Commerce's continued use of the 2010 CBRE Report data on remand for the second time, because more contemporaneous Malaysia data existed on the record.
- Commerce also failed to adequately explain its practice of considering the geographical proximity factor. In the Draft Results of Redetermination, Commerce merely stated that

location is naturally associated with purchasing land, but still fails to answer the question of why the land benchmark country has to be proximate to China.

- Commerce further explained that it must consider geographical proximity because of "the unique nature of land, which cannot be traded across borders like consumer commodities." Even though Commerce relied on the non-liquidity of land in determining to use tier-three benchmarks instead of tier-two market prices, it did not explain in the Draft Results of Redetermination how the non-liquidity of the land validates Commerce's consideration of geographical proximity.
- In explaining its exclusion of the 2016-2018 CBRE Reports, Commerce stated that Zhongji did not provide economic comparability information for Mexico and Brazil and that the reports pertain to "logistics rent but not to manufacturing facilities, claimed that Zhongji did not explain the relevance between Mexico and Brazil being surrogate countries for China and the economic comparability in the CVD benchmark context. However, Commerce, in selecting the surrogate country in the AD proceeding, referenced "economic comparability," which is a factual determination directly relevant to the land benchmark determination here.
- Commerce was incorrect in concluding that the surrogate country list in a parallel AD review does not support Mexico and Brazil's economic comparability to China. To the contrary, the parallel AD determination firmly establishes that "Brazil...Mexico...are at the same level of economic development as China."
- Commerce unreasonably rejected the 2016-2018 CBRE Reports because they pertain to "'logistics rent'...while the 2010 CBRE Report data contains 'industrial land' rent." Logistics facilities, such as warehouses or distribution facilities, are a major land use for industrial companies like Zhongji and are a comparable type of land to measure the adequate remuneration of the land-use rights program.
- With regard to the Nexus Reports, the CIT instructed Commerce to explain "its selection of the 2010 CBRE Report specifically with reference to the adequacy, context and references for the data in that report in comparison to Commerce's criticism of the adequacy, context and references for the data in the Nexus Reports."
- Commerce continued to reject the Nexus Reports because they lack "explanation of the methodology used to collect data," while Commerce failed to point to the record evidence showing the data collection methodology used by the 2010 CBRE Report data.
- The 2010 CBRE Report contains only four pages of price tables with no explanation of data collection methodology.
- The Nexus Reports contains more explanations than the 2010 CBRE Report data, such as highlights on the overall economy and industrial land market overview.
- Commerce's citation to its past reliance on the 2010 CBRE Report data in other cases does not legitimize the lack of data collection methodology in that report.
- Commerce failed to comply with the *Remand Order* to explain its selection of the 2010 CBRE when that report suffers from the same alleged flaw of the Nexus Report.

*Petitioners' Comments*[102]

- Commerce is correct in continuing to rely on the CBRE report for the benchmark for examining the adequacy of remuneration for land.

_____

[102] *See* Petitioners' Comments at 5.

**Commerce's Position:**

We have reviewed the comments submitted for the final results of redetermination and have not changed our selection of the benchmark that we used in the *Final Results*. As we explained above, consistent with our practice, we find that is appropriate to use the 2010 CBRE Thai land data as the benchmark for Zhongji's land-use-rights purchases because, compared to the other benchmark data sources on the record, the 2010 CBRE Thai land data is more contemporaneous, better matches the type of land acquired, and is from a country which is more comparable to China in terms of level of economic development, population, and geographic proximity.

Zhongji argues that we failed to comply with the Court's order to explain the "purported" practice "to select data sources that correspond most closely to the point in time at which land use rights were purchased." Yet, the Zhongji Respondents fail to acknowledge our explanation in the Draft Results of Redetermination:

> {c}ontemporaneity is identified by Commerce's regulations with reference to the year in which the subsidy is approved, for example, when identifying a discount rate for the purposes of allocating a non-recurring subsidy (19 CFR 351.524(d)(3), "… select a discount rate based on the data for the year in which the government agreed to provide the subsidy …"). Additionally, in identifying a land for LTAR benchmark, Commerce's practice is to look to the year in which the land use rights were acquired from the government providing the subsidy to determine the appropriate time period for calculating the land benchmark.[103]

---

[103] *See, e.g., LWS from China* IDM at 17 ("In order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 *to the year the transaction was officially approved by the country*) … ." (emphasis added)); and *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011) ("New Zhongya acquired its land-rights in 2006, and the Guang Ya Companies acquired their land-use rights in 2007. As 2007 is more contemporaneous *with the times of these purchases*, we have used the 2007 prices for Thai industrial land for benchmark purposes." (emphasis added)); *see also Zhaoqing*, 961 F. Supp. 2d at 1345 (upholding Commerce's selection of the land benchmark as reasonable and stating "{Commerce's} defense of its decision not to discount for inflation rests on the relatively short time separating New Zhongya's *acquisition of land use rights* in June and October of 2006 and the second quarter of 2007 from which the indicative values in the CBRE Report were drawn." (emphasis added)).

