## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. ET AL., | ) ) ) |
| Plaintiffs | ) ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) **Ct. No. 21-00133** |
| Defendant, | ) ) **Nonconfidential Version** |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) ) ) |
| Defendant-Intervenors. | ) ) ) |

**OBJECTIONS TO REMAND RESULTS OF PLAINTIFFS JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. (F/K/A JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD.), JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD. AND ANHUI MAXIMUM ALUMINIUM INDUSTRIES COMPANY LIMITED**

Jeffrey S. Grimson
Sarah M. Wyss
Yixin (Cleo) Li
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

September 18, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT .....................................................1

STANDARD OF REVIEW .......................................................................................................2

ARGUMENT ...........................................................................................................................3

  I.  COMMERCE'S CONTINUED RELIANCE ON THE TDM DATA COVERING HTS
      SUBHEADING 7606.12 FOR THE ALUMINUM SHEET AND PLATE BENCHMARK
      WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE
      WITH LAW ...................................................................................................................3

    A.  Commerce Failed to Adequately Explain Its Finding that the TDM Data Correspond
        More Closely to Zhongji's Purchases than the CRU Data ....................................4

    B.  Commerce Wrongly Claimed that the CRU Data are not Tier-Two Benchmark Prices
        ...................................................................................................................................9

    C.  Commerce Continued to Fail to Explain Its Rejection of the CRU Data Based on the
        Calculations of the 1050 Alloy Sheets in the Report ............................................10

  II. COMMERCE'S DETERMINATION TO CONTINUE TO INCLUDE THE 2010
      CBRE REPORT FOR THE LAND BENCHMARK CALCULATION WAS NOT
      SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH
      LAW ...........................................................................................................................12

    A.  Commerce Failed to Adequately Explain its Purported Practice to Select Land
        Benchmarks that Correspond More Closely to the Land Purchase Years ...............12

    B.  Commerce Continued to Rely on Outdated and Flawed Economic Comparability and
        Geographic Proximity Analysis in Selecting the 2010 CBRE Report ...................15

    C.  Commerce Wrongly Continued to Exclude the 2016-2018 CBRE Reports and the
        Nexus Reports...........................................................................................................18

CONCLUSION......................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Huttenwerke v. United States,
28 CIT 94, 310 F. Supp. 2d 1347 (2004) ................................................................2

Canadian Solar, Inc. v. United States,
918 F.3d 909 (Fed. Cir. 2019) ..............................................................................3

Changzhou Trina Solar Energy Co. v. United States,
42 CIT __, 352 F. Supp. 3d 1316 (2018) ...............................................................12

Changzhou Trina Solar Energy Co. v. United States,
975 F.3d 1318 (Fed. Cir. 2020) ............................................................................2

Consol. Edison Co. v. NLRB,
305 U.S. 197 (1938) ............................................................................................2

Huayin Foreign Trade Corp. v. United States,
322 F.3d 1369 (Fed. Cir. 2003) ............................................................................2

Jiangsu Zhongji Lamination Materials Co., (HK) v. United States,
No. 21-00138, 2023 Ct. Intl. Trade LEXIS 88 (June 7, 2023).................................10

Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States,
__ CIT __, 625 F. Supp. 3d 1355 (2023) .......................................................passim

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) ..............................................................................................3

NMB Sing. Ltd. v. United States,
28 CIT 1252, 341 F. Supp. 2d 1327 (2004) ............................................................2

Risen Energy Co. v. United States,
46 CIT __, 570 F. Supp. 3d 1369 (2022) .................................................9, 16, 17

Risen Energy Co. v. United States,
No. 20-03912, 2023 Ct. Intl. Trade LEXIS 52 (Apr. 11, 2023)................................17

Shenzhen Xinboda Indus. Co. v. United States,
41 CIT __,  279 F. Supp. 3d 1265 (2017) ..............................................................5

SKF USA Inc. v. United States,
263 F.3d 1369 (Fed. Cir. 2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003)..................3, 14

SolarWorld Ams., Inc. v. United States,
910 F.3d 1216 (Fed. Cir. 2018)............................................................................2

Transactive Corp. v. United States,
91 F.3d 232 (D.C. Cir. 1996) ...........................................................................3, 14

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...............................................................................2

**Regulations**

19 C.F.R. 351.511(a)(2)…………………………………………………….........9, 10

**Other Authorities**

Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Countervailing
Duty Administrative Review and Rescission of Review, in Part; 2021, 88 Fed. Reg. 28,496
(Dep't of Commerce May 4, 2023) .......................................................................14

Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping
    Duty Administrative Review, Preliminary Determination of No Shipments, and Partial
    Rescission; 2017-2019, 85 Fed. Reg. 37,829 (Dep't of Commerce June 24, 2020) ..................... 19

Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty
    Administrative Review; Calendar Year  2012 and Rescission of Countervailing Duty
    Administrative Review, in Part, 79 Fed. Reg. 51,140 (Dep't of Commerce Aug. 27, 2014) .......... 9

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's
    Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative
    Review; 2019, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) ...................................... 14

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's
    Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed.
    Reg. 46,904 (Dep't of Commerce July 19, 2016) .......................................................................... 8

Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances
    Determination: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules,
    from the People's Republic of China, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) 21

Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in part,
    of Critical Circumstances: Laminated Woven Sacks from the People's Republic of China, 73 Fed.
    Reg. 35,639 (Dep't of Commerce June 24, 2008) ....................................................................... 21

Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative
    Countervailing Duty Determination; Preliminary Affirmative Determination of Critical
    Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final
    Antidumping Duty Determination, 72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007) ...... 16

Multilayered Wood Flooring From the People's Republic of China: Preliminary Results and Partial
    Rescission of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 78,644 (Dep't of
    Commerce Dec. 22, 2022) .............................................................................................................. 14

Preliminary Affirmative Determination and Alignment of Final Determination With Final
    Antidumping Duty Determination: Certain Iron Mechanical Transfer Drive Components from the
    People's Republic of China, 81 Fed. Reg. 21,316 (Dep't of Commerce Oct. 28, 2016) ............... 21

Plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (F/K/A Jiangsu Zhongji Lamination Materials Stock Co., Ltd.), Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry Co., Ltd. and Anhui Maximum Aluminium Industries Company Limited (collectively, "Zhongji"), producers and exporters of the subject merchandise, submit comments in opposition to the remand redetermination filed by the U.S. Department of Commerce ("Commerce").  See Final Results of Redetermination Pursuant to Court Remand (Aug. 4, 2023) (Public Version), ECF No. 68 ("Remand Redetermination") (REM P.R. 6).

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

In its Remand Redetermination, Commerce failed to implement the directive of the Court by not adequately explaining its continued selection of the Trade Data Monitor ("TDM") data over the Commodities Research Unit ("CRU") data, its purported practice of selecting the contemporaneous land benchmark, and its comparability analysis in selecting the Coldwell Banker Richard Ellis Asian Marketview Report for Thailand Industrial Land Report ("2010 CBRE Report") over Zhongji's proposed benchmarks.  This Court remanded Commerce's Final Results in the first administrative review of the countervailing duty order on certain aluminum foil from China to reconsider 1) the benchmark selection for the provision of aluminum sheet and/or plate and strip for less than adequate remuneration ("LTAR") program and 2) the benchmark selection for the provision of land-use rights for LTAR program.  See Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States, __ CIT __, __, 625 F. Supp. 3d 1355, 1377 (2023) (Public Version) ("Remand Order").

Commerce's Remand Redetermination on these two issues continues to be unsupported by substantial evidence and not in accordance with law.  Specifically, Commerce failed to adequately

explain how the overbroad TDM data correspond more closely to Zhongji's sheet purchases than the CRU data provided by Zhongji.  Based on the record evidence, Commerce only had one reasonable benchmark choice – the product-specific data in the CRU Report.  Second, Commerce failed to support its continued reliance on the outdated 2010 CBRE Report as the land benchmark, an extremely outdated source compared to the period of review ("POR") years 2017-2018.  Commerce also failed to support its purported practice of using the land purchase years, instead of the POR, to assess the contemporaneity of the land benchmark sources.  In addition, Commerce was unsupported in its continued reliance on one obsolete case in 2007 as the basis for the economic comparability analysis of the 2010 CBRE Report.  Finally, Commerce's criticisms of Zhongji's proffered land benchmarks remain unsupported and unreasonable.

## STANDARD OF REVIEW

The Court reviews remand determinations for compliance with its remand order.  See NMB Sing. Ltd. v. United States, 28 CIT 1252, 1260, 341 F. Supp. 2d 1327, 1334 (2004).  Further, any factual findings on remand must be supported by substantial evidence and the agency's legal determinations must be in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B)(i); see also AG der Dillinger Huttenwerke v. United States, 28 CIT 94, 106, 310 F. Supp. 2d 1347, 1358 (2004).

Substantial evidence requires "more than a mere scintilla," see, e.g., Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020)  (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the court shall consider not only the information that supports the agency's decision but also whatever in the

"record fairly detracts from the substantiality of the evidence." Changzhou Trina, 975 F.3d at 1326 (quoting SolarWorld Ams., Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018)).

Further, the arbitrary and capricious standard requires that "Commerce's determination is the product of reasoned decision making" or "a reasoned explanation." Canadian Solar, Inc. v. United States, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983)). An agency's action is arbitrary when the agency offers insufficient reasons for treating similar situations differently. See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003) quoting Transactive Corp. v. United States, 91 F.3d 232, 237, (D.C. Cir. 1996) (internal quotation marks omitted).

## ARGUMENT

**I.  COMMERCE'S CONTINUED RELIANCE ON THE TDM DATA COVERING HTS SUBHEADING 7606.12 FOR THE ALUMINUM SHEET AND PLATE BENCHMARK WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

Commerce's continued use of the TDM data is inconsistent with the Remand Order, unsupported by substantial evidence and not in accordance with law because Commerce ignored the severe overbreadth of the TDM data, wrongly claimed that relying on CRU data alone deviates from tier-two world market benchmark prices and failed to explain its rejection of the CRU data based on the London Metal Exchange ("LME") data in the report. The Court remanded Commerce's use of the TDM data for Commerce to further explain its selection of the TDM data over the CRU data covering alloy 1050 sheets. See Remand Order, __ CIT at __, 625 F. Supp. 3d at 1370. In the Remand Order, the Court stated that Commerce did not adequately explain its finding that the TDM data correspond more closely to Zhongji's purchases than the CRU data. See id. at 1371. Specifically, Commerce did not adequately explain the alleged "wider variation"

3

between the CRU Report's alloy 1050 products and Zhongji's purchases, compared to TDM's six-digit HTS subheading products.  Id.  The Court also instructed Commerce to further explain how the LME data in the CRU Report supported Commerce's decision to reject the CRU Report.  See id. at 1371-1372.

As explained below, first, Commerce's continued selection of TDM data over the CRU data is unsupported by substantial evidence and not in accordance with law because Commerce fixated on the imperfection of Zhongji's CRU data while ignoring the more severe overbreadth issue with the TDM data.  In doing so, Commerce unreasonably dismissed various pieces of record evidence corroborating the overbreadth of the TDM data.  Second, Commerce wrongly claimed that relying on CRU data alone deviates entirely from tier-two world market benchmark prices when the regulation doesn't demand use of global export data and when Commerce itself has relied on data short of global coverage in other cases.  Third, Commerce's attempted explanation of its rejection of CRU data based on the LME data in the report is entirely unreasonable and unsupported.

## A. Commerce Failed to Adequately Explain Its Finding that the TDM Data Correspond More Closely to Zhongji's Purchases than the CRU Data

First, Commerce did not adequately explain the superiority of the TDM data over the CRU data.  The CRU data covering alloy 1050 correspond more closely to Zhongji's 1XXX alloy and 8XXX alloy purchases[1] than TDM's overbroad global export data covering HTS subheading 7606.12.  Zhongji provided a declaration from [ ██████████████████████████████████ ██████████████████████████████ ] who has extensive experience in trading aluminum sheet in a wide range of alloys and a U.S. International Trade Commission ("ITC")

---

[1] The Court granted Zhongji's motion for leave to publicly disclose Zhongji's own alloy purchase information in the litigation.  See Order (Nov. 9, 2022), ECF No. 55.

4

report on the aluminum industry to establish that most aluminum products under HTS subheading 7606.12 are not suitable for foil production.  <u>See</u> Letter on Behalf of Zhongji to Commerce re: Benchmark Submission at Ex. 10 (Apr. 1, 2020) (Public Version) ("Zhongji Benchmark") (P.R. 311); Zhongji Benchmark at Ex. 11 (Business Proprietary Document) (C.R. 205).  Specifically, the expert declaration states that "[ ███████████████████████████████ ███████████████████████   ████████████████████████████ ████████████████████████████████████████████ ████████████████ ]"  <u>See</u> Zhongji Benchmark at Ex. 11 (Business Proprietary Document) (C.R. 205).  The ITC Report corroborates this claim in showing that alloy series 2XXX to 7XXX, the majority of the alloy series under HTS subheading 7606.12, are often used in expensive industries, such as aircraft, automotive and shipbuilding industries.  <u>See id.</u>  at Ex. 10, pp. 530-31, Table I.1 (Public Version) (P.R. 311).

In the Remand Redetermination, Commerce unreasonably found the expert declaration non-authoritative and dismissed both the expert declaration and the ITC Report because they do not specify the exact export volumes of irrelevant products under the six-digit code.  <u>See</u> Remand Redetermination at 39-41 (Public Version) (REM P.R. 6).   Commerce's conclusions are unsupported.  Commerce deemed the third-party expert declaration non-authoritative simply by reasoning that the declaration is "contradicted by the petitioners," a participating party of opposite interest in the case.  <u>Id.</u> at 11 (not specifying which of the petitioners' statements on the record contradict Zhongji's expert declaration).  Commerce added that it "merely recognize{s} that this expert is no more authoritative on this matter than either Zhongji or the petitioners."  <u>Id.</u> at 39-40. It, however, failed to establish how the expert is no more authoritative when the expert is an independent third party and has had experience in producing and trading aluminum sheets for [

██████████ ].  See Zhongji Benchmark at Ex. 11 (Business Proprietary Document) (C.R. 205);

see also Shenzhen Xinboda Indus. Co. v. United States, 41 CIT __, __, 279 F. Supp. 3d 1265, 1289

(2017) (remanding Commerce's dismissal of an expert opinion by an import and export trade

expert with over twenty years of experience).  In fact, the current case is analogous to Shenzhen

Xinboda in that Commerce did not, and could not, point to any contrary record evidence

controverting the facts established in the expert declaration.  Shenzhen Xinboda, 41 CIT at __, 279

F. Supp. 3d at 1281 (In remanding Commerce's dismissal of the expert opinion, the court reasoned:

"neither Commerce nor the Domestic Producers point to any record evidence to controvert the

facts set forth in the Researcher Declaration.").

In addition, Commerce does not need the specific export volumes of the aluminum sheet

and plate not used for foil production to determine that the TDM data are overbroad because ample

record evidence indicates that a majority of aluminum plate, sheets and strip classified under HTS

subheading 7606.12 are not foil stock.  For example, as shown in the below excerpt of the ITC

Harmonized Tariff Schedule of the United States, 7606.12.60 is a subcategory for "Clad"

aluminum, which cannot be used as foil stock.

| 7606.12 | | Of aluminum alloys: |
|---|---|---|
| 7606.12.30 | | Not clad……................................................................ |
| | 30 | With a thickness of more than 6.3 mm…................................... |
| | | With a thickness of 6.3 mm or less: |
| | | Aluminum can stock: |
| | 45 | Body stock…................................................................ |
| | 55 | Lid stock…................................................................ |
| | 90 | Other….................................................................... |
| 7606.12.60 | 0 | Clad….................................................................... |

Letter on Behalf of Xiashun to Commerce re: Final - Benchmark Submission at Ex. 11 (Apr. 1,

2020) (Public Version) (P.R. 321).  Further, for products less than 6.3 mm thick, 7606.12.30.45

and 7606.12.55 are aluminum can stock that is not usable as foil stock.  One eight-digit subheading

and two ten-digit subheadings under the HTS subheading 7606.12 cannot possibly be used for foil stock. Thus, Commerce was unreasonable in concluding that HTS subheading 7606.12 is not overbroad because Zhongji did not provide specific export volume of non-foil-stock products.

In addition to the majority of subcategories under 7606.12 not being used as foil stock, the HTS subheading also does not distinguish between different alloys. Zhongji provided the International Alloy Designation Standard to show that there are eight alloy series groups with a total of hundreds of alloys designed for different end uses and customer needs. See Zhongji Benchmark at Ex. 9 (Public Version) (P.R. 311). Zhongji also provided the ITC Aluminum Report showing the major end uses for each series. See id. at Ex. 10, pp. 530-31, Table I.1. Notably, only series 1XXX and 8XXX show end uses "food packaging" and "foil," while series 2XXX to 7XXX only show end uses that require expensive, high-value-added products, such as end uses for aircraft, automotive or marine industries. Id. This further proves that the HTS subheading 7606.12 not only includes irrelevant subcategories for foil production such as clad aluminum or can stock, but also includes hundreds of irrelevant alloys not suitable for foil production.

Commerce's discussion on alloy grades and comparison of chemical compositions is also misplaced. Commerce wrongly focused on the fact that Zhongji and Xiashun did not purchase the exact alloy grade, 1050 alloy, covered by the CRU data but failed to acknowledge the wider variation between Zhongji's alloy purchases and the hundreds of other alloys covered under HTS subheading 7606.12. See Remand Redetermination at 34-35 (Public Version) (REM P.R. 6). Commerce emphasized that Zhongji's 8XXX alloy purchases have a slightly lower aluminum content than 99%, compared to 1050 alloy's 99.5% aluminum content, but ignored that most alloy grades from 2XXX to 7XXX have much lower aluminum content. See id. at 35; see also Zhongji Benchmark at Ex. 9 (Public Version) (P.R. 311) (showing, for example, that most 7XXX alloys

contain 4-9% percent of Zinc, making the residual aluminum purity as low as 91%).  The addition

of other chemical elements in most alloy grades from 2XXX to 7XXX provides different physical

characteristics for many other industry uses than foil production.  When compared to the hundreds

of other alloys with much lower aluminum content, CRU's 1050 alloy is more representative of

both Zhongji's 1XXX and 8XXX alloy purchases than the alloys reflected in the TDM data.  See

Zhongji Benchmark at Ex. 9 (Public Version) (P.R. 311-314).  Commerce also failed to explain

why the "other elements" other than aluminum matter more than aluminum content and why other

elements must match perfectly among Zhongji's own alloys, and also in relation to 1050 alloy.

See Remand Redetermination at 15 (Public Version) (REM P.R. 6).  It is, therefore, unreasonable

for Commerce to focus on the minor mismatch between alloy 1050 and Zhongji's alloys without

considering the much bigger mismatch between other hundreds of alloys and Zhongji's alloys.

Most importantly, Commerce and the petitioner never pointed to contrary evidence proving

how products under the HTS subheading 7606.12 correspond more closely to Zhongji's alloys.

Remand Order, __ CIT at __, 625 F. Supp. 3d at 1371.  Commerce relied on the only fact that

Zhongji's alloys are all classified under the HTS subheading 7606.12.  See Remand

Redetermination at 9 (Public Version) (REM P.R. 6).  In fact, Commerce itself recognized that the

TDM data are "imperfect in terms of the exact range of products covered by the data and their

relative proportions *vis a vis* the range and proportions of the products found in the Zhongji

Respondents' (and Xiashun's) purchase data, in particular with regard to chemical compositions

and primary commercial uses."  Id. at 13.  Being the most inclusive product category does not

make the data more representative than a narrower set of data with minor mismatches.  On the

contrary, when ample record evidence proves that the HTS subheading 7606.12 includes an

overwhelming majority of products unsuitable for foil production, the only reasonable and

representative benchmark option is the CRU data.  See Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1335 (2018) ("Trina I") ("Commerce failed to meaningfully assess the reliability of the Comtrade data and included it despite indications that it is overinclusive in regards to the types of glass included in the data."); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying Issues and Dec. Mem. at Cmt. 6, p. 20 ("{Commerce} normally attempts to rely on data reflecting the narrowest category of products encompassing the input product, where possible.")

In sum, Commerce wrongly concluded in the Remand Determination that Zhongji did not provide evidence on the overbreadth of HTS subheading 7606.12 when 1) the HTS subheading 7606.12 includes a majority of subcategories not used as foil stock and 2) the subheading does not distinguish between alloys, the majority of which cannot be used for foil production.  Commerce's continued reliance on the TDM data, therefore, was inconsistent with the Remand Order, not supported by substantial evidence and not in accordance with law.

**B. Commerce Wrongly Claimed that the CRU Data are not Tier-Two Benchmark Prices**

Zhongji proposed that Commerce use CRU data alone if Commerce did not agree with Zhongji's inclusion of GTA data to reach [███████████████].  Zhongji Comments on Draft Remand Redetermination at 7 (Business Proprietary Document) (REM C.R. 2).  In response, Commerce overstated in the Remand Redetermination that it would "have to depart entirely from the 'tier two' (world market) prices" in order to adopt Zhongji's data.  Remand Redetermination at 38 (Public Version) (REM P.R. 6) (citing to 19 C.F.R. 351.511(a)(2)).  This statement is unsupported by the law.  The regulation does not define "world market price" and

certainly does not limit it to global export data only.  See 19 C.F.R. 351.511(a)(2).  Commerce, in fact, has frequently used data short of global coverage as tier two world market benchmarks in the past.  See, e.g., Risen Energy Co. v. United States, 46 CIT __, __, 570 F. Supp. 3d 1369 at 1377-79 (2022) ("Risen I") (sustaining Commerce's use of Xeneta data covering only a few countries for the tier-two ocean freight benchmark); Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year  2012 and Rescission of Countervailing Duty Administrative Review, in Part, 79 Fed. Reg. 51,140 (Dep't of Commerce Aug. 27, 2014), and accompanying Issues and Dec. Mem. Cmt. 1, p. 11 (averaging European and Russian prices, less than global coverage, for the tier-two natural gas benchmark). The CRU data are world market prices because they cover [ ██ ] different countries which are representative of prices that would be available to purchasers.  See 19 C.F.R. 351.511(a)(2). Commerce's rejection of using CRU data alone on the basis that it is not a world market price is, therefore, unsupported by substantial evidence and not in accordance with law.

**C.  Commerce Continued to Fail to Explain Its Rejection of the CRU Data Based on the Calculations of the 1050 Alloy Sheets in the Report**

Commerce, lastly, failed to comply with the Court's instructions to explain its rejection of the CRU Report based on the LME data included in the report.  See Remand Order, __ CIT at __, 625 F. Supp. 3d at 1371-1372.  Commerce stated in the Remand Determination that:

> It is not clear whether the 1050 aluminum alloy rolled product prices are derived from the LME primary aluminum prices and the conversion fees or whether the conversion fees are derived from the LME primary aluminum prices and the 1050 aluminum alloy rolled product prices.

Remand Redetermination at 39 (Public Version) (REM P.R. 6).  Commerce failed to explain why this alleged difference is meaningful.  Alloy sheet prices are composed of the LME ingot prices

and the additional conversion premiums.[2]  <u>See</u> Zhongji Benchmark at Ex. 7 (Business Proprietary

Document) (C.R. 205); <u>see also</u> <u>Jiangsu Zhongji Lamination Materials Co., (HK) v. United States</u>,

No. 21-00138, 2023 Ct. Intl. Trade LEXIS 88, at *28-29 (June 7, 2023) ("According to Zhongji,

'{a}luminum pricing generally consists of two components: (1) a conversion premium, negotiated

and agreed by the parties and (2) the price of the metal component that is based on the {LME}

ingot price.'").   The very presence of [ ███████████████████████████████████████

██████████████████████████████████████████ ], here aluminum sheet.  Both the record

and the court's past review of aluminum products, therefore, confirms that the sheet prices are

derived from LME prices plus conversion fees and premiums.  Further, regardless of whether the

1050 alloy sheet prices are derived from the LME base prices by adding conversion fees or whether

the 1050 alloy sheet prices are directly reported in the report, the 1050 alloy sheet prices were

published by a reputable metal market research company and remain accurate and usable.  <u>See</u>

Zhongji Benchmark at Ex. 7 (Business Proprietary Document) (C.R. 205).

In conclusion, Commerce's continued selection of the TDM data over the CRU data in the

is inconsistent with the <u>Remand Order</u>, unsupported by substantial evidence and not in accordance

with law.  Ample record evidence suggests that the HTS subheading 7606.12 (TDM data) includes

an overwhelming majority of aluminum products unsuitable for foil production.  The 1050 alloy

(CRU data), despite having minor mismatch from Zhongji's alloys, corresponds to Zhongji's

purchases more closely than the overbroad TDM data.  Commerce also baselessly claimed that

relying on CRU data alone deviates from tier-two benchmark, which is not supported by law or

past practice.  Lastly, Commerce's criticism of the calculations of the alloy sheet prices based on

---

[2] For example, [ ██████████ ]  1050 alloy price in 2017 is calculated as [ ██████████████████
████████████████████████████████████ ].  <u>See</u> Zhongji Benchmark at Ex.
7 (Business Proprietary Document) (C.R 205).

the LME ingot prices in the CRU Report was unreasonable and unsupported.  The Court must remand Commerce's reliance on the TDM data for the reasons stated herein.

**II.  COMMERCE'S DETERMINATION TO CONTINUE TO INCLUDE THE 2010 CBRE REPORT FOR THE LAND BENCHMARK CALCULATION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

The Court remanded Commerce's selection of the 2010 CBRE Report as a tier-three benchmark to assess the value of land-use rights.  See Remand Order, __ CIT at __, 625 F. Supp. 3d at 1373.  In remanding this issue, the Court directed Commerce to "explain further or reconsider its evaluation of the contemporaneity of data sources in the record — particularly Commerce's purported practice to select data sources that correspond most closely to the point in time at which land use rights were *purchased*."  Id. at __, 625 F. Supp. 3d at 1376.  The Court further instructed Commerce to explain or reconsider its selection of the 2010 CBRE Report and to address Zhongji's arguments for the 2016 to 2018 CBRE Reports and the Nexus Report.  See id.  In the Remand Redetermination, Commerce continued to find that the Thai land benchmark data in the 2010 CBRE Report contains the best record information to serve as a tier three benchmark for the land for LTAR program.  See Remand Redetermination at 44 (Public Version) (REM P.R. 6).  For the three reasons set forth below, Commerce's decision to include the 2010 CBRE Report in its benchmark calculation, instead of relying on the 2016 to 2018 CBRE Reports and the Nexus Reports was inconsistent with the Remand Order, not supported by substantial evidence and not in accordance with law.

**A. Commerce Failed to Adequately Explain its Purported Practice to Select Land Benchmarks that Correspond More Closely to the Land Purchase Years**

In the Remand Order, the Court directed Commerce to:

explain further or reconsider its evaluation of the contemporaneity of data sources in the record — particularly Commerce's purported practice to select data sources that correspond most closely to the point in time at which land use rights were purchased — with respect to Commerce's selection of a Tier 3 benchmark for the land program. See IDM at 32. Based on Commerce's explanation with respect to any such practice in evaluating the contemporaneity of data sources, the court further directs Commerce to explain the reasons that its selected benchmark on remand is consistent with such a practice.

Remand Order, __ CIT at __, 625 F. Supp. 3d at 1376.  Commerce failed to explain in particularity

its analysis of the "purported practice to select data sources that correspond most closely to the

point in time at which land use rights were purchased" to support its use of Thailand as a tier-three

benchmark source.  Remand Redetermination at 3 (Public Version) (REM P.R. 6).  In the Remand

Redetermination, Commerce focused its explanation on the cited regulation on non-recurring

subsidies in determining that "contemporaneity is identified by Commerce's regulations with

reference to the year in which the subsidy is approved."  Id. at 24.  Commerce then continued to

rely on the reasoning that the 2010 CBRE Report is more contemporaneous than Zhongji's

proposed benchmarks because the 2010 Report corresponds closer to the years when Zhongji

acquired the land use rights.  See id. at 22-24.  Commerce, however, failed to adequately explain

how it could have a "practice" of using data sources that correspond to land use purchases dates

when 1) Commerce put the 2010 CBRE Report on the record before knowing Zhongji's land

purchase dates and 2) Commerce has consistently relied on the same outdated report even when

the land purchase years do not correspond more closely to 2010.

First, Commerce placed the 2010 CBRE Report on the record before Zhongji reported the

land purchase years in its Section III questionnaire response, indicating that Commerce would

intended to use the 2010 CBRE Report regardless of the reported land purchase dates.  More

specifically, Commerce placed the 2010 CBRE Report on the record on July 29, 2019, while

Zhongji revealed the land purchase years for the first time in its September 20, 2019 Section III

questionnaire response.  See Mem. From John C. McGowan to the File re: Asian Marketview Report (July 29, 2019) (Public Document) (P.R. 57) ("Commerce CBRE Placement"); Letter from Zhongji to Commerce re: Section III Questionnaire Response by Jiangsu Zhongji Lamination Materials Co., Ltd. and Affiliates (Sept. 20, 2019) (Public Version) (P.R. 181).  The timing of the placement of the 2010 CBRE by Commerce undermines its own reasoning that Commerce considered land purchasers years in determining the contemporaneity of benchmark sources.

Second, Commerce has relied on the same outdated report in numerous cases even when the land purchase years by respondents do not correspond more closely to 2010.  For example, in the 2019 administrative review of Solar Cells from China, Commerce did not mention the "practice" concerning land purchase years as in this case, but instead relied on the 2010 CBRE Report even though it is "not as contemporaneous as they were when we were sustained in {the 2016 review}."  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019, 87 Fed. Reg. 40,491 (July 7, 2022), and accompanying Issues and Dec. Mem. at Cmt. 17, p. 71; see also Multilayered Wood Flooring From the People's Republic of China: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2020, 87 Fed. Reg. 78,644 (Dec. 22, 2022), and accompanying Dec. Mem. at 51 (unchanged in Final Results).

Notably, in the ongoing 2021 administrative review of the same case, Commerce preliminarily relied on the CBRE Report even though the reported land purchase years were closer to the 2021 POR than to 2010.  See Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2021, 88 Fed. Reg. 28,496 (May 4, 2023), and accompanying Dec. Mem. at 15.  Like the

14

2019 administrative review of Solar Cells from China, Commerce again did not mention any "practice" but only stated that "Commerce has normally relied on {the 2010} CBRE land benchmark data . . . and we continue to rely on such data." Id. It is unreasonable and arbitrary for Commerce to claim that it has a practice here just because the facts in this case happen to support it while failing to follow the supposed "practice" in other cases when the facts do not support it. See SKF USA, 263 F.3d at 1382 ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting Transactive Corp., 91 F.3d at 237 (internal quotation marks omitted)). The absence of Commerce's use of this purported practice in numerous cases, therefore, shows that Commerce, in fact, has no such established past practice to select land benchmarks corresponding to land purchase years. Instead, Commerce has routinely used the POR as the contemporaneity standard. The determination here, therefore, appears to be nothing more than arbitrary.

Because Commerce failed to adequately explain its purported practice of associating contemporaneity with respondents' land purchase years, Commerce failed to explain why the 2010 CBRE Report is more contemporaneous than Zhongji's proposed data covering the POR. See Remand Order, __ CIT at __, 625 F. Supp. 3d at 1376. Commerce's decision to select the 2010 CBRE Report, therefore, was unreasonable and inconsistent with the Remand Order. Commerce should still use the POR year as the standard to determine the contemporaneity of the benchmarks, which renders the 2010 CBRE Report grossly outdated and unusable as a source.

### B. Commerce Continued to Rely on Outdated and Flawed Economic Comparability and Geographic Proximity Analysis in Selecting the 2010 CBRE Report

In addition to the outdated land prices from 2010, Commerce also failed to point to any other record evidence to support its economic comparability analysis other than the extremely outdated underlying data – as old as the year 2000 – relied on in the 2007 Laminated Woven Sacks

from China ("LWS") case.  See Remand Redetermination at 21 (Public Version) (REM P.R. 6).

Commerce, in that case, relied on extremely outdated data in determining that China and Thailand

are economically comparable.  For example, (1) Commerce decided that Thailand and China have

similar Gross National Income ("GNI") based on **2006** data; (2) Commerce decided that population

density of Thailand and China was comparable based on data from **2000** and **2004** and (3)

Commerce tracked investor perception using data from **2005** and **2006**.  See Laminated Woven

Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty

Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and

Alignment of Final Countervailing Duty Determination With Final Antidumping Duty

Determination, 72 Fed. Reg. 67,893, 67,909 (Dec. 3, 2007), and accompanying Issues and Dec.

Mem. ("LWS Final IDM").  In the Remand Redetermination, Commerce stated that "the facts in

LWS from China are reasonably contemporaneous with Zhongji's land purchases and the 2010

CBRE Report data, and there is no record evidence which contradicts Commerce's reasoning in

LWS from China."  Remand Redetermination at 45 (Public Version) (REM P.R. 6).  Commerce,

however, failed to explain how the underlying comparability data as old as year 2000 are

reasonably contemporaneous with Zhongji's land purchases as recent as [ ██ ].  See Mem. from

John C. McGowan to the File re: Final Results Calculations for Zhongji at Ex. 1, Land tabs (Feb.

24, 2021) (Business Proprietary Document) (C.R. 236).  Therefore, the LWS from China decision

Commerce cited in the Remand Redetermination, does not support Commerce's economic

comparability analysis because the underlying data, are fatally outdated and not contemporaneous

with the POR.

Further, the Court has expressed the same staleness concern of Commerce's economic

comparability analysis in selecting the 2010 CBRE Report in the 2017 administrative review of

Solar Cells from China.  See Risen I, 46 CIT at __, 570 F. Supp. 3d at 1375-1376.  The Court reasoned that,

> {S}ince the 2010 CBRE Report was released, it appears that Thailand and China have diverged in terms of comparable national income levels and population density. Commerce has not adequately explained how long it can continue to rely on the 2010 CBRE Report while the gap between Thailand and China's comparability metrics widen each successive year.

Id. at __, 570 F. Supp. 3d at 1375-1376.  The same court then rejected Commerce's continued use of the 2010 CBRE Report on remand for the second time, because more contemporaneous Malaysia data existed on the record.  Risen Energy Co. v. United States, No. 20-03912, 2023 Ct. Intl. Trade LEXIS 52, at *19 (Apr. 11, 2023) (demanding that Commerce "provide a compelling reason for its continued use of the stale 2010 CBRE report or otherwise use the Malaysian data only").  Thus, Commerce has failed to adequately support its economic comparability decision in selecting the 2010 CBRE Report.

Regarding Commerce's consideration of the geographical proximity factor, Commerce again failed to adequately explain why the benchmark country must be proximate to China.  In the Remand Redetermination, Commerce conclusively stated that "geographical proximity is relevant for land, as location is always a primary factor in valuation and, thus, geographical proximity is a cardinal consideration for benchmarking."  Remand Redetermination at 46 (REM P.R. 6).  Commerce then concluded that "because location is always a primary factor in valuation of land, and geographical proximity to China is an aspect of location, geographic proximity to China is a relevant consideration."  Id.  While Commerce concluded geographic proximity is a relevant consideration, Commerce provided no substantive explanation as to why the land benchmark must be proximate to China.  Commerce's explanation only reiterated the self-evident fact that location is naturally associated with purchasing land.  Further, Commerce pointed to the non-liquidity of

17

land as reason for turning to geographical proximity to determine the benchmark but failed to explain why the unique nature of land supports their decision to use geographical proximity as a major factor in determining the benchmark.  In other words, Commerce failed to explain how lands in other parts of the world, with similar economic conditions for manufacturing, cannot be comparable to China when it comes to recreating the manufacturing reality of Chinese respondents.

In conclusion, Commerce continued to only cite a single, old case using even older data but failed to establish record evidence in this case to support its economic comparability decision regarding the 2010 CBRE Report.  Commerce also failed to adequately explain why the benchmark country must be geographically proximate to China and how the non-liquidity of land supports Commerce's use of geographical proximity as a major factor in determining the benchmark. Commerce's continued reliance on the 2010 CBRE Report, therefore, was not supported by substantial evidence and not in accordance with law.

### C.  Commerce Wrongly Continued to Exclude the 2016-2018 CBRE Reports and the Nexus Reports

The Court instructed Commerce to explain or reconsider its selection of the 2010 CBRE Report and to address Zhongji's argument that "the 2016 to 2018 CBRE Reports and the Nexus Reports were more appropriate data."  Remand Order, __ CIT at __, 625 F. Supp. 3d at 1376.   In explaining its exclusion of the 2016-2018 CBRE Report, Commerce stated that Zhongji did not provide economic comparability information for Mexico and Brazil and that the reports pertain to "logistics rent but not to manufacturing facilities."   Remand Redetermination at 27 (Public Version) (REM P.R. 6) (internal quotation marks omitted).  In explaining its exclusion of the Nexus Reports, Commerce stated that the reports lack explanation regarding methodology.  Id. at

29.  For the reasons explained below, Commerce's reasons for excluding both benchmark sources were unsupported.

First, Commerce was incorrect in concluding that the surrogate country list in a parallel antidumping duty ("AD") review does not support Mexico and Brazil's economic comparability to China.  Id.  To the contrary, the AD determination firmly establishes that "Brazil . . . Mexico . . . are at the same level of economic development as China," which is why both Mexico and Brazil were included in Commerce's surrogate country list in Commerce's parallel AD administrative review of this case.  See Certain Aluminum Foil From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019, 85 Fed. Reg. 37,829 (June 24, 2020), and accompanying Dec. Mem. at 11 ("Foil 1AR AD Prelim. Dec. Mem.").  Commerce, in the Remand Redetermination, claimed that Zhongji did not explain the relevance between Mexico and Brazil being surrogate countries for China and the economic comparability in the CVD benchmark context.  See Remand Redetermination at 26 (Public Version) (REM P.R. 6).  As Zhongji has explained throughout this case, however, Commerce, in selecting the surrogate country in the AD proceeding, referenced "economic comparability," which is a factual determination directly relevant to the land benchmark determination here.  See, e.g., Mem. of P. & A in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. of Pls. at 34 (Sept. 21, 2021) (Public Version), ECF No. 31 (citing to Foil 1AR AD Prelim. Dec. Mem. at 11).  More specifically, the presence of Mexico and Brazil in the surrogate country list for the parallel AD proceeding indicates Mexico and Brazil's economic comparability to China based on GNI and is, therefore, directly relevant to the land benchmark determination in the current CVD proceeding.  See id.  Contrary to Commerce's claim, therefore, Zhongji did not need to provide additional information on the record because the

presence of Mexico and Brazil in the surrogate country list already established these two countries' economic comparability to China.

In addition, Commerce unreasonably rejected the 2016-2018 CBRE Reports because they pertain to "'logistics rent' . . . while the 2010 CBRE Report contains 'industrial land' rent." Remand Redetermination at 27 (Public Version) (REM P.R. 6).  Commerce continued to conclude that because "there {was no} record information that the land right purchases in question pertain specifically to logistics-related land because the Zhongji Respondents are manufacturing companies, {Commerce found} that benchmark{} specific to factory land purchases are more suitable . . .  and that the use of land benchmarks that are specific to logistics facilities is not warranted and less preferable."  Id. at 47.  Logistics facilities, such as warehouses or distribution facilities, are a major land use for industrial companies like Zhongji and are a comparable type of land to measure the adequate remuneration of the land-use rights program.  In addition, in its countervailing duty questionnaire, Commerce explicitly requires respondents to report land-use rights beyond factory land.  See Letter from Commerce to Embassy of the People's Republic of China re: Initial Questionnaire at III-12 (Public Document) (P.R. 134) (requesting reporting of "all {land} purchases and leases").  Even though the 2010 CBRE Report contains industrial land values, a better land type as claimed by Commerce, the report is fatally outdated and was selected based on flawed comparability analysis, as elaborated above.  Commerce, therefore, was unsupported by substantial evidence in excluding the 2016-2018 CBRE Reports based on the land type.

Second, with regard to the Nexus Reports, Commerce's criticism of the lack of methodology explanation for the Nexus Reports remained unconvincing because the 2010 CBRE Report suffers from the same flaw.  The Court instructed Commerce to explain "its selection of

the 2010 CBRE Report specifically with reference to the adequacy, context and references for the data in that report in comparison to Commerce's criticism of the adequacy, context and references for the data in the Nexus Reports." Remand Order, __ CIT at __, 625 F. Supp. 3d at 1377. In the Remand Redetermination, Commerce only stated that "Commerce has used the 2010 CBRE Report Data many times and has addressed the methodology used in the CBRE Report in other proceedings." Remand Redetermination at 47 (Public Version) (REM P.R. 6). Commerce's citation to past reliance on the 2010 CBRE Report in other cases does not legitimize the lack of explanation on data collection methodology in that report. The 2010 CBRE Report contains only four pages of price tables with no explanation of data collection methodology. See Commerce CBRE Placement (Public Document) (P.R. 57). Commerce cited to three cases to support its claim that it has "previously evaluated the sources, content, and methodology of the data in the 2010 CBRE Report." Remand Redetermination at 47 (Public Version) (REM P.R. 6) (citing Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in part, of Critical Circumstances: Laminated Woven Sacks from the People's Republic of China, 73 Fed. Reg. 35,639 (Dep't of Commerce June 24, 2008) and accompanying Issues and Dec. Mem. at 17-18 and Cmt. 11; Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) and accompanying Issues and Dec. Mem. at 6; Preliminary Affirmative Determination and Alignment of Final Determination With Final Antidumping Duty Determination: Certain Iron Mechanical Transfer Drive Components from the People's Republic of China, 81 Fed. Reg. 21,316 (Dep't of Commerce Oct. 28, 2016) and accompanying Dec. Mem. at 13-14. The cited three cases, however, do not include any analysis on the methodology of the

2010 CBRE Report.  See id.  Thus, it remains true that the 2010 CBRE Report has only four pages of price tables with no information on methodology, making the 2010 CBRE Report a flawed benchmark source according to Commerce's own reasoning.  The Nexus Reports, by contrast, contain more explanation than the 2010 CBRE Report, such as highlights on the overall economy and industrial land market overview.  See Zhongji Benchmark at Ex. 14 (Public Version) (P.R. 312).  Commerce, therefore, failed to comply with the Court remand order to explain its selection of the 2010 CBRE when that report suffers from the same alleged flaw of the Nexus Report.

For these reasons, Commerce's exclusion of the 2016-2018 CBRE Reports, and the Nexus Report data was not supported by substantial evidence and not in accordance with law.

## CONCLUSION

For the reasons set forth herein, the Court should find that Commerce's Remand Redetermination remains unsupported by substantial evidence and not in accordance with law and should remand to Commerce again with instructions to (1) remove the TDM data covering HTS 7606.12 and replace it with the CRU data covering alloy 1050 sheets because Commerce ignored the severe overbreadth of the TDM data, wrongly claimed that relying on CRU data alone deviates entirely from tier-two world market benchmark prices and failed to explain its rejection of the CRU data based on the LME data in the report; and to (2) remove the 2010 CBRE Report for the land benchmark, replacing it with the 2016-2018 CBRE Reports and Nexus Reports because Commerce failed to adequately explain its purported practice of associating contemporaneity with respondents' land purchase years, failed to support its outdated comparability analysis of the 2010 CBRE Report and use of outdated 2010 land prices, and failed to effectively explain its exclusion of the 2016-2018 CBRE Report and Nexus Reports.

Respectfully submitted,


<u>Dated</u>; September 18, 2023                    /s/ Jeffrey S. Grimson
                                                Jeffrey S. Grimson
                                                Sarah M. Wyss
                                                Yixin (Cleo) Li
                                                Mowry & Grimson, PLLC
                                                *Counsel to Zhongji*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that these objections to the remand redetermination comply with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,986 words.


Dated; September 18, 2023                    /s/ Jeffrey S. Grimson
                                             Jeffrey S. Grimson
                                             Sarah M. Wyss
                                             Yixin (Cleo) Li
                                             Mowry & Grimson, PLLC
                                             *Counsel to Zhongji*