IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. (F/K/A JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD.) JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD., and ANHUI MAXIMUM ALUMINIUM INDUSTRIES COMPANY LIMITED, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Court No. 21-00133 |
| UNITED STATES, | ) |
| Defendant, | ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) ) ) |
| Defendant-Intervenors. | ) ) |

**DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

OF COUNSEL:

JESUS N. SAENZ
Office of the Chief Counsel for Trade
  Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

SOSUN BAE
Senior Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7568
Fax: (202) 305-7644
Email: Sosun.Bae@usdoj.gov

October 31, 2023

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................ ii

DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION .............. 1

ARGUMENT ........................................................................................................................ 2

I.    Standard Of Review ................................................................................................ 2

II.   Commerce Fully Explained Commerce's Selection Of TDM Data For Calculating The Aluminum Plate, Sheet, And/Or Strip Program Benchmark, And Its Determination Is Supported By Substantial Evidence ............................................. 3

    A.   Relevant Background ................................................................................. 3

    B.   Commerce Explained Why The TDM Data Is The Best Available Benchmark On The Record ......................................................................... 5

    C.   Zhongji Fails To Demonstrate That Commerce's Decision To Use The TDM Data Is Unsupported By Substantial Evidence ................................. 7

III.  Commerce's Selection Of The 2010 CBRE Report As The Land Benchmark Is Supported By Substantial Evidence And In Accordance With Law ................... 12

    A.   Relevant Background ............................................................................... 13

    B.   Commerce Complied With The Court's Order And Explained Its Practice Of Considering Contemporaneity When Analyzing Land For Less Than Adequate Remuneration Benchmarks ....................................................... 15

    C.   Commerce Correctly Concluded That The 2010 CBRE Report Was The Most Contemporaneous Benchmark ....................................................... 18

    D.   Commerce Addressed Zhongji's Arguments For An Alternative Benchmark, And Compared The 2010 CBRE Report To The Nexus Report ...................................................................................................... 20

        1.   Geographic Proximity ................................................................. 21

        2.   Economic Comparability ............................................................. 22

        3.   Land Type ................................................................................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Canadian Solar Inc. v. United States*,
  537 F.Supp.3d 1380 (Ct. Int'l Trade 2021) ............................................................. 20

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ................................................................................................. 2

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ............................................................................................. 3, 7

*I.N.S. v. Elias-Zacarias*,
  502 U.S. 478 (1992) ................................................................................................. 3

*Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*,
  No. 21-00138, 2023 Ct. Intl. Trade LEXIS 88 (Ct. Int'l Trade June 7, 2023) ......... 11

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
  625 F. Supp. 3d 1355 (Ct. Int'l Trade 2023) ................................................... 2, 5, 12

*MacLean-Fogg Co. v. United States*,
  100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ............................................................. 2

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ................................................................................ 3

*Shenzhen Xinboda Indus. Co. v. United States*,
  279 F. Supp. 3d 1265 (Ct. Int'l Trade) ...................................................................... 9

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
  961 F. Supp. 2d. 1346 (Ct. Int'l Trade 2014) .......................................................... 17

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................... 2

## REGULATIONS

19 C.F.R. § 351.511(a)(2) .......................................................................................... 3

19 C.F.R. § 351.511(a)(2)(ii) ..................................................................................... 6

19 C.F.R. § 351.524 ................................................................................................. 16

19 C.F.R. § 351.524(a)........................................................................................... 16

19 C.F.R. § 351.524(d) .......................................................................................... 16

19 C.F.R. § 351.524(d)(3)...................................................................................... 16

## FEDERAL REGISTER NOTICES

*Laminated Woven Sacks from the People's Republic of China*,
    73 Fed. Reg. 35,639 (Dep't of Commerce June 24, 2008). .................................... 16

*Aluminum Extrusions from the People's Republic of China*,
    76 Fed. Reg. 18,521 (Dep't of Commerce Apr. 4, 2011),........................................ 17

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China*,
    77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012)........................................ 22

*Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing
Duty Administrative Review; 2017-2018*,
    86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021). ............................................ 2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
People's Republic of China*,
    87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022),. ....................................... 19

*Multilayered Wood Flooring From the People's Republic of China*,
    87 Fed. Reg. 78,644 (Dep't of Commerce Dec. 22, 2022)....................................... 19

*Certain Aluminum Foil from the People's Republic of China*,
    88 Fed. Reg. 28,496 (Dep't of Commerce May 4, 2023). ....................................... 19

THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD. (F/K/A JIANGSU ZHONGJI LAMINATION MATERIALS STOCK CO., LTD.), JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD., SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD., JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD. , and ANHUI MAXIMUM ALUMINIUM INDUSTRIES COMPANY LIMITED, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Court No. 21-00133 |
| UNITED STATES, | ) ██████████████ |
| Defendant, | ) ) ██████████████ |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) ) ) |
| Defendant-Intervenors. | ) |

## DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION

Defendant, the United States, respectfully submits these comments in support of the

Department of Commerce's (Commerce) remand redetermination this matter, and in response to

the comments filed by plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd. (f/k/a Jiangsu

Zhongji Lamination Materials Stock Co., Ltd.), Jiangsu Zhongji Lamination Materials Co., (HK)

Ltd., Shantou Wanshun Package Material Stock Co., Ltd., Jiangsu Huafeng Aluminium Industry

Co., Ltd. and Anhui Maximum Aluminium Industries Company Limited (collectively, Zhongji).

*See* Final Results of Remand Pursuant to Court Remand, ECF No. 67, Remand P.R. 6, Remand C.R. 4 (Aug. 4, 2023) (Remand Redetermination).[1]  Commerce's remand redetermination supplements the agency's final determination in its administrative review of the countervailing duty order on aluminum foil from the People's Republic of China (China).  *See Certain Aluminum Foil From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2017-2018*, 86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021) (final results) (P.R. 395), and accompanying Issues and Decision Memorandum (IDM) (P.R. 390).

The Court's March 21, 2023 opinion and order remanded Commerce's selection of the benchmarks regarding the aluminum plate, sheet, and/or strip for less than adequate remuneration and the land for less than adequate remuneration programs for further explanation or reconsideration.  *See Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 625 F. Supp. 3d 1355 (Ct. Int'l Trade 2023) (remand order).  Because Commerce has fully complied with the Court's order, and the remand redetermination is supported by substantial evidence and otherwise lawful, we respectfully request that the Court sustain the remand redetermination.

## ARGUMENT

### I. Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than

---

[1] In this brief, "P.R.__" and "C.R.__" refer to documents in the public and confidential records; "Remand P.R." and "Remand C.R." refer to the records of the remand proceeding.

the weight of the evidence" and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). Indeed, when, as in this case, Congress entrusts an agency to administer a statute demanding inherently fact-intensive inquiries, the agency's conclusions may be set aside only if the record evidence is "so compelling that no reasonable factfinder" could reach the same conclusion. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Thus, a party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

## II. Commerce Fully Explained Commerce's Selection of TDM Data For Calculating The Aluminum Plate, Sheet, And/Or Strip Program Benchmark, And Its Determination Is Supported By Substantial Evidence

Zhongji alleges that Commerce's remand redetermination regarding the aluminum plate, sheet, and/or strip benchmark does not comply with the Court's order and is not supported by substantial evidence. Contrary to Zhongji's arguments, Commerce's remand redetermination fully complies with the Court's order, as Commerce further explained its position on each issue addressed by the Court. The redetermination is also supported by substantial evidence; Zhongji's claims to the contrary amount to no more than a simple disagreement with Commerce's weighing of the evidence and do not constitute sufficient grounds for further remand.

### A. Relevant Background

During the underlying review, and in accordance with 19 C.R.F. § 351.511(a)(2), Commerce considered tier-two input benchmarks for the aluminum plate, sheet and strip for less

than adequate remuneration program. For Commerce's benchmark consideration, Zhongji provided 2017 and 2018 Global Trade Atlas (GTA) data from certain ████████████ and ███████ countries specific to HTS subheading 7606.12, and a Commodities Research Unit (CRU) Report on aluminum alloy grade 1050 rolled product prices, which Zhongji claimed was based, in part, on London Market Exchange (LME) data. *See* Remand Redetermination at 5-6. The petitioners (defendant-intervenors in this case) provided Trade Data Monitor (TDM) benchmark data covering the Harmonized Tariff Schedule (HTS) subheading 7606.12. *See* IDM at 21-22. Notably, the other mandatory respondent, Xiamen Xiashun Aluminum Foil Co., Ltd (Xiashun), also identified HTS subheading 7606.12 as consistent with its own purchases. *See* Remand Redetermination at 13 (citing Xiashun Benchmark Submission at 3, Exh. 7 (C.R. 210, 212)).

In the review, Commerce determined that the record did not support Zhongji's assertion that its aluminum sheet purchases correspond more closely to aluminum alloy grade 1050 rolled product than to the TDM data covering HTS subheading 7606.12. *See* PDM at 19. Thus, Commerce declined to rely on the CRU Report for aluminum alloy grade 1050 rolled product prices, whether alone or averaged with the GTA data, as a benchmark to measure the benefit from Zhongji's purchases of aluminum sheet. *See* IDM at 21-22. Indeed, Commerce found that Zhongji's and Xiashun's reported aluminum plate, sheet, and/or strip purchases are all covered by the HTS subheading 7606.12. *Id*. at 21-22. Commerce also explained that, although it found that aluminum alloy grade 1050 rolled products are a specific type of aluminum categorized under the broader HTS subheading 7606.12, Zhongji did not purchase aluminum alloy grade 1050. *Id*. Commerce also found that the LME data contained in the CRU Report reflected only a "cash" price for primary aluminum. PDM at 19. Accordingly, Commerce concluded that record evidence did not demonstrate that the Zhongji's purchases were more comparable to

grade 1050 alloy than to the aluminum sheet products represented in the TDM data covering HTS subheading 7606.12. IDM at 21-22. Commerce thus relied on the TDM data covering the HTS subheading 7606.12, as it was more representative of *all* the types of aluminum purchased by Zhongji and Xiashun. *Id*. at 22.

The Court remanded Commerce's selection of the data used to calculate benchmark for aluminum plate, sheet, and/or strip for further explanation. *See Jiangsu Zhongji*, 625 F. Supp. 3d 1355, 1377. In doing so, the Court stated that Commerce had not adequately explained its decision to select the TDM data source to calculate the benchmark or its decision not to use Zhongji's data instead. *Id.* The Court also found that Commerce had not adequately explained its finding regarding the relevance of LME data with respect to Commerce's rejection of the CRU Report. *Id.* On remand, Commerce addressed the Court's concerns, and provided further explanation to support the same conclusion reached in the final results.

**B.    Commerce Explained Why The TDM Data Is The Best Available Benchmark On The Record**

On remand, Commerce continued to find that the best available record data for purposes of serving as the aluminum plate, sheet, and/or strip benchmark is the TDM data, explaining that the TDM data for HTS subheading 7606.12 contained "world market export quantities and total values from which {average unit values} may be derived." Remand Redetermination at 9, 19. In addition, the TDM data for HTS subheading 7606.12 is the only record submission covering the wide range of products purchased by Zhongji and Xiashun and is based on export average useful values (AUVs). *Id*. at 19, 33.

Commerce also further explained on remand why the benchmarks comprising CRU and GTA data are not overall superior to the TDM data. First, Commerce found that the CRU and GTA data are merely estimates and not based on world market prices. Commerce first observed

that the proposed CRU data provides only ███████████ price data and data for only grade 1050 aluminum alloy rolled product—a product not purchased by Zhongji. *Id.* at 9. Commerce then explained that Zhongji calculated a "world price benchmark" by using the 1050 aluminum alloy rolled product price data and GTA export data for HS subheading 7506.12 to derive price estimates for 1050 aluminum alloy rolled products. *Id.* at 9-10 (citing Zhongji Benchmark Submission at Exhibits 5, 6, and 7) (C.R. 209, 215-217). Specifically, Zhongji



calculated by reducing certain ████ export AUVs for HS subheading 7606.12 by the ratio of ████████ 1050 aluminum alloy rolled product prices to ████ export AUVs for HS subheading 7606.12. These adjusted ████ export AUVs are then averaged with the ███████ 1050 aluminum alloy rolled product prices themselves to create a combined ██████████████ *estimate* for 1050 aluminum alloy rolled product prices.

*Id.* at 10 (emphasis in original). Such a constructed benchmark based on *estimates*, however, leaves out *actual* world market prices. Because Zhongji's proposed benchmark is an estimate "based largely on extrapolation," Commerce was unable to reasonably "conclude that such prices would be available to purchasers in" China, consistent with 19 C.F.R § 351.511(a)(2)(ii). *Id.*

Commerce also more fully explained its finding that the CRU and GTA data do not cover the range of products purchased by the respondents, finding that "{n}either respondent purchased any 1050 aluminum alloy rolled products." *Id.* at 14. Moreover, as Commerce explained, "the evidence on the administrative record did not demonstrate that the Zhongji{'s} purchases are more comparable to grade 1050 alloy than to the aluminum sheet products represented in the TDM data covering HS subheading 7606.12." *Id.* at 34.

First, Commerce found that, with regard to Zhongji's purchases, "the minimum aluminum content of the ████████████████████████████████████████████████████ ████████," and the "minimum aluminum content of ████████████████████████████

██████████████████████████████████████████████████████.” *Id*. at 35. Commerce then

explained that, "compared to the 1050 aluminum alloy's 99.5 percent aluminum content, the

minimum aluminum content of the ████████████████████████████████████████

█████ sheet that the Zhongji Respondents purchased range from ████████████████ percent

aluminum content." *Id*. at 34. Accordingly, Commerce reasonably determined that the 1050

aluminum sheet products are not representative of the products Zhongji (or, for that matter,

Xiashun) purchased, and are "at best a vague approximation" of the products purchased. *Id*. at

14, 34. Commerce fully explained its decision to continue relying on the TDM data, rather than

Zhongji's preferred data, and its explanation complies with the Court's remand order.

**C.      Zhongji Fails To Demonstrate That Commerce's Decision To Use The TDM Data Is Unsupported By Substantial Evidence**

Zhongji's fails to demonstrate that Commerce's decision to rely on the TDM data over

Zhongji's own preferred data is unsupported by substantial evidence or in contravention of the

law. The materials relied on by Zhongji—namely, a provided declaration, the International

Trade Commission (ITC) Report, and a document titled *International Alloy Designations and*

*Chemical Composition Limits for Wrought Aluminum and Wrought Aluminum Alloys* (*Aluminum*

*Association's Standards Publication*)—do not support Zhongji's contention that its proposed

benchmark data (*i.e.*, the CRU and/or GTA data) are superior to the TDM benchmark data. Even

if Zhongji has provided *some* amount of evidence in favor of its preferred data, that would not

render Commerce's reliance on the TDM data unreasonable or unsupported by substantial

evidence, particularly given that Commerce clearly considered the arguments raised by Zhongji

and made a reasoned, fully explained decision based on the record evidence. *See Consolo*, 383

U.S. at 620.

Zhongji first contends that Commerce unreasonably dismissed certain record evidence that supports its claim that the CRU data covering alloy 1050 correspond more closely to Zhognji's 1XXX alloy and 8XXX alloy purchases than the TDM data, which covers HTS subheading 7606.12. *Id*. at 4. Zhongji primarily bases its argument on a declaration it submitted from an individual with "extensive experience in trading aluminum sheet" and an ITC Report that purportedly "establish{es} that most aluminum products under HTS subheading 7606.12 are not suitable for foil production." Remand Redetermination at 4-5. Zhongji's declaration states that ████████████████████████████████████████████████████████████████████████

██████. Zhongji Br. at 5 (citing Zhongji Benchmark at Ex. 11 (C.R. 205)). To Zhongji's view, the ITC Report corroborates the statement from the declaration. *Id*. (citing Zhongji Benchmark at Ex. 10, pp. 530-31, Table 11 (P.R. 311)). Zhongji also claims that the ITC Report supports the notion "that a majority of aluminum plate, sheets and strip classified under HTS subheading 7606.12 are not foil stock." *Id*. at 6.

Despite Zhongji's protestations to the contrary, Commerce explicitly considered both Zhongji's declaration and the ITC Report. *See* Remand Redetermination at 11-12. In doing so, Commerce examined both items and explained why the declaration and ITC Report failed to support Zhongji's position that the CRU data covering alloy 1050 correspond more closely to Zhognji's purchases than the TDM data. *Id*. Simply because Zhongji disagrees with Commerce's decision to rely on the TDM data does not mean that Commerce failed to consider the information provided by Zhongji that purportedly supports the data Zhongji would prefer as a benchmark.

With respect to the declaration, Commerce explained that the statements were "no more specific and no more authoritative" than Zhongji's own assertions. *Id*. at 39. Commerce also

determined that the declaration did not specify the quantity of world exports under HTS subheading 7606.12 that are represented by the same foil stock aluminum sheet used by Zhongji, or by 1050 aluminum alloy rolled products. *Id*. at 40. The declaration also failed to specify the quantity of the export volumes comprising the types of sheet and plate that are unsuitable for use as foil stock. *Id*.

Commerce further recognized that the declaration is contradicted by the record,[2] which indicates that Zhongji's purchases are represented within HTS subheading 7606.12, which in turn covers "{a}luminum plate, sheets, and strip, of a thickness exceeding 0.2mm . . . of aluminum alloys" and all of the four Chinese HTS subheadings used by Zhongji as reported by the government of China. *Id*. at 14-15 (citing Zhongji Benchmark Submission at Exhibit 10 (page 477) (P.R. 311, C.R. 205); *see also* GOC NSA Response at 20; Zhongji Respondents NSA QR at Exhibit NSA-2 (P.R. 234, C.R. 133); Zhongji NSA SQR at Exhibits NSAS-1 and NSAS-2 (P.R. 267, C.R. 148); Zhongji Final Calculation Memorandum at worksheets Zhongji Sheet AR. (P.R. 392, C.R. 235)). Accordingly, Commerce did not dismiss the declaration out of hand; rather, it considered that the statements were "neither specific nor sufficiently supported (either alone or in combination with the Zhongji Respondents' own expertise) to supersede the expertise of the petitioners or other record evidence." *Id*. at 40.

Commerce also considered the substance of the ITC Report and found that the report did not contain sufficient information for Commerce to conclude that the "1050 aluminum alloy rolled products prices provide a better benchmark than the TDM HS subheading 7606.12 export

---

[2] Zhongji claims this case is analogous to *Shenzhen Xinboda Indus. Co. v. United States*, 279 F. Supp. 3d 1265 (Ct. Int'l Trade), in which the Court remanded Commerce's consideration of a declaration at least in part because Commerce had not identified record evidence controverting the declaration. Zhongji Br. at 6. In this case, however, Commerce did identify contradictory record evidence. Moreover, unlike in *Shenzhen*, the declaration is not the sole record evidence speaking to the issue.

AUVs." *Id*. at 12. Commerce explained that the ITC Report "does not specify the relative proportions of these identified applications nor their proportions relative to the overall uses of aluminum plate and sheet{,}" and observed that the purpose of the ITC Report is to simply list examples of applications of aluminum plate and sheet, *not* to identify a complete list of the applications and uses of aluminum plate and sheet or to "distinguish between the relative volumes of different commercial grades of aluminum sheet exported from around the world." *Id*. at 12, 40-41. Accordingly, Zhongji's reliance on the ITC Report is misplaced, or, at the very least, overstated.

Zhongji also relies on a certain publication titled *Aluminum Association's Standards Publication* to support its contention that HTS subheading 7606.12 is overly broad. Zhongji Br. at 7; Remand Redetermination at 12-13. According to Zhongji, HTS subheading 7606.12 "not only includes irrelevant subcategories for foil production such as clad aluminum or can stock, but also includes hundreds of irrelevant alloys not suitable for foil production." Zhongji Br. at 7. Commerce, however, considered the publication and found it does not support Zhongji's position. *See* Remand Redetermination at 15. Commerce explained that, "compared to the 1050 aluminum alloy's 99.5 percent aluminum content, the minimum aluminum content of the █████ ████████████████████████████████████████████████ sheet that {} Zhongji {} purchase{s} range from ████████████████ percent aluminum content." *Id*. at 34. Thus, as Commerce reiterated, Zhongji's reported purchases encompass a "much wider range of sheet products than the 1050 aluminum alloy rolled products{,}" and, again, Zhongji did not purchase any 1050 aluminum alloy rolled products. *Id*. at 14. Furthermore, although the *Aluminum Association's Standards Publication* does provide relevant aluminum content, Commerce explained that, "without examining these differences in other elements, it is apparent that the differences in

aluminum content alone demonstrate that the 1050 products are at best only a vague approximation for the ███████████████████ and are better described as a mis-match{.}" *Id.* at 16, 35.

Zhongji next claims that Commerce failed to comply with the Court's order to further explain the rejection of the CRU report based on the LME data included in the report. Zhongji Br. at 10. This argument is belied by the record. On remand, Commerce considered the LME data and, on further review, determined that it was not clear from the information in the CRU Report that the "[████████████ prices for 1050 aluminum alloy rolled products are derived from the LME data in the CRU Report, rather than possibly being simply reported separately, independent of each other." Remand Redetermination at 17. Commerce further explained that the record is unclear as to

> whether the CRU Report prices for 1050 aluminum alloy rolled
> products are derived from {London Metal Exchange} prices
> contained therein by adding the cost of conversion from primary
> aluminum to 1050 aluminum alloy rolled products (*i.e.*,
> "conversion fees"), or whether these conversion fees are derived
> from the {London Metal Exchange} prices and the 1050 aluminum
> alloy rolled product prices.

*Id.* at 38-39.

Zhongji also argues that the Commerce failed to demonstrate why this distinction is meaningful. *See* Zhongji Br. at 10. According to Zhongji, "alloy sheet prices are composed of the {London Metal Exchange} ingot prices and the additional conversion premiums." *Id.* at 10-11. Moreover, according to Zhongji, prior cases before this Court support a finding that aluminum sheet prices are derived from London Metal Exchange prices plus conversion fees and premiums. *Id.* at 11 (citing *Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, No. 21-00138, 2023 Ct. Intl. Trade LEXIS 88, at *28-29 (Ct. Int'l Trade June 7, 2023). But

Zhongji's arguments misunderstands the issue at hand.  As Commerce stated in its remand
redetermination, the issue of whether the prices for alloy 1050 products ████████████
████████████████████████████████████ is not in dispute.  *See* Remand Redetermination
at 39.  Rather, as Commerce explained, "conversion fees represent the difference between the
1050 aluminum alloy rolled product prices and the LME primary aluminum prices."  *Id*.  What is
*not* clear, however, is whether "the 1050 aluminum alloy rolled product prices are derived from
the LME primary aluminum prices and the conversion fees or whether the conversion fees are
derived from the LME primary aluminum prices and the 1050 aluminum alloy rolled product
prices.  *Id*.  Finally, as Commerce observed, the distinction was not "necessary to the results" of
its analysis, and there were "other sufficient reasons to reject the CRU 1050 aluminum allot
prices and the Zhongji Respondents' proposed benchmarks derived therefrom."  *Id*.

In conclusion, Zhongji fails to demonstrate that Commerce failed to comply with the
Court's remand order, and its arguments do not prove that its proposed benchmarks are superior
to the TDM data or that the Court must find Commerce's determination unsupported by
substantial evidence.  Commerce's decision to rely on the TDM data is fully explained and
amply supported by the record; thus, it should be sustained.

III.    **Commerce's Selection Of The 2010 CBRE Report As The Land Benchmark Is
        Supported By Substantial Evidence And In Accordance With Law**

This Court remanded for further explanation Commerce's selection of a tier-three
benchmark for the land for less than adequate remuneration program.  *See* Remand Order, 625 F.
Supp. 3d 1355, 1377.  Specifically, the Court remanded for Commerce:  1) to explain further or
to reconsider its evaluation of the contemporaneity of data sources in the record, particularly the
practice of selecting sources corresponding most closely to the time when land use rights were
purchased; 2) to explain why Commerce's selected benchmark is consistent with such a practice;

3) to explain why each data source that Commerce may select on remand, assuming Commerce selects more than one data source, is consistent with Commerce's practice; and 4) to explain further or to reconsider its selection of the 2010 Coldwell Banker Richard Ellis (CBRE) report in comparison to the Nexus Innovative Real Estate Solutions Reports (Nexus Report) favored by Zhongji.

On remand, Commerce complied with the Court's directions. Commerce again evaluated all benchmark sources and continued to find that the 2010 CBRE report is the best available information on the record for the purpose of serving as a benchmark. *See* Remand Redetermination at 29. Commerce also further explained its practice of considering the contemporaneity of data sources on the record, including the selection of data sources that correspond most closely to the time when the land use rights were purchased. *Id*. at 23-26. Commerce demonstrated how the selection of the 2010 CBRE report is consistent with Commerce's contemporaneity practice and the most appropriate tier three benchmark. *Id*. In addition, Commerce considered its analysis of the 2010 CBRE Report relative to the identified flaws with the 2016-18 CBRE Reports and Nexus Report for the purpose of calculating the benefits under the land for less than adequate remuneration program. *Id*. at 29. Finally, Commerce considered Zhongji's arguments that the 2010 CBRE report was not the best benchmark on the record and concluded that Zhongii's arguments did not support relying on an alternative benchmark. *Id*. at 41-47.

A.    **Relevant Background**

During the underlying review, Commerce placed on the record a 2010 CBRE Report as a tier-three benchmark for valuing land from the land for less than adequate remuneration program. *See* Memorandum, "Asian Marketview Report," dated July 29, 2019 (Land

Benchmark Data Memorandum) (containing 2010 "CB Robert Ellis Asian Marketview Report" (2010 CBRE Report)) (P.R. 58). This report has been used by Commerce as a benchmark both in a prior segment of the underlying proceeding and in numerous other proceedings. Remand Redetermination at 21.

Zhongji submitted, as potential land benchmark data, 2016-18 CBRE Reports from multiple countries: Australia, Belgium, Brazil, Canada, Chile, the Czech Republic, France, Germany, Hong Kong, Hungary, Italy, Japan, Mexico, the Netherlands, New Zealand, Poland, Russia, Singapore, South Korea, Spain, the United Kingdom, and the United States. *Id.* at 21 (citing Zhongji's Benchmark Submission at Ex. 12-13 (P.R. 311-12, C.R. 205-06). Zhongji also provided a 2020 Nexus Report containing data from Thailand concerning the first half of 2018. *Id*. at 22; *see also* Zhongji's Benchmark Submission at Ex. 14 (P.R. 312, C.R. 206).

In the final results, Commerce determined to rely on the 2010 CBRE Report as a tier-three benchmark to calculate the benefits under the land for less than adequate remuneration program. IDM at 31. In doing so, Commerce analyzed the 2016-2018 CBRE Reports (containing data from Mexico and Brazil) and the Nexus Report, finding them not superior sources compared to the 2010 CBRE Report. *Id.* at 32

Specifically, Commerce explained that Thailand is in closer geographic proximity to China than Mexico and Brazil (the countries preferred by Zhongji) and, apart from the fact that Commerce relies on data from Mexico and Brazil for deriving certain costs in antidumping proceedings, is more economically comparable to China than Mexico and Brazil. *Id*. Additionally, the 2016-2018 CBRE Reports data pertain to "logistics rent" and not "manufacturing facilities," while the 2010 CBRE Report contains data corresponding to industrial land prices in Thailand. *Id.*; *see also* Zhongji Benchmark Submission Pt. 1 at Exhibit

14

13, page 18 (P.R. 311, C.R. 205). Commerce also explained that the 2010 CBRE Report is most contemporaneous with the dates of Zhongji's land-use-rights purchases. IDM at 32-33.

On remand, Commerce continued to rely on the 2010 CBRE Report as the best available information on the record for serving as a benchmark for the land for less than adequate remuneration program, explaining in more detail its choice. *See* Remand Redetermination at 23-30, 44-47. As Commerce explained, the data from the 2010 CBRE Report is the most "contemporaneous, better matches the type of land acquired, and is from a country which is more comparable to China in terms of level of economic development, population, and geographic proximity." *Id*. at 44. Commerce also explained its reasoning and practice of assessing contemporaneity with regard to the year land use rights were acquired from the foreign government. *Id* at 24-26.

### B. Commerce Complied With The Court's Order And Explained Its Practice Of Considering Contemporaneity When Analyzing Land For Less Than Adequate Remuneration Benchmarks

In selecting benchmark data for calculating the benefit of the land for less than adequate remuneration, Commerce's regulations do not specify how to conduct a benchmark comparison analysis. Thus, Commerce's practice is to examine the data "'on a case-by-case basis and {to} consider the extent to which proposed benchmarks represent prices in a comparable setting' (*e.g.*, a country's geographic proximity to China and the level of economic development comparable to China)." Remand Redetermination at 23-24 (citing IDM at 32). On remand, Commerce further explained its practice of also considering the contemporaneity of data sources in selecting a land benchmark. *Id*. at 24-26.

Although Commerce's regulations do not specify how to conduct a tier-three benchmark comparison analysis, the regulations do prescribe a method for allocating the calculated benefit,

from a program found to be countervailable, to a particular time frame. *See* 19 C.F.R. § 351.524.

Thus, in selecting a benchmark for a countervailable program, Commerce explained that its

analysis of contemporaneity is guided by its regulations at 19 C.F.R. § 351.524(d)(3). Remand

Redetermination at 24. For recurring benefits, the regulations provide that Commerce will

allocate the recurring benefit to the year in which the benefit is received. *See* 19 C.F.R.

§ 351.351.524(a). For non-recurring benefits, however, such as land for less than adequate

remuneration, the regulations provide a formula that determines the annual benefit amount that

should be assigned to a particular year. *See* 19 C.F.R. § 351.524(d). The formula includes a

variable for the discount rate, and the regulations direct Commerce to "select a discount rate

based on the data of the year in which the government agreed to provide the subsidy{.}" 19

C.F.R. § 351.524(d)(3). Accordingly, and as explained by Commerce, for purposes of

identifying a land for less than adequate remuneration benchmark in China, Commerce

determines when the producer/exporter acquired the land-use rights from the {government of

China} and seeks benchmark information that is contemporaneous with that event. Remand

Redetermination at 24.

Commerce also identified several prior examples of Commerce's practice of relying on

the year "in which the land use rights were acquired from the government providing the subsidy

to determine the appropriate time period for calculating the land benchmark." Remand

Redetermination at 24 n.65. In one such proceeding, Commerce explained its benefit

calculations with regard to the same land for less than adequate remuneration program at issue in

this case. *See Laminated Woven Sacks from the People's Republic of China*, 73 Fed. Reg.

35,639 (Dep't of Commerce June 24, 2008) (*LWS from China*), and accompanying IDM. In

*LWS from China*, Commerce explained that it first "looked for an appropriate basis to determine

the extent to which land-use rights are provided for less than adequate remuneration." *LWS from China* IDM at 17. In doing so, it conducted a comparison of "prices for land-use rights in China with comparable market-based prices for land purchases in a country at a comparable level of economic development that is reasonably proximate to, but outside of, China." *Id.* Commerce then determined (using the same 2010 CBRE Report in question in this case) that the land prices from Thailand were most appropriate for conducting this comparison. *Id.* Consistent with its regulations, Commerce then calculated the benefit, explaining that, "{in} order to calculate the benefit, we first multiplied the benchmark land rate (deflated from 2007 to the year the transaction was officially approved by the county) by the total area of Aifudi's tracts." *Id.*

Commerce's practice of how it considers contemporaneity is also explained in other countervailing duty proceedings cited in the remand redetermination. In the investigation of aluminum extrusions from China, Commerce stated, while analyzing the most appropriate tier three benchmark for the same program at issue in this case,

> We agree with the Zhongya Companies that we should use the
> 2007 land prices, as opposed to the 2008 land prices we used in our
> preliminary calculations. New Zhongya acquired its land-rights in
> 2006, and the Guang Ya Companies acquired their land-use rights
> in 2007. As 2007 is *more contemporaneous* with the times of
> these purchases, we have used the 2007 prices for Thai industrial
> land for benchmark purposes.

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 18,521 (Dep't of Commerce Apr. 4, 2011), and accompanying IDM at 107 (emphasis added). In litigation stemming from that investigation, this Court sustained Commerce's selection of the land benchmark. *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 961 F. Supp. 2d. 1346, 1355 (Ct. Int'l Trade 2014) (stating that "{Commerce's} defense of its decision not to discount for inflation rests on the relatively short time separating New Zhongya's acquisition of land use

rights in June and October of 2006 and the second quarter of 2007 from which the indicative values in the CBRE Report were drawn.").

Accordingly, Commerce explained its practice of evaluating the contemporaneity of data sources when analyzing benchmark data for the land for less than adequate remuneration program, as well as the regulations undergirding that practice. Zhongji cannot demonstrate otherwise.

### C. Commerce Correctly Concluded That The 2010 CBRE Report Was The Most Contemporaneous Benchmark

On remand, Commerce further explained its practice and also described why it continued to find that the 2010 CBRE Report was the most contemporaneous land benchmark data. As an initial matter, there is no dispute as to the timing of the of the 2010 CBRE Report (or indeed the reports proffered by Zhongji) or Zhongji's reported land-use-rights purchases. "{T}he 2010 CBRE report data were issued in 2010, and were based on 2010 data; Zhongji's land-use-rights purchases took place in ███████████████, while the 2016-2018 CBRE Reports and 2018 Nexus Report were issued, and pertain to data collected, nearly a decade after Zhongji's land-use-rights purchases." Remand Redetermination at 45. Thus, Commerce's determination that the 2010 CBRE Report is the most contemporaneous is supported by the record.

Zhongji argues that Commerce failed to "adequately explain how it could have a 'practice' of using such data sources" given that Commerce placed the 2010 CBRE Report on the record before knowing Zhongji's land purchase dates, and that Commerce "has consistently relied on the same outdated report" when land purchase years do not correspond more closely to 2010. Zhongji Br. at 13. Zhongji also claims that "Commerce has routinely used the {period of review} as the contemporaneity standard." *Id*. at 15.

Zhongji fails to support its claim that "Commerce has routinely used the {period of review} as the contemporaneity standard." None of the cases relied upon by Zhongji state that Commerce's practice is to rely on the period of review for assessing contemporaneity. *See* Zhongji Br. at 14-15 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022), and accompanying IDM at Cmt. 17, p. 71; *Multilayered Wood Flooring From the People's Republic of China*, 87 Fed. Reg. 78,644 (Dep't of Commerce Dec. 22, 2022) (preliminary results, unchanged in final results), and accompanying PDM at 51, and *Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 28,496 (Dep't of Commerce May 4, 2023) (preliminary results) (*2021 Aluminum Foil* review), and accompanying PDM at 15). Moreover, the proceedings cited by Zhongji post-date the underlying review and could not have represented Commerce's practice at the time of review; indeed, Commerce only completed the *2021 Aluminum Foil* review on October 27, 2023. As Commerce also stated, Zhongji, during the remand proceedings, failed to support its claims by identifying a statute, regulation, or case contradicting Commerce's practice. Remand Redetermination at 45.

Zhongji's contention that Commerce "undermine{d} its own reasoning" by placing the 2010 CBRE report on the record before knowing Zhongji's own land purchase dates makes little sense because Commerce was not required to rely on the 2010 CBRE Report if a party placed a superior data source on the record, and even if a party had placed more contemporaneous data on the record, the Thai data from the 2010 CBRE Report would have still been supported by the elements of economic comparability and geographic proximity. The timing of the placement of the 2010 CBRE Report on the record does not detract from Commerce's practice with regard to analyzing contemporaneity.

### D. Commerce Addressed Zhongji's Arguments For An Alternative Benchmark, And Compared The 2010 CBRE Report To The Nexus Report

Commerce's decision to continue relying on the 2010 CBRE Report is supported by substantial evidence, and Commerce addressed both Zhongji's arguments and the Court's concerns in reanalyzing and explaining its determination. In selecting a benchmark for land for less than adequate remuneration, Commerce examines the proposed benchmark data on a "case-by-case basis and will consider the extent to which proposed benchmarks represent prices in a comparable setting" (*e.g.*, a country's geographic proximity to China and the level of economic development comparable to China). IDM at 32; *see also Canadian Solar Inc. v. United States*, 537 F.Supp.3d 1380, 1391 (Ct. Int'l Trade 2021) (identifying geographic proximity and economic comparability as two important factors in Commerce's tier-three analysis). Commerce also looks at several factors to determine which data to use as a benchmark, including national income levels, population density, and the extent to which benchmark prices are derived from a country proximate to China, which encompasses "producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production." PDM at 17.

On remand, Commerce further considered the benchmark data and the arguments lodged by Zhongji, finding that the 2016-18 CBRE Reports and the Nexus Report were not superior to the 2010 CBRE Report as a tier-three land benchmark. Specifically, Commerce found that the 2010 CBRE Report had data from a country more geographically proximate to China (Thailand), was more contemporaneous with Zhongji's acquisition of the land-use purchases, represented manufacturing facilities, and had data from a country economically comparable to China. *Id*. at 29. In addition to the contemporaneity aspect discussed in the preceding sections, Commerce also found that the 2016-18 CBRE Reports contained data from countries not geographically proximate to China (Mexico and Brazil), not economically comparable for purposes of serving as

a land benchmark, and pertaining to logistics rent. With regard to the Nexus Report, Commerce was unable to determine the methodology used to collect the data in that report. *Id.* at 45. As Commerce stated, although the Nexus Report does contain data that "identify 'ready-build factory' land in three regions within Thailand," "there is no explanation of the methodology used to collect the data used in the Nexus Report on our administrative record."[3] *Id*. at 29. Although Zhongji might claim that the 2010 CBRE Report suffers from a similar flaw as the Nexus Report, Commerce has addressed the methodology in the 2010 CBRE Report. *See* Remand Redetermination at 47.

Zhongji raised several arguments against Commerce's selection; Commerce considered these arguments and ultimately found that the 2010 CBRE Report data is the most superior benchmark.

### 1.　　Geographic Proximity

Zhongji does not contest that Thailand is more geographically proximate to China than the countries in the 2016-2018 CBRE Reports, but claims that Commerce failed to "adequately explain why the benchmark country must be proximate to China." Zhongji Br. at 17. This is patently false. As an initial matter, Zhongji fails to support this argument with any reference to Commerce's practice or demonstrate that Commerce's reliance on geographic proximity is unreasonable or inconsistent with its prior practice.

More important, Commerce explained on remand that, "because location is always a primary factor in valuation of land, and geographical proximity to China is an aspect of location, geographic proximity to China is a relevant consideration." Remand Redetermination at 46. Commerce also explained that the "unique nature of land, which cannot be traded across borders

---

[3] Moreover, as explained above, the 2010 CBRE Report is more contemporaneous than the 2018 Nexus Report.

like consumer commodities{,}" requires that a land benchmark analysis consider geographic proximity. *Id.* Commerce elucidated that point in detail:

> {T}he geographic location, not merely with respect to, *e.g.*, urban vs. rural locations within a given country, but also with respect to localized land pricing conditions in different parts of the world, must naturally be a central factor in our selection of suitable benchmarks for the purposes of evaluating the adequacy of remuneration for land.

*Id*. at 28.

Accordingly, Commerce "cannot consider land located anywhere in the world as interchangeable with land in a country which shares not only a continent, but also a border with China." *Id*. at 46. Put another way, "demonstrating geographical proximity is a cardinal consideration for benchmarking land." *Id*. at 46 (citing *LWS from China* IDM at 17-18 ("We continue to base our finding on a comparison of prices for land use rights in China with comparable market-based prices for land purchases in a country at a comparable level of economic development that is reasonably proximate to, but outside of, China."), and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012), and accompanying IDM at Cmt. 11 ("While we did take the proximity of Thailand to {China} into consideration, it was part of a wider finding regarding the 'perception that producers consider a number of markets, including Thailand, as an option for diversifying production bases in Asia beyond China'")).

### 2. Economic Comparability

Zhongji also claims that Mexico and Brazil are economically comparable to China. Zhongji Br. at 19-20. In doing so, Zhongji attempts to undermine the economic comparability of Thailand, arguing that *LWS from China* decision failed to support Commerce's conclusion that Thailand is economically comparable to China. *Id.* at 16-17. But Commerce's remand

redetermination addresses Zhongji's contentions, and its reliance on Thailand continues to be reasonable and supported by substantial evidence.

As Commerce explained in the final results, it "conducted an in-depth analysis of the economic comparability in the context of a CVD proceeding and finds Thailand and Vietnam comparable in terms of *e.g.*, industrial land prices, per capita income, population density, stages of economic development, *etc*." *See* PDM at 16 (citing *LWS from China* IDM at Cmt. 6); *see also* Memorandum, "Countervailing Duty Administrative Review of Aluminum Foil from the People's Republic of China: Land Analysis Memo," dated July 29, 2020 at Att. 1. (P.R. 60). Moreover, as Commerce pointed out, *LWS from China* is reasonably contemporaneous with Zhongji's land purchases, and no record evidence contradicts Commerce's reasoning in that proceeding.  Remand Redetermination at 45.

Significantly, other than with regard to the use of Mexico and Brazil as surrogate countries in antidumping proceedings, Zhongji has "provided no information demonstrating that these countries are more economically comparable to China than Thailand."  Remand Redetermination at 26.  And although Mexico and Brazil have been considered economically comparable with China for the purpose of selecting a surrogate country in non-market economy antidumping proceedings, Commerce explained why comparability for the purposes of determining a surrogate country in an antidumping proceeding does not apply to the selection of land benchmark data in a countervailing duty proceeding:  "the object of AD surrogate value analysis is market pricing of portable commodities traded across borders, which are not directly comparable to land (which is not traded across borders)."  *Id*.

Moreover, Commerce's surrogate country analysis predominately rests on per capita gross national income, and as such, the list of economically comparable countries may change

from year to year.  As an example, neither Mexico nor Brazil are currently on Commerce's most recent list of surrogate countries for administrative reviews and investigation from China.  *See* U.S. Dep't of Commerce, Surrogate Country Memorandum, *available at* https://access.trade.gov/Resources/surrogate/China_Surrogate_Country_List_Memo.pdf. Finally, Commerce explained that its analysis concerning the consideration of a land for less than adequate remuneration benchmark "is focused on the economic conditions affecting land and land rent prices alone, not the overall economic conditions affecting a variety of labor, material, overhead, energy, and other inputs, which are at issue in NME surrogate country selection analyses."  Remand Redetermination at 28.

In sum, Commerce considered Zhongji's argument with regard to Mexico and Brazil and found it unavailing.  Coupled with the relevant consideration of geographic proximity to China and the contemporaneity of the data, Commerce reasonably determined to continue its reliance on the 2010 CBRE Report.

### 3.     <u>Land Type</u>

In the final results, Commerce found that "the 2016-2018 CBRE Reports provided by Zhongji pertain to "logistics rent" but not "manufacturing facilities," while the 2010 CBRE Report contains industrial land prices in Thailand."  IDM at 32.  On remand, Commerce continued to find that the potential use of the land to be significant and explained that certain categories of rent are more appropriate than others for purposes of a land benchmark.  *See* Remand Redetermination at 28-29.

Zhongji claims that Commerce "unreasonably" rejected the 2016-18 CBRE Reports because they pertain to logistics rent whereas the 2010 CBRE Report pertains to industrial land rent.  Zhongji Br. at 20.  Zhongji, however, does not specifically address Commerce's findings

and fails to demonstrate that land related to logistics is a better land type for comparing Zhongji's aluminum foil producing facilities. Instead, it merely alleges that logistics facilities constitute a "major land use" of Zhongji and, thus, a comparable type of land. *Id.*

Commerce explained on remand, however, that no record information supports Zhongji's claim that land right purchases "pertain specifically to logistics-related land" and that, "because the Zhongji Respondents are manufacturing companies . . . factory land purchases are more suitable for use as benchmarks for Zhongji's land-use-rights purchases{.}" Remand Redetermination at 47. Thus, Commerce appropriately concluded that land benchmark data specific to logistics facilities is not preferable. *Id.*

Commerce also explained that it considered the comparability of land, "in terms of use or potential use, to be highly significant." Remand Redetermination at 28. As Commerce stated:

> For example, all things being equal, factory, or manufacturing facilities rent or even general categories like "industrial" rent are more appropriate than agricultural, residential, or even office, warehouse, or "logistics" property rent as a benchmark for land use rights in LTAR analyses in which the land use rights in question are for land used primarily for manufacturing or general industrial applications.

Remand Redetermination at 28.

Zhongji's arguments regarding land type or land use are unavailing, particularly when coupled with Commerce's assessment of contemporaneity, geographic proximity, economic comparability, and the flaws in the Nexus Report.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Reginald T. Blades, Jr.
REGINALD T. BLADES, Jr.
Assistant Director

OF COUNSEL:
JESUS N. SAENZ
Office of the Chief Counsel for Trade
  Enforcement and Compliance
U.S Department of Commerce
Washington, D.C.

/s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7568
Email: Sosun.Bae@usdoj.gov

October 31, 2023

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that the foregoing complies with the word-count limitation.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare the brief. According to the word count, the brief contains 7,301 words.


/s/Sosun Bae

THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                            )
JIANGSU ZHONGJI LAMINATION                  )
MATERIALS CO., LTD. (F/K/A JIANGSU          )
ZHONGJI LAMINATION MATERIALS STOCK   )
CO., LTD.), JIANGSU ZHONGJI LAMINATION  )
MATERIALS CO., (HK) LTD., SHANTOU          )
WANSHUN PACKAGE MATERIAL STOCK        )
CO., LTD., JIANGSU HUAFENG ALUMINIUM    )
INDUSTRY CO., LTD. , and ANHUI                  )
MAXIMUM ALUMINIUM INDUSTRIES             )
COMPANY LIMITED,                                      )
                                                            )
                    Plaintiffs,                             )
                                                            )
            v.                                                )          Court No. 21-00133
                                                            )
UNITED STATES,                                         )
                                                            )
                    Defendant,                            )
                                                            )
            and                                             )
                                                            )
ALUMINUM ASSOCIATION TRADE             )
ENFORCEMENT WORKING GROUP, ET AL.,  )
                                                            )
                    Defendant-Intervenors.            )
_____)

**<u>ORDER</u>**

Upon consideration of the remand redetermination, the comments and responses filed by

the parties, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand results are sustained in all

respects, and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                         _____
            New York, NY                                                   JUDGE