Slip Op. 24-128

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIANGSU ZHONGJI LAMINATION MATERIALS CO., LTD.; JIANGSU ZHONGJI LAMINATION MATERIALS CO., (HK) LTD.; SHANTOU WANSHUN PACKAGE MATERIAL STOCK CO., LTD.; JIANGSU HUAFENG ALUMINIUM INDUSTRY CO., LTD.; ANHUI MAXIMUM ALUMINIUM INDUSTRIES COMPANY LIMITED,** | |
| Plaintiffs, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES,** | **Court No. 21-00133** |
| Defendant, | **PUBLIC VERSION** |
| and | |
| **ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS; JW ALUMINUM COMPANY; NOVELIS CORPORATION; REYNOLDS CONSUMER PRODUCTS LLC,** | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Sustaining Commerce's final remand redetermination in its first administrative review of the countervailing duty order on certain aluminum foil from the People's Republic of China.]

Dated: November 22, 2024

<u>Kristin H. Mowry</u> and <u>Yixin (Cleo) Li</u>, Mowry & Grimson, PLLC, of Washington, D.C., argued for plaintiffs Jiangsu Zhongji Lamination Materials Co., Ltd.; Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.; Shantou Wanshun Package Material Stock Co., Ltd.; Jiangsu Huafeng Aluminium Industry Co., Ltd.; and Anhui Maximum Aluminium

Industries Company Limited.  With them on the brief were <u>Jeffrey S. Grimson</u> and <u>Sarah M. Wyss</u>.

<u>Sosun Bae</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel was <u>Jesus N. Saenz</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Grace W. Kim</u>, Kelley Drye & Warren LLP, of Washington, D.C., argued for defendant-intervenors Aluminum Association Trade Enforcement Working Group; JW Aluminum Company; Novelis Corporation; and Reynolds Consumer Products LLC.  With her on the brief was <u>John M. Herrmann</u>.

* * *

Reif, Judge:  Before the court is the remand redetermination of the U.S. Department of Commerce ("Commerce") issued pursuant to the Court's order in *Jiangsu Zhongji Lamination Materials Co. v. United States* ("*Jiangsu Zhongji I*," or the "Remand Order"), 47 CIT __, 625 F. Supp. 3d 1355 (2023).  *See* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 67-68, Rem PR 6, PJA Tab 1.

In *Jiangsu Zhongji I*, the Court sustained in part and remanded in part Commerce's final determination in its first administrative review of the countervailing duty ("CVD") order on certain aluminum foil from the People's Republic of China for the period of review ("POR") August 14, 2017, through December 31, 2018.  47 CIT at __, 625 F. Supp. 3d at 1359-60; *see Certain Aluminum Foil from the People's Republic of China: Final Results of the Countervailing Duty Administrative Review; 2017-2018* ("*AR 1 Final Results*"), 86 Fed. Reg. 12,171 (Dep't of Commerce Mar. 2, 2021) and accompanying Issues and Decision Memorandum ("IDM") (Dep't of Commerce Feb. 24, 2021); *see also Certain Aluminum Foil from the People's Republic of China: Preliminary*

*Results of the Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017-2018* ("*AR 1 Preliminary Results*")*,* 85 Fed. Reg. 38,861 (Dep't of Commerce June 29, 2020) and accompanying Preliminary Decision Memorandum ("PDM") (Dep't of Commerce June 17, 2020); *Certain Aluminum Foil from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 Fed. Reg. 17,360 (Dep't of Commerce Apr. 19, 2018). The Court remanded to Commerce its selection of data to calculate the benchmark for the aluminum plate, sheet and strip program ("aluminum plate/sheet program"). *Jiangsu Zhongji I*, 47 CIT at __, 625 F. Supp. 3d at 1370. In addition, the Court remanded to Commerce its selection of data to calculate the benchmark for the land program. *Id.* at __, 625 F. Supp 3d at 1373.

On remand, Commerce provided explanation and analysis for its conclusion that the Trade Data Monitor ("TDM") data source is superior to the proposed benchmarks of the Zhongji Respondents. *See* Remand Results at 5-20, 33-41. Commerce also provided explanation and analysis for its conclusion that the Coldwell Banker Richard Ellis ("CBRE") Asia Marketview Report containing 2010 data from Thailand (the "2010 CBRE Report") is better suited to serve as a benchmark than are the proposed land benchmarks of the Zhongji Respondents. *See id.* at 20-30, 44-48; *see* Letter from Commerce to File Pertaining to Interested Parties Land Benchmark (July 29, 2019) at Attach. I ("2010 CBRE Report"), PR 57-58, PJA Tab 2.

Jiangsu Zhongji Lamination Materials Co., Ltd. ("Jiangsu Zhongji"), Jiangsu Zhongji Lamination Materials Co., (HK) Ltd., Shantou Wanshun Package Material Stock

**PUBLIC VERSION**

Co., Ltd. ("Shantou Wanshun"), Jiangsu Huafeng Aluminium Industry Co., Ltd. ("Jiangsu

Huafeng") and Anhui Maximum Aluminium Industries Company Limited (collectively, the

"Zhongji Respondents," or "plaintiffs") challenge the Remand Results.  *See* Remand

Results.

For the reasons discussed below, the court sustains the Remand Results.

## BACKGROUND

The court presumes familiarity with the facts as set out in *Jiangsu Zhongji I* and

recounts only those facts relevant to the issues before the court on remand.

On March 21, 2023, the Court concluded that Commerce did not explain

adequately: (1) Commerce's selection of the TDM data source to calculate the

benchmark for the aluminum plate/sheet program; (2) Commerce's rejection of the

proposed benchmarks of the Zhongji Respondents for the aluminum plate/sheet

program; (3) Commerce's selection of the 2010 CBRE Report to calculate the

benchmark for the land program; and (4) Commerce's rejection of the proposed

benchmarks of the Zhongji Respondents for the land program.  *Jiangsu Zhongji I*, 47

CIT at __, 625 F. Supp. 3d at 1370, 1373.

The Court ordered Commerce on remand to explain further or reconsider,

consistent with *Jiangsu Zhongji I*, Commerce's selection of data to calculate the

benchmark for the aluminum plate/sheet program.  *Id.* at __, 625 F. Supp. 3d at 1377.

In addition, the Court ordered Commerce to provide the following explanations on

remand with respect to Commerce's selection of a benchmark for the land program:

(1) explain further or reconsider [Commerce's] evaluation of the
contemporaneity of data sources in the record — particularly Commerce's

purported practice to select data sources that correspond most closely to the point in time at which land use rights were *purchased*; (2) explain the reasons that Commerce's selected benchmark on remand is consistent with such a practice in evaluating the contemporaneity of data sources; (3) explain the reasons that *each* data source that Commerce may decide to select on remand — should Commerce select more than one data source — is consistent with Commerce's practice in determining whether a data source provides an appropriate remuneration benchmark; and (4) explain further or reconsider its selection of the 2010 CBRE Report specifically with reference to the adequacy, context and references for the data in that report in comparison to Commerce's criticism of the adequacy, context and references for the data in the Nexus Reports[.]

*Id.*

On June 6, 2023, Commerce issued its draft redetermination.  *See* Remand Results at 4.

On June 14, 2023, the Court granted defendant United States' consent motion for an extension of time to file the Remand Results.  Ct.'s Order Granting Def.'s Mot. Extension of Time, ECF No. 66.

On June 26, 2023, the Aluminum Association Trade Enforcement Working Group and its Individual Members (JW Aluminum Company, Novelis Corporation and Reynolds Consumer Products LLC) (collectively, "defendant-intervenors") and the Zhongji Respondents provided comments on the draft redetermination.  *See* Remand Results at 4.

On August 4, 2023, Commerce filed the Remand Results.  *See id.*  On September 18, 2023, plaintiffs filed comments in response to the Remand Results. Objs. Remand Results of Pls. ("Pls. Br."), ECF No. 74-75.

On October 19, 2023, the Court granted defendant's second consent motion for extension of time to file comments in support of the Remand Results.  Ct.'s Order Granting Def.'s Mot. Extension of Time, ECF No. 77.

On October 31, 2023, defendant-intervenors filed comments in support of the Remand Results.  Def.-Intervenors' Cmts. Supp. Remand Redetermination ("Def.-Intervenors Br."), ECF No. 78-79.  On October 31, 2023, defendant filed comments in support of the Remand Results.  Def.'s Cmts. Supp. Remand Redetermination ("Def. Br."), ECF No. 80-81.  The Court reviewed parties' filings and responses thereto.

On October 24, 2024, the Court heard oral argument.  *See* Oral Arg. Tr., ECF No. 87.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c).  Plaintiffs bring the instant action pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018).[1]

On remand, the Court will sustain Commerce's determinations "if they are in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1349, 1355 (2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see Prime Time Com. LLC v. United States*, 45 CIT __, __, 495 F. Supp. 3d 1308, 1313 (2021) ("The results of a redetermination pursuant to court remand are also reviewed 'for

---

[1] References to the U.S. Code are to the 2018 edition.  Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code.

compliance with the court's remand order.'") (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT 189, 190, 968 F. Supp. 2d 1255, 1259 (2014)), *aff'd*, 2022 WL 2313968 (Fed. Cir. June 28, 2022); *see also Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 44 CIT __, __, 435 F. Supp. 3d 1273, 1276 (2020).

Substantial evidence constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," but it requires "more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  Moreover, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Id.* at 488.

For a reviewing court to "fulfill [its] obligation" to determine whether a determination of Commerce is supported by substantial evidence and in accordance with law, Commerce is required to "examine the record and articulate a satisfactory explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

Further, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147, 149 (2001)), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).  "[T]he possibility of drawing

two inconsistent conclusions from the evidence does not prevent an administrative

agency's finding from being supported by substantial evidence." *Altx, Inc. v. United*

*States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

      Finally, "[i]t is well-established that an agency's action must be upheld, if at all, on

the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines,*

*Inc. v. United States*, 371 U.S. 156, 168 (1962); *SEC v. Chenery Corp.*, 332 U.S. 194,

196 (1947); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)).

## DISCUSSION

      The court addresses whether the Remand Results as related to: (1) Commerce's

benchmark selection for the aluminum plate/sheet program; and (2) Commerce's

benchmark selection for the land program are supported by substantial evidence and

comply with the Remand Order.

**I.    Commerce's selection of data to calculate the benchmark for the
aluminum plate/sheet program**

    **A.    Background**

      In the *AR 1 Preliminary Results*, Commerce explained that it relied on Tier 2

world market prices for the benchmark for the aluminum plate/sheet program in

accordance with 19 C.F.R. § 351.511(a)(2).  Remand Results at 5 (citing *AR 1*

*Preliminary Results* PDM at 15-16).

      The Zhongji Respondents provided 2017 and 2018 Global Trade Atlas ("GTA")

data from certain [[         ]] and [[  ]] countries specific to Harmonized Commodity

Description and Coding System, or Harmonized System ("HS") subheading 76.06.12 for the Tier 2 benchmark.  *Id.* at 5-6.  The Zhongji Respondents submitted also a Commodities Research Unit report ("CRU Report") on 1050 aluminum alloy grade rolled product prices which incorporates London Metal Exchange ("LME") data.  *Id.* at 6.  The Zhongji Respondents used these data sources to derive price estimates for 1050 aluminum alloy grade rolled products.  *Id.* at 9.

Petitioners submitted TDM data covering HS subheading 76.06.12 for the Tier 2 benchmark.  *Id.* at 6-7.

In the final results of the first administrative review, Commerce determined that it would select the TDM data source to calculate the benchmark for the aluminum plate/sheet program.  *See AR 1 Final Results* IDM at 21-24.

The Court concluded in *Jiangsu Zhongji I* that Commerce "did not explain adequately its decision to select the TDM data source and to reject the submissions of the Zhongji Respondents to calculate the benchmark for the aluminum plate/sheet program."  47 CIT at __, 625 F. Supp. 3d at 1370.  The Court concluded further that Commerce "did not explain adequately its conclusion regarding the relevance of LME data with respect to Commerce's rejection of the CRU Report."  *Id.* at __, 625 F. Supp. 3d at 1371-72.  Accordingly, the Court remanded Commerce's selection of the TDM data source for further explanation or reconsideration.  *Id.* at __, 625 F. Supp. 3d at 1372.

> **B.    Whether Commerce explained adequately its decision to select the TDM data source and to reject the proposed benchmarks of the Zhongji Respondents**

The court concludes that Commerce explained adequately its decision to select the TDM data source covering HS subheading 76.06.12 and to reject the benchmark submissions of the Zhongji Respondents.  *See* Remand Results at 8-17, 33-38.

In *Jiangsu Zhongji I*, the Court concluded that Commerce "did not explain adequately its determination that the TDM data source corresponded more closely to the purchases of the Zhongji Respondents than did their own benchmark submissions." 47 CIT at __, 625 F. Supp. 3d at 1371.  In particular, Commerce "did not explain adequately its conclusion that there was '*wider* variation between' the alloy 1050 products referenced in the CRU Report and the purchases of the Zhongji Respondents than there was between the products referenced in the TDM data source and the purchases of the Zhongji Respondents."  *Id.* (quoting *AR 1 Final Results* IDM at 22).

The Court concluded also that Commerce did not explain the relevance of two record exhibits, NSAS-1 and NSAS-2, that Commerce cited to support its "wider variation" conclusion.  *Id.* (citing *AR 1 Final Results* IDM at 22 n.104); *see* Response from Mowry & Grimson PLLC to Sec'y of Commerce Pertaining to Jiangsu Zhongji Supp. NSA Questionnaire (Feb. 6, 2020) at Exs. NSAS-1, NSAS-2, CR 148, CJA Tab 3. The Court remanded for further explanation or reconsideration.  *Jiangsu Zhongji I*, 47 CIT at __, 625 F. Supp. 3d at 1372.

Plaintiffs argue that Commerce's continued selection of the TDM data on remand is not supported by substantial evidence for two reasons.  Pls. Br. at 4.

### 1.      Commerce's selection of the TDM data

Plaintiffs' first reason is that Commerce did not explain adequately the "superiority of the TDM data over the CRU data" because the CRU data covering aluminum alloy grade 1050 rolled products "correspond more closely to Zhongji's . . . purchases than TDM's overbroad global export data covering [HS subheading 76.06.12]."  *Id.* (footnote omitted).

On remand, Commerce continued to determine that the TDM data are superior to the Zhongji Respondents' proposed benchmarks.  *Id.* at 9.  Commerce explained that the TDM data for HS subheading 76.06.12 "provide world market export quantities and total values from which average unit values [("AUVs")] may be derived."  *Id.*

By contrast, the CRU Report provides Region 1 price data for 1050 aluminum alloy rolled products only.[2]  *Id.*  The Zhongji Respondents introduced also GTA export data for HS subheading 76.06.12 and proposed that Commerce use the CRU Report and the GTA export data together to derive a world price benchmark through a five-step process.  *Id.* at 9-10.

Commerce explained that the Zhongji Respondents' proposed benchmark "is calculated by reducing certain [Region 2] export AUVs for HS subheading [76.06.12] by the ratio of [Region 1] 1050 aluminum alloy rolled product prices to [Region 1] export AUVs for HS subheading [76.06.12]."  *Id.* at 10.  Next, the "adjusted [Region 2] export AUVs are . . . averaged with the [Region 1] 1050 aluminum alloy rolled product prices

---

[2] Region 1 and Region 2 are [[            ]] and [[    ]], respectively.  *See* Remand Results at 10.

themselves to create a combined [Region 1]-[Region 2] *estimate* for 1050 aluminum

alloy rolled product prices." *Id.*

Commerce maintained that the estimate resulting from the Zhongji Respondents'

calculation is "based largely on extrapolation" and continued to find that the estimate

"did not satisfy the requirements of 19 C.F.R. [§] 351.511(a)(2)(ii), 'where it is

reasonable to conclude that such prices would be available to purchasers in' China." *Id.*

Commerce concluded that there were "serious flaws" in the use of "either the [Region 1]

1050 aluminum alloy rolled product prices or the Zhongji Respondents' estimates of

worldwide 1050 alloy prices as the proposed aluminum sheet benchmark." *Id.*

Commerce's explanation on remand complies with the court's instructions.  The

TDM data provide "world market export quantities and total values from which [AUVs]

may be derived" such that it is "reasonable to conclude that such price[s] would be

available to purchasers in" China.  *Id.* at 9-10; 19 C.F.R. § 351.511(a)(2)(ii).  In setting

forth the "extrapolation" required to arrive at the Zhongji Respondents' proposed

benchmark, as compared to the prices and AUVs available readily in the TDM data,

Commerce explained adequately that the TDM data "correspond[] more closely to the

purchases of the Zhongji Respondents than did [the Zhongji Respondents'] own

benchmark submissions."  *Jiangsu Zhongji I*, 47 CIT at __, 625 F. Supp. 3d at 1371; *see*

Remand Results at 10.

In addition, Commerce complied with the Court's remand instructions when

Commerce cited to exhibits NSAS-1 and NSAS-2 and listed the different specifications

of the aluminum sheet products that the Zhongji Respondents purchased.[3]  Remand

Results at 8 n.25.  Commerce noted that each of the purchases of the Zhongji

Respondents is "covered by HS subheading [76.06.12]," which is the "most detailed

tariff schedule classification covering these products at the internationally harmonized

(six-digit) level of specification."  *Id.* at 9.  Moreover, neither mandatory respondent

purchased 1050 aluminum alloy rolled products during the POR.  *Id.* at 14.  Commerce

observed that the majority of the Zhongji Respondents' purchases involve products

manufactured with a non-1050 aluminum alloy.  *Id.* at 35.

Plaintiffs object that "[b]eing the most inclusive product category does not make

the data more representative than a narrower set of data with minor mismatches."  Pls.

Br. at 8.  In support of their argument, plaintiffs quote the following language from the

*Solar Cells 13 AR*:  "[Commerce] normally attempts to rely on data reflecting the

narrowest category of products encompassing the input product, where possible."  *Id.* at

9 (quoting *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into*

*Modules, from the People's Republic of China: Final Results of Countervailing Duty*

*Administrative Review; 2013* (the "*Solar Cells 2013 AR*"), 81 Fed. Reg. 46,904 (Dep't of

Commerce July 19, 2016) and accompanying IDM (Dep't of Commerce July 12, 2016)

at cmt. 6) (alteration in original).

Commerce conceded that the TDM data for HS subheading 76.06.12 are

"imperfect in terms of the exact range of products covered by the data and their relative

---

[3] Xiamen Xiashun Aluminum Foil Co., Ltd. ("Xiashun"), the other mandatory respondent in the underlying administrative review, purchased aluminum sheet products of one non-1050 alloy only during the POR.  *Id.* at 8.

proportions *vis a vis* the range and proportions of the products found in the Zhongji

Respondents' . . . purchase data."  Remand Results at 13.  However, Commerce

concluded that "this imperfection does not by itself automatically rule out the petitioners'

proposed benchmark in favor of the Zhongji Respondents' proposed benchmark."  *Id.*

Commerce's conclusions are reasonable and supported by the record as a

whole.  *See Shandong Huarong*, 25 CIT at 837, 159 F. Supp. 2d at 718 ("[T]he Court

will not disturb an agency determination if its factual findings are reasonable and

supported by the record as a whole, even if there is some evidence that detracts from

the agency's conclusion.").  The *Solar Cells 2013 AR* is inapposite.  The 1050 alloy data

cannot be said to "encompass[] the input product" because the Zhongi Respondents did

not purchase 1050 aluminum alloy rolled products during the POR.  Remand Results at

14.  Instead, Commerce explained that each of the Zhongji Respondents' purchases are

"covered by HS subheading [76.06.12]," which is the "most detailed tariff schedule

classification covering these products at the internationally harmonized (six-digit) level

of specification."  *Id.* at 9.

For that reason, Commerce's selection of the TDM data is more aligned with

Commerce's practice of "rely[ing] on data reflecting the narrowest category of products

encompassing the input product, where possible" than would be Commerce's selection

of the Zhongji Respondents' proposed benchmark.  *Solar Cells 2013 AR* IDM at cmt. 6.

### 2. Commerce's treatment of the expert declaration and the ITC Report

The Zhongji Respondents provided (1) a declaration from a third party with

"extensive experience in trading aluminum sheet in a wide range of alloys"; and (2) a

U.S. International Trade Commission report on the aluminum industry (the "ITC Report")

to buttress the CRU Report data covering 1050 aluminum alloy products.  Pls. Br. at 4-

5; *see* Letter from Mowry & Grimson PLLC to Sec'y of Commerce Pertaining to Jiangji

Zhongji Benchmark Submission (Apr. 1, 2020) ("Zhongji Benchmark Submission") at Ex.

11, CR 205-206, CJA Tab 4; *id.* at Ex. 10, PR 311-314, PJA Tab 6.  Plaintiffs' second

reason for arguing that Commerce's selection of the TDM data is not supported by

substantial evidence is that Commerce "unreasonably found the expert declaration non-

authoritative and dismissed both the expert declaration and the ITC Report because

they do not specify the exact export volumes of irrelevant products under the six-digit

code."  *Id.* at 5 (citing Remand Results at 39-41).

The court concludes that Commerce explained adequately its evaluation of the

third-party expert declaration and the ITC Report.  *See* Remand Results at 11-12, 39-

41.

### a.    The third-party expert declaration

The Court directed Commerce, in the event that it continued to select the TDM

data source on remand, to explain further or reconsider whether Commerce's evaluation

of the Zhongji Respondents' third-party expert declaration aligned with Commerce's

past practice with respect to the probative value of standalone third-party declarations.

*Jiangsu Zhongji I*, 47 CIT at __, 625 F. Supp. 3d at 1372.

Contrary to plaintiffs' allegation, Commerce did not find the declaration to be

"non-authoritative," but rather "no more specific and no more authoritative than the

Zhongji Respondents' own assertions."  Pls. Br. at 5; Remand Results at 11.

Commerce noted that the declaration is "contradicted by the petitioners, who comprise multiple U.S. producers of aluminum foil with expertise in these [aluminum sheet] product comparisons."  Remand Results at 11.  Commerce then noted different ways in which the "statements contained in the declaration" failed to provide elucidation as to the import or validity of the database: e.g., the statements "do not specify how much of world exports under HS subheading [76.06.12] are represented by foil stock aluminum sheet of the kind that the Zhongji Respondents used, or of 1050 aluminum alloy rolled products, or how much of these export volumes are made up of the types of sheet and plate which are unsuitable for use as foil stock."  *Id.*

Plaintiffs argue that the Court's decision in *Shenzhen Xinboda Indus. Co. v. United States* supports plaintiffs' contention that Commerce's decision to reject the third-party expert declaration was not supported by substantial evidence.  *See* Pls. Br. at 6 (citing *Shenzhen Xinboda Indus. Co. v. United States*, 41 CIT __, __, 279 F. Supp. 3d 1265, 1289 (2017)).  In *Shenzhen Xinboda*, the Court held that Commerce's decision to reject a third-party declaration that respondents placed on the record was not supported by substantial evidence.  *Shenzhen Xinboda*, 41 CIT at __, 279 F. Supp. 3d at 1289.  The declaration was the "sole record evidence" that spoke to the relevant issue, and "neither Commerce nor the [petitioners] point[ed] to any record evidence to controvert the facts set forth" in the declaration.  *Id.* at __, 279 F. Supp. 3d at 1280-81.  The Court reasoned that "this is not a situation where Commerce is confronted with two authorities that address the same point but take positions that are diametrically

opposite, thus requiring Commerce to determine which of the two authorities is accurate or correct or more reliable." *Id.* at __, 279 F. Supp. 3d at 1284 n.17.

*Shenzhen Xinboda* is inapposite. In this case, unlike *Shenzhen Xinboda*, Commerce *was* "confronted with two authorities," namely the petitioners' statements on the record and the third-party expert declaration, "that address the same point but take positions that are diametrically opposite." *Id.* With regard to the declaration and plaintiffs' contention that "most aluminum products under [HS subheading 76.06.12] are not suitable for foil production," Commerce determined reasonably that there was nothing in the record to support those contentions. *See* Remand Results at 11, 40; Pls. Br. at 5; Zhongji Benchmark Submission at Ex. 11. The declaration demonstrates only that "the majority of the alloy series under [HS subheading 76.06.12]" cannot be used as foil stock. Pls. Br. at 5. In the absence of an accounting of the *proportion* of the goods under HS subheading 76.06.12 that can be used as foil stock, Commerce's rejection of the third-party expert declaration was reasonable and supported by substantial evidence. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 39 CIT __, __, 61 F. Supp. 3d 1306, 1322 (2015) (stating that on review, a "court may [not] displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.") (alterations in original) (quoting *Universal Camera Corp.*, 340 U.S. at 488).

### b. The ITC Report

Plaintiffs also cite the ITC Report to support their argument that "ample record evidence indicates that a majority of aluminum plate, sheets and strip classified under

[HS subheading 76.06.12] are not foil stock."  Pls. Br. at 6.  Plaintiffs explain that, within

HS subheading 76.06.12, "[o]ne eight-digit subheading and two ten-digit subheadings . .

. cannot possibly be used for foil stock."  *Id.* at 6-7.

       Commerce determined that the ITC Report did not demonstrate that 1050 alloy

rolled products "better represent the products that the Zhongji Respondents purchased

than the TDM subheading [76.06.12] export data."  Remand Results at 12.  Commerce

noted that the ITC Report presents the same flaw as does the third-party expert

declaration:  the ITC Report discusses neither the "relative proportions" of the identified

applications of aluminum plate, "nor their proportions relative to the overall uses of

aluminum plate and sheet."  *Id.* at 12, 40.  Commerce observed further that the ITC

Report's "apparent purpose is not to distinguish between the relative volumes of

different commercial grades of aluminum sheet exported from around the world, but

merely to list examples of applications of aluminum plate and sheet."  *Id.* at 12.

       In sum, Commerce explained adequately its decision to select the TDM data

source and to reject the proposed benchmarks of the Zhongji Respondents.  *See*

Remand Results at 8-17, 33-38.  The court concludes that Commerce's explanation

complies with the Remand Order and is supported by substantial evidence.  *See*

*MacLean-Fogg*, 39 CIT at __, 100 F. Supp. 3d at 1355; 19 U.S.C. § 1516a(b)(1)(B)(i).

    **C.**    **Whether Commerce explained adequately its conclusions regarding**
              **the LME data in the CRU Report**

       The court concludes that Commerce's explanation on remand regarding the LME

data in the CRU Report complies with the Remand Order and is supported by

substantial evidence.  *See* Remand Results at 17-19, 38-41.

In *Jiangsu Zhongji I*, the Court concluded that "Commerce did not explain adequately its conclusion regarding the relevance of LME data with respect to Commerce's rejection of the CRU Report." 47 CIT at __, 625 F. Supp. 3d at 1371-72. "Specifically, Commerce did not elucidate whether one or both of its particular findings regarding the LME data — (1) that these data contain only a 'cash price' for primary aluminum or (2) that this cash price pertains only to primary aluminum with a 'minimum aluminum content of 99.7 percent' — provided the basis for Commerce's rejection of the CRU Report." *Id.* at 1372 (quoting *AR 1 Preliminary Results* PDM at 18). The Court remanded to Commerce for further explanation or reconsideration. *Id.*

Plaintiffs argue that Commerce's "explanation of its rejection of CRU data based on the LME data in the [CRU] [R]eport is entirely unreasonable and unsupported" and fails to comply with the Court's instructions in the Remand Order. Pls. Br. at 4, 10.

On remand, Commerce explained that it is "not clear from the information in the CRU Report that the [Region 1] prices for 1050 aluminum alloy rolled products are derived from LME data in the CRU Report, rather than possibly being simply reported separately, independent of each other." Remand Results at 17-18. Commerce reasoned that the possibility that these data were reported separately undermined Commerce's original basis for rejecting the CRU Report. *Id.* at 18; see *AR 1 Final Results* IDM at 21. Accordingly, Commerce determined that its original finding "that the 1050 aluminum alloy rolled product prices appear to be derived from LME prices" is not a valid reason for rejecting the CRU Report or the Zhongji Respondents' proposed benchmarks. Remand Results at 18.

Commerce reconsidered also its determination that "LME data contained in the CRU Report reflect[] only a 'cash' price for primary aluminum."  *Id.*  Commerce found on remand that the LME prices in the CRU Report "appear to be '3-month' LME prices, not 'cash' settlement prices."  *Id.*  However, Commerce explained that the distinction between "3-month" prices and "cash" prices "is largely unimportant to this analysis and it does not argue in favor of using either of the LME prices which the Zhongji Respondents submitted as benchmarks for aluminum plate, or sheet."  *Id.* at 18-19.  Commerce reasoned that "the important distinction is that the LME prices are for primary aluminum," which is "a significantly different product than the aluminum sheet which the Zhongji Respondents . . . purchased."  *Id.*

In addition, Commerce expressed concern with respect to the origin of certain "conversion fees."  *Id.* at 18, 39.  Commerce explained that the "conversion fees represent the difference between the 1050 aluminum alloy rolled product prices and the LME primary aluminum prices."  *Id.* at 39.  But Commerce suggested that "[i]t is not clear whether the 1050 aluminum alloy rolled product prices are derived from the LME primary aluminum prices and the conversion fees or whether the conversion fees are derived from the LME primary aluminum prices and the 1050 aluminum alloy rolled product prices."  *Id.*

Ultimately, Commerce put aside its concern with respect to the origin of the conversion fees and explained that the "distinction is not necessary to the results of our analysis" and that "as long as this matter is in doubt, it would not be reasonable for [Commerce] to reject the CRU 1050 aluminum alloy rolled product prices merely on the

basis that they are derived from LME prices." *Id.* Commerce determined that the LME data is not a sufficient basis for its rejection of the CRU Report. *Id.*

However, Commerce asserted that "there are other sufficient reasons to reject the CRU 1050 aluminum allot [sic] prices and the Zhongji Respondents' proposed benchmarks derived therefrom." *Id.* Elsewhere in the Remand Results, Commerce explained its decision to reject the CRU 1050 aluminum prices for "other sufficient reasons," *see id.* at 19-20; *see also supra* Section I.B, such that the "path" of Commerce's decision to reject the CRU Report data is "reasonably discernible." Remand Results at 39; *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

In sum, Commerce reconsidered and offered an adequate explanation of why Commerce rejected the Zhongji Respondents' proposed benchmark. Remand Results at 18. The explanation and reconsideration comply with the Remand Order and are supported by substantial evidence. *See MacLean-Fogg*, 39 CIT at __, 100 F. Supp. 3d at 1355; 19 U.S.C. § 1516a(b)(1)(B)(i).

## II.    Commerce's selection of data to calculate the benchmark for the land program

### A.    Background

In the *AR 1 Preliminary Results*, Commerce determined to use land prices external to China to calculate a Tier 3 benchmark for the land program pursuant to 19 C.F.R. § 351.511(a)(2)(iii). *See AR 1 Preliminary Results* PDM at 15-18. Commerce

selected the 2010 CBRE Report as the data source for the benchmark and decided not

to use the CBRE Reports from 2016, 2017 and 2018 (the "2016 to 2018 CBRE

Reports") and reports compiled by Nexus Innovative Real Estate Solutions (the "Nexus

Reports") from 2018 submitted by the Zhongji Respondents.  *AR 1 Final Results* IDM at

31-33; *see* Zhongji Benchmark Submission at Exs. 13-14.

In *Jiangsu Zhongji I*, the Court concluded that Commerce "did not explain

adequately its decision to: (1) select for a Tier 3 benchmark the 2010 CBRE Report; and

(2) reject the 2016 to 2018 CBRE Reports and the Nexus Reports.  47 CIT at __, 625 F.

Supp. 3d at 1375 (citing *AR 1 Final Results IDM* at 31-33).  The Court directed

Commerce to "explain further or reconsider its evaluation of the contemporaneity of data

sources in the record — particularly Commerce's purported practice to select data

sources that correspond most closely to the point in time at which land use rights were

*purchased*."  *Id.* at __, 625 F. Supp. 3d at 1376.

### B.    Whether Commerce explained adequately its purported practice in evaluating the contemporaneity of data sources

The court concludes that Commerce's explanation of its purported practice in

evaluating the contemporaneity of data sources complies with the Remand Order and is

supported by substantial evidence.  *See* Remand Results at 23-25, 44-45.  Plaintiffs

argue that Commerce failed to explain adequately its purported practice in evaluating

the contemporaneity of data sources on the record.  Pls. Br. at 12-13.

Commerce on remand stated that, pursuant to Commerce's regulations,

contemporaneity is identified with "reference to the year in which the subsidy is

approved."  Remand Results at 24.  Commerce explained that when identifying a

discount rate for the purposes of allocating a "non-recurring subsidy," 19 C.F.R. §
351.524(d)(3) requires that Commerce "select a discount rate based [upon] . . . data for
the year in which the government agreed to provide the subsidy."  *Id.* (quoting 19 C.F.R.
§ 351.524(d)(3)).  Commerce further noted that "in identifying a land for LTAR
benchmark, Commerce's practice is to look to the year in which the land use rights were
acquired from the government providing the subsidy to determine the appropriate time
period for calculating the land benchmark."  *Id.*

Commerce maintained that it evaluates the contemporaneity of benchmark data
"*vis a vis* the company or government transaction at issue."  *Id.* at 45.  For subsidies
approved "before the POR, like the provision of land-use rights under examination here,
the POR is not the relevant time period."  *Id.*  Commerce explained that the relevant
time period for cases in which the subsidy is approved before the POR is "the year in
which the government agreed to provide the subsidy."  *Id.* (quoting 19 C.F.R. §
351.524(d)(3)(i)).

Plaintiffs argue that Commerce's explanation of its purported practice is not
supported by substantial evidence for two reasons.  *See* Pls. Br. at 12-14.

### 1.    The timing of Commerce's placement of the 2010 CBRE Report on the record

Plaintiffs assert first that Commerce "undermine[d] its own reasoning that
Commerce considered land purchasers [sic] years in determining the contemporaneity
of benchmark sources" because Commerce placed the 2010 CBRE Report on the
record before the Zhongji Respondents reported their land purchase dates.  *Id.* at 13-

14.  Commerce did not address plaintiffs' allegation on remand.  *See generally* Remand
Results.

However, plaintiffs' allegation is unavailing.  The intent of Commerce when it
placed the 2010 CBRE Report on the record is not relevant to the question whether
Commerce's purported practice is supported by substantial evidence.

## 2.    Commerce's practice in previous proceedings

Plaintiffs' second contention is that "Commerce has relied on the same outdated
[2010 CBRE Report] in numerous cases even when the land purchase years by
respondents do not correspond more closely to 2010."  Pls. Br. at 14.  Plaintiffs cite to
the administrative review of the CVD order on solar cells from China for the POR
January 1, 2019, through December 31, 2019, in which Commerce did not mention its
purported practice and relied on the 2010 CBRE Report while acknowledging its lack of
contemporaneity with the POR.  *See* Pls. Br. at 14 (citing *Crystalline Silicon
Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's
Republic of China: Final Results and Partial Rescission of Countervailing Duty
Administrative Review; 2019* (the "*Solar Cells 2019 AR*"), 87 Fed. Reg. 40,491 (Dep't of
Commerce July 7, 2022) and accompanying IDM (Dep't of Commerce June 29, 2022) at
cmt. 17).

Plaintiffs also argue that Commerce did not follow its purported contemporaneity
practice in the administrative review of the CVD order on multilayered wood flooring
from China for the POR January 1, 2020, through December 31, 2020.  Pls. Br. at 14
(citing *Multilayered Wood Flooring from the People's Republic of China: Preliminary*

**PUBLIC VERSION**

*Results and Partial Rescission of Countervailing Duty Administrative Review; 2020* (the
"*Wood Flooring AR*")*,* 87 Fed. Reg. 78,644 (Dep't of Commerce Dec. 22, 2022) and
accompanying PDM (Dep't of Commerce Dec. 15, 2022) at 51).  In that proceeding,
Commerce stated that its selected CBRE report was "suitable . . . to measure any
benefit received . . . through the provision of land or land-use rights by the Chinese
government during *the AUL period of this review*."  *Wood Flooring AR* PDM at 51
(emphasis supplied) (unchanged in final results)*.*

    Plaintiffs insist that "[t]he absence of Commerce's use of this purported
[contemporaneity] practice in numerous cases . . . shows that Commerce . . . has no
such established past practice to select land benchmarks corresponding to land
purchase years."  Pls. Br. at 15.  Plaintiffs assert that, instead, "Commerce has routinely
used the POR as the contemporaneity standard."  *Id.*

    In response, defendant argues that "[n]one of the cases relied upon by Zhongji
state that Commerce's practice is to rely on the [POR] for assessing contemporaneity."
Def. Br. at 19.

    It is true that Solar Cells 2019 AR does not state explicitly that Commerce's
practice is to rely on the POR for assessing contemporaneity.  *See id.*; *see generally
Solar Cells 2019 AR*.  However, Commerce in the *Solar Cells 2019 AR* conceded that
the 2010 CBRE Report data were not as contemporaneous as they were when
Commerce was sustained in *Canadian Solar*, a case that concerned an *earlier*
administrative review for the POR January 1, 2016, to December 31, 2016.  *Solar Cells
2019 AR* IDM at cmt. 17 (citing *Canadian Solar Inc. v. United States*, 45 CIT __, __, 537

F. Supp. 3d 1380, 1389 (2021)).  This explanation suggests that Commerce in the *Solar Cells 2019 AR* evaluated the contemporaneity of the benchmark data based on its correspondence to the POR January 1, 2019, through December 31, 2019, rather than to the year in which the land use rights were purchased.  *Id.*

However, with respect to the *Wood Flooring AR*, the section that plaintiffs cite describes the "*AUL* period of *this* review," not the 'period of review.'  *Wood Flooring AR* PDM at 51 (emphasis supplied); *see* Pls. Br. at 14.  Commerce explained on remand that "for subsidies approved during the *AUL period*, or *before the POR*, like the provision of land-use rights under examination here, the POR is not the relevant time period."  Remand Results at 45 (emphases supplied).  Commerce's usage on remand and its regulations both indicate that the "AUL period" and the "POR" are distinct but potentially overlapping periods of time.  *Id.*; *see* 19 C.F.R. § 351.524(b)(1) (stating that non-recurring benefits are allocated normally "over the number of years corresponding to the average useful life . . . of renewable physical assets"); *see also id.* § 351.213(e)(2) (defining the POR for CVD proceedings as covering, in general, "entries or exports of the subject merchandise during the most recently completed calendar year").  Contrary to plaintiffs' assertion, the *Wood Flooring AR* does not undermine Commerce's explanation of its purported practice.  *See* Pls. Br. at 14.

Moreover, Commerce buttressed its explanation further by reference to two prior proceedings.  Remand Results at 24 (citing *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances* ("*LWS from China*"), 73

Fed. Reg. 35,639 (Dep't of Commerce June 24, 2008) and accompanying IDM (Dep't of

Commerce June 16, 2008) at 17 ("In order to calculate the benefit, we first multiplied the

benchmark land rate (deflated from 2007 to the year the transaction was officially

approved by the country) . . . ."); *Aluminum Extrusions from the People's Republic of

China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18,521 (Dep't

of Commerce Apr. 4, 2011) and accompanying IDM (Dep't of Commerce Mar. 28, 2011)

at cmt. 24 ("New Zhongya acquired its land-rights in 2006, and the Guang Ya

Companies acquired their land-use rights in 2007.  As 2007 is more contemporaneous

with the times of these purchases, we have used the 2007 prices for Thai industrial land

for benchmark purposes.")).

Commerce also maintained that the Court in *Zhaoqing New Zhongya Aluminum

Co. v. United States*, 38 CIT 203, 961 F. Supp. 2d 1346 (2014), "acknowledged"

Commerce's purported practice of evaluating contemporaneity.  Remand Results at 24

(citing *id.* at 211-13, 961 F. Supp. 2d at 1354-55).  That is not correct.  The Court in

*Zhaoqing* did not "acknowledge" Commerce's purported practice.  *See generally

Zhaoqing*; Remand Results at 24.  The Court upheld only Commerce's decision not to

discount the land benchmark for inflation.  *Zhaoqing*, 38 CIT at 212-13, F. Supp. 2d at

1354.[4]

      Based on the foregoing reasons, the court concludes that Commerce explained

adequately its purported practice.  Commerce demonstrated that its purported practice

in evaluating the contemporaneity of data sources for benchmark determinations follows

two prior proceedings and adheres to Commerce's regulations at 19 C.F.R. §

351.524(d)(3).  *See* Remand Results at 23-25, 44-45.  Plaintiffs offered only one

proceeding that appears to undermine Commerce's explanation on remand.  *See* Pls.

Br. at 14; *see also Solar Cells 2019 AR* IDM at cmt. 17.  Accordingly, Commerce's

explanation of its purported practice complies with the Remand Order and is supported

by substantial evidence.

    **C.    Whether Commerce explained adequately that the selection of the
        2010 CBRE Report is consistent with its purported practice**

      The court concludes that Commerce's explanation that the selection of the 2010

CBRE Report is consistent with Commerce's purported practice in evaluating the

contemporaneity of data sources complies with the Remand Order and is supported by

substantial evidence.  *See* Remand Results at 25-26, 45.

---

[4] But in *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, Slip Op. 15-28, 2015 WL
1455445 (CIT Apr. 1, 2015), a case that Commerce did not cite on remand, the Court
sustained Commerce's determination to use land benchmark prices close to the year of
the sale of land in the absence of "benchmark prices that correspond[] to the year in
which the land transaction at issue occurred, which would otherwise have been
[Commerce's] preferred choice."  2015 WL 1455445, at *2.  Commerce in that case
determined to use land prices for 2009, 2010 and 2011, indexed to 2008 for a 2008 sale
of land.  *Id.*

In *Jiangsu Zhongji I*, the Court instructed Commerce to "explain the reasons that its selected benchmark on remand is consistent" with its "practice in evaluating the contemporaneity of data sources."  47 CIT at __, 625 F. Supp. 3d at 1376.[5]

Plaintiffs argue that "[b]ecause Commerce failed to adequately explain its purported practice of associating contemporaneity with respondents' land purchase years, Commerce failed to explain why the 2010 CBRE Report is more contemporaneous than Zhongji's proposed data covering the POR."  Pls. Br. at 15. Plaintiffs assert, as a result, that Commerce's selection of the 2010 CBRE Report was "unreasonable and inconsistent with the [Remand Order]."  *Id.*

As discussed above, Commerce explained adequately its purported practice of evaluating contemporaneity based on the points in time at which land use rights were purchased.  *See supra* Section II.B.2.

In light of that practice, Commerce insisted that the Zhongji Respondents' argument that the 2016 to 2018 CBRE Reports and the Nexus Reports were more contemporaneous than the 2010 CBRE Report was "misplaced."  Remand Results at 25.  The Zhongji Respondents argued that their proposed benchmarks were more contemporaneous because they were closer in time to the POR.  *Id.*  Commerce

---

[5] The Court stated also that "should Commerce decide on remand to select more than one data source to calculate the benchmark for the land program, the court directs Commerce to explain the reasons that *each* selected data source is consistent with Commerce's practice in determining whether a data source provides an 'appropriate remuneration benchmark.'"  *Jiangsu Zhongji Lamination Materials Co. v. United States,* 47 CIT __, __, 625 F. Supp. 3d 1355, 1376 (2023).  Because Commerce continued to select the 2010 CBRE Report alone on remand, the court need not evaluate Commerce's compliance with those instructions.  *See* Remand Results at 25, 44.

responded that "the relevant time periods to consider are the years when the Zhongji

Respondents acquired the land use rights, which took place in [[                    ]] . . .

and not during the POR."  *Id.* at 25-26.

Commerce explained that the 2010 CBRE Report data are more

contemporaneous with the above land purchase years than are the 2016 to 2018 CBRE

Reports data and the Nexus Reports data.  *Id.* at 26, 45.  Commerce determined to

continue to use the 2010 CBRE Report data "inflated or deflated, as appropriate, to the

year of government's approval [sic] of the land-use rights."  *Id.* at 26.

Commerce demonstrated adequately that the 2010 CBRE Report is consistent

with its purported practice because the report is relatively close in time to the years of

the land purchases of the Zhongji Respondents.  *See id.* at 26, 45.  By contrast, the

2016 to 2018 CBRE Reports and the Nexus Reports "pertain to data collected[] nearly a

decade after Zhongji's land-use-rights [sic] purchases."  *Id.* at 45.  Accordingly,

Commerce's explanation on remand is supported by substantial evidence and complies

with the Remand Order.[6]  *See id.* at 25-26, 45.

---

[6] Even so, the court wishes to address one point.  In *Jiangsu Zhongji I*, this court
directed Commerce on remand "to explain further or reconsider its selection of the 2010
CBRE Report specifically with reference to the adequacy, context and references for the
data in that report in comparison to Commerce's criticism of the adequacy, context and
references for the data in the Nexus Reports."  47 CIT at __, 625 F. Supp. 3d at 1376.
(footnote continued)

Court No. 21-00133                **PUBLIC VERSION**                Page 31

**CONCLUSION**

For the foregoing reasons, the court sustains the Remand Results.  Judgment

will enter accordingly.

/s/  Timothy M. Reif 

Timothy M. Reif, Judge

Dated: November 22, 2024
  New York, New York

---

Commerce on remand maintained that "there is no explanation of the methodology used to collect the data used in the Nexus Report[s] on our administrative record."  Remand Results at 29.  Commerce also cited three determinations in support of its assertion that "Commerce has used the 2010 CBRE Report many times and has addressed the methodology used in the CBRE Report in other proceedings."  *Id.* at 47 (citing *LWS from China* IDM at 17-18, cmt. 11; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 77 Fed. Reg. 63,788 (Dep't of Commerce Oct. 17, 2012) and accompanying IDM (Dep't of Commerce Oct. 9, 2012) at 6; *Countervailing Duty Investigation of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China: Final Affirmative Determination*, 81 Fed. Reg. 75,037 (Dep't of Commerce Oct. 28, 2016) and accompanying IDM (Dep't of Commerce Oct. 21, 2016) at 13-14).

The court notes that not one of the cited proceedings supports Commerce's assertion.  At oral argument, defendant conceded as much.  Oral Arg. Tr. at 52:18-54:7.  However, this unfortunate mistake is not outcome-determinative and does not invalidate the court's conclusion that Commerce explained adequately its decision to select the 2010 CBRE Report.