Thus, Commerce's analysis, per its regulations and longstanding practice, is to consider the contemporaneity of a benchmark data source *vis a vis* the company or government transaction at issue; for subsidies approved during the AUL period, or before the POR, like the provision of land-use rights under examination here, the POR is not the relevant time period.[104] Here, the 2010 CBRE report data were issued in 2010, and were based on 2010 data; Zhongji's land-use-rights purchases took place in [                    ], while the 2016-2018 CBRE Reports and 2018 Nexus Report were issued, and pertain to data collected, nearly a decade after Zhongji's land-use-rights purchases.[105]  Thus, contrary to Zhongji's claims, the 2016-2018 CBRE Reports and 2018 Nexus Reports are not more contemporaneous "to the year in which the government agreed to provide the subsidy," which here, are the years [                    ].[106]

Regarding Zhongji's arguments that we "cannot point to any other record evidence to support {the} economic comparability analysis other than the extremely outdated underlying data relied on in {*LWS from China*}" and that, Commerce "failed to adequately explain its analysis of geographic proximity," Zhongji fails to point to the statute, a regulation, or case supporting its contention (or contradicting Commerce's practice) as explained above and in our Draft Results of Redetermination.  Indeed, the facts in *LWS from China* are reasonably contemporaneous with Zhongji's land purchases and the 2010 CBRE Report data, and there is no record evidence which contradicts Commerce's reasoning in *LWS from China*.

Moreover, Zhongji's argument that we failed to explain why the land benchmark country has to be proximate to China is misguided.  As we explained in the Draft Results of

---

[104] *See* 19 CFR 351.524(d)(3); *LWS from China* IDM at 17; *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2011) (*Aluminum Extrusions from China*); and *Zhaoqing*, 961 F. Supp. 2d at 1345.
[105] *See* Zhongji Respondents Final Calculation Memorandum at Exhibit 1 (worksheets "Zhongji Companies' Land LTAR AR," "Zhongji Co. Land Alloc AR," and "Land Benchmark AR").
[106] *Id.*; 19 CFR 351.524(d)(3); *LWS from China* IDM at 17; *see also Aluminum Extrusions from China*; and *Zhaoqing*, 961 F. Supp. 2d at 1345.

Redetermination, and above, geographical proximity is relevant for land, as location is always a primary factor in valuation, demonstrating geographical proximity is a cardinal consideration for benchmarking land.  As we further explained in the Draft Results of Redetermination, and above, land "cannot be traded across borders like consumer commodities."[107]  We have also explained why geographic proximity is an important factor, though it is not generally important for valuing tradeable commodities, which can be expressed based on consistent terms of delivery by making adjustments for movement expenses.  No such movement expense adjustments exist which can bring land onto consistent terms *vis a vis* location, as compared with land in China.  Therefore, because location is always a primary factor in valuation of land, and geographical proximity to China is an aspect of location, geographic proximity to China is a relevant consideration.  If we had potential benchmarks which were similar or identical in other respects, but differed in terms of, for example, whether the land was urban or rural land, we might consider that aspect of location as an important or even an overriding factor.  However, that is not the case here.  Here, we cannot consider land located anywhere in the world as interchangeable with land in a country which shares not only a continent, but also a border with China.  Therefore, geographical proximity is necessarily one factor to consider in our analysis.

Zhongji also disputes our finding that logistics rent is less applicable to Zhongji's land purchases than industrial land rent in general because logistics facilities, such as warehouses or distribution facilities, are a major land use for industrial companies like Zhongji and are a

---

[107] *See, e.g., LWS from China* IDM at 17-18 ("We continue to base our finding on a comparison of prices for land-use rights in China with comparable market-based prices for land purchases in a country at a comparable level of economic development that is reasonably proximate to, but outside of, China."); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 FR 63788 (October 17, 2012) (*Solar Cells China*), and accompanying IDM at Comment 11 ("While we did take the proximity of Thailand to {China} into consideration, it was part of a wider finding regarding the 'perception that producers consider a number of markets, including Thailand, as an option for diversifying production bases in Asia beyond China'").

comparable type of land.  However, we conclude that since there is not record information that

the land right purchases in question pertain specifically to logistics-related land because the

Zhongji Respondents are manufacturing companies, we find that benchmarks specific to factory

land purchases are more suitable for use as benchmarks for Zhongji's land-use-rights purchases,

and that the use of land benchmarks that are specific to logistics facilities is not warranted and

less preferable.

With regard to Zhongji's argument that our criticism of the lack of methodology

explanation for the Nexus Reports was unconvincing because the 2010 CBRE Report data

suffers from the same flaw, we note that Commerce has used the 2010 CBRE Report data many

times and has addressed the methodology used in the CBRE Report in other proceedings.[108]

Accordingly, we find that no changes to the *Final Results* are necessary.  With the above

matters addressed, we conclude that we have complied with the *Remand Order*.

## V.    FINAL RESULTS OF REDETERMINATION

We have addressed the issues remanded to us by the Court.  As described above, we

determine that no changes are necessary to our selection of benchmarks with respect to the

---

[108] *See LWS from China* IDM at 17-18 and Comment 11; *Solar Cells China* IDM at 6; and *Mechanical Transfer Drive Components from China* IDM at 13-14.

LTAR benefit calculation for respondent's aluminum sheet purchases, or to our selection of

benchmarks with respect to the LTAR benefit calculation for respondent's land use rights.

8/4/2023

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance